Receipt number AUSFCC-11157961

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HIAS; AMERICAN BAR ASSOCIATION; ADVANCING DEMOCRATIC ELECTIONS AND POLITICAL TRANSITION LLC; DAI GLOBAL, LLC; DEMOCRACY INTERNATIONAL, INC.; MANAGEMENT SCIENCES FOR HEALTH, INC.; MERCY CORPS; SAVE THE CHILDREN FEDERATION, INC., *Plaintiffs*, v. UNITED STATES OF AMERICA, *Defendant*. | Case No. _____  **26-429 C** |

**COMPLAINT**

1.      Plaintiffs in this action are among the nation's most respected international development organizations. For decades, they served as trusted partners of the U.S. Agency for International Development (USAID) and the U.S. Department of State. Acting at the behest of the federal government and pursuant to binding award agreements, they carried out Congress's foreign assistance objectives across the globe: combating disease, feeding the hungry, caring for mothers and children, protecting refugees, promoting democracy, and strengthening the rule of law. Each Plaintiff staked its institutional resources, reputation, and workforce on the government's contractual commitments. The United States, in turn, benefited from Plaintiffs' expertise, local relationships, and years of institutional knowledge in some of the world's most challenging environments.

2.      Beginning in January 2025, the government repudiated its commitments to Plaintiffs wholesale. In the span of weeks, USAID and the State Department suspended and then terminated virtually all foreign assistance grants and cooperative agreements—thousands of awards (including Plaintiffs'), representing tens of billions of dollars in congressionally appropriated funds.

3.      The agencies did not conduct individualized reviews of the awards. They did not consult the Grants Officers and Agreement Officers responsible for administering them. They did not assess the details of the actual projects underlying the awards, nor did they make any individualized assessment of whether each terminated award served the national interest, furthered agency priorities, or warranted continuation. They did not weigh the costs of suspensions and terminations to the U.S. government and its allies, consider the reliance interests of Plaintiffs and other partners (much less the ultimate recipients of the aid), or evaluate alternatives short of suspension and termination. Instead, political appointees and officials of the so-called Department of Government Efficiency (DOGE)—who possessed no expertise in foreign assistance and no legal authority over the agencies' award portfolios—directed mass award terminations in "tranches" of hundreds or thousands of awards at a time, using boilerplate form letters, based on spreadsheets containing as little as a single line of data per award.

4.      Even after a federal court enjoined the agencies' blanket suspensions and terminations as likely arbitrary and capricious, the agencies kept terminating awards *en masse*. To circumvent the injunction while still terminating hundreds and thousands of awards at a time, the agencies implausibly claimed that the Secretary of State personally reviewed each and every termination. In reality, the agencies continued terminating awards *en masse* through the same boilerplate machinery, with the same absence of individualized consideration of the nature of

each award. The terminations were conducted in such a capricious manner that some recipients received termination notices addressed to the wrong entity, and many Plaintiffs received multiple termination notices on different dates for the same award. Some termination notices began with "Dear Recipient" or "Dear Implementing Partner" rather than the name of the awardee, and others stated that the awards were being terminated for convenience even though that is not a lawful basis for terminating grants and cooperative agreements (as opposed to procurement contracts).

5.     Through these actions, the government breached its agreements with Plaintiffs. Each of Plaintiffs' grants and cooperative agreements was a valid, enforceable contract between Plaintiffs and the United States. The terms of those contracts (and the regulations they incorporated by reference) limited the circumstances under which the agencies could suspend or terminate an award. None of those provisions authorized what occurred here: indiscriminate, *en masse* terminations carried out without any meaningful or individualized review, as part of a broader government effort to simply terminate as many awards as possible as fast as possible. The agencies abused their discretion in terminating Plaintiffs' grants and cooperative agreements in this arbitrary and capricious manner. And the agencies destroyed the reasonable expectations that Plaintiffs held when they entered into these agreements—expectations grounded in decades of agency practice in which no federal agency had ever carried out a mass termination of grants and cooperative agreements like this.

6.     The consequences have been devastating—for Plaintiffs, for the partners around the world with whom Plaintiffs had longstanding working relationships, and for the millions of people worldwide who depended on the programs that Plaintiffs were contractually obligated to carry out. The terminations cut off hundreds of millions of dollars in funding that Plaintiffs were

contractually entitled to receive over the life of their awards to carry out their missions. Plaintiffs were forced to lay off thousands of employees, terminate subcontracts and vendor agreements across dozens of countries, and abandon critical programs midway through performance—inflicting severe financial harms and lasting damage to their reputations, relationships, and institutional capacity built over decades. And overseas, the abrupt termination of foreign assistance funding brought Plaintiffs' life-saving work to a halt. Plaintiffs' programs combating malaria, tuberculosis, and HIV were shut down; food aid rotted in ports and warehouses; decades of work promoting religious freedom and the rule of law were upended; and refugees, displaced persons, and victims of human trafficking suddenly lost the vital protection that Plaintiffs had provided.

7.     The harms to Plaintiffs were the direct and foreseeable result of the government's decision to terminate thousands of contracts indiscriminately rather than honor its commitments. Plaintiffs accordingly bring this action under the Tucker Act, 28 U.S.C. § 1491(a), to recover damages for the government's breach of its agreements.

## JURISDICTION

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1491(a).

## PARTIES

9.     Plaintiff the American Bar Association (ABA) is a non-partisan membership organization founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the ABA, features many pro bono, public service, education, and technical assistance programs that improve access to justice in the United States and globally. The ABA Center for Global Programs (CGP) is a division funded through ABA FJE whose mission serves the ABA's Goal

4

IV: Advance the Rule of Law, particularly overseas. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of and in partnership with USAID, the Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. As of January 20, 2025, 98% of ABA CGP's funding came from the U.S. government, including the Department of State and USAID.

10.     Plaintiff DAI Global, LLC (DAI) is an employee-owned global development company headquartered in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted partner of the U.S. government, especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. As of January 20, 2025, nearly 80% of DAI's revenue (more than $750 million in 2024) came from USAID. As of January 20, 2025, DAI was working with USAID and Millennium Challenge Accounts on 99 different projects in 45 countries.

11.     Plaintiff Democracy International, Inc. (Democracy International or DI), a small business, is an international development company founded in 2003 and headquartered in Bethesda, Maryland. Over the past 23 years, it has conducted more than 200 democracy, human rights, governance, peace and resilience, and other projects for USAID in more than 80 countries. Approximately 96% of Democracy International's revenues in 2024 came from prime awards from USAID.

12.     Plaintiff Advancing Democratic Elections and Political Transitions LLC (ADEPT) is a joint venture, of which Democracy International is a member, founded in 2015 to conduct elections and political transition programs for USAID, based in Bethesda, Maryland.

13.     Plaintiff HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered in Silver Spring, Maryland. Working with the organized American Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find

5

welcome, safety, and freedom. As of January 20, 2025, 38% of HIAS's funding came from Department of State and USAID awards.

14.    Plaintiff Management Sciences for Health, Inc. (Management Sciences for Health or MSH) is a global nonprofit organization incorporated in Massachusetts and headquartered in Arlington, Virginia. Founded in 1971, MSH has worked to improve health systems and health outcomes in more than 150 countries by providing governments, health organizations, and the private sector with the strategies, tools, and management support to effectively and efficiently deliver high-functioning health systems. As of January 20, 2025, approximately 88% of MSH's funding came from USAID.

15.    Mercy Corps is a nonprofit organization founded in 1979 and headquartered in Portland, Oregon. Mercy Corps is a global team of humanitarians working on the front lines of crisis, disaster, and poverty to create a world where everyone can prosper. As of January 2025, approximately 45% of Mercy Corps' funding came from USAID and State Department awards.

16.    Save the Children Federation, Inc. (Save the Children USA) is a Connecticut non-stock corporation and 501(c)(3) organization, headquartered in Fairfield, Connecticut. Save the Children USA is a member of the global Save the Children Association. Through its predecessor, the International Save the Children Fund of America, Save the Children USA has operated in the United States since 1932. Since that time, Save the Children USA has worked to give children in the United States a healthy start, the opportunity to learn, and protection from harm, and since World War II, it has carried out the same work on behalf of children around the world. As of January 2025, approximately 42% of Save the Children USA's funding came from USAID or State Department awards.

17.    The United States of America is a defendant pursuant to 28 U.S.C. § 1491.

**FACTUAL ALLEGATIONS**

**A.    USAID and the State Department Historically Implement Foreign Aid Programs Through Awards to Implementing Partners**

18.    USAID and the State Department are the two principal agencies to which Congress has assigned statutory responsibilities to carry out foreign assistance programs in furtherance of the U.S. national interest. Each year in recent memory, Congress has appropriated tens of billions of dollars to both agencies for such programs. Congress appropriates funds for a wide range of foreign aid, including for global health programs, economic assistance, promotion of democracy and the rule of law, disaster recovery, combatting drug trafficking, and more.

19.    The federal government accomplishes the vast majority of this foreign assistance work through partnerships with private "implementing partners"—nonprofits, companies, and academic institutions that receive foreign assistance awards issued by the State Department or USAID. *See* CRS, R48150, *Foreign Assistance: Where Does the Money Go?* 1 (2024). When the agencies make these awards—in the form of contracts, grants, and cooperative agreements—they "obligate" funds to the recipient, creating a legal liability to the recipient in that amount, conditioned on the recipient performing the award as required. CRS, R47106, *The Appropriations Process: A Brief Overview* 1 (2023). Implementing partners then use those obligated funds to carry out project work that furthers one or more statutory aims. CRS, R48150, at 3–6. A project may include building infrastructure, technical assistance, supply of goods or services, or some combination of all three. *Id.* at 5.

20.    The federal government's partnerships with implementing partners are broadly classified as either acquisition or assistance relationships. Acquisition largely corresponds to procurement contracts and direct purchases, typically with for-profit entities. Assistance includes

grants and cooperative agreements, typically but not always awarded to nonprofit organizations. *Id.* at 9. This lawsuit concerns only grants and cooperative agreements.

21. At the time the current Administration took office in January 2025, USAID and the State Department each had thousands of active grants and cooperative agreements with implementing partners to carry out those agencies' foreign aid programs.

22. Whereas procurement contracts are awarded and administered pursuant to the Federal Acquisition Regulation (FAR), the Office of Management and Budget's Uniform Grants Guidance, promulgated at 2 C.F.R. part 200, generally governs the administration of federal grants and cooperative agreements. Like most agencies, the State Department and USAID have adopted the Uniform Grants Guidance in their own regulations. *See* 2 C.F.R. § 601.101 (State Department); 2 C.F.R. § 700.2 (USAID).

23. The Uniform Grants Guidance contains provisions governing the suspension and termination of grants and cooperative agreements. With respect to suspensions, at all times relevant to this action, the Guidance permitted suspension only if the awardee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," and the agency "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339(c). The Guidance did not permit suspensions for policy reasons or any other reason besides noncompliance.

24. With respect to terminations, for all grants and cooperative agreements that the State Department and USAID awarded between August 13, 2020 and September 30, 2024, the Guidance provided just four scenarios where the agency could terminate an award: (1) if the recipient fails to comply with the terms and conditions of a Federal award; (2) "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency

priorities;" (3) if the agency and recipient mutually agree to the termination; (4) if the recipient initiates a termination. 85 Fed. Reg. 49,506, 49,559 (Aug. 13, 2020) (promulgating 2 C.F.R. § 200.340 (2020)).

25.     On information and belief, prior to the events at issue in this case, USAID and the State Department had never terminated a single award based on changed program goals or agency priorities. The agencies certainly never carried out mass terminations of grants and cooperative agreements on these bases.

26.     In addition to adopting the provisions of the Uniform Grants Guidance, USAID has its own regulation setting forth other circumstances in which the agency may suspend or terminate a grant or cooperative agreement. Under that provision: "If at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States or would be in violation of an applicable law, then USAID may, following notice to the recipient, suspend or terminate the award in whole or in part and prohibit the recipient from incurring additional obligations chargeable to the award other than those costs specified in the notice of suspension." 2 C.F.R. § 700.14.

27.     USAID first issued a version of this regulation in 1995 and, in the 30 years between then and 2025, USAID never invoked this provision to suspend or terminate grants and cooperative agreements *en masse*.

28.     Most USAID and State Department grant and cooperative agreements did not include specific provisions governing suspensions or terminations; instead, most agreements merely incorporated by reference the Uniform Grants Guidance and relevant agency regulations, which included those regulations' termination provisions. However, some State Department

9

awards, including Plaintiffs' awards, did include a provision that "[t]he Grants Officer is the only person authorized [to] award, amend, terminate a federal assistance award," or that "[t]he Grants Officer is the authorized signatory for the Department of State to award, amend, and terminate federal assistance awards."

**B.      USAID and the State Department Indiscriminately Suspend and Terminate Grants and Cooperative Agreements, Without Individualized Determinations of Merit**

29.     In Executive Order 14,169, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." Exec. Order 14,169, § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). He further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

30.     On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," the Secretary of State issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (the "January 24 State Memo"), *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), ECF No. 17-1.

31.     The Secretary of State asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda,"

10

he ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He further directed that "contracting officers and grant officers [must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7.

32.    The same day, then-Senior Procurement Executive (SPE) at USAID, Jami Rodgers, issued a notice directing agency contracting and agreement officers to "<u>immediately</u> issue stop-work orders, [and] amend, or suspend existing awards." *Id.*

33.    Also the same day, then-USAID Acting Administrator Jason Gray issued instructions to agency employees for implementing the Executive Order and the January 24 State Memo. USAID, Follow-Up Instructions for Implementing Executive Order *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (the "Gray Instructions"), *Global Health Council*, ECF No. 57-2. The instructions directed that, "[p]er the [January 24 State Memo], within 30 days, the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop appropriate review standards to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda. Information on this review process will be shared as it becomes available." *Id.* The instructions also announced that Gray was "immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." *Id.* Finally, Gray summarized the provisions of the January 24 State Memo regarding waivers and stated, "[w]e will provide further guidance related to implementation of this direction including the process for waivers as soon as possible. We will also provide subsequent guidance on how USAID will review all programs, to include current and ongoing programs, to ensure they are aligned with the foreign policy of the President of the United States." *Id.*

34.     Two days later, on January 26, 2025, Gray issued a clarification. USAID, Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) (the "Gray Clarification"), *Global Health Council*, ECF No. 57-4. As described by the USAID Inspector General, this clarification "also included a directive for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* at 1 (Feb. 10, 2025) (quotation marks omitted).

35.     Consistent with these directives, USAID and the State Department halted all disbursement of appropriated foreign assistance funding and issued Stop Work Orders (SWOs) and suspension notices to implementing partners.

36.     USAID issued SWOs and suspension notices as form letters addressed to "Implementing Partners." The SWOs and suspension notices stated that they were issued "[i]n accordance with" Executive Order 14,169 and the January 24 State Memo and directed implementing partners to "immediately stop, cease, and/or suspend any work being performed under your respective funding agreement, including but not limited to, a contract, task order, grant, cooperative agreement, or other acquisition or assistance instrument until further notice." The SWOs and suspension notices further stated, "[t]his action is taken in accordance with the applicable authority under your award, which may include FAR Clause 52.242-15 Stop-Work Order (or Alternate I), 2 C.F.R. § 700.14 (Award Suspension and Termination), the Mandatory Standard Provisions for Non-U.S. Nongovernmental Organizations, as appropriate, or other terms in the agreement related to suspension of activities."

37.     In a declaration filed in a lawsuit on February 10, 2025, then-Acting Deputy Administrator Peter Marocco admitted that USAID had "generally paused all expenditures in connection with foreign aid," for "both new programs … as well as existing ones." Decl. of Peter Marocco   28, *Am. Foreign Serv. Ass'n v. Trump* (*AFSA*), No. 25-cv-352 (D.D.C. Feb. 10, 2025), ECF No. 20-1; *see* Notice of Correction, *AFSA*, ECF No. 21 (similar).

38.     The State Department similarly issued form-letter suspension notices addressed to "Grant Recipients." Some suspension notices stated that they were issued "[c]onsistent with" Executive Order 14,169 and notified implementing partners "that, consistent with the terms of the award(s), the referenced award(s) are immediately suspended." These suspension notices stated: "Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs." Other suspension notices stated: "As of [the date of the notice], this award no longer effectuates agency priorities and is suspended in accordance with the U.S. Department of State Standard Terms and Conditions." The State Department cited "agency priorities" as the basis for suspending grants and cooperative agreements, even though regulations applicable to such awards at the time, incorporated into each agreement, permitted suspensions only if the awardee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." 2 C.F.R. § 200.339. The suspension notices directed: "Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible."

39.      The State Department also halted disbursement of appropriated foreign assistance funding through programs administered outside USAID.

13

40.     During this period, President Trump also established the United States DOGE Service (DOGE). *See* Exec. Order 14,158, *Establishing and Implementing the President's 'Department of Governmental Efficiency'*, 90 Fed. Reg. 8441 (2025).

41.     Elon Musk, who at some point was made a "special government employee" within the White House, was the functional head of DOGE, and DOGE teams were embedded within USAID and the State Department "to implement the President's DOGE Agenda." *Id.* § 1; *see id.* § 3(c) (establishing DOGE Teams within each agency).

42.     On February 2, 2025, Musk posted on X that it is "[t]ime for [USAID] to die." @ElonMusk, X.com (Feb. 2, 2025), https://x.com/elonmusk/status/1886102414194835755. And on February 3, he posted that he had "spent the weekend feeding USAID into the wood chipper." @ElonMusk, X.com (Feb. 3, 2025), https://x.com/elonmusk/status/1886307316804263979.

43.     Musk spread various false conspiracy theories about USAID to justify eliminating its programs and the associated grants and cooperative agreements that implemented the programs.

44.     For example, Musk falsely claimed that only 10% of USAID funding reached local communities. The truth is that while 10% of funds went *directly* to local organizations, the remaining funding went to multilateral agencies and American organizations that used the funds to provide for local communities. *See* Rachel Bonnifield & Justin Sandefur, *No, 90 Percent of Aid Is Not Skimmed Off Before Reaching Target Communities*, Ctr. for Glob. Dev. (Feb. 3, 2025), https://perma.cc/34FQ-R8SE.

45.     Musk also falsely claimed that USAID had funded a contract worth $50 million to provide condoms to Gaza. *See* Daniel Dale, *'Some of the Things That I Say Will Be Incorrect':*

14

*Musk Backs Away from False Claim of $50 Million for Gaza Condoms*, CNN (Feb. 12, 2025),

https://perma.cc/4VHA-DDAS.

46.     Over the following weeks, USAID and the State Department terminated awards

*en masse*, including Plaintiffs' grants and cooperative agreements. By the end of February 2025,

over 85% of USAID's total awards—5,341 in total—had been terminated. Stephanie Nolen,

*U.S.A.I.D. Cuts Threaten Polio, H.I.V., Malaria and Bird Flu Efforts*, N.Y. Times (Mar. 26,

2025), https://perma.cc/DFD8-SVBC.

47.     The initial terminations took place in early February 2025. For instance, Plaintiff

Save the Children USA received a notice on February 3, 2025 that its State Department award

had been terminated on January 31, 2025 because it purportedly no longer effectuated State

Department priorities. The termination letter did not explain how the award no longer served

agency priorities or otherwise included any evidence of individualized consideration. The letter

stated in full:

15

**Department of State**



---

**Termination Notification**

---

NOTICE OF TERMINATION

February 03, 2025

██████████████

Save the Children Federation, Inc.
501 Kings Highway East
Fairfield, CT, 06825-4861

REF: SPRMCO24CA0179

The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of January 31, 2025. This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 CFR 200.340.

A modification to your award to codify this termination was processed in MyGrants and countersigned on your behalf to reflect the termination of this award on January 31, 2025.

Effective immediately upon receipt of this Notice of Termination the Recipient must stop all work on the program and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

This termination is for the entirety of the award. In compliance with 2 CFR 200.343, the grants officer will issue a final modification to the award adjusting for costs that result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of termination, and not in anticipation of it.

Final performance and financial reports are due 120 days after the termination date.

48.    Plaintiff Mercy Corps received a termination notice from the State Department dated February 5, 2025. The notice stated that one of its awards was terminated effective January 25, 2025—eleven days earlier—because the award purportedly no longer effectuated State

16

Department priorities. Like the letter sent to Save the Children days earlier, it did not explain how the award no longer served agency priorities or otherwise included any evidence of individualized consideration.

49. Plaintiff the ABA similarly received a termination notice from USAID on February 6, 2025, which stated that the award was being "fully terminated for convenience," even though no provision of the award agreement or the regulations incorporated into the agreement permitted terminating the award for convenience. The notice also stated that the award had been reviewed for efficiency and consistency with U.S. foreign policy pursuant to the Executive Order, but the letter did not provide any individualized explanation for how the ABA's award was inefficient or failed to accord with the government's foreign policy. The letter stated in full:



**Recipient:** ████████████

American Bar Association Fund For Justice And Education

**Subject:** Notice of Full Termination

**Agreement:** #7200AA22CA00021

Date: February 06, 2025

Dear Recipient:

In accordance with Executive Order 14169 Reevaluating and Realigning United States Foreign Aid, additional guidance provided by USAID in the January 28, 2025 communication to implementing partners, and the formal suspension notice issued on January 27, 2025, your award has been reviewed for programmatic efficiency and consistency with United States foreign policy.

Based on this review, Award #7200AA22CA00021 is fully terminated for convenience, in accordance with 2 CFR 700.14/Schedule A.18/the termination condition in your award, effective as of the date of this notice. Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Detailed further instructions on documentation required to negotiate a termination settlement (e.g., unavoidable costs associated with the funding pause and costs associated with this termination) will be provided shortly.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below by COB today. Should you have questions concerning this letter, please contact me at ██████@usaid.gov. We will follow up with further guidance as soon as possible.

50.     Several days later, USAID began terminating awards in large groups that the agency itself described as "tranches." The agency carried out four tranches of terminations from February 9, 2025 through February 12, 2025. USAID undertook these terminations despite

18

having just announced the 90-day review period for agency officials to "[r]eview[] each foreign assistance program" under new guidelines. *See* January 24 State Memo § 3(a).

51. Rather than engage in program-specific review, it appears that USAID undertook and accelerated these terminations in response to litigation seeking emergency relief against the suspensions and stop-work orders.

52. On February 9, 2025 USAID's then-SPE Jami Rodgers emailed to USAID staff a link to a list of awards identified for termination. Rodgers requested "[staff] support in taking action on these activities by issuing notices to [agency] partners." The email stated: "For your convenience, M/OAA Policy has drafted several templates to assist with this process." The email did not include a timeframe for completion of these terminations, nor did it state that the terminations should be processed with urgency.

53. On Monday, February 10, 2025, two grantees filed suit in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State* (*AVAC*), No. 25-cv-400 (D.D.C.), challenging the suspension of foreign aid. The next day, February 11, a larger coalition of grantees, cooperative agreement recipients, and contractors filed a complaint in *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), and that same day they moved for a temporary restraining order and preliminary injunction. The court held a hearing on the TRO motion on February 12, 2025.

54. Before the court could act on the TRO, on or about Tuesday, February 11, 2025, SPE Rodgers sent a follow-up message (ECF No. 19-2) to USAID Contracting and Agreement Officers informing them that "Agency leadership has asked that we move quickly to terminate the awards." The message included two tranches of awards slated for termination no later than February 11—that day—and another tranche slated for termination no later than February 12—the next day.

55.     Rodgers' message also answered questions the agency had received, apparently in response to internal apprehension about the terminations. One question was whether the general counsel could provide "a formal written opinion confirming the Contracting & Agreement Officers are acting within their warrant authority in executing these terminations" and clarification that "COs/AOs will not be held personally liable if the Agency is later found to have acted arbitrarily or violated federal statutes, such as the Impoundment Act." Rodgers responded by stating that Contracting and Agreement Officers would be acting within their authority and could not be held personally liable. *See* ECF No. 19-2.

56.     Other questions included "[u]nder whose authority … the Office of Acquisition and Assistance [is] terminating these awards" and "[w]hat should be used as the basis" for the terminations. Rodgers responded that the State Department had prepared an action memorandum for each tranche that provided blanket authorization for every termination within that tranche. Rodgers further stated that, "given the timeline for completing termination notifications … the termination notices do not need to contain termination process details." As authority for the terminations, Rodgers stated that the Secretary of State "has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid." *See* ECF No. 19-2.

57.     Consistent with this direction from SPE Rodgers, several Plaintiffs immediately received a wave of new termination notices. For example, after receiving no termination notices prior to February 10, 2025, Plaintiff DAI Global received a termination notice on February 10 and another termination notice on February 11, and Plaintiff Democracy International received three termination notices on February 10, five termination notices on February 11, and one

termination notice on February 12. Examples of termination notices Plaintiffs received are below:



February 10, 2025

███████████████

Chief of Party
DAI Global, LLC
7600 Wisconsin Avenue, Suite 200
Bethesda, MD 20814

Subject:       Notice of Full Termination

Agreement:    Cooperative Agreement No. 7200AA19CA00019, Feed the Future Policy Leadership, Interactions, Networks and Knowledge (Policy LINK)

Dear ███████:

In accordance with Executive Order 14169 Reevaluating and Realigning United States Foreign Aid, additional guidance provided by USAID in the January 24 communication to implementing partners, and the formal suspension notice issued on January 27, 2025, your award has been reviewed for programmatic efficiency and consistency with United States foreign policy.

Based on this review, Award 7200AA19CA00019 is fully terminated, in accordance with 2 CFR 200.340(a)(4), effective as of the date of this notice. Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Detailed further instructions on documentation required to negotiate a termination settlement (e.g., unavoidable costs associated with the funding pause and costs associated with this termination) will be provided shortly.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below. Should you have questions concerning this letter, please contact me at ████████ @usaid.gov. We will follow up with further guidance as soon as possible.

21



February 11, 2025

███████████████████
Democracy International, Inc.
7600 Wisconsin Avenue
Suite 1010, Bethesda MD 20814, USA

**Subject:**    Notice of Full Termination

**Reference:**    Award #72038824CA00007 titled *Responsive Local Governance (RLG) Activity*

Dear ████████████ :

In accordance with Executive Order 14169 Reevaluating and Realigning United States Foreign Aid, additional guidance provided by USAID in the January 28 communication to implementing partners, and the formal suspension notice issued on January 25, 2025, your award has been reviewed for programmatic efficiency and consistency with United States foreign policy.

Based on this review, Award #72038824CA00007 titled *Responsive Local Governance (RLG) Activity* is fully terminated in accordance with 2 CFR 700.14, effective as of February 11, 2025. Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Detailed further instructions on documentation required to negotiate a termination settlement (e.g., unavoidable costs associated with the funding pause and costs associated with this termination) will be provided shortly.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below. Should you have questions concerning this letter, please contact me at ████████ @usaid.gov. We will follow up with further guidance as soon as possible.

Sincerely,

58.    These termination notices cited "programmatic efficiency" as one of the two bases for termination, even though no provision of the award agreements or the regulations incorporated into the agreements permitted termination for "programmatic efficiency."

59.    On February 13, 2025, the district court in *Global Health Council* and *AVAC* issued a temporary restraining order. *Global Health Council*, ECF No. 21. The court found the plaintiffs were likely to succeed on the merits because, among other reasons, "the stated purpose

in implementing the suspension of all foreign aid [was] to provide the opportunity to review programs for their efficiency and consistency with priorities," but "Defendants ha[d] not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs." *Id.* The TRO prohibited USAID and the State Department from, *inter alia*, "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.* at 14.

60.     Several days later, the *AVAC* plaintiffs filed a motion to enforce, alleging that the government was not complying with the TRO. *AVAC*, ECF No. 26. In granting the motion in part, the district court explained that "[t]he TRO [did] not preclude Defendants from undertaking a good-faith, individualized assessment of a contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures required." *Global Health Council*, ECF No. 28 at 6. But the court emphasized that the TRO did not permit the agencies to "simply replace their earlier implementations with other directives to their agencies to suspend, pause, or prevent the obligation or disbursement of appropriated foreign-assistance funds or issue, implement, enforce, or otherwise give effect to terminations, suspensions, or stop-work orders as to programs in existence as of January 19, 2025." *Id.* at 5–6 (cleaned up).

61.     Undeterred by the TRO, on February 23, 2025, SPE Rodgers circulated another tranche of terminations and directed Contracting Officers to an FAQ dated February 20, 2025, which referred to the Executive Order, notwithstanding that the Executive Order had recently

been enjoined in *AVAC* and *Global Health Council*. The FAQ stated: "The termination authority is delegated to the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid."

62.    The plaintiffs' counsel in *Global Health Council* thereafter alerted the government that this directive violated the temporary restraining order. *Global Health Council*, ECF No. 42 at 8–9.

63.    At this point, the agencies suddenly shifted strategies and began claiming that the terminations were being undertaken pursuant to an individualized review process, in an effort to take advantage of the carve-out provided for in the temporary restraining order.

64.    Within *an hour* of *Global Health Council* plaintiffs' counsel alerting the government that the next tranche of terminations would violate the TRO, USAID Industry Liaison Matthew Johnson sent an email stating that the prior guidance from SPE Rodgers on February 23, 2025 was retracted and that, "[f]or the avoidance of doubt, Tranche 5 termination authority has no relationship to any Executive Order. These awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities." *Global Health Council*, ECF No. 42-1 ¶ 26.

65.    The email continued further: "Accordingly, USAID has elected to enforce termination authorities in the relevant instruments." *Id.* ¶ 28. Then, for the first time, USAID alleged that "Secretary Rubio has individually reviewed Tranches 1-4 and made similar determinations in his capacity as Acting Administrator of USAID." *Id.*

66.    The next day, February 24, 2025, USAID Senior Technical Advisory Adam Cox sent an internal email stating: "we've [he and remaining Contracting Officers in Washington]

24

been instructed by DOGE and Jami [Rodgers] to terminate several awards tonight, so you may see some awards of yours that have been terminated. You should be CC'd on any emails that are going out. This of course will have to be officially done later in time through a GLAAS [Global Acquisition and Assistance System] action from someone [else] in the Mission/Region covering that portfolio, but I wanted to give you a heads up." *Id.*    32. The email continued: "There are MANY more terminations coming, so please gear up!" *Id.*

67.    Over the next three days, from February 24 to February 26, 2025, USAID terminated an enormous number of awards—seemingly around 2,000 in total—including numerous awards to Plaintiffs.

68.    On information and belief, the thousands of termination notices issued on these three days were all identical or substantially similar. An example of the termination notices sent on these days is the following termination received by Plaintiff Management Sciences for Health:



**February 26, 2025**

**To:**        MANAGEMENT SCIENCES FOR HEALTH

**Subject:**    Termination Notice of Award No. 72066323CA00002

Dear Implementing Partner,

This award is being terminated for convenience and the interests of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for the U.S. Agency for International Development ("the Agency" or "USAID") and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID. Secretary Rubio and PTDO Deputy Administrator Marocco have determined your award is not aligned with Agency priorities and made a determination that continuing this program is not in the national interest. The decision to terminate this individual award is a policy determination vested in the Acting Administrator and the person performing the duties and functions of the Deputy Administrator.

I have been delegated authority to issue this termination notice.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming. . Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,

69.     The termination notice did not even state which official gave which directive to terminate the award; the notice stated that the termination was "pursuant to a directive from U.S. Secretary of State Marco Rubio. . . *and/or* Peter W. Marocco" (emphasis added). And the notice stated that it was "for convenience," even though the relevant award agreement and regulations incorporated into the agreement did not permit termination for convenience.

26

70.     On March 6, 2025, USAID Contracting Officers and Agreement Officers received an email from SPE Rodgers, instructing them to immediately review a list of terminated awards for which "expedited notices" had been issued and "issue [] detailed, expanded termination notice[s]" using templates linked in the email. *AVAC*, ECF No. 55-1 at 1. Rodgers further directed that "[e]ach template must be tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award." *Id.* at 2. He stated that the "templates [we]re designed to ensure consistent … communication between USAID CO/AOs and implementing partners following terminations." *Id.*

71.     USAID executed several hundred more grant and cooperative agreement terminations in the days that followed.

72.     Like USAID, the State Department carried out mass, indiscriminate waves of terminations in February and March of 2025. According to data on the official government website of the Department of Government Efficiency, DOGE.gov, the State Department terminated 3,925 grants and cooperative agreements on a single day—February 26, 2025. On information and belief, the termination notices for all the terminated grants and cooperative agreements were substantially similar. Plaintiffs ABA, HIAS, and Save the Children USA all had State Department awards terminated that day. On information and belief, the termination notices that the State Department sent on February 26, 2025 took one of the following two forms:

27

**Department of State**



**Termination Notification**

NOTICE OF TERMINATION

February 26, 2025

████████████████

Save the Children Federation, Inc.
501 Kings Highway East
Fairfield, CT, 06825-4861

REF:  SPRMCO24CA0156; No Lost Generation

Dear ████████ :

The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of February 26, 2025. This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions, 2 CFR 200.340, and/or Award Provisions as applicable.

This termination will be further codified through an amendment to the award reflecting the termination date.

Effective immediately upon receipt of this Notice of Termination, the Recipient must stop all work on the program and not incur any new costs after the effective date cited above. Payment requests for legitimate costs incurred prior to this notification are allowable. If your award is already in suspended status, payment requests for legitimate costs incurred prior to the effective date of the Notice of Suspension are allowable. The Recipient must cancel as many outstanding obligations as possible.



**February 26, 2025**

**To:**    AMERICAN BAR ASSOCIATION

**Email:**    ▮▮▮▮▮▮▮@americanbar.org

**Subject:** Termination Notification of Award No.  SLMAQM20CA2101

**Reference:** state.gov/federal-assistance-policies-appeals/

Dear Partner,

This award is being terminated for the convenience of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, for alignment with Agency priorities and national interest. The decision to terminate this individual award is a policy determination vested in the Secretary of State.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming from the Grants Office for specific awards. Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,

73.    Any suggestion that the Secretary of State, Peter Marroco, other agency leaders, or DOGE individually reviewed thousands of award terminations in February and March of 2025 is implausible. Grants and cooperative agreements are often long, technical, and complicated documents. They often include technical specifications that are dozens of pages long, as well as lengthy technical appendices. And to understand all the work to be done under a given award, one would typically need to review the funding application that led to the award issuance. It would take a single person many weeks of work to substantively review hundreds—let alone thousands—of such awards, especially if that person was not already familiar with the programs at issue. *Global Health Council*, ECF No. 42-1 ¶ 36; *see also AVAC*, ECF No. 26-3 ¶ 49.

29

74.     Further, without consulting the Contracting Officers, Agreement Officers, Contracting Officer's Representatives (CORs), or Agreement Officer's Representatives (AORs) who manage a specific contract or award—or the implementing partners themselves—it would be impossible in most cases to understand whether a specific award could be terminated, effective immediately, without incurring even greater termination costs or causing harm to the national interest or agency priorities.

75.     For example, the Contracting Officers, Agreement Officers, and CORs/AORs have specific information about the status of ongoing work, whether immediate termination would incur sunk costs (for example, by allowing already-purchased food and medicine to expire), and whether immediate termination would risk the health or safety of agency personnel or implementing partners, among many other award-specific factors.

76.     It is thus implausible that the Secretary himself, the Acting Deputy Administrator, or even a group of political appointees engaged in a meaningful individualized review of the thousands of grants and cooperative agreements that were terminated.

77.     Indeed, for USAID, then-Acting Deputy Administrator Peter Marocco described the so-called "review process" as a cursory review of a spreadsheet, with a single line of data per award, which "included information about the recipient, the amount of the award, the subject matter, and a description of the project that *often*"—i.e., not always—"included the location of the project." *Global Health Council*, ECF No. 39-1 at   5 (emphasis added).

78.     USAID thus was terminating and suspending hundreds of millions of dollars in awards based on a one-line summary, without actually looking at the award documents themselves, without consulting the personnel who manage the project, without understanding what the project was intended to achieve, without assessing how it was performing, without

30

considering how many beneficiaries would be affected by project termination, and, in many cases, without even knowing the location of the project.

79. The *en masse* terminations were carried out in such a capricious manner that they included even awards for which USAID or the State Department had granted waivers for life-saving humanitarian aid and essential services, and thus intended to continue. For example, a wave of terminations on February 26, 2025 included "almost all of the awards that were needed to implement lifesaving activities," including in relation to malaria, tuberculosis, and Ebola. *Global Health Council*, ECF No. 47-1  6. After these terminations, a USAID official sent an email "indicat[ing] that the awards that were terminated should not have been, and had been terminated in error: 'Please hold on these life saving programs and let us review in the morning. There is an acknowledgment some may have been sent out in error and we have the ability to rescind. We need to identify what those are.'" *Id.*

80. On March 10, 2025, the district court in *Global Health Council* and *AVAC* granted in part the plaintiffs' motion for a preliminary injunction. As relevant here, the district court held that the plaintiffs were likely to succeed on their claims that the initial agency actions implementing a blanket suspension of awards, pursuant to the President's Executive Order, was arbitrary and capricious. *Global Health Council*, ECF No. 21 at 21–24. The court held that the government's stated "desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid." *Id.* at 22. And the court rejected the government's contention that "the funding freeze was not 'comprehensive or undifferentiated' because the Secretary of State approved certain waivers." *Id.* at 23.

31

81.     The district court, however, denied the plaintiffs' request that the court also vacate the mass terminations that had occurred after the court entered its TRO on February 13, 2025. The court explained that the plaintiffs had "opted to rely on their initial TRO motions at the preliminary injunction stage," and accordingly "their opening motions [did] not address the post-TRO landscape, and their arguments were limited to their reply briefs and oral argument." *Id.* at 26. The court acknowledged the plaintiffs' arguments that the purported individualized review process was a sham and merely a pretext for effectuating the blanket suspensions and terminations that were subject to the TRO. *Id.* at 26–27. But the court "[did] not reach the merits of these arguments," *id.* at 27, because the court tentatively concluded that the plaintiffs had not shown, on the record presented, that the mass terminations arose from the same initial agency directives implementing the blanket suspensions. "To be sure," the court recognized, "Plaintiffs may be able to formulate some new challenge to Defendants' process leading to these later terminations, whether in an [Administrative Procedure Act] claim premised on the relevant action or a contractual challenge based on the terms of individual awards." *Id.* at 27 n.11.

82.     The court preliminarily enjoined the government from "giving effect to any terminations, suspensions, or stop-work orders issued between January 20, 2025, and February 13, 2025," the latter date being when the district court had entered its TRO. *Id.* at 47–48.

83.     On or around April 5, USAID executed yet another tranche of mass terminations, this time for roughly 50 humanitarian aid programs within the USAID Bureau of Humanitarian Assistance totaling over $1.3 billion. Many of these programs had previously received waivers for life-saving food aid programs. The terminated awards included every remaining USAID program in Afghanistan, Syria, and Yemen, as well as many awards in Lebanon, Jordan, Niger, Somalia, and others. Upon information and belief, these terminations were directly ordered by

the official performing the duties of USAID Deputy Administrator for Policy and Programming and Chief Operating Officer.

84.     In addition, during the months after the terminations first began, USAID and the State Department *re-terminated* numerous awards for which they had already sent termination notices. The termination notices for these superseding terminations sometimes provided a different reason for termination than the original termination letter. For example, the ABA's State Department award SAQMIP22GR0067 was terminated on February 26, 2025 "for convenience" and "for alignment with Agency priorities and national interest," and was terminated again on February 27, 2025, because it "no longer effectuates agency priorities." It was then terminated a third time on March 1, 2025 because the award "no longer effectuates agency priorities." The full text of each notice is the following:



**February 26, 2025**

**To:**     AMERICAN BAR ASSOCIATION

**Email:**     ▮▮▮▮▮▮▮▮@americanbar.org

**Subject:** Termination Notification of Award No. SAQMIP22GR0067

**Reference:** state.gov/federal-assistance-policies-appeals/

Dear Partner,

This award is being terminated for the convenience of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, for alignment with Agency priorities and national interest. The decision to terminate this individual award is a policy determination vested in the Secretary of State.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming from the Grants Office for specific awards. Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,

**Department of State**



**Termination Notification**

NOTICE OF TERMINATION

February 27, 2025

American Bar Association DBA American Bar Association Fund for Justice and Education

██████████████

1050 Connecticut Ave, NW, Suite 400
Washington, DC 20036

REF: SAQMIP22GR0067; Program to Strengthen Legal Protections for Indonesia's Religious Minorities

Dear ████████,

The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of February 26, 2025. This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions, 2 CFR 200.340, and/or Award Provisions as applicable.

This termination will be further codified through an amendment to the award reflecting the termination date.

Effective immediately upon receipt of this Notice of Termination, the Recipient must stop all work on the program and not incur any new costs after the effective date cited above. Payment requests for legitimate costs incurred prior to this notification are allowable. If your award is already in suspended status, payment requests for legitimate costs incurred prior to the effective date of the Notice of Suspension are allowable. The Recipient must cancel as many outstanding obligations as possible.

Final reports will be due in accordance with the Award Provisions.



**Department of State**

**Termination Notification**

NOTICE OF TERMINATION

March 1, 2025

AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUCATION
REF: SAQMIP22GR0067; Program to Strengthen Legal Protect

Dear AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUC:

The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of March 1, 2025. This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions, 2 CFR 200.340, and/or Award Provisions as applicable.

This termination will be further codified through an amendment to the award reflecting the termination date.

Effective immediately upon receipt of this Notice of Termination, the Recipient must stop all work on the program and not incur any new costs after the effective date cited above. Payment requests for legitimate costs incurred prior to this notification are allowable. If your award is already in suspended status, payment requests for legitimate costs incurred prior to the effective date of the Notice of Suspension are allowable. The Recipient must cancel as many outstanding obligations as possible.

Final reports will be due in accordance with the Award Provisions.

For specific questions related to your award, please contact your Grants Officer.

Sincerely,

85.     In another instance, USAID gave substantially the same reasons for re-terminating an award held by Save the Children USA in April that the agency had originally terminated in February, as the following notices illustrate:



**February 26, 2025**

**To:**       SAVE THE CHILDREN FEDERATION, INC.

**Subject:**   Termination Notice of Award No. 720BHA23GR00029

Dear Implementing Partner,

This award is being terminated for convenience and the interests of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for the U.S. Agency for International Development ("the Agency" or "USAID") and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID. Secretary Rubio and PTDO Deputy Administrator Marocco have determined your award is not aligned with Agency priorities and made a determination that continuing this program is not in the national interest. The decision to terminate this individual award is a policy determination vested in the Acting Administrator and the person performing the duties and functions of the Deputy Administrator.

I have been delegated authority to issue this termination notice.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming. . Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,



**April 5, 2025**

████████
████████████

Save the Children Federation, Inc.
50 King Highway East
Fairfield, CT 06825
E-mail: ████@savechildren.org
POC Email: ████@savechildren.org

Subject:      Termination Notice of Award No. 720BHA23GR00029

Reference:    Assistance Provision M.1 incorporating 2 CFR 200.340 (4), 2 CFR 700.14 (US NGOs)

Dear Implementing Partner,

This award is being terminated for the convenience of the U.S. Government pursuant to a directive from Jeremy Lewin, performing the duties of the Deputy Administrator for Policy and Programming and Chief Operating Officer for the U.S. Agency for International Development ("the Agency" or "USAID"), for alignment with Agency priorities and national interest. The decision to terminate this individual award is pursuant to a review and determination that the award is inconsistent with the Administration's priorities.

I have been delegated authority to terminate this award. In accordance with the referenced authority, the subject award is hereby completely terminated effective immediately as of the date of this letter.

Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming from the Cognizant Agreement Officer. For questions regarding this letter, please contact me at ████@usaid.gov, with a copy to the Agreement Officer's Representative (AOR). Kindly confirm receipt of this Termination Notice via electronic email response to the sender with a copy to ████@usaid.gov and the Industry Liaison email at ████@usaid.gov.

Sincerely,

86.    Additionally, even though the district court had prohibited the government from "'giving effect to any terminations' issued prior to February 13, 2025," USAID and the State Department did in fact give effect to such terminations and did not undertake new terminations for many awards that were terminated prior to that date. For example, DAI received a

38

termination notice for cooperative agreement 7200AA19CA00019 from USAID on February 10, 2025. USAID never issued another termination notice for this award.

87.     For other awards terminated prior to February 13, 2025, USAID purported to "effectuate" the pre-February 13 terminations by ratifying them, even though the preliminary injunction precluded the agency from "giving effect" to those terminations. The official performing the duties of USAID Deputy for Policy and Programming and Chief Operating Officer approved an Action Memo "to effectuate" 462 award terminations issued prior to February 13. *Global Health Council*, ECF No. 97-2 at 1, 3. USAID's Chief Acquisition Officer then directed staff "to effectuate the terminations of awards issued prior to February 13, 2025." *Global Health Council*, ECF No. 97-3. For many of these awards, USAID issued new termination notices ratifying the earlier termination, maintaining the initial, pre-February 13 effective date for the terminations.

88.     For instance, DAI's Feed the Future Policy LINK and Palestine SMART cooperative agreements were terminated on February 10 and February 11, 2025. USAID later issued a follow-on notice of termination for each award that purported to give effect to the original termination dates. Democracy International's Liberia Elections and Democracy Activity similarly was terminated on February 10, 2025, and USAID later issued a follow-on notice that purported to give effect to the February 10 termination date.

89.     Plaintiffs in *Global Health Council* moved to enforce the preliminary injunction, and the district court granted the motion in relevant part, explaining: "The Court's preliminary injunction did not include any exception for Defendants to evade its terms through post hoc explanations for terminations, and the Court has previously rejected similar attempts by Defendants. … Defendants may not give effect to terminations issued prior to February 13, 2025,

39

and must promptly take steps to come into compliance as to the awards at issue." *Global Health Council*, ECF No. 107 at 8–9. But, on information and belief, the agencies never took steps to come into compliance, and the effectively ratified terminations remain in place.

90.    When taking mass actions involving awards, USAID sometimes communicated with the wrong organization about an award. For example, Save the Children USA received this communication about an award held by another organization:

**From:** ████████████████ @savechildren.org>
**Sent:** Monday, March 3, 2025 6:11 PM
**To:** ████████ @usaid.gov
**Cc:** ████████ @usaid.gov; SWOinbox
**Subject:** Re: Rescission of Termination Notice for Award No. 7200AA25C00249

Dear ████ ,

Please be aware that this has been sent to the wrong recipient. I am the SAM.gov point of contact for Save the Children and this notification is addressed to the Norwegian Refugee Council.

I have checked our records and the agreement number does not appear to be associated with Save the Children.

Kind regards,

████

---

**From:** ████ @usaid.gov < ████ @usaid.gov>
**Sent:** Monday, March 3, 2025 5:59 PM
**To:** ████████████ @savechildren.org>
**Cc:** ████████████████████ n@usaid.gov>
**Subject:** Rescission of Termination Notice for Award No. 7200AA25C00249

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear NORWEGIAN REFUGEE COUNCIL (NRC) - STIFTELSEN FLYKTNINGHJELPEN,

The termination for your award, 7200AA25C00249, is hereby rescinded. Please resume your normal work duties.

Kindly confirm receipt of this message.

████████████

Contracting and Agreement Officer
USAID

40

91.     On information and belief, DOGE and agency personnel prepared, and the Secretary of State or other agency officials approved, an action memorandum for each tranche of award terminations. On information and belief, none of the action memoranda provided individualized information about the awards selected for termination.

92.     On information and belief, the action memoranda state that tranches of awards were selected for termination for programmatic reasons described at a high level of generality—for example, because the awards related to "democracy promotion."

93.     On information and belief, these action memoranda state that terminating the selected awards will result in cost savings and will save taxpayers money.

94.     On information and belief, agency personnel prepared a spreadsheet listing the awards selected for termination, which was attached to each action memorandum.

95.     On information and belief, the spreadsheets listing awards selected for termination did not include substantial information concerning the content, scope, or location of the programs at issue; nor did the spreadsheets identify any potential reliance interests that would be upended, nor any costs or other adverse effects that would arise, if the awards were terminated.

96.     On June 3, 2025, the government filed a motion to dismiss in *Global Health Council*, in which they argued that the Tucker Act precluded district court jurisdiction over the plaintiffs' claims against the termination of their awards, and that the plaintiffs instead needed to file in the Court of Federal Claims to obtain redress for the terminations. *Global Health Council*, ECF No. 89.

97.     On August 21, 2025, the Supreme Court granted a stay pending appeal in a case challenging the termination of grants from the National Institutes of Health (NIH). The Court

held the Tucker Act precluded the district court's jurisdiction over APA claims "based on" the grants or seeking relief 'designed to enforce any obligation to pay money' pursuant to those grants." *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025). The plaintiffs had argued to the Supreme Court that the grants were not "contracts" subject to the Court of Federal Claims' jurisdiction under the Tucker Act. Resp. to App. 25–30, *NIH*, No. 25A103 (U.S. Aug. 1, 2025). But the government successfully argued otherwise. The Solicitor General contended that "Respondents have *express*, not implied, contracts with the NIH—the notices of award"—and "consideration[] turns on the conditions attached to [the] grants." Reply to App. at 8–9, *NIH*, No. 25A103 (U.S. Aug. 4, 2025) (emphasis in original). The Supreme Court implicitly agreed with the government in issuing its stay.

98.     Thereafter, "in light of the Supreme Court's recent decision in [*NIH*]," the plaintiffs in *Global Health Council* moved to amend their complaint to "remove[] claims related to terminations of contracts, grants, cooperative agreements, and awards," so that the plaintiffs could pursue claims over the terminations in the Court of Federal Claims. *See Global Health Council*, ECF No. 171 at 2. The district court granted the motion for leave to amend, and thus the ongoing *Global Health Council* case does not contain any claims relating to the termination of awards. *See Global Health Council*, ECF No. 174 (Jan. 5, 2026).

99.     Plaintiffs ABA, DAI, DI, HIAS, and MSH are among the plaintiffs in *Global Health Council*. The remaining Plaintiffs in this case are not part of that lawsuit.

**C.     Plaintiffs' USAID and State Department Grants and Cooperative Agreements Were Suspended and Then Terminated in the Mass Terminations**

100.     Across the eight Plaintiffs to this action, USAID and the State Department terminated more than 150 different grants and cooperative agreements. The full list of terminated

grants and cooperative agreements, including the dates that each Plaintiff received termination notices for each award, is in the chart attached to the Complaint as Appendix A.

*American Bar Association*

101.    As of January 2025, Plaintiff ABA was serving as the prime recipient for 56 grants and cooperative agreements awarded by the State Department and USAID. The awards were largely to advance the rule of law, human rights, including instituting anti-human trafficking and sexual exploitation monitoring and disrupting mechanisms, and anti-corruption programs in foreign nations. ABA had performed awards for such programs for decades.

102.    As of January 2025, State Department and USAID awards comprised approximately 98% of the ABA Center for Global Programs' funding.

103.    Between January 24, 2025 and January 27, 2025, USAID and the State Department sent suspension notices to the ABA for all of its awards. Neither USAID nor the State Department conducted any individualized review of ABA's awards, nor did the agencies provide any individualized explanations for the suspensions.

104.    In February and March 2025, as part of the mass waves of terminations by USAID and the State Department, the agencies terminated 48 of the ABA's grants and cooperative agreements with those agencies. For some of the grants and cooperative agreements, USAID and/or the State Department sent multiple termination notices.

105.    In terminating the ABA's awards, neither the State Department nor USAID conducted any individualized review of the ABA's awards, including assessing the nature of the work to be performed and the extent to which the ABA's specific awards furthered the national interest and relevant policy goals. The agencies likewise provided no individualized explanations as to why the ABA's awards were terminated, including how they were purportedly inconsistent

with the national interest or agency priorities. As just one example, the State Department did not explain how the ABA's award to strengthen religious freedom through the rule of law in Sudan was contrary to the national interest or inconsistent with this Administration's priorities.

106. Instead, the agencies sent the ABA boilerplate termination letters that, on information and belief, were identical to the termination letters sent to numerous other recipients on or around the same days that the ABA received its termination notices.

*DAI Global*

107. As of January 2025, Plaintiff DAI was serving as the prime recipient for 15 cooperative agreements awarded by USAID. For more than 50 years, DAI has held awards from USAID and the Department of State that implemented nearly the entire spectrum of U.S.-funded foreign assistance—from facilitating trade and investment opportunities between the United States and its partners, to reducing the crime and violence that drive illegal immigration, to improving the efficiency of agricultural production and markets, to strengthening the tax systems that allow developing countries to become self-supporting, to building more capable health delivery systems and ensuring continued access to safe water in conflict-affected areas.

108. As of January 20, 2025, nearly 80% of DAI's revenue (more than $750 million in 2024) came from USAID.

109. In January and February 2025, USAID sent suspension notices to DAI for all of its awards. USAID did not conduct any individualized review of DAI's awards, nor did it provide any individualized explanations in the suspension notices.

110. In February and March 2025, as part of the mass waves of terminations by USAID, the agency terminated all 14 of DAI's cooperative agreements with USAID. For some of the awards and cooperative agreements, USAID sent multiple termination notices.

In terminating DAI's awards, USAID did not conduct any individualized review of DAI's awards, including to assess the nature of the work to be performed and the extent to which DAI's specific awards furthered the national interest and relevant policy goals. The agency likewise provided no individualized explanations as to why DAI's awards were terminated, including how they were purportedly inconsistent with the national interest or agency priorities. For example, USAID did not explain how supporting the development of a unified Libyan government and contributing to regional stability was contrary to the national interest or inconsistent with this Administration's priorities.

*Democracy International*

111.     As of January 2025, Plaintiff Democracy International was serving as the prime recipient for 11 cooperative agreements awarded by USAID. Democracy International has held awards that support democracy, good governance, human rights, religious freedom, peace and conflict resolution, budget transparency, efforts to reduce violence against women and girls, urgent humanitarian needs, and other international development work. DI has performed on awards for these purposes for 23 years since its founding.

112.     As of January 2025, the percentage of Democracy International's revenue coming from USAID cooperative agreements was 72%.

113.     Between January 25, 2025 and January 27, 2025, USAID sent Democracy International suspension notices for all of its awards. USAID did not conduct any individualized review of DI's awards, nor did it provide any individualized explanations for the suspensions.

114.     In February through May 2025, as part of the mass waves of terminations by USAID, the agency terminated all 11 of Democracy International's cooperative agreements with

USAID. For some of the awards and cooperative agreements, USAID sent multiple termination notices.

115.    In terminating Democracy International's awards, USAID did not conduct any individualized review of Democracy International's awards, including to assess the nature of the work to be performed and the extent to which Democracy International's specific awards furthered the national interest and relevant policy goals. The agency likewise provided no individualized explanations as to why Democracy International's awards were terminated, including how they were purportedly inconsistent with the national interest or agency priorities. As just one example, USAID did not explain how Democracy International's efforts to provide the agency with an evidence-driven approach to rapid response assistance for human rights defenders was contrary to the national interest or inconsistent with this Administration's priorities.

116.    Instead, USAID sent Democracy International boilerplate termination letters that, on information and belief, were identical to the termination letters sent to numerous other recipients on or around the same days that Democracy International received its termination notices.

*ADEPT*

117.    As of January 2025, ADEPT was serving as the prime awardee of a USAID election-related program in Guinea awarded in 2024 and managed by DI as a subawardee.

118.    On January 25, 2025, USAID sent ADEPT a suspension notice for the award. USAID did not conduct an individualized review of ADEPT's award or provide any individualized explanation in the suspension notice.

119.     In February, as part of the mass waves of terminations by USAID, the agency terminated ADEPT's award with USAID.

120.     In terminating ADEPT's award, USAID did not conduct an individualized review, including to assess the nature of the work to be performed and the extent to which ADEPT's specific award furthered the national interest and relevant policy goals. The agency likewise provided no individualized explanation as to why ADEPT's award was terminated, including how the award was purportedly inconsistent with the national interest or agency priorities. USAID did not explain how improving the operation of elections in Guinea was contrary to the national interest or inconsistent with this Administration's priorities.

*HIAS*

121.     As of January 2025, Plaintiff HIAS was serving as the prime recipient for nine cooperative agreements awarded by the State Department and one cooperative agreement awarded by USAID. HIAS has held awards that support human rights and other humanitarian work as part of HIAS's work to protect the most vulnerable refugees, asylum seekers, and other forcibly displaced people for 100 years.

122.     As of January 2025, USAID and State Department awards comprised approximately 38% of HIAS's funding.

123.     In 2025, USAID and the State Department sent SWOs and suspension notices to HIAS for all of its awards. Neither USAID nor the State Department conducted any individualized review of HIAS's awards, nor did they provide any individualized explanations in the SWOs or suspension notices.

124.    In February and March 2025, as part of the mass waves of terminations by the State Department and USAID, the agencies terminated all ten of HIAS's cooperative agreements with those agencies.

125.    In terminating HIAS's awards, neither USAID nor the State Department conducted any individualized review of HIAS's awards, including to assess the nature of the work to be performed and the extent to which HIAS's specific awards furthered the national interest and relevant policy goals. The agencies likewise provided no individualized explanations as to why HIAS's awards were terminated, including how they were purportedly inconsistent with the national interest or agency priorities. For example, the State Department did not explain how promoting economic empowerment for refugees and migrants in Ecuador was contrary to the national interest or inconsistent with this Administration's priorities.

*Management Sciences for Health*

126.    As of January 2025, Plaintiff Management Sciences for Health was serving as the prime recipient for eight cooperative agreements awarded by USAID. MSH held awards that support good governance, human rights, health care access, and other humanitarian work. It has performed on awards for programs for these purposes for 55 years, with its first USAID project starting in 1971.

127.    As of January 2025, USAID cooperative agreements comprised approximately 48% of MSH's funding.

128.    Between January 25, 2025 and January 26, 2025, USAID sent Management Sciences for Health suspension notices for all of its cooperative agreements with the agency. USAID did not conduct any individualized review of MSH's awards, nor did it provide any individualized explanations for their suspension.

129.    In February and March 2025, as part of the mass waves of terminations by USAID, the agency terminated eight out of nine of MSH's cooperative agreements with the agency. For some of the cooperative agreements, USAID and State sent multiple termination notices.

130.    In terminating Management Sciences for Health's awards, USAID did not conduct meaningful individualized review of the awards, including to assess the nature of the work to be performed and the extent to which MSH's specific awards furthered the national interest and relevant policy goals.  The agency likewise provided no individualized explanations as to why MSH's awards were terminated, including how they were purportedly inconsistent with the national interest or agency priorities. Indeed, for some of MSH's awards, USAID terminated the awards even though the agency had granted waivers in February 2025 to the blanket suspensions for those awards, because the projects involved life-saving, humanitarian work.

*Mercy Corps*

131.    As of January 2025, Plaintiff Mercy Corps was serving as the prime recipient for four grants and 15 cooperative agreements from USAID and one grant and one cooperative agreement from the State Department. Mercy Corps' awards supported humanitarian and development programs in Indonesia, Pakistan, Timor Leste, DRC, Ethiopia, Sudan, Somalia, Palestine, Jordan, Yemen, CAR, Nigeria, Liberia and Mauritania.

132.    As of January 2025, 45% of Mercy Corps' funding came from USAID and State Department grants and cooperative agreements.

133.    Beginning on January 24, 2025, USAID and the State Department sent suspension notices to Mercy Corps for all of its awards. Neither USAID nor the State Department conducted

any individualized review of Mercy Corps' awards, nor did they provide any individualized explanations for the suspensions.

134. In February and March 2025, as part of the mass waves of terminations by the State Department and USAID, the agencies terminated 19 of Mercy Corps' grants and cooperative agreements with the agencies. For some of the awards and cooperative agreements, USAID and/or the State Department sent multiple termination notices.

135. In terminating Mercy Corps' awards, neither USAID nor the State Department conducted any individualized review of Mercy Corps' awards, including to assess the nature of the work to be performed and the extent to which Mercy Corps' specific awards furthered the national interest and relevant policy goals. The agencies likewise provided no individualized explanations as to why Mercy Corps' awards were terminated, including how they were purportedly inconsistent with the national interest or agency priorities. For example, USAID did not explain how providing food to otherwise food-insecure families in Ethiopia was contrary to the national interest or inconsistent with this Administration's priorities.

*Save the Children USA*

136. As of January 2025, Plaintiff Save the Children USA was serving as the prime recipient of 56 USAID grants and cooperative agreements and 16 Department of State grants and cooperative agreements. These awards supported a wide range of life-saving humanitarian and development activities across more than 40 countries, enabling integrated health, nutrition, water and sanitation, protection, food assistance, livelihood, and education programs that reached millions of children and families worldwide. These funds supported essential services such as treatment for acute malnutrition, vaccination campaigns, cash and food distributions, emergency

50

shelter, and school-based programming, forming a critical pillar of Save the Children USA's global operations.

137.    As of January 2025, 42% of Save the Children USA's revenue came from USAID and Department of State awards.

138.    Between January 24, 2025 and January 29, 2025, USAID sent Save the Children USA suspension and stop work order notices for the vast majority of its USAID and Department of State awards. Neither USAID nor the State Department conducted meaningful individualized review or explained the reasons for suspending most or all of Save the Children USA's awards.

139.    Between January 31, 2025 and April 5, 2025, as part of the mass waves of terminations by the State Department and USAID, the agencies terminated the majority of Save the Children USA's grants and cooperative agreements with the agencies, including 37 grants and cooperative agreements from USAID and 11 grants and cooperative agreements from the Department of State.[1]

140.    In terminating all or nearly all Save the Children USA's awards, neither USAID nor the State Department conducted any individualized review of Save the Children USA's awards, including to assess the nature of the work to be performed and the extent to which Save the Children USA's specific awards furthered the national interest and relevant policy goals.

141.    The agencies likewise provided no individualized explanations as to why Save the Children USA's awards were terminated, including how they were purportedly inconsistent with the national interest or agency priorities. For example, USAID terminated an award in El Salvador designed to contribute to the goal of reducing irregular migration by improving school

---

[1] One of Save the Children USA's awards received an initial termination notice on February 26, 2025 and a second on September 8, 2025. The second notice states that the effective termination date is September 8, 2025.

systems and increasing student retention, without explaining how stemming irregular migration was contrary to the national interest or the Administration's priorities.

**D.      The Government Owes Plaintiffs Significant Sums for Unpaid Reimbursements and Closeout Costs**

142.      The government owes some Plaintiffs substantial sums for unpaid reimbursements and closeout costs owed to Plaintiffs in connection with the terminated awards.

143.      For each relevant award that disbursed funds via reimbursements, applicable regulations incorporated into each award agreement required that each agency "must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3). The government has failed to make payments for pre-termination costs to some Plaintiffs, including Plaintiff ABA, within 30 calendar days.

144.      The ABA, for example, has had a request for reimbursement of pre-termination costs with the State Department outstanding for far more than 30 calendar days, and the State Department has not notified the ABA that any of the costs included in the outstanding reimbursement requests are considered improper.

145.      Regulations incorporated by reference into each award agreement also require each agency to pay certain termination closeout costs in connection with each award termination. *See, e.g.*, 2 C.F.R. §§ 200.343, 200.472 (2020). The agency must pay, for example, for costs that an awardee could reasonably discontinue immediately after the termination effective date, costs of disposing of property acquired for purposes of the award, and costs that would have been allowable after the end of the period of the performance if the award had not been terminated. *See id.* USAID and the State Department have failed to make payments for closeout costs to

Plaintiffs, including Plaintiffs ABA, Management Sciences for Health, and Democracy International.

**E.      Plaintiffs Have Suffered Multiple Forms of Significant Damages from the Suspensions and Terminations**

146.    The breaches of contract by USAID and the State Department in stopping or suspending Plaintiffs' work under their grants and cooperative agreement, and in then terminating the grants and cooperative agreements, have caused Plaintiffs significant damages.

147.    The government's improper SWOs and suspensions of Plaintiffs' grants and cooperative agreements caused Plaintiffs damage in the time between those actions and the termination of the awards. Plaintiffs lost out on all of the funding that they would have drawn down in the time between when the SWOs and suspension notices were issued and the corresponding awards were terminated. Plaintiffs also incurred out-of-pocket costs during this time as they scrambled to take measures to cease work under the awards in response to the sudden SWOs and suspensions.

148.    With respect to the terminations, Plaintiffs suffered at least four different categories of damages.

149.    First, the breaches of contract in terminating the awards deprived Plaintiffs of the benefit of their bargain in entering into the grants and cooperative agreements. Plaintiffs' damages include "the difference between the amounts they should have received under their contracts and the amounts they actually received," even where Plaintiffs would have used those funds in support of their missions rather than keeping the funds as profits. *See Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1363, 1369–70 (Fed. Cir. 2021); *see also Hous. Auth. of the Cnty. of Santa Clara v. United States*, 125 Fed. Cl. 557, 569–70 (2016). Plaintiffs' expectancy damages thus encompass the full amounts that it is reasonably certain Plaintiffs

would have received over the life of the terminated awards but for the agencies' breach of the award agreements. Across Plaintiffs, these damages are in the hundreds of millions of dollars.

150.     Second, Plaintiffs have suffered damages from the loss of funds that Plaintiffs would have received for indirect costs but for the breaches, where Plaintiffs continued to incur those costs following the terminations. Plaintiffs have suffered out-of-pocket losses from having to cover these indirect costs, whereas they would have been able to use the funds awarded under the grants and cooperative agreements to cover these costs. Plaintiffs' expectancy damages at a minimum include these amounts.

151.     Third, the government's breaches have caused substantial damages to Plaintiffs' reputation, brand, goodwill, and pro bono investments. The termination of Plaintiffs' awards forced Plaintiffs to suddenly cease performing critical projects in foreign nations that Plaintiffs would have performed and completed but for the breaches. Plaintiffs' forced abandonment of these projects midway through performance has seriously damaged Plaintiffs' relationships—built over decades in most cases—with foreign governments, civil society organizations, subgrantees, subcontractors, vendors, employees, and other stakeholders.

152.     Fourth, Plaintiffs have suffered reliance damages that they are entitled to recover in the alternative to expectancy damages. Plaintiffs hired employees, entered leases, purchased software, and entered into other contracts in reliance on the government fulfilling its obligations under the grants and cooperative agreements, and Plaintiffs have suffered out-of-pocket losses from these costs due to the agencies' breaches of the agreements.

## CAUSES OF ACTION

### Count One
### Breach of Contractual Provisions – Unpaid Reimbursements and Closeout Costs
### State Department and USAID

153. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–152 as if set out fully herein.

154. Plaintiffs' grants and cooperative agreements with the State Department and USAID were valid and enforceable contracts.

155. Under those contracts and the regulations incorporated by reference into those contracts, the agencies were obligated to pay Plaintiffs reimbursements for allowable costs and expenses incurred in connection with the award. Each agreement incorporated by reference 2 C.F.R. § 200.305(b)(3), which provides that each agency "must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper."

156. Despite this contractual requirement, USAID and the State Department have not paid some Plaintiffs—including but not limited to Plaintiff the ABA—for allowable costs and expenses incurred prior to the award terminations, for which Plaintiffs submitted payment requests long ago. The agencies have breached their contractual obligations to make timely payments for costs and expenses incurred prior to the terminations.

157. Regulations incorporated by reference into each of Plaintiffs' awards also require the agencies to pay certain terminations and closeout costs when the agency terminates a grant or cooperative agreement. *See, e.g.*, 2 C.F.R. §§ 200.344(g), 200.472 (2020). Despite these contractual requirements, USAID and the State Department have not paid some Plaintiffs—including but not limited to Plaintiffs ABA, Management Sciences for Health, and Democracy International—allowable terminations and closeout costs. In most cases, the agencies

have not paid these costs as required even though more than one year has passed since the terminations. *See* 2 C.F.R. § 200.344(g) ("When a recipient or subrecipient completes all closeout requirements, the Federal awarding agency or pass-through entity must promptly complete all closeout actions for Federal awards. The Federal awarding agency must make every effort to complete closeout actions no later than one year after the end of the period of performance unless otherwise directed by authorizing statutes."). The agencies have breached their contractual obligations to timely pay allowable termination and closeouts costs, resulting in monetary damages, plus interest, costs, and expenses, as well as legal fees and costs.

**Count Two**
**Breach of Contractual Provisions – Stop-Work Orders and Suspensions**
**State Department**

158.    Plaintiffs re-allege each and every allegation set forth in paragraphs 1–152 as if set out fully herein.

159.    The State Department breached its award agreements with Plaintiffs in suspending the awards or issuing stop-work orders. The relevant regulations adopted by the State Department and incorporated by reference into the award agreements permitted suspensions or stop work orders *only if* the awardee "fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award," and the agency "determines that noncompliance cannot be remedied by imposing additional conditions." 2 C.F.R. § 200.339(c). The contracts did not permit suspensions or stop-work orders on policy grounds, such as if the award no longer effectuated program goals or agency priorities. And yet many of the State Department's suspension letters, including to Plaintiffs, cite program goals and agency priorities as the basis for the suspension or stop-work order. In suspending or issuing stop-work orders to Plaintiffs for non-contractually permitted reasons, the State Department breached the contracts.

160.    As a result of the State Department's breach of contract, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees and costs.

**Count Three**
**Breach of Contractual Provisions – Terminations**
**State Department**

161.    Plaintiffs re-allege each and every allegation set forth in paragraphs 1–152 as if set out fully herein.

162.    Plaintiffs' grants and cooperative agreements with the State Department were valid and enforceable contracts.

163.    Regulations incorporated by reference into each of Plaintiffs' grant and cooperative agreements with the State Department permitted the agency to terminate the awards unilaterally only in two circumstances: (a) if Plaintiffs "fail[ed] to comply with the terms and conditions of [the] Federal award;" or (b) "to the greatest extent authorized by law, if [the] award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1)-(2) (2020); 85 Fed. Reg. 49,506, 49,559 (Aug. 13, 2020). Some of the award agreements also spelled out these grounds for termination in the agreement itself, but none of the language in those agreements materially differed from the regulation.

164.    Plaintiffs complied fully with all the terms and conditions of the awards, and the State Department never asserted otherwise.

165.    The State Department's termination of Plaintiffs' awards was not "authorized by law," 2 C.F.R. § 200.340(a)(2) (2020)—and thus constituted a breach of the terms and conditions of the contracts—because the terminations violated the requirements of the Administrative

57

Procedure Act (APA) that the State Department not engage in arbitrary and capricious action, 5 U.S.C. § 706(2)(A).

166. The terminations of Plaintiffs' awards reflected unlawful arbitrary and capricious agency action on two levels. First, the terminations were undertaken pursuant to high-level policy decisions to terminate awards *en masse*, and those policy decisions were arbitrary and capricious. Second, each termination of Plaintiffs' awards was arbitrary and capricious at the individual award level.

167. The State Department's policy decisions to mass terminate awards, including but not limited to terminating several thousand awards on February 26, 2025, were arbitrary and capricious because:

   a. The agency did not provide reasoned explanations for why it was mass terminating awards, rather than conducting an individualized review of the details of—and the policies reflected in—each award, given that the stated ground for the terminations was that each award did not effectuate agency priorities;

   b. The agency did not actually assess the facts of each award and consider whether each award was consistent with agency priorities;

   c. The agency ignored an important aspect of the issue in failing to grapple with how the agency would fulfill its statutory mandates upon mass terminating the awards;

   d. The agency failed to consider the reliance interests of Plaintiffs and their employees, contractors, and partner organizations;

   e. The agency failed to consider relevant factors that Congress directed it to consider in carrying out Congress's foreign policy objectives;

f.      The agency did not consider the costs of mass terminating the awards, in the middle of a budget period and performance period, after substantial investments had already been made in many of the projects;

g.      The agency failed to consider alternatives to mass terminating the awards, such as modifying the awards to reflect the agency's purported priorities;

h.      The mass termination decisions were not made by Grants Officers most familiar with the details of each award and responsible for administering the awards under the terms of the relevant agreements.

i.      The mass termination decisions were driven by officials from DOGE, who lacked any knowledge or expertise over foreign policy and foreign assistance grants and cooperative agreements, and who lacked any legal authority to compel the termination of the agency's awards.

168.    Each termination of Plaintiffs' individual awards was arbitrary and capricious because:

a.      The agency did not provide a reasoned explanation for the termination;

b.      The agency terminated the awards without any individualized consideration or analysis at all, as part of an indiscriminate mass termination of agency awards carried out to defy the will of Congress;

c.      The Grants Officer did not make the decision to terminate the award and exercised no independent judgment in terminating the awards;

d.      Neither the Grants Officer nor any other agency official considered, let alone explained, how the specific award was contrary to the agency's purported policies and priorities;

e.     Neither the Grants Officer nor any other agency official considered the important reliance interests that were upended by the termination of the specific award;

f.     The agency ignored an important aspect of the issue in failing to grapple with how the agency would fulfill its statutory mandates upon terminating each award;

g.     The agency did not consider the costs of terminating each specific award, including the investments already made in the award and the inefficiencies of terminating the specific award at its then-current point in the project period;

h.     The agency failed to consider alternatives to termination, such as modifying the specific award to address any purportedly problematic aspects.

169.     The State Department's terminations of Plaintiffs' awards based on program goals and agency priorities also constitute a breach as a matter of law because Plaintiffs' contracts permit termination only if the award "no longer effectuates" the agency's goals or priorities that existed at the time that the State Department issued the awards. This contractual ground for termination is based on OMB's Uniform Grants Guidance issued in 2020. OMB was clear that the intent of the provision was to protect the government in two circumstances: if post-award evidence reveals that an award "is ineffective at achieving program goals," or if later evidence leads to a significant question about "the feasibility of the intended objective of the award." *See* 85 Fed. Reg. 49,506, 49,507–08 (Aug. 13, 2020). The State Department has not claimed—and could not have credibly claimed—that the awards it terminated *en masse* had become "ineffective" in effectuating the program goals and agency priorities underlying the awards, or that the awards could no longer "feasibly" accomplish those goals and policies.

60

170.   Even if the contracts permitted the State Department to terminate based on changed program goals or agency priorities, the terminations of Plaintiffs' awards still violated 2 C.F.R. § 200.340(a)(2) (2020), as incorporated into the terms of the contracts.

171.   Contractual provisions must be interpreted as the parties would have reasonably expected at the time of entering the award. *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) ("This court adheres to the principle that 'the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965))); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998) ("[A] proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents.").

172.   Here, the parties would have reasonably understood 2 C.F.R. § 200.340(a)(2) (2020), as incorporated into the contracts, to require the State Department to make an individualized determination that each individual award "no longer effectuates the program goals or agency priorities"—not a mass determination that nearly *all* State Department foreign assistance awards no longer effectuate agency priority. This understanding follows from the plain text of the provision, which allows for termination, to the extent authorized by law, "if *an award* no longer effectuates the program goals or agency priorities." *Id.* (emphasis added). And agency practice supported this reading, as neither the State Department nor any other agency incorporating this provision of the Uniform Grants Guidance had ever carried out a mass termination of awards in reliance on this provision prior to 2025.

61

173.    In addition, the contracts cannot be read to permit the State Department to terminate based on changed goals and priorities that directly conflict with Congress's goals and priorities in requiring the agencies to spend the relevant funds. Otherwise, the contracts and the underlying regulation upon which they are based would be unlawful. The State Department took the unilateral action to terminate based on goals and priorities that directly conflict with the goals and priorities promulgated by Congress.

174.    Finally, for all of Plaintiffs' awards for which the terms of the award agreement specified that "[t]he Grants Officer is the only person authorized [to] award, amend, [or] terminate" the award, the termination independently constitutes a breach of contract because the Grants Officer did not, in fact, decide to terminate the award.

175.    For all of these independent reasons, the State Department's unilateral terminations of Plaintiffs' awards constitute a breach of contract.

176.    As a result of the State Department's breaches of contract, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees and costs.

### Count Four
### Breach of Contractual Provisions – Stop-Work Orders, Suspensions, and Terminations
### USAID

177.    Plaintiffs re-allege each and every allegation set forth in paragraphs 1–152 as if set out fully herein.

178.    Plaintiffs' grants and cooperative agreements with USAID were valid and enforceable contracts.

179.    Under 2 C.F.R. § 700.14, which was incorporated by reference into each of Plaintiffs' grants and cooperative agreements with USAID, the agency could suspend or to terminate the awards if: (a) Plaintiffs failed to comply with the terms and conditions of the

award; or (b) USAID "determine[d] that continuation" of the award "would not be in the national interest of the United States."

180. Plaintiffs complied fully with all the terms and conditions of the awards, and USAID never asserted otherwise.

181. USAID's unprecedented mass suspensions and terminations violated the terms of the award agreements by relying on 2 C.F.R. § 700.14 to suspend and terminate the awards without an individualized finding that continuation of each award was not in the national interest.

182. Contractual provisions must be interpreted as the parties would have reasonably expected at the time of entering the award. *See Metric Constructors*, 169 F.3d at 752; *H.B. Mac*, 153 F.3d at 1345 (Fed. Cir. 1998).

183. Here, Plaintiffs would have reasonably understood 2 C.F.R. § 700.14, as incorporated into the contracts, to require USAID to make an individualized determination on an award-by-award basis—not a mass termination across hundreds or thousands of awards—that "continuation" of the award "would not be in the national interest of the United States." This understanding follows from the plain text of the provision, which allows for suspension or termination if "USAID determines that continuation of all or part of the funding for *a program* should be suspended or terminated because such assistance would not be in the national interest of the United States." *Id.* (emphasis added). USAID referred to each individual award as its own "program," meaning the regulation required a determination that continuing *a* specific award would not be in the national interest. Agency practice supported this reading, as USAID had never carried out a mass termination of awards pursuant to this provision since it was first promulgated in 1995.

184.    Separately, with respect to Plaintiffs' awards that USAID purported to terminate "for convenience," those terminations independently breached the terms of the awards because the applicable award terms, and the regulations incorporated into the award terms, do not permit USAID to terminate awards for convenience.

185.    As a result of USAID's breaches of contract, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees and costs.

**Count Five**
**Abuse of Discretion – Stop-Work Orders, Suspensions, and Terminations**
**State Department and USAID**

186.    Plaintiffs re-allege each and every allegation set forth in paragraphs 1–152 as if set out fully herein.

187.    Plaintiffs' grants and cooperative agreements with the State Department and USAID were valid and enforceable contracts.

188.    "The cases are legion establishing that where a contract affords discretion to the government, 'exercise of that discretion must be fair and reasonable, not arbitrary and capricious.'" *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020) (citation omitted). Thus, even where a contract gives an agency wide discretion in terminating a contract, the government breaches a contract where it abuses its discretion in carrying out a termination. *JKB Sols. & Servs., LLC v. United States*, 18 F.4th 704, 709 (Fed. Cir. 2021). And the government abuses its discretion where "the contracting officer's decision to terminate was arbitrary and capricious." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 361 (2013); *see TigerSwan, Inc. v. United States*, 118 Fed. Cl. 447, 453 (2014) (finding abuse of discretion in termination).

189.    The terms of the State Department and USAID agreements, as described above, allow for less discretion than with a termination for convenience. But even under the termination for convenience standards, the terminations were arbitrary and capricious and thus an abuse of discretion.

190.    The suspensions and terminations of Plaintiffs' awards were arbitrary and capricious, and abuses of discretion, on two levels. First, the suspensions and terminations were undertaken pursuant to high-level policy decisions to suspend and terminate awards *en masse*, and those policy decisions were arbitrary and capricious and abuses of discretion. Second, each suspension and termination of Plaintiffs' awards was arbitrary and capricious, and an abuse of discretion, at the individual award level.

191.    The agencies' policy decisions to suspend and terminate awards *en masse*, which resulted in the individual award terminations, were arbitrary and capricious because:

a.    The agencies did not provide reasoned explanations for why they were suspending and terminating awards *en masse*, rather than conducting an individualized review of the details of, the policies reflected in, and the national interest served by each award;

b.    The agencies did not actually assess the facts of each award and consider whether each award encompassed in the mass suspensions and terminations was consistent with agency priorities or the national interest;

c.    The agencies did not consult with the Grants Officer or the Agreement Officer responsible for administering each award;

d.    The agencies did not consider how they would fulfill their statutory mandates upon suspending and terminating the vast majority of their awards;

e.      The agencies did not consider the costs to the federal government of suspending and terminating the awards *en masse*, during the budget and performance periods, after substantial investments had already been made in many of the projects;

f.      The agencies did not consider the consequences of suspending and terminating their awards *en masse*, to Plaintiffs and other implementing partners, and to the ultimate intended beneficiaries of the awards—the people in desperate need of the aid around the world;

g.      The agencies failed to consider alternatives to suspending and terminating the awards *en masse*, such as modifying the awards to reflect the agencies' purported priorities or perception of the national interest;

h.      The decisions to suspend and terminate awards *en masse* were not made by the Grants Officers, Agreement Officers, or other agency officials most familiar with the details of each award; and

i.      The decisions to suspend and terminate awards *en masse* were driven by the whims and dictates of DOGE officials, who lacked any knowledge or expertise over foreign policy and foreign assistance grants and cooperative agreements, and who lacked any legal authority to compel the suspension or termination of the agencies' awards.

192.    Each suspension and termination of Plaintiffs' individual awards was arbitrary and capricious because:

a.      The agencies did not provide reasoned explanations for the suspensions or terminations;

b.      The agencies suspended and terminated the awards without any individualized consideration or analysis at all, as part of an indiscriminate mass termination of agency awards carried out to defy the will of Congress;

c.      The agencies did not consult with the Grants Officer or the Agreement Officer responsible for administering each award;

d.      The Grants Officer or Agreement Officer did not make the decision to suspend or terminate the award and exercised no independent judgment in terminating the awards;

e.      Neither the Grants Officer, the Agreement Officer, nor any other agency official considered, let alone explained, how the specific award was contrary to the national interest or each agency's purported policies and priorities;

f.      Neither the Grants Officer, the Agreement Officer, nor any other agency official considered the important reliance interests that were upended by the termination of the specific award;

g.      The agencies did not consider the costs of the suspension and termination of each specific award, including the investments already made in the award and the inefficiencies of suspending or terminating the specific award at its then-current point in the project period; and

h.      The agencies failed to consider alternatives to suspension or termination, such as modifying the specific award to address any purportedly problematic aspects.

193.    Accordingly, the State Department and USAID breached the contracts in abusing their discretion in suspending and terminating Plaintiffs' grants and cooperative agreements.

194. As a result of such breaches, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees and costs.

**Count Six**
**Breach of the Implied Covenant of Good Faith and Fair Dealing –**
**Stop-Work Orders, Suspensions, and Terminations**
**State Department and USAID**

195. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–152 as if set out fully herein.

196. Plaintiffs' grants and cooperative agreements with the State Department and USAID were valid and enforceable contracts.

197. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (1981)). Courts have "long applied those principles to contracts with the federal government." *Id.*

198. The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* at 991 (emphases removed); *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

199. Where a contract confers discretion on a party, the implied covenant of good faith and fair dealing "limits the manner in which [the] party . . . may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996) (citation omitted); *see also Hous. Auth. of Slidell*, 149 Fed. Cl. at 638 (plaintiff's "allegations of arbitrary and capricious agency conduct"

supported its "claim for breach of the implied duty of good faith and fair dealing"). This requires that an exercise of discretion "be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power." *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993) (citation omitted).

200.    Here, the abrupt suspensions and terminations of Plaintiffs' awards was arbitrary and capricious for all of the reasons explained above, including because the State Department and USAID did not provide a reasoned explanation for the suspensions and terminations, suspended and terminated the awards without any individualized consideration or analysis at all, failed to consider—let alone explain—how each individual award was contrary to the national interest or the Administration's purported policies, ignored an important aspect of the issue in failing to grapple with how the agencies would fulfill their statutory mandates upon terminating Plaintiffs' awards, failed to consider the relevant factors that Congress directed them to consider, failed to consider the reliance interests of Plaintiffs, their employees, contractors, and partners, failed to provide Plaintiffs notice and opportunity to cure, failed to consider alternatives to suspension and termination, and acted irrationally because terminating Plaintiffs' awards in the middle of a budget period or even just months from the conclusion of the project, was extraordinarily inefficient and harmful to the government's interests.

201.    The suspensions and terminations of the awards also ran counter to Plaintiffs' "reasonable expectations." *Barseback Kraft*, 36 Fed. Cl. at 705–06. Prior to 2025, neither USAID nor the State Department nor any other federal agency had ever carried out a mass suspension or termination of awards across the agency. In entering into their awards, Plaintiffs could not have reasonably expected that the awards would be indiscriminately terminated, with no individualized consideration at all, as part of a mass suspension or termination of awards.

202.    Further, the agencies did not exercise any discretion that they had to suspend or terminate the awards "honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power." *Orange Cove*, 28 Fed. Cl. at 800–01. Upon entering the relevant agreements prior to 2025, the parties did not intend that the relevant contractual provisions would or could be relied upon by the agencies to suspend or terminate an award as part of a broader, indiscriminate evisceration of the agencies' awards.

203.    Accordingly, the State Department and USAID breached the implied covenant of good faith and fair dealing in suspending and terminating Plaintiffs' awards.

204.    As a result of such breaches, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Plaintiffs and against the United States in the amount of Plaintiffs' damages, or such other amount as to be proven at trial, as well as costs, expenses, fees, interest, and such further and other relief as the Court deems just and proper.

Dated: March 17, 2026                         Respectfully submitted,

                                              /s/ *Daniel F. Jacobson*
                                              Daniel F. Jacobson (D.C. Bar # 1016621)
                                              Stephen K. Wirth (D.C. Bar # 1034038)
                                              Brian C. Rosen-Shaud (D.C. Bar # 90042065)
                                              JACOBSON LAWYERS GROUP PLLC
                                              5100 Wisconsin Ave. NW, Suite 301
                                              Washington, DC 20016
                                              Tel: (301) 823-1148
                                              dan@jacobsonlawyersgroup.com
                                              stephen@jacobsonlawyersgroup.com
                                              brian@jacobsonlawyersgroup.com

                                              *Counsel for Plaintiffs*

70