No. 26-429C
(Chief Judge Solomson)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HIAS et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CORINNE A. NIOSI
Assistant Director

MATTHEW P. ROCHE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0466
Facsimile: (202) 514-8624
Matthew.p.roche@usdoj.gov

Dated: September 11, 2026

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE**


INTRODUCTION ........ 1

STATEMENT OF THE ISSUES ........ 3

BACKGROUND ........ 5

I. Applicable Statutes And Regulations ........ 5

A. Statutory Background Governing Foreign Assistance ........ 5

B. Legal Principles Governing Administration Of State Department Awards ........ 6

C. Legal Principles Governing Administration Of USAID Awards ........ 7

II. Factual History ........ 8

III. Procedural History ........ 11

ARGUMENT ........ 15

I. Standards Of Review ........ 15

II. Although We Do Not Contest The Contractual Nature Of Their Claims, The Court Lacks Jurisdiction Over Five Plaintiffs' Claims Pursuant to 28 U.S.C. § 1500 ........ 16

A. Five Plaintiffs' Pending District Court Claims That Are Based On The Same Operative Facts Divest This Court Of Jurisdiction And Mandate Dismissal Pursuant To 28 U.S.C. § 1500 ........ 18

B. The Only Way To Cure The Jurisdictional Defect Is For The Court To Dismiss The Five Plaintiffs And Any Claims Specific To Them And For Those Plaintiffs To Refile At An Appropriate Time ........ 21

III. Counts Two Through Seven Should Be Dismissed For Failure To State A Claim ........ 22

A. Count Two Should Be Dismissed For Failure To State A Claim, Or, Alternatively For Lack Of Jurisdiction Due To Mootness ........ 22

B. Count Three Should Be Dismissed For Failure To State A Claim ........ 25

C. Count Four Should Be Dismissed For Failure To State A Claim............. 34

D. Count Five Should Be Dismissed For Failure To State A Claim ............. 38

E. Count Six Should Be Dismissed For Failure To State A Claim............... 41

F. Count Seven Should Be Dismissed For Failure To State A Claim........... 46

CONCLUSION........................................................................................................................ 50

**TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
766 F. Supp. 3d 74 (D.D.C. 2025) ........ 11

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
768 F. Supp. 3d 1 (D.D.C. 2025) ........ 11, 12

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
768 F. Supp. 3d 26 (D.D.C. 2025) ........ 11, 12

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
770 F. Supp. 3d 121 (D.D.C.) ........ 12, 13

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
803 F. Supp. 3d 164 (D.D.C. 2025) ........ 14

*Alder Terrace, Inc. v. United States*,
161 F.3d 1372 (Fed. Cir. 1998) ........ 15

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ........ 40

*Am. Pubic Health Ass'n*,
145 S. Ct. 2658 (2025) ........ 2, 14

*Am-Pro Protective Agency, Inc. v. United States*,
281 F.3d 1234 (Fed. Cir. 2002) ........ 46, 47, 48

*Aries Constr. Corp. v. United States*,
164 Fed. Cl. 290 (2023) ........ 43

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 15

*Athey v. United States*,
908 F.3d 696 (Fed. Cir. 2018) ........ 16

*AVAC/GHC I*,
708 F. Supp. 3d ........ 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 545 (2007)........................................................................................... 47

*Bell/Heery v. United States*,
106 Fed. Cl. 300 (2012) ............................................................................................ 16

*Bell/Heery v. United States*,
739 F.3d 1324 (Fed. Cir. 2014) ........................................................................... 16, 43

*Benjamin v. United States*,
348 F.2d 502 (Ct. Cl. 1965) ....................................................................................... 34

*BGT Holdings LLC v. United States*,
984 F.3d 1003 (Fed. Cir. 2020) .................................................................................. 46

*Brandt v. United States*,
710 F.3d 1369 (Fed. Cir. 2013) .................................................................................. 17

*Briscoe v. LaHue*,
663 F.2d 713 (7th Cir. 1981) ...................................................................................... 15

*Buckeye Cablevision, Inc. v. United States,*
438 F.2d 948 (6th Cir. 1971) ...................................................................................... 28

*Caldwell & Santmyer, Inc. v. Glickman*,
55 F.3d 1578 (Fed. Cir. 1995) ............................................................................. 41, 47

*C. Sanchez & Son, Inc. v. United States*,
6 F.3d 1539 (Fed. Cir. 1993) ...................................................................................... 27

*CC Distrib., Inc. v. United States*,
38 Fed. Cl. 771 (1997) ............................................................................................... 15

*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) .................................................................................... 15

*Cent. Pines Land Co., L.L.C. v. United States*,
697 F.3d 1360 (Fed. Cir. 2012) ........................................................................... 17, 21

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005) .................................................................................. 43

*CFS Int'l Capital Corp. v. United States*,
118 Fed. Cl. 694 (2014) ............................................................................................. 43

*Chapman L. Firm Co. v. Greenleaf Constr. Co.*,
*490 F.3d 934* (Fed. Cir. 2007) ........................................ 25

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003) ........................................ 27

*Croman Corp. v. United States*,
724 F.3d 1357 (Fed. Cir. 2013) ........................................ 47

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
698 F. Supp. 3d 39 (D.D.C. 2023)........................................ 28

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025)........................................ 27

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
606 U.S. ---, 146 S. Ct. 19 (2025)........................................ 14

*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015) ........................................ 1, 16

*Dobyns v. United States*,
915 F.3d 733 (Fed. Cir. 2019)........................................ 43, 44

*Dotcom Assocs. I, LLC v. United States*,
112 Fed. Cl. 594 (2013) ........................................ 43

*El Rescate Legal Servs. v. Exec. Office of Immigration Review,*
959 F.2d 742 (9th Cir. 1991) ........................................ 29

*Furlong v. Shalala,*
156 F.3d 384 (2d Cir. 1998) ........................................ 29

*Gilbert v. Dep't of Justice*,
334 F.3d 1065 (Fed.Cir.2003)........................................ 24

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)........................................ passim

*Grumman Data Sys. Corp. v. Dalton*,
88 F.3d 990 (Fed. Cir. 1996) ........................................ 27

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)........................................ 15

*Int'l Eng'g Co., Div. of A-T-O v. Richardson*,
512 F.2d 573 (D.C. Cir. 1975) ........ 44

*Irwin Cnty. v. United States*,
170 Fed. Cl. 355 (2024) ........ 47

*JKB Sols. & Servs. v. United States*,
18 F.4th 704 (Fed. Cir. 2021) ........ 46

*Kalvar Corp., Inc. v. United States,*
543 F.2d 1298 (Ct. Cl. 1976) ........ 39, 46, 48

*Keco Indus., Inc. v. United States*,
492 F.2d 1200 (Ct. Cl. 1974) ........ 39

*Keene Corp. v. United States*,
508 U.S. 200 (1993) ........ 17

*Krygoski Const. Co. v. United States*,
94 F.3d 1537 (Fed. Cir. 1996) ........ 39, 47

*Laguna Hermosa Corp. v. United States*,
671 F.3d 1284 (Fed. Cir. 2012) ........ 15

*Lary v. U.S. Postal Serv.*,
472 F.3d 1363 (Fed. Cir. 2006) ........ 24

*Lewis v. Con't Bank Corp.*,
494 U.S. 472 (1990) ........ 25

*Lutz v. U.S. Postal Serv.*,
485 F.3d 1377 (Fed. Cir. 2007) ........ 24

*Madison Servs., Inc. v. United States*,
94 Fed. Cl. 501 (2010) ........ 50

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*,
298 U.S. 178 (1936) ........ 15

*Ministerio Roca Solida v. United States*,
778 F.3d 1351 (Fed. Cir. 2015) ........ 17

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 31

*Mutakaber v. Sec'y of State*,
162 F.4th 1141 (Fed. Cir. 2025) ........................................................................... 44, 45

*Navab-Safavi v. Broad. Bd. of Governors*,
650 F. Supp. 2d 40 (D.D.C. 2009) .......................................................................... 28

*New Jersey v. OMB*,
No. 1:25-cv-11816, 2026 WL 2069832 (D. Mass. July 17, 2026) ........................................... 30

*NIH v. American Pubic Health Association*,
145 S. Ct. 2658 (2025) ....................................................................................... 2, 14

*NVT Techs., Inc. v. United States*,
370 F.3d 1153 (Fed. Cir. 2004) ........................................................................... 23, 27

*Parkwood Assocs. Ltd. P'ship v. United States*,
97 Fed. Cl. 809 (2011) ........................................................................................ 34

*Perales v. Casillas,*
903 F.2d 1043 (5th Cir. 1990) ............................................................................... 29

*Petro-Hunt, L.L.C. v. United States*,
862 F.3d 1370 (Fed. Cir. 2017) ............................................................................. 17

*Portland Mint v. United States*,
102 F.4th 1371 (Fed. Cir. 2024) ............................................................................ 42

*Precision Pine & Timber, Inc. v. United States*,
596 F.3d 817 (Fed. Cir. 2010) ........................................................................ 43, 45, 40

*Resource Investments, Inc. v. United States*,
785 F.3d 660 (Fed. Cir. 2015) ............................................................................... 21

*Rocky Mtn. Helium, LLC v. United States*,
841 F.3d 1320 (Fed. Cir. 2016) ............................................................................. 16

*S.J. Amoroso Const. Co. v. United States*,
12 F.3d 1072 (Fed. Cir. 1993) ............................................................................... 38

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993) .......................................................................................... 40

*Salsbury Indus. v. United States*,
905 F.2d 1518 (Fed. Cir. 1990) ........................................................................... 40, 41

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) .......... 15

*Solenex LLC v. United States*,
163 Fed. Cl. 128 (2022) .......... 20

*Stockman v. Fed. Election Comm'n,*
138 F.3d 144 (5th Cir. 1998) .......... 29

*T & M Distributors, Inc. v. United States*,
185 F.3d 1279 (Fed. Cir. 1999) .......... 41, 42

*Tamerlane, Ltd. v. United States*,
550 F.3d 1135 (Fed. Cir. 2008) .......... 34

*Thomas v. Dep't of Hous. & Urb. Dev.*,
124 F.3d 1439 (Fed. Cir. 1997) .......... 24

*Torncello v. United States*,
681 F.2d 756 (Ct. Cl. 1982) .......... 41

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) .......... 28

*Trusted Integration, Inc. v. United States*,
659 F.3d 1159 (Fed. Cir. 2011) .......... 17, 19

*United States v. Tohono O'Odham Nation*,
563 U.S. 307 (2011) .......... passim

*United States v. Wilson*,
503 U.S. 329 (1992) .......... 31

*Westlands Water Dist. v. United States*,
109 Fed. Cl. 177 (2013) .......... 45

*Wexler v. Dep't of Interior*,
909 F.2d 1496 (Fed. Cir. 1990) .......... 23

*Williams v. United States*,
71 Fed. Cl. 194 (2006) .......... 15

*Winnemucca Indian Colony v. United States*,
156 F.4th 1339 (Fed. Cir. 2025) .......... 18, 20, 21

*XP Vehicles, Inc. v. Dep't of Energy*,
118 F. Supp. 3d 38 (D.D.C. 2015) ........ 28

**STATUTES**

5 U.S.C. § 551 ........ 2

5 U.S.C. § 706 ........ 28

5 U.S.C. § 706(2)(A) ........ 26

22 U.S.C. § 2151 ........ 5

22 U.S.C. § 2381 ........ 5

22 U.S.C. § 2382(c) ........ 5

22 U.S.C. § 6563 ........ 5

22 U.S.C. § 6592 ........ 5

28 U.S.C. § 1498(a) ........ 2

28 U.S.C. § 1500 ........ passim

**RULES**

RCFC 12(b)(1) ........ 1

RCFC 12(b)(6) ........ 1, 15

RCFC 12(d) ........ 16

RCFC 12(h)(3) ........ 25

RCFC 23(b) ........ 48

**REGULATIONS**

2 C.F.R. part 200 ........ 6 ,8

2 C.F.R § 200.308 ........ 33

2 C.F.R. § 200.339 ........ 4, 7, 22

2 C.F.R. § 200.339(c) ........ 23, 24

2 C.F.R. § 200.340 ........ 6, 7

2 C.R.R. § 200.340(a) ........ 30

2 C.F.R. § 200.340(a)(1) ........ 30, 31

2 C.F.R. § 200.340(a)(2) ........ passim

2 C.F.R. § 200.340(a)(4) ........ 31, 32

2 C.F.R. § 200.343 ........ 7

2 C.F.R. § 200.344 ........ 7, 8

2 C.F.R. § 200.349(f) ........ 23

2 C.F.R. § 200.399(c) ........ 24

2 C.F.R. § 200.407 ........ 33

2 C.F.R. § 600.101 ........ 6

2 C.F.R. part 700 ........ 8

2 C.F.R. § 700.1 ........ 37

2 C.F.R. § 700.2 ........ 7

2 C.F.R. § 700.14 ........ passim

48 C.F.R. § 249-2 ........ 42

48 C.F.R. § 52.249-6 ........ 41, 46

Exec. Order No. 10,973,
26 Fed. Reg. 10,469 (Nov. 3, 1961) ........ 5

85 Fed. Reg. 49,506 (2020) ........ 29, 30, 31

Executive Order 14,169 of January 20, 2025,
*Reevaluating and Realigning United States Foreign Aid*,
90 Fed. Reg. 8619 (Jan. 30, 2025) ........ passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HIAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 26-429C |
| v. | ) | (Chief Judge Solomson) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that this Court: (1) dismiss the amended complaint in its entirety as to plaintiffs HIAS, American Bar Association (ABA), DAI Global, LLC (DAI), Democracy International Inc. (DI), and Management Sciences for Health, Inc. (MSH), pursuant to 28 U.S.C. § 1500; and (2) dismiss counts two through seven of the amended complaint for failure to state a claim as to all plaintiffs. In support of this motion, we rely upon the following brief and the accompanying appendix. [1]

INTRODUCTION

Plaintiffs style themselves as "among the nation's most respected international development organizations" who "carried out Congress's foreign assistance objectives across the globe" by "combating disease, feeding the hungry, caring for mothers and children, protecting refugees, promoting democracy and strengthening the rule of law." Am. Compl. ¶ 1. Plaintiffs carried out this work through their foreign assistance grants and cooperative agreements (funding instruments), as well as procurement contracts for DI and MSH, with the United States

[1] "Appx___" refers to pages from the appendix attached to this motion. The documents in the appendix are "incorporated by reference or integral to [plaintiffs'] claim[s.]" *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015).

Department of State (State) and United States Agency for International Development (USAID). *Id*. ¶¶ 9-16. In 2025, plaintiffs' funding instruments, procurement contracts, and supporting programs were terminated as part of Secretary of State Marco Rubio's implementation of Executive Order 14,169, through which President Donald J. Trump sought to reorient United States foreign policy away from soft power policies. Plaintiffs' amended complaint challenges the terminations by contending that they breached the terms of the awards.

This is not the first or only lawsuit, however, in which some of the plaintiffs challenge these terminations or the elimination of various foreign assistance programs by State and USAID. In February 2025, five plaintiffs in this action, HIAS, ABA, DAI, DI, and MSH, challenged the same funding instrument and foreign assistance program terminations that were connected with implementing Executive Order 14,169 as a violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*., in the United States District Court for the District of Columbia. *See Glob. Health Council v. Trump*, No. 25-cv-402 (D.D.C.) (*GHC*). Following the decision of the Supreme Court of the United States in *NIH v. American Pubic Health Association*, 145 S. Ct. 2658 (2025), which held that similarly terminated National Institute of Health grants were contracts over which APA jurisdiction did not extend, plaintiffs reframed their APA challenges to the funding instrument terminations as breach of contract claims, and filed their complaint in this Court under the Tucker Act, 28 U.S.C. § 1498(a). Am. Compl. ¶¶ 8, 103.

To be clear, by filing the instant motion, the Government does not seek to question the contractual nature of plaintiffs' claims nor this Court's Tucker Act jurisdiction to adjudicate those claims. Here, however, because both this and the pending *GHC* cases are factually grounded in challenges to State and USAID's implementation of Executive Order 14,169, and

because the agreements at issue in this case were terminated following the eliminations of plaintiffs' respective underlying programs, which plaintiffs are still challenging in *GHC*, both cases are based on substantially the same operative facts. The amended complaint does not cure this underlying jurisdictional defect. Consequently, 28 U.S.C. § 1500 precludes this Court's jurisdiction to entertain the claims brought by five of the plaintiffs.

Beyond § 1500, we also seek to dismiss counts two through seven as to all plaintiffs.[2] The Executive Branch possesses wide discretion to implement the foreign policy determinations of the President of the United States, including terminating foreign assistance grants that no longer align with those policies, as was done here. This is precisely why applicable regulations, incorporated by reference into all the grants and cooperative agreements in this case (either directly or through the incorporation of State's and USAID's standard terms and procedures), unambiguously provide that funding instruments that do not align with an agency's policy may be terminated. As set forth below, none of the claims in counts two through seven plausibly allege facts stating a claim for breach of any of the agreements. At bottom, counts two through seven merely express plaintiffs' fundamental disagreement with President Trump's policy choices and do not state claims for breach of contract.

<u>STATEMENT OF THE ISSUES</u>

1. Whether the claims brought by plaintiffs HIAS, ABA, DAI, DI, and MSH, are barred by 28 U.S.C. § 1500, when, at the time the first complaint in this case was filed, those

[2] The Government does not seek dismissal of count one, which posits that State and USAID breached the funding instruments through unpaid reimbursements and closeout costs, Am. Compl. ¶¶ 192-96, although it is our understanding that State has, in fact, paid out all closeout costs for its terminated agreements. Appx001. To the extent plaintiffs contest our understanding, we welcome the opportunity to work with plaintiffs to pay these claims, as well as any outstanding termination settlement claims from terminated USAID agreements. This does not mean, however, that the terminations breached any agreements. They did not.

plaintiffs also had a case pending in district court that is based on substantially the same operative facts?

2. Whether count two of the amended complaint should be dismissed for failure to state a claim when the State Department's suspensions of plaintiffs' funding instruments were not precluded by 2 C.F.R. § 200.339?

3. Whether the amended complaint states a claim for breach of contract due to the termination of plaintiffs' funding instruments as part of reordering the United States's foreign policy as directed by the President of the United States, and as implemented by the United States Secretary of State?

4. Whether counts three through six should be dismissed for failure to state a claim when the terminations of plaintiffs' funding instruments were expressly authorized by 2 C.F.R. § 200.340(a)(2) and 2 C.F.R. § 700.14?

5. Whether counts three through six should be dismissed for failure to state a claim when the APA is not incorporated into the funding instruments or applicable regulations, does not govern the agreements, and is not a source of substantive law?

6. Whether count six, which alleges breach of the implied duty of good faith and fair dealing, should be dismissed for failure to state a claim because the terminations may only be challenged for abuse of discretion or bad faith and when count six is redundant with counts three and five?

7. Whether count seven should be dismissed for failure to state a claim when the amended complaint fails to allege any facts plausibly suggesting that the terminations were specifically intended to harm plaintiffs or were motivated by animus towards plaintiffs?

## BACKGROUND

### I. Applicable Statutes And Regulations

#### A. Statutory Background Governing Foreign Assistance

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance. Many of the authorities provided under the Foreign Assistance Act of 1961 (FAA), Pub. L. No. 87-195, 75 Stat. 424 (22 U.S.C. § 2151 *et seq.*) and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."

The Secretary of State may exercise those authorities, including under delegations from the President. For example, section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c). Executive Order 12163 (22 U.S.C. § 2381 note) delegated to the Secretary of State a range of functions related to foreign assistance, including most functions under the FAA.

President Kennedy in 1961 issued Executive Order 10,973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). Congress later recognized USAID as an "independent establishment." *See* 22 U.S.C. § 6563. The USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592.

B. Legal Principles Governing Administration Of State Department Awards

Plaintiffs who have entered into Federal assistance agreements with the State Department have agreed to comply with both State Department regulations and the Department of State Standard Terms and Conditions for Federal Awards. *E.g.*, Appx132 (ABA); Appx173 (HIAS); Appx186 (Mercy Corps); Appx203 (Save the Children).

The State Department's regulations provide that 2 C.F.R. part 200, [3] Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, generally applies to awards made by the State Department. 2 C.F.R. § 600.101. 2 C.F.R. part 200 authorizes terminations of awards by the awarding agency in the following circumstances:

> (a) The Federal award may be terminated in whole or in part as follows:
>
> (1) By the Federal awarding agency or pass-through entity, if a non–Federal entity fails to comply with the terms and conditions of a Federal award;
>
> (2) By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;
>
> . . . or
>
> (5) By the Federal awarding agency or pass-through entity pursuant to termination provisions included in the Federal award.

2 C.F.R. § 200.340. Similarly, the regulations provide for suspensions as a Government remedy in certain, non-exclusive circumstances:

> If a non-Federal entity fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award, the Federal awarding agency . . . may impose additional conditions as described in § 200.208. If the Federal

[3] All citations in this motion to provisions in 2 C.F.R. part 200 are to the 2020 version, which was in effect from August, 13, 2020 to September 30, 2024. The October 2024 version of the provisions in part 200 cited herein are not substantively different from the 2020 version.

> awarding agency . . . determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency . . . may take one or more of the following actions as appropriate in the circumstances: . . . (c) Wholly or partially suspend or terminate the Federal award. . . . (f) Take other remedies that may be legally available.

2 C.F.R. § 200.339.

The regulations provide a mechanism for terminated awardees to pursue costs incurred in performance of the terminated award. They recognize that "[c]osts to the non-Federal entity resulting from financial obligations incurred by the non-Federal entity during a suspension or after the termination of a Federal award" are allowable under specified circumstances. 2 C.F.R. § 200.343. The regulations also provide for a closeout process for terminated awards that includes a requirement that the Federal agencies pay authorized costs, *id.* § 200.344, and that terminated grantees must refund the balance of any unobligated funds paid in advance or that are not authorized to be retained for use in other projects, *id.* § 200.344(d).

The State Department has also promulgated Standard Terms and Conditions for Federal Awards that are incorporated by reference into its agreements with plaintiffs. *E.g.*, Appx135 (ABA); Appx174 (HIAS); Appx187 (Mercy Corps); Appx204 (Save the Children). The Department of State Standard Terms and Conditions for Federal Awards recognize the same termination authority set forth in 2 C.F.R. § 200.340. Appx011-12; Appx025.

C. <u>Legal Principles Governing Administration Of USAID Awards</u>

Similarly, plaintiffs who entered into Federal assistance agreements with USAID agreed to be bound by terms contained in USAID-promulgated rules. *E.g.*, Appx147 (ABA); Appx161 (ADEPT); Appx166 (DAI); Appx172 (DI); Appx185 (HIAS); Appx193 (Mercy Corps); Appx202 (MSH); Appx217 (Save the Children); Appx238. The U.S.-based awardees of USAID must comply with regulations governing foreign assistance. In particular, in 2 C.F.R. § 700.2,

USAID adopted subparts A through F of 2 C.F.R. part 200 as the USAID policies and procedures for Federal financial assistance administration, as supplemented by 2 C.F.R. part 700.[4] In 2 C.F.R. part 700, USAID has promulgated supplemental regulations that govern the termination of foreign assistance awards for U.S. entities. These regulations *expressly* authorize USAID to suspend or terminate grants "[i]f at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States or would be in violation of an applicable law[.]" 2 C.F.R. § 700.14. Under these circumstances, "then USAID may, following notice to the recipient, suspend or terminate the award in whole or in part and prohibit the recipient from incurring additional obligations chargeable to the award other than those costs specified in the notice of suspension." *Id.* USAID's U.S.-based Federal assistance awardees are required to follow closeout procedures, including those contained in 2 C.F.R. § 200.344(b).

## II. Factual History[5]

Plaintiffs are U.S.-based not-for-profit and for-profit companies and organizations who were the recipients of USAID and State Department foreign assistance grants and cooperative agreements and USAID procurement contracts. Am. Compl. ¶¶ 9-17. On January 20, 2025, President Donald J. Trump signed Executive Order 14,169 of January 20, 2025, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619 (published Jan. 30, 2025) (EO), which states that certain foreign assistance funds "are not aligned with American interests and in many cases antithetical to American values" in ways that "serve to destabilize world peace." *Id.*

---

[4] All citations in this motion to provisions in 2 C.F.R. part 700 are to the 2015 version, which was in effect from October 19, 2015, to September 30, 2024. The 2024 version of the part 700 provisions cited herein are not substantively different from the 2015 version.

[5] Our recitation of facts is taken from the amended complaint or from documents and court filings referenced therein.

§ 1, 90 Fed. Reg. at 8619; Am. Compl. ¶ 31. The EO declared that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." Exec. Order § 2, 90 Fed. Reg. at 8619; Am. Compl. ¶ 31.

To provide time to review foreign assistance programs "for programmatic efficiency and consistency with United States foreign policy," the EO directed agencies to "immediately pause new obligations and disbursements of development assistance funds to foreign countries" and implementing organizations and contractors. Exec. Order No. 14,169, § 3(a), 90 Fed. Reg. at 8619. "[W]ithin 90 days," agencies were to conduct a review and determine "whether to continue, modify, or cease each foreign assistance program" in consultation with the Director of the Office of Management and Budget and with the concurrence of the Secretary of State. *Id.* § 3(b), (c), 90 Fed. Reg. at 8619. The Secretary of State had authority to waive the pause "for specific programs" and to approve new obligations or resume disbursements during the 90-day review period if review was completed sooner. *Id.* § 3(d), (e), 90 Fed. Reg. at 8619.

The Secretary of State then directed a pause on foreign assistance programs funded by or through State and USAID. Am. Compl. ¶ 32. The agencies completed a review of USAID and State foreign assistance awards and contracts, deciding to retain hundreds of preexisting USAID awards and thousands of preexisting State awards; the rest of the preexisting awards were issued stop work orders and later were terminated. *Id.* ¶¶ 35-41, 49; *see infra* note 6.

As explained in a declaration filed in *GHC* and quoted in the amended complaint, *see* Am. Compl. ¶ 82, "USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the

amount of the award, the subject matter, and a description of the project that often included the location of the project." Appx057-58 (Decl. of Peter Marocco, ¶ 5, *GHC*, No. 25-cv-402 (D.D.C. Feb. 25, 2025)). The review sought to "determine whether the individual agreement was in line with foreign policy priorities (and therefore could potentially be continued) or not (and presumptively could be terminated as inconsistent with Agency priorities and the national interest)." *Id*. The agency leadership review in some instances disagreed with initial recommendations. *Id*. For example, an agreement initially recommended for termination still "might be continued for a variety of foreign policy reasons, such as the location of the project or the general subject matter, or the judgment and foreign policy perspectives of the second line reviewer." *Id*. At the final stage, "[t]he Secretary of State's personal involvement confirmed that termination decisions were taken with full visibility into the unique diplomatic, national security, and foreign policy interests at stake vis-à-vis foreign assistance programs." *Id*.

With respect to State's funding instruments, Mr. Marocco explained that "the review process for grants began with compiling a list of all the grants administered by the Department." *Id*. ¶ 6. The list was "then sorted by the Department bureau responsible for each grant," and the "Senior Bureau Official (Assistant Secretary or equivalent) in each Bureau was tasked with reviewing each grant within his or her Bureau and providing a recommendation to the Office of the Secretary on whether to continue or terminate the grant." *Id*. Justifications were required for grants the "Bureau desired to continue." *Id*. "Upon receipt, the Office of the Secretary would review the recommendations and made additional edits pursuant to the Secretary's instructions." *Id*. "As with USAID, this resulted in recommendations that receive the Secretary of State's ultimate review. The Secretary of State's personal involvement confirms that, for example, work of particular importance to the United States' relationships with particular foreign nations is not

impaired." *Id*. Thus, the awards at issue in this case were terminated at the direction of Secretary Rubio. Am. Comp. ¶¶ 59, 65, 68-69 (USAID); *id*. at 31, 36 (State).

III. Procedural History

On February 11, 2025, a group of State Department and USAID grantees, cooperative agreement recipients, and contractors filed a complaint in *GHC*, and moved for a temporary restraining order (TRO) and preliminary injunction. Am. Compl. ¶ 56. Plaintiffs ABA, DAI, DI, HIAS, and MSH are among the plaintiffs in *GHC*. Am. Compl. ¶ 105. The *GHC* lawsuit followed a similar suit filed in the United States District Court for the District of Columbia, *see AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25-cv-40 (D.D.C.) (*AVAC*), and on February 12, 2025, both cases followed a single track. Both cases challenged the implementation of Executive Order No. 14,169 at State and USAID. The *GHC* complaint raised various constitutional, APA, and *ultra vires* challenges to the cancellation of foreign-assistance grants and awards as well as the pause of obligating appropriated funds for future awards. *GHC*, No. 25 cv-402, ECF No. 1. On February 13, 2025, the district court granted the *AVAC/GHC* plaintiffs' motions for temporary restraining orders and enjoined the Government from "giving effect to terminations, suspensions, or stop work orders in connection with any contracts, grants, cooperative agreements, . . . or any other federal foreign assistance award that was in existence as of January 19, 2025." Am. Compl ¶ 63 (quoting *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 85 (D.D.C. 2025) (*AVAC/GHC I*), *enforced*, 768 F. Supp. 3d 1 (D.D.C. 2025)). But the court allowed the Government to "tak[e] action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *AVAC/GHC I*, 768 F. Supp. 3d at 85.

The district court later clarified that the TRO "does not restrain Defendants from taking action with respect to agreements based on their 'exercise of authorities under statutes, regulations, and other legal authorities.'" *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 768 F. Supp. 3d 1, 4 (D.D.C. 2025) (*AVAC/GHC II*). In a separate order, the court expressly disclaimed any intention of "supervising [agencies'] determinations as to whether to continue or terminate individual grants based on their terms," or of requiring them to "'litigate every arguable breach of contract in a contempt posture.'" *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 768 F. Supp. 3d 26, 28 (D.D.C. 2025) (*AVAC/GHC III*). USAID and State thus continued to exercise agency discretion to enforce award terms and conditions, including provisions contained in those awards allowing it to terminate awards. Am. Compl. ¶¶ 65-77.

Thereafter, the parties litigated various disputes regarding compliance with the TRO. *Id.* ¶ 68. On February 25, 2026, the district court held an emergency TRO hearing and ordered the Government to immediately pay the *GHC* plaintiffs and non-plaintiffs money due and owing for work completed before February 13, 2025. The February 25, 2025 order compelled the Government to pay within 36 hours "*all* invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's [TRO] on February 13." App. to Vacate Order, *Dep't of State, v. AIDS Vaccine Advoc. Coalition*, (U.S., Feb. 26, 2025) 2025 WL 653297, at *2.

On March 10, 2025, the district court partially granted the *GHC* plaintiffs' motions for a preliminary injunction precluding State and USAID from giving effect to any suspension or terminations of funding instruments issued between January 20 and February 13, 2025. Am. Compl. ¶ 85. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 155 (D.D.C.) (*AVAC/GHC IV*), *vacated and remanded sub nom. Glob. Health Council v. Trump*, 153

F.4th 1 (D.C. Cir. 2025). The court rejected the *GHC* plaintiffs' request to enjoin the agencies' terminations of funding instruments post-dating the TROs, explaining that plaintiffs had not shown that those terminations arose "from the same agency action they challenged in this case." *AVAC/GHC IV*, 770 F. Supp. 3d at 140. Thus, the court declined to order the agencies to revoke terminations and suspensions of previous funding instruments and to resume funding those instruments. *Id.* [6]

On April 22, 2025, the *GHC* plaintiffs voluntarily amended their complaints to address some events subsequent to their original complaints. Among other things, they alleged that the Government's terminations post-dating the February 13, 2025 TROs were based on purportedly insufficient review of the underlying instruments, where the agencies announced the terminations "*en masse*" in several "tranches." Am. Compl. ¶¶ 94, 98-99, 107-08, *Global Health Council v. Trump*, No. 25-cv-402, ECF No. 73. They further alleged that the decisional process was insufficient because they deem it "impossible" or "implausible that the Secretary himself or even a group of political appointees engaged in a meaningful individualized review" of contracts before reaching termination decisions. *Id*. ¶¶ 101-02, 104.

On August 28, 2025, the United States Court of Appeals for the D.C. Circuit reversed the district court's preliminary injunction, finding that the *GHC* plaintiffs "lack[ed] a cause of action to press their claims." *Global. Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025). On remand, the *GHC* plaintiffs moved to amend the complaint a second time, contending that the terminations were reviewable under the APA and seeking to compel the Government to obligate

---

[6] The court's March 10, 2025 preliminary injunction order observed that "Defendants represented that they had completed an independent, individualized review process for over 13,000 USAID and State Department awards following the Court's TRO, which resulted in the termination of all but 500 USAID awards and all but 2,700 State Department awards." *AVAC/GHC IV*, 770 F. Supp. 3d at 130.

all funds expiring on September 30, 2025. 2d Am. Compl. ¶¶ 174-94, 274-85, *GHC v. Trump*, No. 25-cv-402, ECF No. 144. The district court granted partial relief, holding that appropriations statutes required the Government to obligate all appropriate funds that were expiring on September 30, 2025. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 192 (D.D.C. 2025) (*AVAC/GHC V*), *appeal dismissed*, No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18, 2026). The Supreme Court then granted a stay of that ruling. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 606 U.S. ---, 146 S. Ct. 19, 19 (2025).

On August 21, 2025, the Supreme Court issued a decision in *NIH v. American Pubic Health Association*, 145 S. Ct. 2658 (2025), which held that terminated National Institute of Health grants were contracts over which district court APA jurisdiction did not extend. After the Supreme Court's ruling, the *GHC* plaintiffs moved to file a third amended complaint, which "remove[d] claims related to terminations of contracts, grants, cooperative agreements, and awards" that those plaintiffs held. Am. Compl. ¶ 103. Plaintiffs contend that, as a result, "the ongoing *Global Health Council* case does not contain any *claims* relating to the termination of awards." *Id*. The *GHC* case remains pending in the district court.

On March 17, 2026, plaintiffs filed the instant complaint alleging that the grant terminations breach their respective agreements because they violated the APA or were otherwise arbitrary and capricious. ECF No. 1. On June 25, 2026, the Government filed a motion for partial dismissal. ECF No. 18. Plaintiffs responded on August 3, 2026, by filing an amended complaint, in which they joined an additional plaintiff, Free Russia Foundation (FRF), added breach of procurement contract claims for plaintiffs DI and MSH, as well as counts seven through nine alleging that the terminations were in bad faith and Contract Disputes Act (CDA)

claims for DI and MSH. ECF No. 21. Otherwise, the amended complaint does not address the arguments raised in our motion for partial dismissal.

## ARGUMENT

### I. Standards Of Review

Plaintiffs bear the burden of establishing this Court's jurisdiction. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). In considering a motion to dismiss for lack of jurisdiction, the Court accepts as true the complaint's undisputed allegations of fact and construes the facts in the light most favorable to the plaintiff. *Williams v. United States*, 71 Fed. Cl. 194, 197 (2006) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). Once the Government challenges facts upon which the plaintiff bases this Court's jurisdiction, however, the plaintiff bears the burden to demonstrate that jurisdiction exists. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993). Unless the undisputed facts reveal a basis on which the non-moving party may prevail, the Court should grant a motion to dismiss. *Williams*, 71 Fed. Cl. at 197 (citing *Scheuer*, 416 U.S. at 236). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *CC Distrib., Inc. v. United States*, 38 Fed. Cl. 771, 775 (1997) (quoting *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981)).

"A complaint must be dismissed under [RCFC] 12(b)(6) when the facts asserted do not give rise to a legal remedy, or do not elevate a claim for relief to the realm of plausibility." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court must generally accept the plaintiff's uncontested factual allegations as true for purposes of a motion to dismiss, *see Athey v. United States*, 908 F.3d 696, 705 (Fed. Cir. 2018), the Court is "not limited to the four corners of the complaint" in ruling on such a motion. *Dimare Fresh*, 808 F.3d at 1306. Rather, the Court "'may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *Id.* (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). Such review does not require converting a motion to dismiss into a motion for summary judgment pursuant to RCFC 12(d). *See, e.g.*, *Bell/Heery v. United States*, 106 Fed. Cl. 300, 307 (2012), *aff'd*, 739 F.3d 1324 (Fed. Cir. 2014). Moreover, the Court should not credit allegations in a complaint that conflict with the contents of documents referenced by the complaint. *See Rocky Mtn. Helium, LLC v. United States*, 841 F.3d 1320, 1325-26 (Fed. Cir. 2016).

## II. Although We Do Not Contest The Contractual Nature Of Their Claims, The Court Lacks Jurisdiction Over Five Plaintiffs' Claims Pursuant to 28 U.S.C. § 1500

This Court does not possess jurisdiction to entertain the claims brought by HIAS, ABA, DAI, DI, and MSH because, at the time those plaintiffs filed their complaint in this Court, they already had a suit pending in the United States District Court for the District of Columbia that is based on the same set of operative facts. *See* Am. Compl. ¶ 103.

Since 1868, Congress has imposed a "broad prohibition" on the ability of plaintiffs to simultaneously pursue related actions in the Court of Federal Claims and another court. *See, e.g.*, *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 312 (2011). That restriction is currently codified at 28 U.S.C. § 1500, which provides that this Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States . . . ." 28 U.S.C. § 1500. "In other words, § 1500

bars the Court of Federal Claims' jurisdiction over a suit if a plaintiff, upon filing in the Court of Federal Claims, has a suit pending in any other court 'for or in respect to' the same claim." *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1381 (Fed. Cir. 2017) (citation omitted). The underlying purpose of the statute is "to save the Government from burdens of redundant litigation." *Tohono*, 563 U.S. at 315. "To determine whether § 1500 applies, a court must make two inquiries: (1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action." *Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013) (citation omitted).

The first prong of the § 1500 analysis requires the Court to determine whether a "suit or process" was "pending" as of the date of the filing of the Court of Federal Claims complaint. The Court is guided by the "longstanding principle that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (citation omitted). Accordingly, the Court "look[s] to the facts as they exist when a plaintiff filed his Claims Court complaint." *Cent. Pines Land Co., L.L.C. v. United States*, 697 F.3d 1360, 1364 (Fed. Cir. 2012) (citation omitted).

With respect to the second prong, the Supreme Court directs that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC [Court of Federal Claims], if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *Tohono*, 563 U.S. at 317. "After *Tohono*, it is clear that we must: (1) not view § 1500 narrowly; (2) focus only on whether two claims share the same operative facts and not on the relief requested; and (3) determine whether two suits share substantially the same operative facts . . . ." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1164 (Fed. Cir. 2011). The "two co-

pending suits need not be identical." *Ministerio Roca Solida v. United States*, 778 F.3d 1351, 1353 (Fed. Cir. 2015).

Here, the first prong for § 1500 is met: it is indisputable that five plaintiffs filed an earlier suit in the United States District Court for the District of Columbia, which is ongoing as of the time of the filing of this motion. *See* Am. Compl. ¶ 105; *GHC*, No. 25-cv-402 (D.D.C.). As to the second prong, a comparison of *GHC*'s third amended complaint and plaintiffs' instant complaint demonstrates substantial overlap between the operative facts underlying the claims; indeed, some of the wording in the two complaints is substantially similar, if not nearly identical. *See Winnemucca Indian Colony v. United States*, 156 F.4th 1339, 1351 (Fed. Cir. 2025) (explaining that court must "'compare the operative facts asserted at the time the two complaints were filed'" when determining "[i]f the section 1500 bar applies" (citation omitted)).

### A. Five Plaintiffs' Pending District Court Claims That Are Based On The Same Operative Facts Divest This Court Of Jurisdiction And Mandate Dismissal Pursuant To 28 U.S.C. § 1500

Although the relief sought differs, this case and the *GHC* case are "based on substantially the same operative facts." *Tohono*, 563 U.S. at 317. Both cases arose from President Trump's issuance of Executive Order 14,169, which provided that foreign assistance grants must be aligned with the foreign policy of the President of the United States. *Compare* Compl. ¶ 29, with Appx086-88 (*GHC* 3d Am. Compl. ¶¶ 52-59, discussing Executive Order). Further, both cases are factually rooted in the implementation of Executive Order 14,169, with this case challenging the grants terminated at State and USAID following the elimination of foreign assistance programs, and *GHC* now challenging the elimination of the same foreign assistance programs and the administration's restructuring of USAID. *Compare* Compl. ¶¶ 30-34 (discussing Secretary Rubio's January 24, 2025 memorandum, the Rodgers notice, and the Gray

instructions), *with*, Appx088-90 (*GHC* 3d Am. Compl. ¶¶ 60-65, also discussing, almost word-for-word, Secretary Rubio's January 24, 2025 memorandum, the Rodgers notice, and the Gray instructions). Both cases expressly challenge the same USAID and State Department actions that "halted all disbursements of appropriated foreign assistance funding." Compl. ¶ 35; *see* Appx090 (*GHC* 3d Am. Compl. ¶ 66 ("The State Department also halted most spending of appropriated foreign assistance funding through programs administered outside USAID.")). Similarly, both cases allege that the challenged Government action was arbitrary and capricious in-part because it did not consider "Congress's foreign policy objectives," *id.* ¶ 167(e), or "defied the will of Congress," *id.* ¶ 168(b), and that the challenged agency action conflicts with Congressional appropriations, *id.* ¶ 173. *See* Appx122-24 (*GHC* 3d Am. Compl. ¶¶ 208-221). Finally, the terminated USAID grants at issue in this case were terminated as part of a larger restructuring of USAID, which is directly at issue in *GHC*. *See* Appx092, 115-19 (*GHC* 3d Am. Compl. ¶¶ 74, 166-190).

Plaintiffs contend that their third amended complaint in *GHC* removes "claims related to terminations of contracts, grants, cooperative agreements, and awards," so they could pursue those claims in this Court. Am. Compl. ¶ 103. They posit that the GHC plaintiffs "do not, in that action, challenge the lawfulness of" the "terminations of Plaintiffs' awards that are at issue in this case" or "rely on the loss of the awards to establish standing." *Id.* ¶ 104. These allegations miss the mark; although *GHC* may not contain any of the *claims* filed in this case, that is irrelevant because the filings demonstrate that the "two suits share substantially the same operative facts." *Trusted Integration*, 659 F.3d at 1164.

As set forth above, both cases are rooted in Executive Order 14,169 and the Government's actions to effectuate and implement that order. Indeed, the challenged grant

terminations in this case were the result of the termination of the underlying Federal assistance programs pursuant to which the grants had issued, specifically the termination of certain USAID foreign assistance programs, which are still being litigated in *GHC*.[7] *See* Compl. ¶¶ 33, 183; Appx120-21 (*GHC* 3d Am. Compl. ¶¶ 198-206 (elimination of foreign assistance programs). *GHC* plaintiffs' third amended complaint states that "[m]ost of USAID's programs were implemented—whether by grants [or] cooperative agreements . . . by private sector parties," which includes the plaintiffs in this case. Appx078, 102 (*GHC* 3d Am. Compl. ¶¶ 33, 110).

Finally, both suits contend that the resulting loss of funding from the terminated funding instruments and underlying programs have irreparably harmed plaintiffs. *Compare* Compl. ¶¶ 6-7, 146 (discussing harm to plaintiffs), *with* Appx069 (*GHC* 3d Am. Compl. ¶ 2 (same)); *compare also* Compl. ¶¶ 9, 102 (harm to ABA), *id*. ¶¶ 10, 108 (harm to DAI), *id*. ¶¶ 11, 112 (harm to DI), *id*. ¶¶ 13, 122 (harm to HIAS), *id*. ¶¶ 14, 127 (harm to MSH), *with* Appx073-74, 107-08 (*GHC* 3d Am. Compl. ¶¶ 20, 124 (harm to ABA), *id*. ¶¶ 18, 119 (harm to DAI), *id*. ¶¶ 19, 116-17 (harm to DI), *id*. ¶¶ 15, 123 (harm to HIAS), and *id*. ¶¶ 16, 121-22 (harm to MSH)).

Courts have found that § 1500 applied in similar circumstances. For example, in *Solenex LLC v. United States*, the Court determined that a breach claim before this Court and an APA claim in district court were based on the same operative facts in part because they involved the same lease. 163 Fed. Cl. 128, 134 (2022). Similarly, in *Resource Investments, Inc. v. United States*, 785 F.3d 660 (Fed. Cir. 2015), the Federal Circuit affirmed this Court's judgment that "the same operative facts test was satisfied because both suits were based on the denial of the [Clean Water Act] permit and the economic injury to Resource Investments that the permit

[7] *Compare, e.g.*, Compl. ¶ 88 (DAI's Feed the Future Policy LINK), *with* Appx093 (*GHC* 3d Am. Compl. ¶ 84, discussing elimination of USAID's Feed the Future Initiative); *see also* Compl. App'x A at 21, 40.

denial allegedly caused." *Id.* at 664. The Federal Circuit echoed that rationale in *Winnemucca Indian Colony*:

> The problem for the Colony is that the Nevada action included significant and broad allegations of trespass and occupation. . . . In the Nevada complaint, the Colony alleged that the BIA "allowed and supported" "[t]he lands of the . . . Colony [to] continue to be occupied by non[-]members of [the Colony]," and that "[t]here ha[d] been no federal consent to convey any interest in the . . . Colony lands including any possessory interest." These allegations are operative facts in the Claims Court complaint.

156 F.4th at 1352–53 (citations omitted) ("These overlapping facts 'are not mere background facts; they are critical to [the Colony's] claims in both actions.'" (quoting *Cent. Pines*, 697 F.3d at 1365)). Similarly here, the terminations being challenged and the resulting alleged injuries are based on the termination of the foreign assistance programs at issue in *GHC*.

Moreover, it is "irrelevant" to the § 1500 analysis that the plaintiffs filed an amended complaint in this Court "because of 'the longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought." *Res. Invs., Inc. v. United States*, 785 F.3d 660, 669 (Fed. Cir. 2015) (quotation marks omitted). "The relevant comparison focuses on whether . . . the *original* district court action arises from substantially the same operative facts as the *original* Claims Court complaint." *Id.* (emphasis added). Thus, the Court lacks jurisdiction over the claims of HIAS, ABA, DAI, DI, and MSH pursuant to § 1500.

B. The Only Way To Cure The Jurisdictional Defect Is For The Court To Dismiss The Five Plaintiffs And Any Claims Specific To Them And For Those Plaintiffs To Refile At An Appropriate Time

The only way to cure the jurisdictional defect is for the Court to dismiss the five plaintiffs from this case, including counts eight and nine of the amended complaint that only involve DI and MSH, and for those plaintiffs to refile in this Court after their district court litigation concludes, or after they are dismissed from that case. As the Supreme Court explained in

*Tohono*, when § 1500 precludes this Court from exercising jurisdiction over a suit "while the District Court case is pending," then "[s]hould the [plaintiff] choose to dismiss the latter action, or upon that action's completion, the [plaintiff] is free to file suit again in the CFC if the statute of limitations is no bar." 563 U.S. at 318 ("In the meantime, and in light of the substantial overlap in operative facts between them, the two suits are 'for or in respect to' the same claim under § 1500, and the CFC case must be dismissed. *Id*. Thus, the Court should dismiss the five plaintiffs from this case as well as counts eight and nine.

## III. Counts Two Through Seven Should Be Dismissed For Failure To State A Claim

### A. Count Two Should Be Dismissed For Failure To State A Claim, Or, Alternatively For Lack Of Jurisdiction Due To Mootness

Plaintiffs contend in count two that 2 C.F.R. § 200.339(c) allows suspensions or stop work orders for State Department grants "*only if*" the awardee "fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award," and the agency "determines that noncompliance cannot be remedied by imposing additional conditions." Am. Compl. ¶ 198(emphasis added). The grant regulations provide, in pertinent part, as follows:

> If a non-Federal entity fails to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award, the Federal awarding agency . . . may impose additional conditions as described in § 200.208. If the Federal awarding agency . . . determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency . . . may take one or more of the following actions as appropriate in the circumstances: . . . (c) Wholly or partially suspend or terminate the Federal award. . . . (f) Take other remedies that may be legally available.

2 C.F.R. § 200.339. In other words, this provides for agency discretion to suspend or terminate a grant award for cause in certain circumstances. According to plaintiffs, section 200.339(c) does

not provide for suspensions or work stoppage "on policy grounds," which is what many suspension letters stated. Am. Compl. ¶ 198.

Plaintiffs' construction of section 200.339 makes no sense. First, the regulation does not state that grants may be suspended "only if . . ." there is cause. Rather, the provision allows for suspensions as a "for cause" remedy, among others, but it does not operate to limit the State Department's inherent discretion to suspend grants that no longer effectuate United States foreign policy. Indeed, the list of available remedies is not exhaustive, as paragraph (f) states that agencies may "[t]ake other remedies that may be legally available." 2 C.F.R. § 200.349(f).

Moreover, as the amended complaint admits, the State Department funding instruments included, either expressly or by reference, 2 C.F.R. § 200.340(a)(2), which permit terminations "if an award no longer effectuates the program goals or agency priorities." The Court must give reasonable meaning to all parts of the contract, *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004), and interpretations "leading to absurd result should be avoided," *Wexler v. Dep't of Interior*, 909 F.2d 1496 (Fed. Cir. 1990). Applying these well-settled cannons of contract interpretation, section 200.339 must be read in conjunction with 200.340, which allows such terminations, both of which are listed under the regulatory heading, "REMEDIES FOR NONCOMPLIANCE." It is unreasonable to read section 200.339 as precluding State from suspending awards that no longer effectuate agency priorities but then permitting State to terminate the same awards for that reason. Simply put, it is illogical to conclude that State could breach certain agreements that were suspended before termination but not breach other agreements that were terminated without first being suspended.

In any event, assuming, *arguendo*, that any suspensions were technically in violation of 2 C.F.R. § 200.339(c), the amended complaint does not state a claim for breach because, as it

alleges, the terminations almost immediately followed the suspensions. The amended complaint alleges no *facts* tending to show that the State awardee plaintiffs were harmed by the suspensions, as opposed to the terminations. *See Gilbert v. Dep't of Justice*, 334 F.3d 1065, 1071 (Fed. Cir. 2003) ("A party breaches a contract when it is in material noncompliance with the terms of the contract."). "A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." *Thomas v. Dep't of Hous. & Urb. Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997).[8]

Here, the suspension remedy contained in section 200.339(c) is neither a matter of vital importance, nor goes to the essence of the agreements because it was not a major benefit that the awardees received under the agreements. If anything, the opposite is the case, as the suspension remedy was one of several *available to the Government* for noncompliance. *See id.* (holding breach of a confidentiality clause was material breach when "agency's agreement to deny to potential future employers, including other agencies of the United States Government, the truth about [plaintiff's] performance at [the agency] was the major benefit that [plaintiff] received in exchange for agreeing to resign from his position"). Due to the availability of other remedies included in section 200.339, including termination, the suspension provision was not central to the agreements. *Cf. Lary v. U.S. Postal Serv.*, 472 F.3d 1363, 1367 (Fed. Cir. 2006) ("Here the government's failure to timely provide the three documents was central to the settlement agreement."), *decision clarified on denial of reh'g*, 493 F.3d 1355 (Fed. Cir. 2007).

[8] When "the facts are undisputed the determination of whether there has been material non-compliance with the terms of a contract necessarily reduces to a question of law." *Lutz v. U.S. Postal Serv.*, 485 F.3d 1377, 1381 (Fed. Cir. 2007). Thus, it is appropriate for the Court to consider this issue as part of a motion to dismiss.

For this reason, any technical noncompliance with 2 C.F.R. § 200.399(c) due to the suspensions does not constitute a material breach.

Alternatively, count two should be dismissed for lack of jurisdiction due to mootness. HIAS, DI, Save the Children, Mercy Corps, and the ABA held State Department awards. Compl. App'x A. As demonstrated by the attached declaration of Rudolf Strom, each of those organizations has received payment for closeout costs on their respective State awards. Appx001. Thus, any costs that were incurred as a result of the suspensions were mooted by the payment of those termination closeout costs. "When, during the course of litigation. it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed" as moot. *Chapman L. Firm Co. v. Greenleaf Constr. Co.*, *490 F.3d 934*, 939 (Fed. Cir. 2007). "That a dispute was very much alive when suit was filed" is "not enough" "[t]o sustain [] jurisdiction." *Lewis v. Con't Bank Corp.*, 494 U.S. 472, 477 (1990). If the Court determines "at any time that it lacks subject-matter jurisdiction, it must dismiss the action." RCFC 12(h)(3). Thus, to the extent that any of the grants were suspended prior to termination, and no reimbursements were disbursed during the suspension period, those concerns were resolved once the grants were noticed for termination and all outstanding reimbursement requests were paid.

B. Count Three Should Be Dismissed For Failure To State A Claim

Count three fails to state a claim for breach of contract. To begin with, plaintiffs' principal theory of its case fails as a matter of law because the grant regulations expressly allow for terminations when the funding instruments no longer effectuate Government policy. 2 C.F.R. § 200.340(a)(2) was incorporated into State Department grants and cooperative agreements either expressly or through the State Department's Standard Terms and Conditions, which were incorporated by reference into each agreement. *See, e.g.*, Appx135 (ABA); Appx173-74

(HIAS); Appx186-87 (Mercy Corps); Appx209-210 (Save the Children). That regulation, 2 C.F.R. § 340(a)(2), provides: "The Federal award may be terminated in whole or in part as follows: . . . By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities . . . ."

The amended complaint concedes that the agreements were terminated in order to implement Executive Order 14,169, which provided that foreign assistance grants must be aligned with the foreign policy of the President of the United States. Am. Compl. ¶ 31. As alleged in the amended complaint, that foreign policy does not include exercising the type of "soft power" that these contracts and their underlying programs were designed to facilitate. Indeed, the termination notices quoted in the amended complaint and its appendix state that the grants were terminated because it was determined that the awards "no longer effectuated State Department priorities." Am. Compl. ¶ 50. *See id*. at 17 (notice sent to Save the Children Federation Inc., stating: "award no longer effectuates agency priorities"); *id*. at 30 (same); *id*. at 31 (termination notice sent to ABA stating: "This award is being terminated . . . for alignment with Agency priorities and national interest."); *see generally* Am. Compl. App'x A. State's terminations were, therefore, fully consistent with the termination provisions of the funding instruments. *See* 2 C.F.R. § 200.340(a)(2). Because this was permissible under the terms of the grants, there can be no breach as a matter of law.

Nevertheless, count three attempts to manufacture a breach by alleging that the "State Department's termination of Plaintiffs' awards was not "authorized by law,' 2 C.F.R. § 200.340(a)(2) (2020)—and thus constituted a breach of the terms and conditions of the contracts—because the terminations violated the requirements of the Administrative Procedure Act (APA) that the State Department not engage in arbitrary and capricious action, 5 U.S.C.

§ 706(2)(A)." According to the amended complaint, State cannot rely on section 200.340(a)(2) because the terminations violated the APA's standard of review. Am. Compl. ¶ 206 (alleging that State's "policy decisions" "did not provide a reasoned explanation for why it was mass terminating awards"; nor "assess the facts of each award"; and "ignored an important aspect of the issue in failing to grapple with how the agency would fulfill its statutory mandates"; "failed to consider" plaintiffs' "reliance interests"' etc.). Similarly, the amended complaint alleges that each "termination of Plaintiffs' individual awards was arbitrary and capricious" for largely the same reasons. *Id.* ¶ 207 (listing failure to provide a rational explanation for the terminations; terminating without individualized considerations; grants officers did not make the decisions to terminate; failing to explain how terminated awards were contrary to agency policies; failure to consider plaintiffs' relance interests; etc.). None of these arguments state a claim for breach of contract.

First, plaintiffs' interpretation of 2 C.F.R. § 200.340(a)(2) is textually unsupported. The interpretation of a Government contract is a matter of law. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990 (Fed. Cir. 1996). "Contract interpretation begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "A contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993). In addition, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *NVT Techs., Inc.*, 370 F.3d at 1159. When the contract's language is unambiguous it must be given its "plain and ordinary" meaning and the court may not look to extrinsic evidence to interpret its provisions. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (*en banc*).

Here, the phrase "to the greatest extent authorized by law" in section 200.340(a)(2) does not modify or otherwise attach to an agency's discretion to terminate a grant (or multiple grants) that conflicts with program goals or agency priorities. Rather, the phrase "to the greatest extent authorized by law" follows and is applicable to "the Federal awarding agency or pass-through entity," such that a funding instrument cannot be terminated for a reason that violates *substantive law* unrelated to "program goals or agency priorities." 2 C.F.R. § 200.340(a)(2). In other words, a grant may not be terminated for an illegal purpose that is unrelated to program goals or agency priorities. For example, a grants officer could not terminate a grant for a discriminatory purpose, or if the termination was the result of a kickback or some other illegal conduct. This is unrelated, however, to an agency's exercise of its contractual rights to terminate when an agreement no longer effectuates agency priorities.

Second, the amended complaint's invocation of the APA is misplaced as the APA is *not* a source of substantive law. *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 69 (D.D.C. 2015) ("To be sure, the APA itself does not create substantive rights."). Rather, the APA creates a cause of action for challenging final agency action "based on substantive law found elsewhere." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 58 (D.D.C. 2023) (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006)), *aff'd sub nom*. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144 (D.C. Cir. 2025). The APA "was enacted to define the uniform procedures that agencies could employ when administering public rights established in other statutes and to provide for judicial review of that administration." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). But it does not "create any . . . substantive rights that might be violated." *Id*. This principle is well

established. *See Buckeye Cablevision, Inc. v. United States,* 438 F.2d 948, 953 n.2 (6th Cir. 1971) ("Section 10(e) of the Administrative Procedure Act (5 U.S.C. § 706) . . . does not bestow any substantive rights upon parties to administrative action."); *Furlong v. Shalala,* 156 F.3d 384, 394 (2d Cir. 1998) (explaining that APA does not "confer a substantive right to be free from arbitrary agency action"); *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 n.14 (5th Cir. 1998) ("[T]he provisions of the APA 'do not declare self-actuating substantive rights . . . .' ") (quoting *Perales v. Casillas,* 903 F.2d 1043, 1050 n.4 (5th Cir. 1990)); *El Rescate Legal Servs. v. Exec. Office of Immigration Review,* 959 F.2d 742, 753 (9th Cir. 1991) ("Section 702 does not create substantive rights."). Thus, "to the greatest extent authorized by law" in section 200.340(a)(2) does not mean "to the extent the decision complies with the APA standards." Rather, the agency's action is governed by the terms of the contract.

Third, there is no indication in the regulations that a funding instrument must be subjected to an APA-style review as a prerequisite to a decision to terminate. This is made clear by the regulatory history behind OMB's 2020 changes to its grant guidelines, which states that the changes to section 200.340 were to "to *strengthen the ability of the Federal awarding agency to terminate Federal awards*, to the greatest extent authorized by law, when the Federal award no longer effectuates the program goals or Federal awarding agency priorities." 85 Fed. Reg. 49,506, 49,507 (2020) (emphasis added). Nothing about OMB's comment suggests that OMB was simultaneously incorporating the APA into grant and cooperative agreements.

Moreover, plaintiffs cite nothing in the agreements themselves that incorporates wholesale the APA standards for agency decision making. And plaintiffs cite no law generally that layers APA-standards on top of the Federal Government's contractual obligations. Thus, none of the supposed decision-making deficiencies set out in count three (and variously repeated

throughout the other counts) were ever *required by the agreements* and thus do not, as a matter of law, state a claim for breach of contract.

In addition to claiming breach of the APA, plaintiffs assert that their "contracts permit termination only if the award 'no longer effectuates' the agency's goals or priorities that existed at the time that the State Department issued the awards." Am Compl. ¶ 208 (citing 85 Fed. Reg. 49,506, 49,507-08 (Aug. 13, 2020)).[9] The Federal Register says no such thing. Indeed, *nothing* in the Federal Register provisions relied on by plaintiffs require that an agency's assessment of its priorities be frozen in time when the contract is executed. Rather, the Federal Register states that the "intent of this change is to ensure that Federal awarding agencies prioritize *ongoing support* to Federal awards that *meet program goals*." 85 Fed. Reg. at 49,507 (emphasis added).

In other words, agencies do not have to prioritize continuing support for awards that no longer meet program goals or agency priorities, especially when the Secretary of State, implementing the President's foreign policy, terminates those programs because they no longer align with foreign policies. Similarly, the revisions to section 200.340, were to "to *strengthen* the ability of the Federal awarding agency to terminate Federal awards." *Id*. Tying an administration's assessment of its own program goals and priorities to prior goals and priorities

[9] The amended complaint relies on a recent district court decision in *New Jersey v. OMB*, No. 1:25-cv-11816, 2026 WL 2069832, at *11–17 (D. Mass. July 17, 2026), as support for plaintiffs' argument that the Government cannot terminate based on new agency goals or priorities. Am. Compl. ¶ 208. In *New Jersey*, the district court concluded that the Government's "agencies priorities" termination right in 2 C.F.R. § 200.340(a) only applied to agency priorities at the time the contract was awarded, a position that is inconsistent with the regulation's language and that renders the phrase "agency priorities" superfluous." This Court, which is not bound by the district court decision, should not follow this stray conclusion. For one, the mere fact that the award was issued demonstrates that, at the time of award, its issuance was an agency priority—otherwise the agency would not have issued the award. Likewise, if the agency were to determine during performance that its priorities were not met through the award due to noncompliance with the terms of the award by the grantee, this termination ground would be coextensive with for-cause terminations under section 200.340(a)(1).

hardly "strengthens" an agency's ability to terminate awards that are no longer aligned with *current* foreign policy of the United States. *Id*. In any event, the APA does not preclude agency understandings of the national interest and agency priorities to shift, for example, in keeping with a "change in administration brought about by the people casting their votes." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part).

In fact, the regulatory history demonstrates that, in finalizing section 200.340(a)(2)'s termination language, OMB declined to limit Federal discretion in the termination of contract awards. OMB recognized that "[t]he largest number of commenters expressed a concern that the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards[,]" but despite recognizing that the termination language provided the Government's broad leverage to terminate awards, OMB determined that it should not amend the regulation language. 85 Fed. Reg. at 49509. Similarly, "[s]everal commenters requested OMB reinstate the language, *for cause*, to address the expanded Federal termination discretion, but OMB again declined to do so. *Id*. (emphasis in original). OMB's choice not to further limit Federal termination authority under the expressly considered circumstances reflects a goal to provide agencies broad termination authority.

Moreover, the tense of "program goals or agency priorities" does not limit those priorities to only agency concerns in the past tense, *i.e.*, priorities at the time the agreement was made. "[U]se of a verb tense is significant in construing" the intended meaning of policies. *See United States v. Wilson*, 503 U.S. 329, 333 (1992). And in this specific regulation, the regulations apply specific tenses to denote different purposes. In section 200.340(a)(4), should a recipient choose to partially terminate its award, an agency may terminate the remaining portion of the award if

the remaining portion "will not accomplish the purposes for which the Federal award was made[.]" But section 200.340(a)(2) permits termination when "an award no longer effectuates . . . agency priorities." Similarly, a for-cause termination under (a)(1) permits the Government to terminate a recipient if it fails to comply with the terms of the agreement, using similar present-tense language. It is unreasonable to interpret this present-tense language to preclude the agency from terminating a problematic awardee based only on whether the recipient failed to comply with the terms and conditions at the time of the award, instead the Government may terminate based upon a recipient's present failure to administer an award.

Plaintiffs also argue that the terminations violate section 200.340(a)(2) because "the parties would have reasonably understood" the regulation "to require the State Department to make an individualized determination that each individual award 'no longer effectuates the program goals or agency priorities' – not a mass determination that nearly *all* State Department foreign assistance awards no longer effectuate agency priority." Am. Compl. ¶ 211. Plaintiffs cite nothing in the regulation or terms of any particular grant or cooperative agreement to support their subjective expectation. As with the plaintiffs' failed invocation of the APA, nothing in the regulation calls for "individualized determinations." Indeed, plaintiffs' attempts here (and elsewhere in the amended complaint) to impose an obligation for individualized determinations onto the agreements make very little sense and would hamper agency discretion to expeditiously terminate awards in the event of national emergency or war. This is precisely why phrases such as "national interest" in 2 C.F.R.§ 700.14 and "agency priorities" in 2 C.F.R. § 200.340(a)(2) are exceptionally flexible, affording the Government expansive discretion. By executing written instruments with the Government incorporating those flexible regulations, plaintiffs accepted the risk that terminations of their Federal assistance awards could arise from application of pertinent

regulations. In any event, individualized consideration did occur, as State retained 2,700 awards, nearly 40-percent of its awards. *See supra* note 6.[10]

Finally, plaintiffs contend that certain State Department grant agreements specified that only the grants officer could terminate, and plaintiffs maintain that the grants officers did not "decide to terminate the award." Am. Compl. ¶ 213. But the applicable grant provision provides only that the grants officer "is the only person authorized [to] award, amend, [or] terminate a federal assistance award, and provide formal, required award approval including those outlined in 2 CFR 200.308 and 2 CFR 200.407." Am. Compl. App'x A at 1. This provision says nothing about any required decision making that must precede the termination. That is, it doesn't say that a grant officer must independently "decide" to terminate the award. And in fact, to read that provision as requiring the grants officer to make that kind of independent decision would be inconsistent with the agreement's provision that the grant can be terminated based on a change in agency priorities. Grant officers are not making decisions about what is or is not an agency priority. Here, the decision to terminate each award at State was ultimately approved by the Secretary of State, who was implementing the President's foreign policy. Grant officers do not get to second-guess a determination by the Secretary of State that certain grants are inconsistent with foreign policy.

[10] The amended complaint also contends that the contracts "cannot be read to permit the State Department to terminate based on changed goals and priorities that directly conflict with Congress's goals and priorities in requiring the agencies to spend the relevant funds." Am. Compl. ¶ 212. This precise question is currently being litigated in the district court action. *See id*. ¶ 104 (noting that *GHC* third amended complaint includes claim that the Government is "violating annual appropriations acts by not spending foreign assistance funds in the amounts or for the purposes that Congress required"). In any event, the amended complaint *in this case* never identifies any Congressional directive to spend funds on any particular contract or funding instrument that was terminated in this case. The argument raised in paragraph 212 is, therefore, a red herring.

C. Count Four Should Be Dismissed For Failure To State A Claim

In count four, plaintiffs argue that USAID breached the contracts by issuing stop work orders, suspension, and terminations because the suspensions and terminations violated 2 C.F.R. § 700.14. *See* Am. Compl. ¶¶ 218-23. Plaintiffs argue that "USAID's unprecedented mass suspensions and terminations violated the terms of the award agreements by relying on 2 C.F.R. § 700.14 to suspend and terminate the awards without an individualized finding that continuation of each award was not in the national interest." Am. Compl. ¶ 220. Plaintiffs further contend that they "would have reasonably understood 2 C.F.R. § 700.14, as incorporated into the contracts, to require USAID to make an individualized determination on an award-by-award basis—not a mass termination across hundreds or thousands of awards—that 'continuation' of the award 'would not be in the national interest of the United States.'" *Id.* ¶ 222 (quoting § 700.14). Plaintiffs' arguments fail as a matter of law.

To begin with, pursuant to the objective theory of contracts, plaintiffs' subjective understanding is irrelevant to determining breach. *See Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1144 n.15 (Fed. Cir. 2008) ("As with general contract principles, the subjective intent of the parties is immaterial to whether a contract has been breached. Appellants fail to cite any authority for the proposition that the determination of performance or breach of a contract is based on the subjective intent of the parties."); *Parkwood Assocs. Ltd. P'ship v. United States*, 97 Fed. Cl. 809, 817 (2011) ("Consistent with the objective theory of contract enforcement, the undisclosed subjective intent of the parties thus plays no role in this [breach] analysis."), *aff'd*, 465 F. App'x 952 (Fed. Cir. 2012). Rather, the Court must construe the contracts as they are written. *Benjamin v. United States*, 348 F.2d 502, 518 (Ct. Cl. 1965) ("[U]nder the objective

theory of contracts, we must disregard Mr. Benjamin's undisclosed and unknown subjective understanding and give effect to the written contract into which the parties actually entered.").

Moreover, plaintiffs' arguments are belied by USAID's grant regulations that were incorporated into the grants. *E.g.*, Appx147 (ABA): Appx161 (ADEPT); Appx166 (DAI); Appx172 (DI), Appx185 (HIAS), Appx193 (Mercy Corps); Appx202 (MSH); Appx217 (Save the Children); Appx237-38 (FRF). Here, 2 C.F.R. § 700.14 provides: "If at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States . . . then USAID may, following notice to the recipient, suspend or terminate the award in whole or in part . . . ." *Id.* Contrary to the allegations in count four, nothing in this provision requires an "individualized determination on an award-by-award basis." Am. Compl. ¶ 222. Rather, all that is required for a termination is a determination by "USAID" that "continuation of all or part of the funding for a program should be terminated because such assistance would not be in the national interest of the United States." 2 C.F.R. § 700.14. According to the suspension and termination notices quoted in or attached to the amended complaint, that is precisely what happened. *See, e.g.*, Am. Compl. ¶ 39 (quoting Marocco declaration that USAID had "generally paused all expenditures in connection with foreign aid," for "*both new programs . . . as well as existing ones*." (emphasis added) (citation omitted)); *id.* at 19 (ABA termination notice, stating that "[i]n accordance with Executive Order 14169 . . . your award has been reviewed for *programmatic efficiency* and consistency with United States foreign policy." (emphasis added)); *see also id*. at 22 (DAI); *id.* at 23 (DI); *id*. at 27 (MSH termination notice, providing that: "Secretary Rubio and PTDO Deputy Administrator Marocco have . . . made a determination that *continuing this program is not in the national interest*." (emphasis added)); *see also* Am. Compl.

App'x A at 28 (same for HIAS); *id*. at 33 (same for Save the Children); *id*. at 52 (same for Mercy Corps); *id*. at 57 (same for ADEPT and FRF).

Further, nothing in the regulations precludes simultaneous terminations of multiple awards. The opposite is the case, as the regulation contemplates that terminations result from a determination regarding discontinuing funding for a program. A "program" can have multiple funding instruments awarded under it, and so the text does not imply individualized determinations for termination.

In any event, the allegations in the amended complaint make clear that "individualized determination[s] on an award-by-award basis," Am. Compl. ¶ 222, were, in fact, made. *See id*. ¶ 82. USAID Acting Administrator Marocco's declaration in *GHC* describes in detail USAID's grant review process. *Id*. Mr. Marocco stated that "USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project." Appx057-58 (Marocco Decl. ¶ 5). "Policy staff . . . performed a first line review to determine whether the individual agreement was in line with foreign policy priorities . . . or not (and presumptively could be terminated as inconsistent with Agency priorities and the national interest)." *Id*. "Those recommendations were reviewed by a senior policy official" and then "were routed to me for further review, including of institutional and diplomatic equities." *Id*. "Termination recommendations approved by me ultimately received the Secretary of State's review." *Id*. This makes clear that "each contract, grant, or funding instrument" was reviewed. Plaintiffs may not agree with the methodology or its conclusions, but the fact that the review utilized a spreadsheet does not mean that no

individualized determinations were performed at all. Plaintiffs' disagreement with the adequacy of the process does not state a claim for breach of the termination provisions, especially when section 700.14. provides no requirements for how a determination is to be made in the first place.

Nevertheless, plaintiffs contend that "USAID referred to each individual award as its own 'program,' meaning the regulation required a determination that continuing a specific award would not be in the national interest." Am. Compl. ¶ 222. Plaintiffs' interpretation is wholly unsupported by the regulations, which defines "program" as "an organized set of activities and allocation of resources directed toward a common purpose, objective, or goal undertaken or proposed by an organization to carry out the responsibilities assigned to it." 2 C.F.R. § 700.1. Plainly, an "organized set of activities and allocation of resources" is not compatible with an "individual award," as the amended complaint erroneously claims.

Plaintiffs' construction is further belied by the allegations earlier in the amended complaint that the terminations were preceded by a pause in funding for foreign assistance programs pending further review. The amended complaint quotes Secretary Rubio's January 24, 2025 memorandum as "'paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department [of State] and USAID.'" Am. Compl. ¶ 32 (second alteration added) (citation omitted). The amended complaint also quotes the January 24, 2025 instructions issued to USAID employees from USAID Acting Administrator Jason Gray, which stated that "'[w]e will also provide subsequent guidance on how USAID will review all programs, to include current and ongoing programs, to ensure they are aligned with the foreign policy of the President of the United States.'" *Id.* ¶ 35 (citation omitted). The amended complaint also unambiguously alleges that the "Stop Work Orders (SWOs) and suspension notices" were "issued" "[c]onsistent with these directives." *Id.* ¶ 37.

In short, the USAID foreign assistance funding instruments were suspended and/or terminated following determinations by USAID that continuation of funding for the programs that underlay the agreements "would not be in the national interest of the United States." 2 C.F.R. § 700.14. That is fully consistent with the requirements of this provision, and, by extension, the agreements. For these reasons, none of the facts pled in the amended complaint plausibly allege a claim for breach of section 700.14.

That certain termination notices described the terminations as "terminations for convenience" does not change this analysis. *See* Am. Compl. ¶ 223. 2 C.F.R. § 700.14 permitted USAID to terminate awards following a programmatic determination that continuing the awards was not in the national interest. Further, these actions may be done "at any time." *Id*. The specific language used in the notices is immaterial to the authority that the USAID possessed to terminate awards that were determined not to be consistent with the foreign policy of the United States. *Cf. S.J. Amoroso Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (holding that, where a contract contains the wrong convenience termination clause, the *Christian* Doctrine will allow the correct clause to be read into the contract when it "expresses a significant or deeply ingrained strand of public procurement policy").

D. <u>Count Five Should Be Dismissed For Failure To State A Claim</u>

Count five largely repeats the arguments raised in count three, contending that the stop work orders, suspension, and terminations of the grants, cooperative agreements, and procurement contracts by State and USAID were arbitrary and capricious and an abuse of discretion for the same APA-type reasons, *i.e.*, plaintiffs allege that "*en masse*" terminations that resulted from "high-level policy decisions" were arbitrary and capricious, as well as "individual level" terminations were arbitrary and capricious. *Compare* Am. Compl. ¶¶ 205-07 (count

three), with *id*. ¶¶ 229-31 (count five). Plaintiffs further claim that the terminations were "arbitrary and capricious, and thus an abuse of discretion," "even under the termination for convenience standard." *Id*. ¶ 228. Plaintiffs have it exactly backwards.

As we explained, *supra*, count five is based on a misconception about the terms of the agreements themselves, which expressly allow for terminations of awards that no longer align with agency priorities or policies. 2 C.F.R. § 200.340(a)(2); *id*. § 700.14. Simply put, the agreements do not require the kinds of detailed explanations of the decision to terminate, or that the agencies must provide some unstated level of "assessment" of the facts of each award, or that the agencies were required to consult with the grant officers, to which plaintiffs claim contractual entitlement.

In any event, it is undisputed that the State and USAID awards were terminated at the direction of Secretary of State Rubio to implement the foreign policy determinations of the President of the United States, that is, Executive Order 14,169. Contrary to plaintiffs' theory of their case, such foreign policy decisions cannot constitute an abuse of discretion, at least not for breach purposes. Am. Compl. ¶ 229. It would certainly fail under the applicable standards for a breach claim involving an analogous termination for convenience clause in a CDA context. *Id*. ¶ 189. *See Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1543 n.3 (Fed. Cir. 1996) (articulating four factors courts consider when determining whether contracting officers abused their discretion terminating a contract: "(1) the procurement official's bad faith, (2) the reasonableness of the decision, (3) amount of discretion delegated to the procurement official; and (4) violations of an applicable statute or regulation alone may be arbitrary." (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203–04 (Ct. Cl. 1974) (*Keco II*))); *but see Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301, n.1 (Ct. Cl. 1976) (noting that bad faith and

abuse of discretion may be the same thing in this context). Here, applying the *Keco* standards, the claim fails first because, as we demonstrate in section F, *infra*, the amended complaint fails to state a claim that the terminations were made in bad faith; rather, they were made at the direction of Secretary Rubio after a review process. Second, as we have demonstrated, *supra*, the amended complaint does not state a plausible claim for violation of any applicable statute or regulation.

At most, the plaintiffs are left only with their express challenge to the reasonableness of the termination decisions, which is little more than a challenge to President Trump's policy choices. Indeed, the amended complaint expressly states that it is challenging "high-level policy decisions." Am. Compl. ¶ 229. Plaintiffs' arguments in the amended complaint thus disregard the established role of the Executive Branch in formulating foreign policy. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, 420 (2003); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Such foreign policy decisions for which the Executive (not any plaintiff) is responsible necessarily include decisions about contracts for Government-funded activities overseas. In this context, "[i]t is not the province of the courts to decide *de novo* whether termination was the best course." *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990). It follows that, in implementing the President's foreign policy in-part by exercising the Government's contractual right to terminate, neither State nor USAID abused its discretion under the contract or grant instrument by failing to provide explanations for its termination decisions that satisfied plaintiffs' preferred policy choice, nor by failing to consult with grants officers, nor conduct individualized assessments to plaintiffs' satisfaction, nor any of the other myriad factors that plaintiffs complain were *not* done. Under these circumstances, therefore, the terminations do not constitute an abuse of discretion as a matter of law.

Thus, count five of the amended complaint fails to allege any facts plausibly demonstrating any abuse of discretion, and this count must be dismissed.

E. Count Six Should Be Dismissed For Failure To State A Claim

In count six, plaintiffs contend that the terminations of the grants, cooperative agreements, and procurement contracts by State and USAID breached the implied duty of good faith and fair dealing for the same APA-based rationale in counts three and five. Am. Compl. ¶¶ 239-41. This count fails as a matter of law and should be dismissed for three reasons.

First, convenience terminations may only be challenged for abuse of discretion or bad faith. "In the absence of bad faith or clear abuse of discretion, [a] contracting officer's election to terminate for the [G]overnment's convenience is conclusive." *T & M Distributors, Inc. v. United States*, 185 F.3d 1279, 1283 (Fed. Cir. 1999). "It is not the province of the courts to decide *de novo* whether termination was the best course. *Salsbury*, 905 F.2d at 1521. This is because courts presume that "the government acts in good faith when contracting," including decisions to terminate. *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995). For this reason, a plaintiff "can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it." *Id*. (quoting *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982)). These well-settled principles should apply equally to the terminations of grants and cooperative agreements.

Indeed, comparison to the well-founded discretion of the Government to terminate procurement contracts for convenience is compelling. The parallel language between termination for convenience clauses, *e.g.*, FAR 52.249-6, permitting discretionary termination where it "is in the Government's interest[,]" with 2 C.F.R. § 200.340(a)(2), permitting termination when an award "no longer effectuates the program goals or agency priorities" shows a consistent enablement of Federal agencies to administer contracts in light of the Government's

policies. *See also* FAR 52.249-2; 52.249-3; 52.249-4; 52.249-5 (mirroring the "Government's interest" standard across termination for convenience provisions); 2 C.F.R. § 700.14 (permitting USAID to terminate awards based on the "national interest of the United States"). Thus, because convenience terminations may only be challenged on grounds of "bad faith or clear abuse of discretion," and are "otherwise conclusive," *T & M Distributors*, 185 F.3d at 1283, they cannot be challenged based on a theory of breach of an implied duty.[11]

Second and relatedly, plaintiffs' implied duty breach claims should be dismissed because they are entirely redundant from their other breach claims, specifically counts three and five. Indeed, the amended complaint admits as much. Am. Compl. ¶239 ("Here, the abrupt suspensions and terminations of Plaintiffs' awards were arbitrary and capricious for all of the reasons explained above."). *Compare id.* ¶¶ 205-07 (count three, describing terminations as arbitrary and capricious), 229-31 (count five, same), *with id.* ¶ 239 (count six, alleging the same arbitrary and capricious conduct). "[W]here, as here, the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim are based on the same facts, the latter claim should be dismissed as redundant." *Portland Mint v. United States*, 102 F.4th 1371, 1384 (Fed. Cir. 2024); *see BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016 (Fed. Cir. 2020) (dismissing implied duty claim as redundant when "contract provides other avenues of relief"). A complaint must identify "additional facts" that "its good faith and fair dealing claim relies upon" to avoid dismissal as redundant at the pleading stage. *ASI Constructors, Inc. v. United States*, 129 Fed. Cl. 707, 721 (2016).

[11] At a minimum and to the extent that the Court determines that it possesses jurisdiction to entertain the CDA claims of plaintiffs DI and MSH, *see supra* section II, DI and MSH's implied duty claims regarding their terminated CDA contracts must be dismissed.

Here, the amended complaint does not allege any additional facts in count six to support plaintiffs' implied duty claim but instead repeats the same facts that are pled in the other claims. Under these circumstances, therefore, count six should be dismissed. *See CFS Int'l Capital Corp. v. United States*, 118 Fed. Cl. 694, 701 (2014) (implied duty claim dismissed where plaintiff did not allege "any facts supporting a claim for breach of the implied duty of good faith and fair dealing separate from its breach of contract claim").

Third and finally, count six should be dismissed because it does not allege facts plausibly stating a claim for breach of the duty of good faith and fair dealing. "Implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfering with another party's performance or from acting to destroy another party's reasonable expectations regarding the fruits of the contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1334-35 (Fed. Cir. 2014) (citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). However, an implied duty cannot "create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010). Thus, "[a]lthough the implied duty of good faith and fair dealing attaches to every contract, what that duty entails depends in part on what that contract promises (or disclaims)." *Id*. at 830. "To plead a claim for breach of the duty of good faith and fair dealing, plaintiff must allege (1) a specific promise that was undermined, plus some combination of (2) subterfuge, evasion, or dishonesty, and (3) reappropriation of a reasonably expected benefit." *Aries Constr. Corp. v. United States*, 164 Fed. Cl. 290, 297 (2023) (citing *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019); *Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 596 (2013); *Precision Pine & Timber*, 596 F.3d at 829)).

Here, plaintiffs contend that the agencies breached the duty of good faith and fair dealing because the terminations were "arbitrary and capricious for all the reasons explained above," Am. Compl. ¶ 239, that is, for the reasons set forth in the plaintiffs' APA-based breach claims. *Id.* Once again, however, the amended complaint cites nothing in the agreements that incorporate wholesale the APA's requirements for agency decision-making, and indeed there is nothing in the agreements that did so. Moreover, the amended complaint fails to cite any law that generally layers APA-standards on top of contractual obligations. The APA has nothing to say about Government compliance with contractual obligations beyond what is already required by the contract's terms and conditions. *See Int'l Eng'g Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975) ("We also believe that in light of the long-standing Tucker Act remedy and the traditionally long-recognized interest in preventing piecemeal disruption of the procurement process, decisions made by contracting officers pursuant to contract clauses fall outside the contemplation of the [APA]." (internal citation omitted)). In short, because the agreements did not provide for any of the expectations that plaintiffs allege were scuttled by the alleged arbitrary and capricious conduct, there can be no violation of the duty of good faith and fair dealing as a matter of law.

Indeed, the Court cannot predicate a breach of the duty of good faith and fair dealing on duties that are not imposed by the contract. *See Dobyns*, 915 F.3d at 740 ("The flaw with the Claims Court's analysis is that the supposed duties . . . are not duties imposed by the language in the contract."). For example, in *Mutakaber v. Sec'y of State*, 162 F.4th 1141 (Fed. Cir. 2025), following the 2021 withdrawal from Afghanistan, lessors of two properties in Afghanistan leased to the United States argued that the United States had breached the implied duty of good faith and fair dealing and defeated the "essential purpose" of the lease by failing to restore their

physical possession of the properties or their reentry after the properties were subsequently seized by the Taliban. *Id*. at 1145. The leases provided that the properties "are leased in 'as is' condition and *may be returned* in the 'as is' condition as of the date of lease expiry or termination," *id*. at 1147 (emphasis in original). The Federal Circuit held that the implied duty was not breached, nor was the essential purpose of the lease defeated, because the leases did not contain any provision "obligat[ing] the government to restore physical possession of the Properties to Appellants" *id*. at 1148, and did not otherwise "impose any express duty to return the Leased Premises upon termination of the Lease," *id*. at 1149. The Court explained that to rely on the implied duty to read into the leases such an implied obligation would have impermissibly "impose[d] a contractual duty on the government inconsistent Leases' provisions." *Id.*

Similarly here, nothing in the agreements or in the regulations requires any kind of explanation for the suspensions or terminations, nor for any individualized considerations, or that the agencies had to first consider any of plaintiffs' preferred policies, reliance interests, or any other factors. It follows that plaintiffs' breach of implied duties claim fails as a matter of law because implied contractual duties "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber*, 596 F.3d at 831; *e.g.*, *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 205-06 (2013) (dismissing implied duty claim for failure to state a claim when complaint failed to allege a "contractual drainage duty to which the implied duty of good faith and fair dealing can attach").

Plaintiffs further contend that the terminations were contrary to their expectations that their contracts and grants would be terminated as part of a change in agency policies, Am.

Compl. ¶ 240, or that they intended for their contract provisions "could be relied upon by the agencies to suspend or terminate an award," *id.* ¶ 241. However, plaintiffs fail to allege that the agencies ever made such promises. The opposite is the case, as the contracts expressly allow for terminations when an award "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(2), or when continuing with the grants "would not be in the national interest of the United States," *id.* § 700.14, or when terminating a procurement contract was in the "Government's interest," FAR 52.249-6. That is what happened here. Because the terminations were expressly permitted by the agreements, plaintiffs' claim for breach of implied duties must fail. *See BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016 (Fed. Cir. 2020) ("[A counterparty] cannot use the doctrine of good faith and fair dealing to complain of the very conduct that the contract expressly permits.").

F. <u>Count Seven Should Be Dismissed For Failure To State A Claim</u>

In count seven, plaintiffs allege that the suspensions, stop-work orders, and terminations by State and USAID were done in bad faith. Am. Compl. ¶¶ 245-58. Generally, a contracting officer may terminate a contract, without any evidence of fault or breach by the other party, when a contract contains an applicable termination clause. *See JKB Sols. & Servs. v. United States*, 18 F.4th 704, 708 (Fed. Cir. 2021). To state a claim for a bad faith termination, plaintiffs must allege facts plausibly demonstrating conduct that evinces a "specific intent to injure" and "animus" toward the opposing party in terminating the contract. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting *Kalvar*, 543 F.2d 1298). Although plaintiffs need not provide detailed factual statements in their complaint, they are required to provide "more than labels and conclusions, and a formulaic recitation of a cause of action's element," along with factual allegations that "raise a right to relief above the speculative

level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

It is well settled that Government officials are presumed to discharge their duties in good faith. *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."). "A contractor can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it." *Caldwell & Santmyer*, 55 F.3d at 1581 (citation omitted). The Federal Circuit has clarified that "irrefragable proof" amounts to "clear and convincing" evidence. *Am–Pro Protective Agency*, 281 F.3d at 1239–40. "[T]two prototypical examples of bad faith conduct," *Irwin Cnty. v. United States*, 170 Fed. Cl. 355, 370 (2024), are when the Government terminates a contract "simply to acquire a better bargain from another source" and when "the Government enters a contract with no intention of fulfilling its promises" *Krygoski* , 94 F.3d at 1541.

To begin with, the amended complaint "lacks allegations with plausible factual support sufficient to plead either of the prototypical courses of conduct that evidence bad faith." *Irwin Cnty.*, 170 Fed. Cl. at 370. Plaintiffs' bad faith claim is belied by virtually every other claim in the amended complaint, *i.e.*, their principal theories that the terminations were the result of "high-level policy determinations," Am. Compl. ¶¶ 205, 229 (counts three and five), or that the "mass terminations" were arbitrary and capricious because they were performed without any "individualized considerations or analysis," *id*. ¶¶ 206-07 (count three), 220-22 (count four), 230-31 (count five), 239-40 (count six). Indeed, plaintiffs' allegations of indiscriminate mass terminations "with no individualized considerations at all," *id*. ¶ 240, are antithetical to pleading

facts plausibly alleging that the terminations were *specifically intended* to injure plaintiffs or were motivated by animus towards plaintiffs. *Am-Pro*, 281 F.3d at 1240.

In fact, the amended complaint fails to allege *any* facts plausibly demonstrating conduct that evinces a specific intent to injure or animus towards plaintiffs in terminating the contracts. *Id*. Instead, recognizing the illogic of their claims, plaintiffs attempt to dodge the requisite bad faith pleading standard by inventing a quasi-disparate impact theory that "[a]nimus toward a defined group of contractors can support a bad faith claim where the government acts against members of that group because of a shared, disfavored characteristic." Am. Compl. ¶ 247. Of course, plaintiffs' theory is unsupported by Federal Circuit precedent, which unambiguously requires a specific intent to injure individual plaintiffs to support a bad faith claim. *Kalvar*, 543 F.2d at 1302 (noting that for "allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.").[12]

Proceeding from this false premise, plaintiffs contend that statements from President Trump and Elon Musk about the "United States foreign aid industry" or about USAID "expressed overt animus toward implementing partners for foreign assistance activities." Am. Compl. ¶ 248. Even if animus towards a defined group can theoretically satisfy the specific intent standard – and it cannot – none of these statements have anything to do with the terminated contracts, much less support an inference that the contracts were terminated with a specific intent to injure plaintiffs. *See Kalvar*, 543 F.2d at 1302.

[12] Plaintiffs rely on this Court's decision in *Danzinger v. United States*, 181 Fed. Cl. 93, 98 (2026), which only found that allegations of bad faith terminations were sufficient to present common issues of law and fact to satisfy Rule 23(b) for class certification purposes. This has nothing to do with whether a complaint plausibly alleges facts sufficient to meet the specific intent requirement to state a claim for a bad faith termination.

Next, plaintiffs claim that letters sent to DI and ABA in April, 2026, by Eric Ueland, the Chief Operating Officer and Administrator of USAID, demonstrate "animus against individual Plaintiffs." *Id.* ¶ 249. But DI and ABA's respective grants and cooperative agreements were terminated between February and April 2025, *over a year before the letters were sent*. Am. Compl. App'x A at 1-12 (ABA); *id*. at 13-20 (DI). Thus, even assuming that Mr. Ueland's alleged inflammatory statements are inaccurate, they are irrelevant to any termination decisions made a year earlier. Similarly, there are no facts pled connecting Elon Musk's tweets regarding the ABA to any of ABA's grant terminations, much less that the terminations were specifically intended to harm ABA, as opposed to implementing Executive Order 14,169 and a new foreign policy. Am. Compl. ¶ 252.

Relatedly, the allegedly offending tweets regarding the ABA authored by Mike Benz, "a former State Department official," *id*. ¶ 253, were published on May 29, 2025, Appx240-44, approximately two to three months *after* the ABA's grants were terminated in February and March 2025, Am. Compl. App'x A at 1-12. As with Elon Musk and Mr. Ueland, there are no factual allegations pled connecting Mr. Benz to any of the termination decisions, much less facts that support an inference that the terminations were specifically intended to harm the ABA.

Consistent with their other allegations, none of plaintiffs' allegations involving MSH have anything to do with their terminated grants or procurement contracts. Am. Compl. ¶ 254. For example, plaintiffs allege that a State Department report, "America First Global Health Strategy," which listed the compensation of MSH's CEO along with seven other organizations demonstrates the requisite animus. *Id*. But that report was released in September 2025, *id.*, *five months after* MSH's grants and contracts were terminated between February and April 2025, Am. Compl. App'x A at 20-24. It follows that the report's innocuous reference to MSH is

utterly immaterial to the termination decisions. *See Madison Servs., Inc. v. United States*, 94 Fed. Cl. 501, 510 (2010) ("Mere innuendo and inference can never overcome the burden imposed by the clear and convincing evidence standard."). Plaintiffs are reduced to bellyaching about MSH's supposed lack of admission to "an event in New York," which also occurred five months *after* the terminations. Am. Compl. ¶ 254.

Finally, plaintiffs' factual allegations regarding the "lightning speed" of the terminations, *id.* ¶ 255, as well as the issuance of "boilerplate notices in large tranches," sometimes in error, *id.* ¶ 256, and the timing of the termination notices, *id.* ¶ 257, only evince efforts to implement Executive Order 14,169, nothing more.

In sum, none of the facts pled in plaintiffs' bad faith claim plausibly allege that the Government terminated their awards with "a specific intent to injure" them, *Caldwell & Santmyer*, 55 F.3d at 1581. Rather, all of the facts in the amended complaint only show that the terminations were carried out as part of a broad change in foreign policy.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court dismiss plaintiffs HIAS, ABA, DAI, DI, and MSH, as well as counts eight and nine of the amended complaint for lack of jurisdiction pursuant to 28 U.S.C. § 1500, and to dismiss amended complaint counts two through seven for failure to state a claim.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CORINNE A. NIOSI
Assistant Director

/s/Matthew P. Roche
MATTHEW P. ROCHE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0466
Facsimile: (202) 514-8624
Matthew.p.roche@usdoj.gov

Dated: September 11, 2026

Attorneys for Defendant