IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HIAS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 26-429C |
| v. | ) | (Chief Judge Solomson) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

APPENDIX TO DEFENDANT'S
MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CORINNE A. NIOSI
Assistant Director

/s/Matthew P. Roche
MATTHEW P. ROCHE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0466
Facsimile: (202) 514-8624
Matthew.p.roche@usdoj.gov

Dated: September 11, 2026

Attorneys for Defendant

# INDEX TO DEFENDANT'S APPENDIX


Document ........................................ Page

Declaration of Rudolph Strom,
dated June 24,2026 ........................................ Appx001

State Department Standard Terms and Conditions,
dated October 21, 2020 ........................................ Appx003

Excerpts from State Department Standard Terms and Conditions,
dated December 28, 2015 ........................................ Appx023

USAID Standard Provisions ........................................ Appx026

Declaration of Peter Maracco, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.)
dated February 25, 2025 ........................................ Appx056

Third Amended Complaint, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.)
filed January 5, 2026 ........................................ Appx067

Excerpt from ABA Cooperative Agreement SLMAQM20CA2101,
with State Department ........................................ Appx132

Excerpt from ABA Cooperative Agreement 7200AA22CA00021,
with USAID ........................................ Appx136

Excerpt from ABA Cooperative Agreement 72066024CA00003,
with USAID ........................................ Appx148

Excerpt from ADEPT Cooperative Agreement 72067524CA00001,
with USAID ........................................ Appx154

Excerpt from DAI Cooperative Agreement 7200AA19CA00019,
with USAID ........................................ Appx162

Excerpt from Democracy International Cooperative Agreement 72011524CA00005,
with USAID ........................................ Appx167

Excerpt from HIAS Grant SAQMIP23GR0213,
with State Department ........................................ Appx173

Excerpt from HIAS Cooperative Agreement 720BHA24GR00159,
with USAID ........................................................................................................Appx182

Excerpt from Mercy Corps Grant SAQMIP24GR5142-M001,
with State Department...........................................................................................Appx186

Excerpt from Mercy Corps Grant 720BHA21CA00013,
with USAID ........................................................................................................ Appx189

Excerpt from MSH Cooperative Agreement 72030620CA00006,
with USAID ........................................................................................................Appx194

Excerpt From Save The Children Cooperative Agreement SPRMCO24CA0152,
with State Department...........................................................................................Appx203

Excerpt from Save the Children Cooperative Agreement 7200AA20LA00004,
with USAID ........................................................................................................Appx211

Excerpt from ABA Grant SAQMIP22GR0055,
with State Department...........................................................................................Appx218

Excerpt from ABA Grant SINLEC21GR3052,
with State Department...........................................................................................Appx225

Excerpt from Free Russia Foundation Cooperative Agreement 7200AA22CA00022,
with USAID ........................................................................................................Appx231

Mike Benz Tweets,
dated May 29, 2025...............................................................................................Appx240

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HIAS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 26-429C |
| v. | ) | (Chief Judge Solomson) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF Director Strom

l, Rudolf N. Strom, pursuant-to 28 U.S.C. § 17461, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others. I offer this declaration in support of the United States' motion to dismiss in the above-captioned case.

2. Since August 28, 2025, I have performed the duties of Director for the United States Department of State. These duties include being the Assistant Secretary equivalent leader of the Bureau of Global Acquisitions and the Chief Acquisition Officer (CAO) for the United States Department of State.

3. As part of my duties, I have familiarized myself with the grant awards and cooperative agreements (collectively, "awards") awarded by the Department of State that are at issue in this case, and that are listed in Appendix A to plaintiffs' complaint, which I have read. These funding instruments were terminated between January 20, 2025 and March 7, 2025 (with the exception of one award that was terminated during this period initially, then reinstated, then finally ended on September 8, 2025).

4. One award to the American Bar Association (ABA) is designated sensitive. Identifying information about the award, to include the award number, has been redacted from all pleadings by the plaintiffs; therefore, the Department of State has not been able to identify that award and does not have information specific to that award.

5. With the possible exception of the sensitive ABA award, final payments were made for all of the Department of State awards listed in Appendix A, including termination close out costs. Final payments were issued between March 2025 and April 2026. There are no outstanding requests for payment on any of the awards at issue in this case. Several awards have been closed out, and the rest are currently in the closeout process.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on 06/24/2026

Rudolfstrom

Name

U.S. DEPARTMENT OF STATE

# STANDARD TERMS AND CONDITIONS FOR FEDERAL AWARDS

*EFFECTIVE OCTOBER 21, 2020*


| | | | |
|---|---|---|---|
| * | **A.** | Introduction | **02** |
| * | **B.** | Order of Precedence | **02** |
| * | **C.** | Applicability | **02** |
| * | **D.** | Department of State Responsibilities | **03** |
| | **E.** | Recipient Responsibilities and Compliance with Federal Requirements | **03** |
| | **F.** | Universal Identifier and System of Award Management | **04** |
| | **G.** | Reporting Subaward and Executive Compensation Information | **04** |
| * | **H.** | Award Term for Trafficking in Persons | **04** |
| * | **I.** | Never Contract with the Enemy | **04** |
| * | **J.** | Nonprocurement Debarment and Suspension | **05** |
| | **K.** | Governmentwide Requirements for Drug-Free Workplace | **05** |
| * | **L.** | Domestic Preference for Procurements | **05** |
| | **M.** | Prior Approval Requirements | **06** |
| * | **N.** | Branding and Marking | **06** |
| * | **O.** | Government-financed Air Transportation | **07** |
| * | **P.** | Mandatory Disclosure | **07** |
| * | **Q.** | Conflict of Interest | **07** |
| * | **R.** | Restrictions on Lobbying | **08** |
| * | **S.** | Prohibition Against Assignment | **08** |
| | **T.** | Indirect Costs | **09** |
| | **U.** | Audits | **09** |
| * | **V.** | Termination | **09** |
| * | **W.** | Appeals | **10** |
| | **X.** | Closeout | **10** |
| * | **Y.** | Nondiscrimination in Department of State Programs | **11** |
| * | **Z.** | Prohibition of Assistance to Drug Traffickers | **12** |
| * | **AA.** | Prohibition on Use of Funds for Performance or Research Respecting Abortions or Involuntary Sterilization | **12** |
| * | **BB.** | Policy Guidance | **12** |
| | | Appendix 1 | **13** |
| | | Appendix 2 | **14** |
| * | | Appendix 3 | **17** |
| | | Appendix 4 | **19** |


**Applicable to Awards to Individuals*

## A. INTRODUCTION

These Standard Terms and Conditions for Federal Awards outline the Department of State's mandatory award terms as required by Title 2—Grants and Agreements, of the Code of Federal Regulations. Certain applicable Federal administrative standards are incorporated by reference. Electronic copies containing the complete text of the Code of Federal Regulations are available at https://www.ecfr.gov.

The recipient shall provide the principal investigator(s) or project director(s) with a copy of these terms and conditions, including the award provisions, and any subsequent changes to the award. Electronic copies of these Terms and Conditions are publicly available at https://www.state.gov/about-us-office-of-the-procurement-executive/.

These term and conditions may be duplicated, copied or otherwise reproduced as appropriate.

## B. ORDER OF PRECEDENCE

In the event of any inconsistency between provisions of the award, the inconsistency will be resolved by giving precedence in the following order:

(1) Applicable laws and statutes of the United States, including any specific legislative provisions mandated in the statutory authority for the award.

(2) Code of Federal Regulations (CFR)

(3) Standard Terms and Conditions

(4) Award Provisions

(5) Other award documents and attachments

## C. APPLICABILITY

| Organization Type | Applicable Administrative Requirements |
|---|---|
| Domestic Non-federal entity (including state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization) | • 2 CFR 200: Subparts A through F<br>• 2 CFR 600 & 601 |
| Foreign Non-Profit Organization | • 2 CFR 200: Subparts A through E<br>• 2 CFR 600 & 601 |
| Domestic & Foreign For-Profit Organization | • 2 CFR 200: Subparts A through D<br>• 2 CFR 600 & 601<br>• 48 CFR Part 30 & 31 |
| Individuals | • None |
| Foreign Public Entities<br>(Including Public International Organizations) | • None |

## D. DEPARTMENT OF STATE RESPONSIBILITIES

The Department of State (hereinafter referred to as the Department) has overall responsibility for Department-funded awards, including providing oversight for technical, programmatic, financial and administrative performance.

Grants Officer (GO):

Authorized by a warrant issued by the Department's Procurement Executive, the GO is responsible for all actions on behalf of the Department, including entering into, amending, or terminating the award. In addition, the GO is responsible for the administrative coordination and liaison with the recipient. The GO is the only person authorized to approve changes to any of the requirements in the award.

Grants Officer Representative (GOR):

In accordance with Department policy, the GO is responsible for all aspects of the award, but may designate technically qualified personnel to join in the administration of grants. The GOR is delegated by the GO and responsible for the programmatic, technical, and/or scientific aspects of the award. The recipient should direct all correspondence related to programmatic and budgetary issues to both the GO and GOR.

## E. RECIPIENT RESPONSIBILITIES AND COMPLIANCE WITH FEDERAL REQUIREMENTS

The recipient is responsible for notifying the Department of any significant problems relating to the administrative, programmatic or financial aspects of the award.

The recipient has full responsibility for the management of the project or activity supported under the award and for adherence to Federal regulations, the award provisions, and these terms and conditions. Although the recipient is encouraged to seek the advice and opinion of the GO and/or the GOR on special problems that may arise, such advice does not diminish the recipient's responsibility for making prudent and sound administrative judgments under the circumstances prevailing at the time the decision was made and should not imply that the responsibility for operating decisions has shifted to the Department.

In addition to the requirements specified in 2 CFR 200.331, these terms and conditions flow down to all subrecipients and must be included in the recipient's subaward instrument. Depending on the type of entity, all subrecipients and subcontractors are subject to the Federal regulations specified in provision *C–Applicability* of these terms and conditions.

Nothing in this provision alters the recipient's responsibility for conduct of the project and compliance with all applicable laws and regulations.

## F. Universal Identifier and System of Award Management

In compliance with 2 CFR 25.220, the Department has adopted the Award term—System for Award Management and Universal Identifier Requirements. The full text of this award term is included as Appendix 1 to these terms and conditions.

## G. Reporting Subaward and Executive Compensation Information

In compliance with 2 CFR 170.220, the Department has adopted the Award term—Reporting Subawards and Executive Compensation. The full text of this award terms is included as Appendix 2 to these terms and conditions.

Awards that are deemed "sensitive" and therefore do not require Federal Funding Accountability and Transparency Act (FFATA) reporting will be designated in the award provisions stating that the award is not subject to the FFATA subaward reporting requirements as outlined in the Office of Management and Budgets (OMB) guidance issued August 27, 2010.

## H. Award Term for Trafficking in Persons

In compliance with 2 CFR 175.15(a), the Department has adopted the Award term—Trafficking in Persons. The full text of this award term is included as Appendix 3 to these terms and conditions.

## I. Never Contract with the Enemy

In accordance with 2 CFR 183, the following terms apply if the award exceeds $50,000 and is performed outside the United States, including U.S. territories, and is in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities. It does not apply to the authorized intelligence or law enforcement activities of the Federal Government.

I. Prohibition on Providing Funds to the Enemy

A. The recipient must—

1. Exercise due diligence to ensure that none of the funds, including supplies and services, received under this grant or cooperative agreement are provided directly or indirectly (including through subawards or contracts) to a person or entity who is actively opposing the United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities, which must be completed through 2 CFR 180.300 prior to issuing a subaward or contract and;

2. Terminate or void in whole or in part any subaward or contract with a person or entity listed in SAM as a prohibited or restricted source pursuant to subtitle E of Title VIII of the NDAA for FY 2015, unless the Department of State provides written approval to continue the subaward or contract.

B. The recipient may include the substance of this clause, including paragraph (A) of this clause, in subawards under this grant or cooperative agreement that have an estimated value over $50,000 and will be performed outside the United States, including its outlying areas.

C. The Department of State has the authority to terminate or void this grant or cooperative agreement, in whole or in part, if the Department becomes aware that the recipient failed to exercise due diligence as required by paragraph (A) of this clause or if the Department becomes aware that any funds received under this grant or cooperative agreement have been provided directly or indirectly to a person or entity who is actively opposing coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

II. Additional Access to Recipient Records

A. In addition to any other existing examination-of-records authority, the Federal Government is authorized to examine any records of the recipient and its subawards or contracts to the extent necessary to ensure that funds, including supplies and services, available under this grant or cooperative agreement are not provided, directly or indirectly, to a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities, except for awards awarded by the Department of Defense on or before Dec 19, 2017 that will be performed in the United States Central Command (USCENTCOM) theater of operations.

B. The substance of this clause, including this paragraph (B), is required to be included in subawards or contracts under this grant or cooperative agreement that have an estimated value over $50,000 and will be performed outside the United States, including its outlying areas.

## J. NONPROCUREMENT DEBARMENT AND SUSPENSION

In compliance with 2 CFR 180.20, the Department has adopted the OMB guidance in subparts A through I of 2 CFR 180 (and as supplemented by 2 CFR 601), as the Department's policy and procedures for nonprocurement debarment and suspension.

## K. GOVERNMENTWIDE REQUIREMENTS FOR DRUG-FREE WORKPLACE

In compliance with 2 CFR 182.20, the Department has adopted the OMB guidance in subparts A through F of 2 CFR 182 (and as supplemented by 22 CFR 133), as the Department's policies and procedures for the drug-free workplace requirements.

## L. DOMESTIC PREFERENCE FOR PROCUREMENTS

In accordance with 2 CFR 200.322, the recipient should to the greatest extent practicable under the award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other

manufactured products). The requirements of this section must be included in all subawards including all contracts and purchase orders for work or products under the award.

For purposes of this section:

"Produced in the United States" means, for iron and steel products, that all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States.

"Manufactured products" means items and construction materials composed in whole or in part of non-ferrous metals such as aluminum; plastics and polymer-based products such as polyvinyl chloride pipe; aggregates such as concrete; glass, including optical fiber; and lumber.

## M. PRIOR APPROVAL REQUIREMENTS

In addition to prior approval requirements specified in 2 CFR 200.308, the recipient must receive prior approval in order to transfer funds between direct cost categories when the Federal share of the award exceeds the Simplified Acquisition Threshold ($250,000) and the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total budget as last approved by the Department. When requesting approval for budget revisions, the recipient must use the same format for budget information that was used in the application.

## N. BRANDING AND MARKING

All programs, projects, assistance, activities, and public communications to foreign audiences, partially or fully funded by the Department, must be marked appropriately overseas with the standard U.S. flag in a size and prominence equal to (or greater than) any other logo or identity. The recipient may continue to use existing logos or program materials; however, a standard rectangular U.S. flag must be used in conjunction with such logos. Recipients wishing to use the Department of State seal in addition to the U.S. flag must receive prior written permission from the GO.

This requirement does not apply to the recipient's own corporate communications or in the United States. For general questions about the Department marking policy and overall branding strategy, please contact VisiblyAmerican@state.gov.

The recipient must appropriately acknowledge the U.S. Government support in all dealings with program participants, and in press releases, ceremonies, dedications, interviews, publicity, etc. Furthermore, the recipient must coordinate publicity, ceremonial events, dedications, etc., with the sponsoring Department office or embassy office and public affairs officer.

For all Department funded awards, publications or articles resulting from the award must acknowledge the support of the Department and include a disclaimer of official endorsement as follows: "*This [article] was funded [in part] by a grant from the United States Department of State. The opinions, findings and conclusions stated herein are those of the author[s] and do not necessarily reflect those of the United States Department of State*." The recipient must ensure that this disclaimer be included on all brochures, flyers, posters, billboards, or other graphic artwork that are produced under the award.

## O. GOVERNMENT-FINANCED AIR TRANSPORTATION

All Federal government financed international air transportation is required by 49 U.S.C. 40118, commonly referred to as the "Fly America Act," to use U.S. air carrier service for all air travel and cargo transportation services. One exception to this requirement is transportation provided under a bilateral or multilateral air transport agreement, to which the U.S. government and the government of a foreign country are parties, and which the Department of Transportation has determined meets the requirements of the Fly America Act.

Current "Open Skies Agreements" that are in effect can be found here: https://www.gsa.gov/policy-regulations/policy/travel-management-policy/fly-america-act.

It is the recipient's responsibility for making determinations and documenting the decision as to whether an exemption to this requirement applies.

Exceptions vary depending on the direction of travel and are outlined in 41 CFR 301-10.136 and 41 CFR 301-10.137.

## P. MANDATORY DISCLOSURE

Consistent with 2 CFR 200.113, the recipient and any subrecipient must disclose, in a timely manner, in writing to the Department or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the award. Recipients that have received a Federal award including the term and condition outlined in Appendix 4 are required to report certain civil, criminal, or administrative proceedings to SAM (currently FAPIIS). Failure to make required disclosures can result in any of the remedies described in 2 CFR 200.340.

Disclosures must be made to:

U.S. Department of State
Office of Inspector General
P.O. Box 9778
Arlington, VA 22219
Phone: 1-800-409-9926 or 202-647-3320
Website: https://oig.state.gov/hotline

If the total value a recipient's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the award, then you as the recipient must comply with Appendix 4 of these terms and conditions.

## Q. CONFLICT OF INTEREST

In accordance with 2 CFR 200.318, the recipient must maintain written standards of conduct covering conflicts of interest and governing the action of its employees engaged in the selection, award, and administration of contracts. In addition, the recipient must also maintain written standards of conduct covering organizational conflicts of interest.

The recipient must disclose any conflict of interest, including organizational conflicts of interest, and the recipient's approach for resolving the conflict of interest to the GO for the award within ten (10) calendar days of the discovery of the conflict of interest. Upon notice from the recipient of a potential conflict of interest and the approach for resolving it, the GO will make a determination regarding the effectiveness of the recipient's actions to resolve the conflict of interest within thirty (30) calendar days of receipt of the recipient's notice, unless the GO advises the recipient that a longer period is necessary. The recipient must not request payment from the Department for costs for transactions subject to the conflict of interest pending notification of the GO's determination. The recipient's failure to disclose a conflict of interest may result in cost disallowances.

## R. RESTRICTIONS ON LOBBYING

In accordance with 31 USC 1352, the recipient is required to abide by the policy and procedures codified at 22 CFR 138 et seq. By accepting the award, the recipient agrees that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $20,134 and not more than $201,340 for each such failure.

## S. PROHIBITION AGAINST ASSIGNMENT

Notwithstanding any other provision of the award, the recipient must not transfer, pledge, mortgage, or otherwise assign the award, or any interest therein, or any claim arising thereunder, to any party or parties, bank trust companies, or other financing or financial institutions.

## T. INDIRECT COSTS

A non-profit organization which has not previously established an indirect cost rate with a Federal agency, that believes the Department should be its cognizant agency, shall submit its initial indirect cost proposal immediately after the organization is advised that the award will be made and, in no event, later than three months after the effective date of the award. When requested by the recipient, the GO will provide instructions on how to submit the indirect cost rate proposal.

## U. AUDITS

All U.S. recipients (not including for-profit organizations) that expend $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year in accordance with the provisions of 2 CFR Part 200 Subpart F. In addition, the recipients are subject to the audit requirements found in the Single Audit Act of 1984, 31 U.S.C. 7501-7506. The cost of an audit may be charged to the award in accordance with 2 CFR 200.425.

All foreign recipients that expend $750,000 or more during the recipient's fiscal year in Department of State awards must have a single or program-specific audit conducted for that year in accordance with these terms and conditions. In the event the recipient undergoes an audit for another Federal agency, a second audit does not need to be procured so long as the Department's funding was analyzed under the same audit. A program-specific audit means an audit of one Federal award program. Single audit means an audit that includes both the recipient's financial statements and the Department awards received to be conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

The audit must be independently and professionally executed in accordance with GAGAS either prescribed by a government's Supreme Audit Institution with auditing standards approved by the Comptroller General of the United States, or in accordance with the host country's laws or adopted by the host country's public accountants or associations of public accountants, together with generally accepted international auditing standards. However, foreign entity audits consistent with International Standards for Auditing or other auditing standards are acceptable with the GO's approval.

The Department and its authorized representatives have the legally enforceable right to examine, audit, and copy, at any reasonable time, all records in the Department's possession pertaining to the award. Furthermore, the Inspector General or any of his or her duly authorized representatives shall have access to any pertinent books, documents, papers and records of the recipient. Information accessible to the Inspector General includes written, printed, recorded, produced, or reproduced by any mechanical, magnetic, or other process or medium. The Department reserves the right to make audits, inspections, excerpts, transcriptions or other examinations as authorized by law of the recipient's documents and facilities.

## V. TERMINATION

In compliance with 2 CFR 200.340, any award may be terminated in whole or in part as follows:

(1) By the Department, if the recipient fails to comply with the terms and conditions of the award;

(2) By the Department, to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities;

(3) By the Department with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

(4) By the recipient upon sending to the Department GO written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Department determines in the case of partial termination that the reduced or modified portion of the award will not accomplish the purposes for which the award was made, the Department may terminate the award in its entirety; or

(5) By the Department pursuant to termination provisions included in the award provisions.

## W. APPEALS

If the recipient fails to comply with Federal statutes, regulations or the terms and conditions of the award, the GO may take appropriate action including, but not limited to, withholding payments, disallowing costs, suspending or terminating the award, or initiating suspension and debarment proceedings.

In accordance with 2 CFR 200.341, the GO will provide the recipient an opportunity to object and provide information and documentation challenging the action. The recipient has 30 days after receiving the written notification to submit its appeal. The recipient's appeal should contain:

A cover letter with a brief statement of the recipient's argument and the disputed factual, legal, or other issues.

(1) the date the recipient received the GO's decision;

(2) the amount of disallowed costs in dispute (if applicable); and

(3) any other relevant documents.

## X. CLOSEOUT

In accordance with 2 CFR 200.345, the closeout of the award does not affect any of the following:

(1) the right of the Department to disallow costs and recover funds on the basis of a later audit or other review.

(2) The requirement for the recipient to return any funds due as a result of later refunds, corrections, or other transactions including final indirect cost rate adjustments.

(3) The ability of the Department to make financial adjustments to a previously closed award such as resolving indirect cost payments and making final payments.

(4) Audit requirements in subpart F of 2 CFR 200.

(5) Property management and disposition requirements in 2 CFR 200.310 through 200.316.

(6) Records retention as required in 2 CFR 200.334 through 200.337.

After closeout of the award, a relationship created under the award may be modified or ended in whole or in part with the consent of the Department and the recipient, provided the responsibilities of the recipient referred to above including those for property management as applicable, are considered and provisions made for continuing responsibilities of the recipient, as appropriate.

The recipient may charge the award during closeout for the costs of publication or sharing of research results if the costs are not incurred during the period of performance of the award.

## Y. NONDISCRIMINATION IN DEPARTMENT OF STATE PROGRAMS

**Nondiscrimination on the Basis of Handicap in Programs or Activities Receiving Federal Financial Assistance**

In accordance with 29 USC 701 et seq., the recipient is required to abide by the policy and procedures codified at 22 CFR 142, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance.

**Nondiscrimination in Federally-Assisted Programs of the Department of State — Effectuation of Title VI of the Civil Rights Act of 1964**

In accordance with 42 USC 2000d et seq., the recipient is required to abide by the policy and procedures codified at 22 CFR 141, which stipulates that no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from the Department of State.

**Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance**

In accordance with 42 USC 6101 et seq., the recipient is required to abide by the governmentwide policy and procedures codified at 45 CFR 90 and as supplemented by 22 CFR 143, which prohibits discrimination on the basis of age in programs or activities in the United States receiving Federal financial assistance.

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

In accordance with 20 USC 1681 et seq., the recipient is required to abide by the policy and procedures codified at 22 CFR 146, which prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.

## Z. PROHIBITION OF ASSISTANCE TO DRUG TRAFFICKERS

In accordance with 22 USC 2291f, the recipient is required to abide by the policy and procedures codified at 22 CFR 140, which is designed to ensure that Federal assistance funds are not provided to or through any individual or entity that:

(1) Has been convicted of a violation of, or a conspiracy to violate, any law or regulation of the United States, a State or the District of Columbia, or a foreign country relating [to] narcotic or psychotropic drugs or other controlled substances; or

(2) Is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking in any such substance.

## AA. PROHIBITION ON USE OF FUNDS FOR PERFORMANCE OR RESEARCH RESPECTING ABORTIONS OR INVOLUNTARY STERILIZATION

The recipient agrees that in accordance with 22 USC 2151b(f) no foreign assistance funds provided by the award shall be used to:

(1) pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions (Helms Amendment, 1973).

(2) pay for the performance of involuntary sterilizations as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations (Involuntary Sterilization Amendment, 1978).

(3) pay for any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning (Biden Amendment, 1981).

Furthermore, the recipient agrees in accordance with the Department of State's annual appropriation bill, that no funds provided by the award may be used to lobby for or against abortion (Siljander Amendment, 1981).

## BB. POLICY GUIDANCE

The recipient shall comply with the following Executive Orders as applicable:

(1) E.O. 12432 – Minority business enterprise development

(2) E.O. 13224 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism

(3) E.O. 13279 - Equal Protection of the Laws for Faith-Based and Community Organizations

# APPENDIX 1

I. System for Award Management and Universal Identifier Requirements

A. Requirement for System for Award Management

Unless you are exempted from this requirement under 2 CFR 25.110, you as the recipient must maintain current information in the SAM. This includes information on your immediate and highest level owner and subsidiaries, as well as on all of your predecessors that have been awarded a Federal contract or Federal financial assistance within the last three years, if applicable, until you submit the final financial report required under this Federal award or receive the final payment, whichever is later. This requires that you review and update the information at least annually after the initial registration, and more frequently if required by changes in your information or another Federal award term.

B. Requirement for Unique Entity Identifier

If you are authorized to make subawards under this Federal award, you:

1. Must notify potential subrecipients that no entity (see definition in paragraph C of this award term) may receive a subaward from you until the entity has provided its Unique Entity Identifier to you.

2. May not make a subaward to an entity unless the entity has provided its Unique Entity Identifier to you. Subrecipients are not required to obtain an active SAM registration, but must obtain a Unique Entity Identifier.

C. Definitions

For purposes of this term:

1. System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

2. Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

3. Entity includes non-Federal entities as defined at 2 CFR 200.1 and also includes all of the following, for purposes of this part:

   a. A foreign organization;

   b. A foreign public entity;

   c. A domestic for-profit organization; and

   d. A domestic or foreign for-profit organization; and

   e. A Federal agency.

4. Subaward has the meaning given in 2 CFR 200.1.

5. Subrecipient has the meaning given in 2 CFR 200.1.

# APPENDIX 2

I. Reporting Subawards and Executive Compensation

A. Reporting of first-tier subawards.

1. Applicability. Unless you are exempt as provided in paragraph D. of this award term, you must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph E. of this award term).

2. Where and when to report.

a. The non-Federal entity or Federal agency must report each obligating action described in paragraph A.1. of this award term to http://www.fsrs.gov.

b. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

3. What to report. You must report the information about each obligating action that the submission instructions posted at http://www.fsrs.gov specify.

B. Reporting total compensation of recipient executives for non-Federal entities.

1. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

a. The total Federal funding authorized to date under this Federal award equals or exceeds $30,000 as defined in 2 CFR 170.320;

b. In the preceding fiscal year, you received—

i. 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), and

ii. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and,

c. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

2. Where and when to report. You must report executive total compensation described in paragraph B.1. of this award term:

a. As part of your registration profile at https://www.sam.gov.

b. By the end of the month following the month in which this award is made, and annually thereafter.

C. Reporting of Total Compensation of Subrecipient Executives.

1. Applicability and what to report. Unless you are exempt as provided in paragraph D. of this award term, for each first-tier non-Federal entity subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

a. in the subrecipient's preceding fiscal year, the subrecipient received—

i. 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards) and,

ii. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

b. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at http://www.sec.gov/answers/execomp.htm.)

2. Where and when to report. You must report subrecipient executive total compensation described in paragraph C.1. of this award term:

a. To the recipient.

b. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (i.e., between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

D. Exemptions.

1. If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

a. Subawards, and

b. The total compensation of the five most highly compensated executives of any subrecipient.

E. Definitions. For purposes of this award term:

1. Federal Agency means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

2. Non-Federal entity means all of the following, as defined in 2 CFR part 25:

   a. A Governmental organization, which is a State, local government, or Indian tribe;
   b. A foreign public entity;
   c. A domestic or foreign nonprofit organization; and,
   d. A domestic or foreign for-profit organization.

3. Executive means officers, managing partners, or any other employees in management positions.
4. Subaward:
   a. This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.
   b. The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).
   c. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.
5. Subrecipient means a non-Federal entity or Federal agency that:
   a. Receives a subaward from you (the recipient) under this award; and
   b. Is accountable to you for the use of the Federal funds provided by the subaward.
6. Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)).

# APPENDIX 3

I. Trafficking in persons.

A. Provisions applicable to a recipient that is a private entity.

1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not—

a. Engage in severe forms of trafficking in persons during the period of time that the award is in effect;

b. Procure a commercial sex act during the period of time that the award is in effect; or

c. Use forced labor in the performance of the award or subawards under the award.

2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity —

a. Is determined to have violated a prohibition in paragraph A.1 of this award term; or

b. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph A.1 of this award term through conduct that is either—

i. Associated with performance under this award; or

ii. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 601.

B. Provision applicable to a recipient other than a private entity. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity—

1. Is determined to have violated an applicable prohibition in paragraph A.1 of this award term; or

2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph A.1 of this award term through conduct that is either—

a. Associated with performance under this award; or

b. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 601.

C. Provisions applicable to any recipient.

1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph A.1 of this award term.
2. Our right to terminate unilaterally that is described in paragraph A.2 or b. of this section:
    a. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and
    b. Is in addition to all other remedies for noncompliance that are available to us under this award.
3. You must include the requirements of paragraph A.1 of this award term in any subaward you make to a private entity.

D. Definitions. For purposes of this award term:

1. "Employee" means either:
    a. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or
    b. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.
2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.
3. "Private entity":
    a. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.
    b. Includes:
        i. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).
        ii. A for-profit organization.
4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

# APPENDIX 4

I. Reporting of Matters Related to Recipient Integrity and Performance

A. General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

B. Proceedings About Which You Must Report

Submit the information required about each proceeding that:

1. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;
2. Reached its final disposition during the most recent five-year period; and
3. Is one of the following:
   a. A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;
   b. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;
   c. An administrative proceeding, as defined in paragraph E.1. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or
   d. Any other criminal, civil, or administrative proceeding if:
      i. It could have led to an outcome described in paragraph B.3.a., b., or c. of this award term and condition;
      ii. It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and
      iii. The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

C. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph B of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

D. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph A of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

E. Definitions

For purposes of this award term and condition:

1. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

2. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

3. Total value of currently active grants, cooperative agreements, and procurement contracts includes—

    a. Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

    b. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

**THE U.S. DEPARTMENT OF STATE**
**STANDARD TERMS AND CONDITIONS**
**TABLE OF CONTENTS**
***Revised October 1, 2019***
***Effective December 28, 2015***

## Provisions Page


| | | |
|---|---|---|
| **I.** | Introduction* | **2** |
| **II.** | Order of Precedence* | **2** |
| **III.** | Controlling Language* | **2** |
| **IV.** | Department of State Responsibilities* | **2** |
| **V.** | Federal Awardee Performance and Integrity Information System | **3** |
| **VI.** | Recipient Responsibilities and Compliance with Federal Requirements | **3** |
| **VII.** | Mandatory Disclosures* | **4** |
| **VIII.** | Confidentiality of Information | **5** |
| **IX.** | Conflict of Interest and Federal Assistance Awards | **6** |
| **X.** | Liability | **6** |
| **XI.** | Financial Management System Requirements | **7** |
| **XII.** | Payments | **7** |
| **XIII.** | Prior Approval Requirements | **8** |
| **XIV.** | Period of Availability of Funds | **9** |
| **XV.** | Indirect Costs | **9** |
| **XVI.** | Publication for Professional Audiences* | **9** |
| **XVII.** | Branding and Marketing Strategy* | **10** |
| **XVIII.** | Travel* | **10** |
| **XIX.** | Prohibition Against Assignment* | **11** |
| **XX.** | Monitoring and Reporting Requirements | **11** |
| **XXI.** | Post-Award Requirements for Closeout | **15** |
| **XXII.** | Retention and Access Requirements for Records* | **15** |
| **XXIII.** | Audits | **16** |
| **XXIV.** | Debarment and Suspension* | **17** |
| **XXV.** | Termination* | **18** |
| **XXVI.** | Certification Regarding Lobbying* | **19** |
| **XXVII.** | Section 504, Rehabilitation Act* | **20** |
| **XXVIII.** | Award to Faith-Based and Community Organizations | **20** |
| **XXIX.** | Religious Persecution | **20** |
| **XXX.** | Prohibition on Abortion Related Activities* | **21** |
| **XXXI.** | Minority Business Participation | **21** |
| **XXXII.** | Trafficking in Persons* | **21** |
| **XXXIII.** | Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism* | **23** |


**Applicable to Awards to Individuals*

## I. Introduction

The recipient and any subrecipient must, in addition to the assurances and certifications made as part of the award, comply with all applicable terms and conditions during the project period.

## II. Order of Precedence

In the event of any inconsistency between provisions of the award, the inconsistency will be resolved by giving precedence in the following order:

A. Applicable laws and statutes of the United States, including any specific legislative provisions mandated in the statutory authority for the award.
B. Code of Federal Regulations (CFR)
C. Award Specifics
D. Standard Terms and Conditions
E. Other documents and attachments

## III. Controlling Language

In accordance with 2 CFR 200.111, it is the Department of State's policy that all award documents must be in the English language and in terms of U.S. dollars, including correspondence and supporting documents. If the award or any supporting documents are provided in both English and a foreign language, it must be stated in each version that the English language version is the controlling version.

## IV. Department of State Responsibilities

The Department of State has overall responsibility for Department-funded awards, including providing oversight for technical, programmatic, financial and administrative performance.

Agency Award Administrator - Grants Officer (GO):
The GO is responsible for all actions on behalf of the Department, including entering into, changing, or terminating the award. The GO is authorized by a warrant issued by the Procurement Executive in the Office of the Procurement Executive. In addition, the GO is responsible for administrative coordination and liaison with the recipient.

The GO is the only person authorized to approve changes in any of the requirements in the award. In the event the recipient effects any change at the direction of any person other than the GO, the change(s) will be considered to have been made without authority and no adjustment will be made in the amount of the award to cover any increase in costs incurred as a result thereof.

2. Have not within a three-year period preceding this application been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;
3. Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated; and
4. Have not within a three-year period preceding this application had one or more public transactions (Federal, State, or local) terminated for cause or default.

Where the prospective primary participant is unable to certify to any of the statements in this certification, such prospective primary participant shall attach an explanation to the award.

## XXV. Termination

Awards may be terminated in whole or in part if any of the circumstances stated below apply:

National Security or Foreign Policy Interests:
By the Department of State, if at any time the Department determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance is not consistent with the national security or foreign policy interests of the United States, or would be in violation of an applicable law. In such cases, the Department may, following notice to the recipient, suspend or terminate the award in whole or in part and prohibit the recipient from incurring additional obligations chargeable to the award other than those costs specified in the notice of suspension.

By Mutual Agreement:
When the Department of State wishes to terminate a project, the GO will issue, in writing, a termination notice to the recipient's authorized representative with a copy to the project manager and the GOR. The recipient may terminate their performance of a project in whole or in part. When both parties agree that continuation of the project would not produce results commensurate with further expenditure of funds or for any other reason, the award may be terminated by mutual consent. The recipient may terminate the project after the authorized representative advises the GO in writing; and concurrently sends a copy to the GOR. Within 30 days after receipt of a request by either party for termination by mutual agreement, the other party will provide an appropriate written response. The two parties must agree upon the termination conditions, including the effective date, and, in the case of partial termination, the portion to be terminated. The recipient must not incur new

**ATTACHMENT 3 – STANDARD PROVISIONS**

(Note: Throughout this Agreement, the following terms may be used interchangeably: (a) "Grant Officer" and “Agreement Officer;" (b) "Grantee," "Recipient," and "Awardee;" (c) "Grant," “Cooperative Agreement," "Agreement," and "Award;" (d) Agreement Officer’s Representative ,” "Cognizant Technical Officer," “Project Officer,” and "Activity Manager;" (e) "Subaward," "Subgrant," and "Subagreement;" and (f) "Subrecipient," "Subgrantee," and "Subawardee." All references to dollars ($) mean U.S. dollars or the equivalent thereof in another currency. References to “USAID,” without an indication of the specific position or individual within USAID, shall mean “Agreement Officer” unless otherwise indicated or delegated to another USAID position or individual by the Agreement Officer.)

**a) MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS**

**1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (NOVEMBER 2020)**

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of “Non-Federal Entity” in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with Non-U.S. subrecipients the recipient must include the applicable “Standard Provisions for Non-US Nongovernmental Organizations.” Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

**2. INELIGIBLE COUNTRIES (MAY 1986)**

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

**3. NONDISCRIMINATION (JUNE 2012)**

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran’s status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

**4. AMENDMENT OF AWARD (JUNE 2012)**

This award may only be amended in writing, by formal amendment or letter, signed by the Agreement Officer (AO), and in the case of a bilateral amendment, by the AO and an authorized official of the recipient.

[END OF PROVISION]

**5. NOTICES (JUNE 2012)**

Any notice given by USAID or the recipient is sufficient only if in writing and delivered in person, mailed or e-mailed as follows:

(1) To the USAID Agreement Officer, at the address specified in this award; or

(2) To the recipient, at the recipient's address shown in this award, or to such other address specified in this award.

[END OF PROVISION]

**6. SUBAWARDS AND CONTRACTS (DECEMBER 2014)**

a. Subawardees and contractors have no relationship with USAID under the terms of this award. All required USAID approvals must be directed through the recipient to USAID.

b. Notwithstanding any other term of this award, subawardees and contractors have no right to submit claims directly to USAID and USAID assumes no liability for any third party claims against the recipient.

[END OF PROVISION]

**7. OMB APPROVAL UNDER THE PAPERWORK REDUCTION ACT (DECEMBER 2014)**

Information collection requirements imposed by this award are covered by OMB approval number 0412-0510; the current expiration date is 04/30/2005. The Standard Provisions containing the requirement and an estimate of the public reporting burden (including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information) are

| Standard Provision | Burden Estimate |
|---|---|
| Air Travel and Transportation | 1 (hour) |
| Ocean Shipment of Goods | .5 |
| Patent Rights | .5 |
| Publications | .5 |
| Negotiated Indirect Cost Rates - | |
| (Predetermined and Provisional) | 1 |
| Voluntary Population Planning | .5 |
| Protection of the Individual as a | 1 |
| Research Subject | |

| 2 CFR 200 | Burden Estimate |
|---|---|
| 2 CFR 200.318-326, Procurement Standards | 1 |
| 2 CFR 200.310-315, Property Standards | 1.5 |

Comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, may be sent to the Bureau for Management, Office of Acquisition and Assistance, Policy Division (M/OAA/P), U.S. Agency for International Development, Washington, DC 20523 and to the Office of Management and Budget, Paperwork Reduction Project (0412-0510), Washington, DC 20503.

[END OF PROVISION]

**8. USAID ELIGIBILITY RULES FOR GOODS AND SERVICES (MAY 2020)**

a. This provision is not applicable to commodities or services that the recipient provides with private funds as part of a cost-sharing requirement, or with Program Income generated under this award.

b. Ineligible and Restricted Commodities and Services:

(1) Ineligible Commodities and Services. The recipient must not, under any circumstances, procure any of the following under this award:

(i) Military equipment,
(ii) Surveillance equipment,
(iii) Commodities and services for support of police or other law enforcement activities,
(iv) Abortion equipment and services,
(v) Luxury goods and gambling equipment, or
(vi) Weather modification equipment.

(2) Ineligible Suppliers. Any firms or individuals that do not comply with the requirements in Standard Provision, "Debarment, Suspension and Other Responsibility Matters" and Standard Provision, "Preventing Transactions with, or the Provision of Resources or Support to, Sanctioned Groups and Individuals" must not be used to provide any commodities or services funded under this award.

(3) Restricted Commodities. The recipient must obtain prior written approval of the Agreement Officer (AO) or comply with required procedures under an applicable waiver, as provided by the AO when procuring any of the following commodities:

(i) Agricultural commodities,
(ii) Motor vehicles,
(iii) Pharmaceuticals,
(iv) Pesticides,
(v) Used equipment,
(vi) U.S. Government-owned excess property, or
(vii) Fertilizer.

c. Source and Nationality:

Except as may be specifically approved in advance by the AO, all commodities and services that will be reimbursed by USAID under this award must be from the authorized geographic code specified in this award and must meet the source and nationality requirements set forth in 22 CFR 228. If the geographic code is not specified, the authorized geographic code is 937. When the total value of procurement for commodities and services during the life of this award is valued at $250,000 or less, the authorized geographic code for procurement of all goods and services to be reimbursed under this award is code 935. For a current list of countries within each geographic code, see: http://www.usaid.gov/ads/policy/300/310.

d**.** Guidance on the eligibility of specific commodities and services may be obtained from the AO. If USAID determines that the recipient has procured any commodities or services under this award contrary to the requirements of this provision, and has received payment for such purposes, the AO may require the recipient to refund the entire amount of the purchase.

e. This provision must be included in all subawards and contracts which include procurement of commodities or services.

[END OF PROVISION]

**9. DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS (JUNE 2012)**

a. The recipient agrees to notify the Agreement Officer (AO) immediately upon learning that it or any of its principals:

(1) Are presently excluded or disqualified from covered transactions by any Federal department or agency;

(2) Have been convicted within the preceding three-year period preceding this proposal; been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, receiving stolen property, making false claims, or obstruction of justice; commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affects your present responsibility;

(3) Are presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph a.(2); and

(4) Have had one or more public transactions (Federal, State, or local) terminated for cause or default within the preceding three years.

b. The recipient agrees that, unless authorized by the AO, it will not knowingly enter into any subawards or contracts under this award with a person or entity that has an active exclusion on the System for Award Management (SAM) (www.sam.gov). The recipient further agrees to include the following provision in any subawards or contracts entered into under this award:

**DEBARMENT, SUSPENSION, INELIGIBILITY, AND VOLUNTARY EXCLUSION (JUNE 2012)**

The recipient/contractor certifies that neither it nor its principals is presently excluded or disqualified from participation in this transaction by any Federal department or agency.

c. The policies and procedures applicable to debarment, suspension, and ineligibility under USAID-financed transactions are set forth in Subpart C of 2 CFR Section 180, as supplemented by 2 CFR 780.

[END OF PROVISION]

**10. DRUG-FREE WORKPLACE (JUNE 2012)**

The recipient must comply with drug-free workplace requirements in subpart B (or subpart C, if the recipient is an individual) of 2 CFR 782, which adopts the Government-wide implementation (2 CFR part 182) of sec. 5152–5158 of the Drug-Free Workplace Act of 1988 (Pub. L. 100–690, Title V, Subtitle D; 41 U.S.C. 701–707).

[END OF PROVISION]

**11. EQUAL PARTICIPATION BY FAITH-BASED ORGANIZATIONS (JUNE 2016)**

a. Faith-Based Organizations Encouraged

Faith-based organizations are eligible, on the same basis as any other organization, to participate in any USAID program for which they are otherwise eligible. Neither USAID nor entities that make and administer subawards of USAID funds shall discriminate for or against an organization on the basis of the organization's religious character or affiliation. Additionally, religious organizations

shall not be disqualified from participating in USAID programs because such organizations are motivated or influenced by religious faith to provide social services, or because of their religious character or affiliation.

Decisions about awards of USAID financial assistance must be free from political interference or even the appearance of such interference. Awards must be made on the basis of merit, not the basis of the religious affiliation of an applicant, or lack thereof. A faith-based organization may continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs, within the limits contained in this provision. For more information, see the USAID Faith-Based and Community Initiatives Web site and 22 CFR 205.1.

b. Explicitly Religious Activities Prohibited.

(1) Explicitly religious activities include activities that involve overt religious content such as worship, religious instruction, prayer, or proselytization.

(2) The recipient must not engage in explicitly religious activities as part of the programs or services directly funded with financial assistance from USAID. If the recipient engages in explicitly religious activities, the activities must be offered separately, in time or location, from any programs or services directly funded by this award, and participation must be voluntary for beneficiaries of the programs or services funded with USAID assistance.

(3) These restrictions apply equally to religious and secular organizations. All organizations that participate in USAID programs, as recipients or subawardees, including religious ones, must carry out eligible activities in accordance with all program requirements and other applicable requirements governing USAID funded activities.

(4) Notwithstanding the restrictions of b.(1) and (2), a religious organization that participates in USAID-funded programs or services:

(i) May retain its independence and may continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs, provided that it does not use direct financial assistance from USAID to support or engage in any explicitly religious activities or in any other manner prohibited by law;

(ii) May use space in its facilities, without removing religious art, icons, scriptures, or other religious symbols; and

(iii) May retain its authority over its internal governance, and may retain religious terms in its organization’s name, select its board members on a religious basis, and include religious references in its organization's mission statements and other governing documents.

c. Implementation in accordance with the Establishment Clause: Nothing in this provision shall be construed as authorizing the use of USAID funds for activities that are not permitted by Establishment Clause jurisprudence or otherwise by law.

d. Discrimination Based on Religion Prohibited: The recipient must not, in providing services, discriminate against a program beneficiary or potential program beneficiary on the basis of religion or religious belief, refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

e. A religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion, set forth in Sec. 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1 is not forfeited when the organization receives financial assistance from USAID.

f. The Secretary of State may waive the requirements of this section in whole or in part, on a case-by-case basis, where the Secretary determines that such waiver is necessary to further the national security or foreign policy interests of the United States.

g. This provision must be included in all subawards under this award.

[END OF PROVISION]

**12. PREVENTING TRANSACTIONS WITH, OR THE PROVISION OF RESOURCES OR SUPPORT TO, SANCTIONED GROUPS AND INDIVIDUALS (MAY 2020)**

a. In carrying out activities under this award, except as authorized by a license issued by the Office of Foreign Assets Control (OFAC) of the U.S. Department of Treasury, the recipient will not engage in transactions with, or provide resources or support to, any individual or entity that is subject to sanctions administered by OFAC or the United Nations (UN), including any individual or entity that is included on the Specially Designated Nationals and Blocked Persons List maintained by OFAC (https://www.treasury.gov/resource-center/sanctions/SDN List/Pages/default.aspx) or on the UN Security Council consolidated list (https://www.un.org/securitycouncil/content/un-sc-consolidated-list).

b. Any violation of the above will be grounds for unilateral termination of the agreement by USAID.

c. The Recipient must include this provision in all subawards and contracts issued under this award.

[END OF PROVISION]

**13. MARKING AND PUBLIC COMMUNICATIONS UNDER USAID-FUNDED ASSISTANCE (DECEMBER 2014)**

a. The USAID Identity is the official marking for USAID, comprised of the USAID logo and brandmark with the tagline "from the American people," unless amended by USAID to include additional or substitute use of a logo or seal and tagline representing a presidential initiative or other high level interagency initiative. The USAID Identity (including any required presidential initiative or related identity) is on the USAID Web site at www.usaid.gov/branding. Recipients must use the USAID Identity, of a size and prominence equivalent to or greater than any other identity or logo displayed, to mark the following:

(1) Programs, projects, activities, public communications, and commodities partially or fully funded by USAID;

(2) Program, project, or activity sites funded by USAID, including visible infrastructure projects or other physical sites;

(3) Technical assistance, studies, reports, papers, publications, audio-visual productions, public service announcements, Web sites/Internet activities, promotional, informational, media, or communications products funded by USAID;

(4) Commodities, equipment, supplies, and other materials funded by USAID, including commodities or equipment provided under humanitarian assistance or disaster relief programs; and

(5) Events financed by USAID, such as training courses, conferences, seminars, exhibitions, fairs, workshops, press conferences and other public activities. If the USAID Identity cannot be displayed, the recipient is encouraged to otherwise acknowledge USAID and the support of the American people.

b. The recipient must implement the requirements of this provision following the approved Marking Plan in the award.

c. The AO may require a preproduction review of program materials and “public communications” (documents and messages intended for external distribution, including but not limited to correspondence; publications; studies; reports; audio visual productions; applications; forms; press; and promotional materials) used in connection with USAID-funded programs, projects or activities, for compliance with an approved Marking Plan.

d. The recipient is encouraged to give public notice of the receipt of this award and announce progress and accomplishments. The recipient must provide copies of notices or announcements to the Agreement Officer’s Representative (AOR) and to USAID's Office of Legislative and Public Affairs in advance of release, as practicable. Press releases or other public notices must include a statement substantially as follows:

*“The U.S. Agency for International Development administers the U.S. foreign assistance program providing economic and humanitarian assistance in more than 80 countries worldwide.”*

e. Any “public communication” in which the content has not been approved by USAID must contain the following disclaimer:

*“This study/report/audio/visual/other information/media product (specify) is made possible by the generous support of the American people through the United States Agency for International Development (USAID). The contents are the responsibility of [insert recipient name] and do not necessarily reflect the views of USAID or the United States Government.”*

f. The recipient must provide the USAID AOR with two copies of all program and communications materials produced under this award.

g. The recipient may request an exception from USAID marking requirements when USAID marking requirements would:

(1) Compromise the intrinsic independence or neutrality of a program or materials where independence or neutrality is an inherent aspect of the program and materials;

(2) Diminish the credibility of audits, reports, analyses, studies, or policy recommendations whose data or findings must be seen as independent;

(3) Undercut host-country government “ownership” of constitutions, laws, regulations, policies, studies, assessments, reports, publications, surveys or audits, public service announcements, or other communications;

(4) Impair the functionality of an item;

(5) Incur substantial costs or be impractical;

(6) Offend local cultural or social norms, or be considered inappropriate; or

(7) Conflict with international law.

h. The recipient may submit a waiver request of the marking requirements of this provision or the Marking Plan, through the AOR, when USAID-required marking would pose compelling political, safety, or security concerns, or have an adverse impact in the cooperating country.

(1) Approved waivers “flow down” to subawards and contracts unless specified otherwise. The waiver may also include the removal of USAID markings already affixed, if circumstances warrant.

(2) USAID determinations regarding waiver requests are subject to appeal by the recipient, by submitting a written request to reconsider the determination to the cognizant Assistant Administrator.

i. The recipient must include the following marking provision in any subawards entered into under this award:

*"As a condition of receipt of this subaward, marking with the USAID Identity of a size and prominence equivalent to or greater than the recipient's, subrecipient's, other donor's, or third party's is required. In the event the recipient chooses not to require marking with its own identity or logo by the subrecipient, USAID may, at its discretion, require marking by the subrecipient with the USAID Identity."*

[END OF PROVISION]

**14. REGULATIONS GOVERNING EMPLOYEES (JUNE 2018)**

a. While working overseas, the recipient's employees who are not citizens of the cooperating country must maintain private status, and may not rely on local U.S. Government offices or facilities for support while under this award.

b. The sale of personal property or automobiles by the recipient's non-cooperating country citizen employees and their dependents in the foreign country to which they are assigned, are subject to the same limitations and prohibitions that apply to direct-hire USAID personnel employed by the Mission, including the rules contained in 22 CFR 136, except as this may conflict with host government regulations.

c. Other than work to be performed under this award for which an employee is assigned by the recipient, employees of the recipient who are not citizens of the cooperating country must not engage directly or indirectly, either in the individual's own name or in the name or through an agency of another person, in any business, profession, or occupation in the foreign countries to which the individual is assigned. In addition, the individual must not make loans or investments to or in any business, profession, or occupation in the foreign countries to which the individual is assigned.

d. The recipient's employees who are not citizens of the cooperating country, while in a foreign country, are expected to show respect for its conventions, customs, and institutions, to abide by its applicable laws and regulations, and not to interfere in its internal political affairs.

e. In accordance with the internal control requirements in 2 CFR 200.303, which require the recipient to establish standards of conduct for its employees, the recipient must ensure that all its employees adhere to these standards of conduct in a manner consistent with the standards for United Nations (UN) employees in Section 3 of the UN Secretary-General's Bulletin - Special Measures for Protection from Sexual Exploitation and Sexual Abuse (ST/SGB/2003/13).

f. If the recipient determines that the conduct of any recipient employee is not in accordance with the preceding paragraphs, the recipient's Chief of Party must consult with the Agreement Officer and the USAID Mission Director, and the employee involved, and must recommend to the recipient a course of action with regard to such employee.

g. The parties recognize the rights of the U.S. Ambassador to direct the removal from a country of any U.S. citizen, or the discharge from this award of any individual (U.S., third-country, or cooperating-country national) when, in the discretion of the Ambassador, the interests of the United States so require.

h. If it is determined, under paragraph (f) or (g) above, that the services of such employee should be terminated, the recipient must use its best efforts to cause the return of such employee to the United States, or third-country point of origin, as appropriate, and replace the employee with an acceptable substitute at no cost to USAID.

i. Any matters relating to subrecipients, including the employees of subrecipients, must be coordinated through the recipient's Chief of Party.

[END OF PROVISION]

**15. CONVERSION OF UNITED STATES DOLLARS TO LOCAL CURRENCY (NOVEMBER 1985)**

Upon arrival in the cooperating country, and from time to time as appropriate, the recipient's chief of party must consult with the Mission Director who must provide, in writing, the procedure the recipient and its employees must follow in the conversion of United States dollars to local currency. This may include, but is not limited to, the conversion of currency through the cognizant United States Disbursing Officer or Mission Controller, as appropriate.

[END OF PROVISION]

**16. USE OF POUCH FACILITIES (AUGUST 1992)**

a. Use of diplomatic pouch is controlled by the Department of State. The Department of State has authorized the use of pouch facilities for USAID recipients and their employees as a general policy, as detailed in items (1) through (6) below. However, the final decision regarding use of pouch facilities rest with the Embassy or USAID Mission. In consideration of the use of pouch facilities, the recipient and its employees agree to indemnify and hold harmless, the Department of State and USAID for loss or damage occurring in pouch transmission:

(1) Recipients and their employees are authorized use of the pouch for transmission and receipt of up to a maximum of .9 kgs per shipment of correspondence and documents needed in the administration of assistance programs.

(2) U.S. citizen employees are authorized use of the pouch for personal mail up to a maximum of .45 kgs per shipment (but see a.(3) below).

(3) Merchandise, parcels, magazines, or newspapers are not considered to be personal mail for purposes of this standard provision and are not authorized to be sent or received by pouch.

(4) Official and personal mail pursuant to a.(1) and (2) above sent by pouch should be addressed as follows:

Name of individual or organization (followed by letter symbol "G")
City Name of post (USAID/______)
Agency for International Development
Washington, DC 20523-0001

(5) Mail sent via the diplomatic pouch may not be in violation of U.S. Postal laws and may not contain material ineligible for pouch transmission.

(6) Recipient personnel are NOT authorized use of military postal facilities (APO/FPO). This is an Adjutant General's decision based on existing laws and regulations governing military postal facilities and is being enforced worldwide.

b. The recipient is responsible for advising its employees of this authorization, these guidelines, and limitations on use of pouch facilities.

c. Specific additional guidance on grantee use of pouch facilities in accordance with this standard provision is available from the Post Communication Center at the Embassy or USAID Mission.

[END OF PROVISION]

## 17. TRAVEL AND INTERNATIONAL AIR TRANSPORTATION (DECEMBER 2014)

### a. TRAVEL COSTS

All travel costs must comply with the applicable cost principles and must be consistent with those normally allowed in like circumstances in the recipient's non-USAID-funded activities. Costs incurred by employees and officers for travel, including air fare, costs of lodging, other subsistence, and incidental expenses, may be considered reasonable and allowable only to the extent such costs do not exceed reasonable charges normally allowed by the recipient in its regular operations as the result of the recipient organization's written travel policy and are within the limits established by the applicable cost principles.

In the absence of a reasonable written policy regarding international travel costs, the standard for determining the reasonableness of reimbursement for international travel costs will be the Standardized Regulations (Government Civilians, Foreign Areas), published by the U.S. Department of State, as from time to time amended. The most current Standardized Regulations on international travel costs may be obtained from the AO. In the event that the cost for air fare exceeds the customary standard commercial airfare (coach or equivalent) or the lowest commercial discount airfare, the recipient must document one of the allowable exceptions from the applicable cost principles.

### b. FLY AMERICA ACT RESTRICTIONS

(1) The recipient must use U.S. Flag Air Carriers for all international air transportation (including personal effects) funded by this award pursuant to the Fly America Act and its implementing regulations to the extent service by such carriers is available.

(2) In the event that the recipient selects a carrier other than a U.S. Flag Air Carrier for international air transportation, in order for the costs of such international air transportation to be allowable, the recipient must document such transportation in accordance with this provision and maintain such documentation pursuant to the Standard Provision, "Accounting, Audit and Records." The documentation must use one of the following reasons or other exception under the Fly America Act:

(i) The recipient uses a European Union (EU) flag air carrier, which is an airline operating from an EU country that has signed the US-EU "Open Skies" agreement (http://www.state.gov/e/eb/rls/othr/ata/i/ic/170684.htm).

(ii) Travel to or from one of the following countries on an airline of that country when no city pair fare is in effect for that leg (see http://apps.fas.gsa.gov/citypairs/search/):

a. Australia on an Australian airline,
b. Switzerland on a Swiss airline, or
c. Japan on a Japanese airline;

(iii) Only for a particular leg of a route on which no US Flag Air Carrier provides service on that route;

(iv) For a trip of 3 hours or less, the use of a US Flag Air Carrier at least doubles the travel time;

(v) If the US Flag Air Carrier offers direct service, use of the US Flag Air Carrier would increase the travel time by more than 24 hours; or

(vi) If the US Flag Air Carrier does <u>not</u> offer direct service,

a. Use of the US Flag Air Carrier increases the number of aircraft changes by 2 or more,

b. Use of the US Flag Air Carrier extends travel time by 6 hours or more, or

c. Use of the US Flag Air Carrier requires a layover at an overseas interchange of 4 hours or more.

**c. DEFINITIONS**

The terms used in this provision have the following meanings:

(1) “Travel costs” means expenses for transportation, lodging, subsistence (meals and incidentals), and related expenses incurred by employees who are on travel status on official business of the recipient for any travel outside the country in which the organization is located. “Travel costs” do not include expenses incurred by employees who are not on official business of the recipient, such as rest and recuperation (R&R) travel offered as part of an employee’s benefits package that are consistent with the recipient’s personnel and travel policies and procedures.

(2) “International air transportation" means international air travel by individuals (and their personal effects) or transportation of cargo by air between a place in the United States and a place outside thereof, or between two places both of which are outside the United States.

(3) "U.S. Flag Air Carrier" means an air carrier on the list issued by the U.S. Department of Transportation at http://ostpxweb.dot.gov/aviation/certific/certlist.htm. U.S. Flag Air Carrier service also includes service provided under a code share agreement with another air carrier when the ticket, or documentation for an electronic ticket, identifies the U.S. flag air carrier’s designator code and flight number.

(4) For this provision, the term “United States” includes the fifty states, Commonwealth of Puerto Rico, possessions of the United States, and the District of Columbia.

**d. SUBAWARDS AND CONTRACTS**

This provision must be included in all subawards and contracts under which this award will finance international air transportation.

[END OF PROVISION]

**18. OCEAN SHIPMENT OF GOODS (JUNE 2012)**

a. Prior to contracting for ocean transportation to ship goods purchased or financed with USAID funds under this award, the recipient must contact the office below to determine the flag and class of vessel to be used for shipment:

U.S. Agency for International Development
Bureau for Management
Office of Acquisition and Assistance, Transportation Division
1300 Pennsylvania Avenue, NW
USAID Annex
Washington, DC 20523
Email: oceantransportation@usaid.gov

**b.** This provision must be included in all subawards and contracts.

[END OF PROVISION]

**19. VOLUNTARY POPULATION PLANNING ACTIVITIES – MANDATORY REQUIREMENTS (MAY 2006)**

Requirements for Voluntary Sterilization Programs

(1) Funds made available under this award must not be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any individual to practice sterilization.

Prohibition on Abortion-Related Activities:

(1) No funds made available under this award will be used to finance, support, or be attributed to the following activities: (i) procurement or distribution of equipment intended to be used for the purpose of inducing abortions as a method of family planning; (ii) special fees or incentives to any person to coerce or motivate them to have abortions; (iii) payments to persons to perform abortions or to solicit persons to undergo abortions; (iv) information, education, training, or communication programs that seek to promote abortion as a method of family planning; and (v) lobbying for or against abortion. The term “motivate,” as it relates to family planning assistance, must not be construed to prohibit the provision, consistent with local law, of information or counseling about all pregnancy options.

(2) No funds made available under this award will be used to pay for any biomedical research which relates, in whole or in part, to methods of, or the performance of, abortions or involuntary sterilizations as a means of family planning. Epidemiologic or descriptive research to assess the incidence, extent or consequences of abortions is not precluded.

[END OF PROVISION]

**20. TRAFFICKING IN PERSONS (APRIL 2016)**

a. The recipient, subawardee, or contractor, at any tier, or their employees, labor recruiters, brokers or other agents, must not engage in:

(1) Trafficking in persons (as defined in the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, especially Women and Children, supplementing the UN Convention against Transnational Organized Crime) during the period of this award;

(2) Procurement of a commercial sex act during the period of this award;

(3) Use of forced labor in the performance of this award;

(4) Acts that directly support or advance trafficking in persons, including the following acts:

i. Destroying, concealing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents;

ii. Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless:

a) exempted from the requirement to provide or pay for such return transportation by USAID under this award; or

b) the employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action;

iii. Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment;

iv. Charging employees recruitment fees; or

v. Providing or arranging housing that fails to meet the host country housing and safety standards.

b. In the event of a violation of section (a) of this provision, USAID is authorized to terminate this award, without penalty, and is also authorized to pursue any other remedial actions authorized as stated in section 1704(c) of the National Defense Authorization Act for Fiscal Year 2013 (Pub. L. 112-239, enacted January 2, 2013).

c. If the estimated value of services required to be performed under the award outside the United States exceeds $500,000, the recipient must submit to the Agreement Officer, the annual "Certification regarding Trafficking in Persons, Implementing Title XVII of the National Defense Authorization Act for Fiscal Year 2013" as required prior to this award, and must implement a compliance plan to prevent the activities described above in section (a) of this provision. The recipient must provide a copy of the compliance plan to the Agreement Officer upon request and must post the useful and relevant contents of the plan or related materials on its website (if one is maintained) and at the workplace.

d. The recipient's compliance plan must be appropriate to the size and complexity of the award and to the nature and scope of the activities, including the number of non-United States citizens expected to be employed. The plan must include, at a minimum, the following:

(1) An awareness program to inform employees about the trafficking related prohibitions included in this provision, the activities prohibited and the action that will be taken against the employee for violations.

(2) A reporting process for employees to report, without fear of retaliation, activity inconsistent with the policy prohibiting trafficking, including a means to make available to all employees the Global Human Trafficking Hotline at 1-844-888-FREE and its e-mail address at help@befree.org.

(3) A recruitment and wage plan that only permits the use of recruitment companies with trained employees, prohibits charging of recruitment fees to the employee, and ensures that wages meet applicable host-country legal requirements or explains any variance.

(4) A housing plan, if the recipient or any subawardee intends to provide or arrange housing. The housing plan is required to meet any host-country housing and safety standards.

(5) Procedures for the recipient to prevent any agents or subawardee at any tier and at any dollar value from engaging in trafficking in persons activities described in section a of this provision. The recipient must also have procedures to monitor, detect, and terminate any agents or subawardee or subawardee employees that have engaged in such activities.

e. If the Recipient receives any credible information regarding a violation listed in section a(1)-(4) of this provision, the recipient must immediately notify the cognizant Agreement Officer and the USAID Office of the Inspector General; and must fully cooperate with any Federal agencies responsible for audits, investigations, or corrective actions relating to trafficking in persons.

f. The Agreement Officer may direct the Recipient to take specific steps to abate an alleged violation or enforce the requirements of a compliance plan.

g. For purposes of this provision, "employee" means an individual who is engaged in the performance of this award as a direct employee, consultant, or volunteer of the recipient or any subrecipient.

h. The recipient must include in all subawards and contracts a provision prohibiting the conduct described in section a(1)-(4) by the subrecipient, contractor, or any of their employees, or any agents. The recipient must also include a provision authorizing the recipient to terminate the award as described in section b of this provision.

[END OF PROVISION]

**21. SUBMISSIONS TO THE DEVELOPMENT EXPERIENCE CLEARINGHOUSE AND PUBLICATIONS (JUNE 2012)**

a. Submissions to the Development Experience Clearinghouse (DEC).

1) The recipient must provide the Agreement Officer's Representative one copy of any Intellectual Work that is published, and a list of any Intellectual Work that is not published.

2) In addition, the recipient must submit Intellectual Work, whether published or not, to the DEC, either on-line (preferred) or by mail. The recipient must review the DEC Web site for submission instructions, including document formatting and the types of documents to submit. Submission instructions can be found at: http://dec.usaid.gov.

3) For purposes of submissions to the DEC, Intellectual Work includes all works that document the implementation, evaluation, and results of international development assistance activities developed or acquired under this award, which may include program and communications materials, evaluations and assessments, information products, research and technical reports, progress and performance reports required under this award (excluding administrative financial information), and other reports, articles and papers prepared by the recipient under the award, whether published or not. The term does not include the recipient's information that is incidental to award administration, such as financial, administrative, cost or pricing, or management information.

4) Each document submitted should contain essential bibliographic information, such as 1) descriptive title; 2) author(s) name; 3) award number; 4) sponsoring USAID office; 5) development objective; and 6) date of publication.

5) The recipient must not submit to the DEC any financially sensitive information or personally identifiable information, such as social security numbers, home addresses and dates of birth. Such information must be removed prior to submission. The recipient must not submit classified documents to the DEC.

b. In the event award funds are used to underwrite the cost of publishing, in lieu of the publisher assuming this cost as is the normal practice, any profits or royalties up to the amount of such cost must be credited to the award unless the schedule of the award has identified the profits or royalties as program income.

[END OF PROVISION]

**22. LIMITING CONSTRUCTION ACTIVITIES (AUGUST 2013)**

a) Construction is not eligible for reimbursement under this award unless specifically identified in paragraph d) below.

b) Construction means — construction, alteration, or repair (including dredging and excavation) of buildings, structures, or other real property and includes, without limitation, improvements, renovation, alteration and refurbishment. The term includes, without limitation, roads, power plants, buildings, bridges, water treatment facilities, and vertical structures.

c) Agreement Officers will not approve any subawards or procurements by recipients for construction activities that are not listed in paragraph below. USAID will reimburse allowable costs for only the construction activities listed in this provision not to exceed the amount specified in the construction line item of the award budget. The recipient must receive prior written approval from the AO to transfer funds allotted for construction activities to other cost categories, or vice versa.

d) Description

**Construction is not eligible for reimbursement under this award**

e) The recipient must include this provision in all subawards and procurements and make vendors providing services under this award and subrecipients aware of the restrictions of this provision.

[END OF PROVISION]

**23. USAID IMPLEMENTING PARTNER NOTICES (IPN) PORTAL FOR ASSISTANCE (JULY 2014)**

(a) Definitions

“USAID Implementing Partner Notices (IPN) Portal for Assistance (“IPN Portal)” means the single point where USAID posts proposed universal bilateral amendments for USAID awards, which can be accessed electronically by registered USAID recipients. The IPN Portal is located at https://sites.google.com/site/usaidipnforassistance/. Universal amendments are those which affect all assistance awards or a designated class of awards as specified in each amendment by the IPN Portal Administrator.

“IPN Portal Administrator” means the USAID official designated by the Director, M/OAA, who has overall responsibility for managing the USAID Implementing Partner Notices Portal for Assistance.

“Universal bilateral amendment” means those amendments with revisions or new requirements or provisions that affect all awards or a designated class of awards, as specified in the Agency notification of such revisions or new requirements.

(b) By submission of an application and execution of an award, the Applicant/Recipient acknowledges the requirement to:

(1) Register with the IPN Portal if awarded an assistance award resulting from this solicitation, and

(2) Receive universal bilateral amendments to this award and general notices via the IPN Portal.

(c) Procedure to register for notifications.

Go to https://sites.google.com/site/usaidipnforassistance/ and click the “Register” button at the top of the page. Recipient representatives must use their official organization email address when subscribing, not personal email addresses.

(d) Processing of IPN Portal Amendments

The Recipient may access the IPN Portal at any time to review all IPN Portal amendments; however, the system will also notify the Recipient by email when the USAID IPN Portal Administrator posts a universal bilateral amendment for Recipient’s review and signature. Proposed USAID IPN Portal amendments distributed via the IPN Portal are applicable to all awards, unless otherwise noted in the proposed amendment.

Within 15 calendar days from receipt of the notification email from the IPN Portal, the Recipient must do one of the following:

(1) (a) verify applicability of the proposed amendment for their award(s) per the instructions provided with each amendment; (b) download the amendment and incorporate the following information on the amendment form: award number, organization name, and organization mailing address as it appears in the basic award; (c) sign the hardcopy version; and (d) send the signed amendment (by email or hardcopy) to the AO for signature. The Recipient must not incorporate any other changes to the IPN Portal amendment. Bilateral amendments provided through the IPN Portal are not effective until the both the Recipient and the AO sign the amendment;

(2) Notify the AO in writing if the amendment requires negotiation of additional changes to terms and conditions of the award; or

(3) Notify the AO that the Recipient declines to sign the amendment.

Within 30 calendar days of receipt of a signed amendment from the Recipient, the AO must provide the fully executed amendment to the Recipient or initiate discussions with the Recipient.

[END OF PROVISION]

**24. PILOT PROGRAM FOR ENHANCEMENT OF GRANTEE EMPLOYEE WHISTLEBLOWER PROTECTIONS (SEPTEMBER 2014)**

The requirement to comply with and inform all employees of the "Pilot Program for Enhancement of Contractor Employee Whistleblower Protections" is retroactively effective for all assistance awards and subawards (including subcontracts) issued beginning July 1, 2013.

The Grantee must:

1. Inform its employees working under this award in the predominant native language of the workforce that they are afforded the employee whistleblower rights and protections provided under 41 U.S.C. § 4712; and

2. Include such requirement in any subaward or subcontract made under this award.

41 U.S.C. § 4712 states that an employee of a Grantee may not be discharged, demoted, or otherwise discriminated against as a reprisal for "whistleblowing." In addition, whistleblower protections cannot be waived by any agreement, policy, form, or condition of employment.

Whistleblowing is defined as making a disclosure "that the employee reasonably believes" is evidence of any of the following:

- Gross mismanagement of a Federal contract or grant;
- A gross waste of Federal funds;
- An abuse of authority relating to a Federal contract or grant;
- A substantial and specific danger to public health or safety; or
- A violation of law, rule, or regulation related to a Federal contract or grant (including the competition for, or negotiation of, a contract or grant).

To qualify under the statute, the employee's disclosure must be made to:

- A Member of the U.S. Congress, or a representative of a U.S. Congressional Committee;
- A cognizant U.S. Inspector General;
- The U.S. Government Accountability Office;
- A Federal employee responsible for contract or grant oversight or management at the relevant agency;
- A U.S. court or grand jury; or,
- A management official or other employee of the Grantee who has the responsibility to investigate, discover, or address misconduct.

[END OF PROVISION]

**25. SUBMISSION OF DATASETS TO THE DEVELOPMENT DATA LIBRARY (OCTOBER 2014)**

a. Definitions. For the purpose of submissions to the DDL:

(1) "Dataset" is an organized collection of structured data, including data contained in spreadsheets, whether presented in tabular or non-tabular form. For example, a Dataset may represent a single spreadsheet, an extensible mark-up language (XML) file, a geospatial data file, or an organized collection of these. This requirement does not apply to aggregated performance reporting data that the recipient submits directly to a USAID portfolio management system or to unstructured data, such as email messages, PDF files, PowerPoint presentations, word processing documents, photos and graphic images, audio files, collaboration software, and instant messages. Neither does the requirement apply to the recipient's information that is incidental to award administration, such as financial, administrative, cost or pricing, or management information. Datasets submitted to the DDL will generally be those generated with USAID resources and created in support of Intellectual Work that is uploaded to the Development Experience Clearinghouse (DEC) (See M21. SUBMISSIONS TO THE DEVELOPMENT EXPERIENCE CLEARINGHOUSE AND PUBLICATIONS (JUNE 2012).

(2) "Intellectual Work" includes all works that document the implementation, monitoring, evaluation, and results of international development assistance activities developed or acquired under this award, which may include program and communications materials, evaluations and assessments, information products, research and technical reports, progress and performance reports required under this award (excluding administrative financial information), and other reports, articles and papers prepared by the recipient under the award, whether published or not. The term does not include the recipient's information that is incidental to award administration, such as financial, administrative, cost or pricing, or management information.

b. Submissions to the Development Data Library (DDL)

(1) The recipient must submit to the Development Data Library (DDL) at www.usaid.gov/data, in a machine-readable, non-proprietary format, a copy of any Dataset created or obtained in performance of this award, including Datasets produced by a subawardee or a contractor at any tier. The submission must include supporting documentation describing the Dataset, such as code books, data dictionaries, data gathering tools, notes on data quality, and explanations of redactions.

(2) Unless otherwise directed by the Agreement Officer (AO) or the Agreement Officer Representative (AOR), the recipient must submit the Dataset and supporting documentation to the DDL within thirty (30) calendar days after the Dataset is first used to produce an Intellectual Work or is of sufficient quality to produce an Intellectual Work. Within thirty (30) calendar days after award completion, the recipient must submit to the DDL any Datasets and supporting documentation that have not previously been submitted to the DDL, along with an index of all Datasets and Intellectual Work created or obtained under the award. The recipient must also provide to the AOR an itemized list of any and all DDL submissions.

The recipient is not required to submit the data to the DDL, when, in accordance with the terms and conditions of this award, Datasets containing results of federally funded scientific research are submitted to a publicly accessible research database. However, the recipient must submit a notice to the DDL by following the instructions at www.usaid.gov/data, with a copy to the agreement officer representative, providing details on where and how to access the data. The direct results of federally funded scientific research must be reported no later than when the data are ready to be submitted to a peer-reviewed journal for publication, or no later than five calendar days prior to the conclusion of the award, whichever occurs earlier.

(3) The recipient must submit the Datasets following the submission instructions and acceptable formats found at www.usaid.gov/data.

(4) The recipient must ensure that any Dataset submitted to the DDL does not contain any proprietary or personally identifiable information, such as social security numbers, home addresses, and dates of birth. Such information must be removed prior to submission.

(5) The recipient must not submit classified data to the DDL.

[END OF PROVISION]

**26. PROHIBITION ON REQUIRING CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS OR STATEMENTS (MAY 2017)**

(a) Definitions.

"Contract" has the meaning given in 2 CFR Part 200.

"Contractor" means an entity that receives a contract as defined in 2 CFR Part 200.

"Internal confidentiality agreement or statement" means a confidentiality agreement or any other written statement that the recipient requires any of its employees or subrecipients to sign regarding nondisclosure of recipient information, except that it does not include confidentiality agreements arising out of civil litigation or confidentiality agreements that recipient employees or subrecipients sign at the behest of a Federal agency.

"Subaward" has the meaning given in 2 CFR Part 200.

"Subrecipient" has the meaning given in 2 CFR Part 200.

(b) The recipient must not require its employees, subrecipients, or contractors to sign or comply with internal confidentiality agreements or statements that prohibit or otherwise restrict employees, subrecipients, or contractors from lawfully reporting waste, fraud, or abuse related to the performance of a Federal award to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information (for example, the Agency Office of the Inspector General).

(c) The recipient must notify current employees and subrecipients that prohibitions and restrictions of any preexisting internal confidentiality agreements or statements covered by this provision, to the extent that such prohibitions and restrictions are inconsistent with the prohibitions of this provision, are no longer in effect.

(d) The prohibition in paragraph (b) of this provision does not contravene the requirements applicable to Standard Form 312 (Classified Information Nondisclosure Agreement), Form 4414 (Sensitive Compartmented Information Nondisclosure Agreement), or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

(e) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015, (Pub. L. 113-235), and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions) use of funds appropriated (or otherwise made available) is prohibited, if the Government determines that the recipient is not in compliance with the requirements of this provision.

(f) The recipient must include the substance of this provision, including this paragraph (f), in subawards and contracts under such awards.

[END OF PROVISION]

**27. CHILD SAFEGUARDING (JUNE 2015)**

(a) Because the activities to be funded under this award may involve children, or personnel engaged in the implementation of the award may come into contact with children, these activities could raise the risk of child abuse, exploitation, or neglect within USAID-funded programs. The organization agrees to abide by the following child safeguarding core principles:

(1) Ensure compliance with host country and local child welfare and protection legislation or international standards, whichever gives greater protection, and with U.S. law where applicable;

(2) Prohibit all personnel from engaging in child abuse, exploitation, or neglect;

(3) Consider child safeguarding in project planning and implementation to determine potential risks to children that are associated with project activities and operations;

(4) Apply measures to reduce the risk of child abuse, exploitation, or neglect, including, but not limited to, limiting unsupervised interactions with children; prohibiting exposure to pornography; and complying with applicable laws, regulations, or customs regarding the photographing, filming, or other image-generating activities of children;

(5) Promote child-safe screening procedures for personnel, particularly personnel whose work brings them in direct contact with children; and

(6) Have a procedure for ensuring that personnel and others recognize child abuse, exploitation, or neglect; mandating that personnel and others report allegations; investigating and managing allegations; and taking appropriate action in response to such allegations, including, but not limited to, dismissal of personnel.

(b) The organization must also include in their code of conduct for all personnel implementing USAID-funded activities the child safeguarding principles in (a) (1) through (6).

(c) The following definitions apply for purposes of this provision:

(1) Child: A child or children are defined as persons who have not attained 18 years of age.

(2) Child abuse, exploitation, or neglect: Constitutes any form of physical abuse; emotional ill-treatment; sexual abuse; neglect or insufficient supervision; trafficking; or commercial, transactional, labor, or other exploitation resulting in actual or potential harm to the child's health, well-being, survival, development, or dignity. It includes, but is not limited to: any act or failure to act which results in death, serious physical or emotional harm to a child, or an act or failure to act which presents an imminent risk of serious harm to a child.

(3) Physical abuse: Constitutes acts or failures to act resulting in injury (not necessarily visible), unnecessary or unjustified pain or suffering without causing injury, harm or risk of harm to a child's health or welfare, or death. Such acts may include, but are not limited to: punching, beating, kicking, biting, shaking, throwing, stabbing, choking, or hitting (regardless of object used), or burning.

These acts are considered abuse regardless of whether they were intended to hurt the child.

(4) Sexual Abuse: Constitutes fondling a child's genitals, penetration, incest, rape, sodomy, indecent exposure, and exploitation through prostitution or the production of pornographic materials.

(5) Emotional abuse or ill treatment: Constitutes injury to the psychological capacity or emotional stability of the child caused by acts, threats of acts, or coercive tactics. Emotional abuse may include, but is not limited to: humiliation, control, isolation, withholding of information, or any other deliberate activity that makes the child feel diminished or embarrassed.

(6) Exploitation: Constitutes the abuse of a child where some form of remuneration is involved or whereby the perpetrators benefit in some manner. Exploitation represents a form of coercion and violence that is detrimental to the child's physical or mental health, development, education, or well-being.

(7) Neglect: Constitutes failure to provide for a child's basic needs within USAID-funded activities that are responsible for the care of a child in the absence of the child's parent or guardian.

(d) The recipient must insert the provisions in (a) and (b) in all sub-awards under this award.

[END OF PROVISION]

**28. MANDATORY DISCLOSURES (NOVEMBER 2020)**

Consistent with 2 CFR §200.113, applicants and recipients must disclose, in a timely manner, in writing to the USAID Office of the Inspector General, with a copy to the cognizant Agreement Officer, all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. Subrecipients must disclose, in a timely manner, in writing to the USAID Office of the Inspector General and to the prime recipient (pass through entity) all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award.

Disclosures must be sent to:

U.S. Agency for International Development
Office of the Inspector General
P.O. Box 657
Washington, DC 20044-0657

Phone: 1-800-230-6539 or 202-712-1023
Email: ig.hotline@usaid.gov
URL: https://oig.usaid.gov/content/usaid-contractor-reporting-form.

Failure to make required disclosures can result in any of the remedies described in 2 CFR §200.339 Remedies for noncompliance, including suspension or debarment (See 2 CFR 180, 2 CFR 780 and 31 U.S.C. 3321).

The recipient must include this mandatory disclosure requirement in all subawards and contracts under this award.

[END OF PROVISION]

**29. NONDISCRIMINATION AGAINST BENEFICIARIES (NOVEMBER 2016)**

a) USAID policy requires that the recipient not discriminate against any beneficiaries in implementation of this award, such as, but not limited to, by withholding, adversely impacting, or denying equitable access to the benefits provided through this award on the basis of any factor not expressly stated in the award. This includes, for example, race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, disability, age, genetic information, marital status, parental status, political affiliation, or veteran's status. Nothing in this provision is intended to limit the ability of the recipient to target activities toward the assistance needs of certain populations as defined in the award.

b) The Recipient must insert this provision, including this paragraph, in all subawards and contracts under this award.

[END OF PROVISION]

**30. CONFLICT OF INTEREST (AUGUST 2018)**

a) A conflict of interest in the award, administration, or monitoring of subawards arises when an employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of these parties, has a financial or other interest in, or a tangible personal benefit from, a subrecipient considered for a subaward. The officers, employees, and agents of the recipient may neither solicit nor accept gratuities, favors, or anything of monetary value from subrecipients or parties to subawards. However, recipients may set standards for situations in which the financial interest is not substantial or the gift is an unsolicited item of nominal value.

b) The recipient must maintain written standards of conduct covering conflicts of interest and governing the actions of its employees engaged in the selection, award, and administration of subawards. The standards must prohibit employees from using their positions for a purpose that constitutes or presents the appearance of a conflict of interest. The standards of conduct must provide for disciplinary actions to be applied for violations of such standards by officers, employees, or agents of the recipient.

c) The recipient must also maintain written standards of conduct covering organizational conflicts of interest. Organizational conflicts of interest means a situation in which the recipient is unable or appears to be unable to be impartial in conducting a subaward action involving a related organization because of relationships with a parent company, affiliate, or subsidiary organization.

d) The recipient must have a system or systems in place to identify, address, resolve, and disclose to USAID any conflicts of interest as described in this provision that affect any subaward, regardless of the amount of funding.

e) The recipient must disclose any conflict of interest, including organizational conflicts of interest, and the recipient's approach for resolving the conflict of interest to the cognizant Agreement Officer for the award within ten (10) calendar days of the discovery of the conflict of interest.

f) Upon notice from the recipient of a potential conflict of interest and the approach for resolving it, the Agreement Officer will make a determination regarding the effectiveness of the recipient's actions to resolve the conflict of interest within thirty (30) calendar days of receipt of the recipient's notice, unless the Agreement Officer advises the recipient that a longer period is necessary.

g) The recipient must not request payment from USAID for costs for transactions subject to the conflict of interest pending notification of USAID's determination. The recipient's failure to disclose a conflict of interest may result in cost disallowances by USAID.

h) For conflicts of interest, including organizational conflicts of interest, involving contracts, the recipient must follow 2 CFR 200.318, general procurement standards.

i) The recipient must insert the substance of this provision, including paragraph (i), in all subawards under this award, at any subaward tier.

[END OF PROVISION]

**[END OF MANDATORY PROVISIONS]**

b) **REQUIRED AS APPLICABLE STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS**

**31. NEGOTIATED INDIRECT COST RATES - PROVISIONAL (NONPROFIT) (NOVEMBER 2020)**

a. Provisional indirect cost rates must be established for each of the recipient's accounting periods during the term of this award. Pending establishment of revised provisional or final rates, allowable indirect costs must be reimbursed at the rates, on the bases, and for the periods shown in the schedule of the award.

b. Organizations that have previously established indirect cost rates must submit a new indirect cost proposal to the cognizant agency for indirect costs within six months after the close of each fiscal year. Except as otherwise provided in §200.414 Indirect (F&A) costs paragraphs (e) and (f), a nonprofit organization which has not previously established an indirect cost rate with a Federal agency must submit its initial indirect cost proposal immediately after the organization is advised that a Federal award will be made and, in no event, later than three months after the effective date of the Federal award.

If USAID is the cognizant agency or no cognizant agency has been designated, the recipient must submit four copies of the audit report, along with the proposed final indirect cost rates and supporting cost data, to the Overhead, Special Costs, and Closeout Branch, Office of Acquisition and Assistance, USAID, Washington, DC 20523-7802. The proposed rates must be based on the recipient's actual cost experience during that fiscal year. Negotiations of final indirect cost rates must begin soon after receipt of the recipient’s proposal. No proposal to establish indirect (F&A) cost rates will be acceptable unless such costs have been certified by the non-profit organization using the Certificate of Indirect (F&A) Costs set forth in 2 CFR 200, Appendix IV, Section j. The certificate must be signed on behalf of the organization by an individual at a level no lower than vice president or chief financial officer for the organization.

c. Allowability of costs and acceptability of cost allocation methods must be determined in accordance with the applicable cost principles.

d. The results of each negotiation must be set forth in a written indirect cost rate agreement signed by both parties. Such agreement is automatically incorporated into this award and must specify (1) the agreed upon final rates, (2) the bases to which the rates apply, and (3) the fiscal year for which the rates apply. The agreement must not change any monetary ceiling, award obligation, or specific cost allowance or disallowance provided for in this award.

e. Pending establishment of final indirect cost rate(s) for any fiscal year, the recipient must be reimbursed either at negotiated provisional rates or at billing rates acceptable to the Agreement Officer, subject to appropriate adjustment when the final rates for the fiscal year are established. To prevent substantial overpayment or underpayment, the provisional rate may be adjusted by the cognizant agency for indirect costs during the institution's fiscal year.

f. If a dispute arises in a negotiation of an indirect cost rate between the cognizant agency for indirect costs and the nonprofit organization, the dispute must be resolved in accordance with the appeals procedures of the cognizant agency for indirect costs.

[END OF PROVISION]

**32. REPORTING HOST GOVERNMENT TAXES (JUNE 2012)**

a. By April 16 of each year, the recipient must submit a report containing:

(1) Contractor/recipient name.

(2) Contact name with phone, fax and e-mail.

(3) Agreement number(s).

(4) The total amount of value-added taxes and customs duties (but not sales taxes) assessed by the host government (or any entity thereof) on purchases in excess of $500 per transaction of supplies, materials, goods or equipment, during the 12 months ending on the preceding September 30, using funds provided under this contract/agreement.

(5) Any reimbursements received by April 1 of the current year on value-added taxes and customs duties reported in (iv).

(6) Reports are required even if the recipient did not pay any taxes or receive any reimbursements during the reporting period.

(7) Cumulative reports may be provided if the recipient is implementing more than one program in a foreign country.

b. Submit the reports to: obldocCMP@usaid.gov

c. Host government taxes are not allowable where the Agreement Officer provides the necessary means to the recipient to obtain an exemption or refund of such taxes, and the recipient fails to take reasonable steps to obtain such exemption or refund. Otherwise, taxes are allowable in accordance with the Standard Provision, “Allowable Costs,” and must be reported as required in this provision.

d. The recipient must include this reporting requirement in all applicable subawards and contracts.

[END OF PROVISION]

**33. USAID DISABILITY POLICY - ASSISTANCE (DECEMBER 2004)**

a. The objectives of the USAID Disability Policy are (1) to enhance the attainment of United States foreign assistance program goals by promoting the participation and equalization of opportunities of individuals with disabilities in USAID policy, country and sector strategies, activity designs and implementation; (2) to increase awareness of issues of people with disabilities both within USAID programs and in host countries; (3) to engage other U.S. Government agencies, host country counterparts, governments, implementing organizations and other donors in fostering a climate of nondiscrimination against people with disabilities; and (4) to support international advocacy for people with disabilities.

b. USAID therefore requires that the recipient not discriminate against people with disabilities in the implementation of USAID funded programs and that it make every effort to comply with the objectives of the USAID Disability Policy in performing the program under this grant or cooperative agreement. To that end and to the extent it can accomplish this goal within the scope of the program objectives, the recipient should demonstrate a comprehensive and consistent approach for including men, women, and children with disabilities.

[END OF PROVISION]

**34. UNIVERSAL IDENTIFIER AND SYSTEM FOR AWARD MANAGEMENT (NOVEMBER 2020)**

**a. Requirement for System for Award Management (SAM).** Unless you are exempted from this requirement under 2 CFR 25.110, you as the recipient must maintain current information in the SAM. This includes information on your immediate and highest level owner and subsidiaries, as well as on all of your predecessors that have been awarded a Federal contract or Federal financial assistance within the last three years, if applicable, until you submit the final financial report required under this Federal award or receive the final payment, whichever is later. This requires that you review and update the information at least annually after the initial registration, and more frequently, if required by changes in your information or another Federal award term.

**b. Requirement for Unique Entity Identifier.** If you are authorized to make subawards under this Federal award, you:

(1) Must notify potential subrecipients that no entity (see definition in paragraph c. of this award term) may receive a subaward from you until the entity has provided its Unique Entity Identifier to you.

(2) May not make a subaward to an entity unless the entity has provided its Unique Entity Identifier to you. Subrecipients are not required to obtain an active SAM registration but must obtain a Unique Entity Identifier.

**c. Definitions.** For purposes of this term:

(1) System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient. Additional information about registration procedures may be found at the SAM Internet site (currently at https://www.sam.gov).

(2) Unique Entity Identifier means the identifier assigned by SAM to uniquely identify business entities.

(3) Entity includes non-Federal entities as defined in 2 CFR 200.1 and also includes all of the following, for purposes of this part:

a. A foreign organization;
b. A foreign public entity;
c. A domestic for-profit organization; and
d. A Federal agency.

(4) Subaward has the meaning given in 2 CFR 200.1.

(5) Subrecipient has the meaning given in 2 CFR 200.1.

**ADDENDUM (NOVEMBER 2020):**

**d. Exceptions.** The requirements of this provision to obtain a Unique Entity Identifier and maintain a current registration in the SAM do not apply, at the prime award or subaward level, to:
(1) Awards to individuals

(2) Awards less than $25,000, with no anticipated subawards, to foreign organizations to be performed outside the United States (based on a USAID determination)

(3) Awards where the Agreement Officer determines, in writing, that the Agency must protect entity information from disclosure due to national security or foreign policy interests of the United States or that these requirements would cause personal safety concerns.

**e.** This provision does not need to be included in subawards.

[END OF PROVISION]

**35. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION (NOVEMBER 2020)**

**a. Reporting of first-tier subawards.**

(1) Applicability. Unless you are exempt as provided in paragraph d. of this award term, you must report each action that equals or exceeds $30,000 in Federal funds for a subaward to a non-Federal entity or Federal agency (see definitions in paragraph e. of this award term).

(2) Where and when to report.

(i) The non-Federal entity or Federal agency must report each obligating action described in paragraph a.(1) of this award term to www.fsrs.gov/.

(ii) For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

(3) What to report. You must report the information about each obligating action that the submission instructions posted at https://www.fsrs.gov/ specify.

**b. Reporting total compensation of recipient executives for non-Federal entities.**

(1) Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if –

(i) The total Federal funding authorized to date under this Federal award equals or exceeds $30,000 as defined in 2 CFR 170.320;

(ii) In the preceding fiscal year, you received—

(A) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

(iii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at www.sec.gov/answers/execomp.htm.)

(2) Where and when to report. You must report executive total compensation described in paragraph b.(1) of this award term:

(i) As part of your registration profile at https://www.sam.gov/portal.

(ii) By the end of the month following the month in which this award is made, and annually thereafter.

**c. Reporting of Total Compensation of Subrecipient Executives.**

(1) Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier non-Federal entity subrecipient under this award, you must report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if–

(i) In the subrecipient's preceding fiscal year, the subrecipient received—

(A) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

(B) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

(ii) The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at www.sec.gov/answers/execomp.htm.)

(2) Where and when to report. You must report subrecipient executive total compensation described in paragraph c.(1) of this award term:

(i) To the recipient.

(ii) By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (for example, between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

**d. Exemptions.**

If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

(1) Subawards, and

(2) The total compensation of the five most highly compensated executives of any subrecipient.

**e. Definitions.**

For purposes of this award term:

(1) Federal Agency means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

(2) Non-Federal entity means all of the following, as defined in 2 CFR 25:

(i) A governmental organization, which is a State, local government, or Indian tribe;

(ii) A foreign public entity;

(iii) A domestic or foreign nonprofit organization;

(iv) A domestic or foreign for-profit organization.

(3) Executive means officers, managing partners, or any other employees in management positions.

(4) Subaward:

(i) This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

(ii) The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see 2 CFR 200.331).

(iii) A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

(5) Subrecipient means a non-Federal entity or Federal agency that:

(i) Receives a subaward from you (the recipient) under this award; and

(ii) Is accountable to you for the use of the Federal funds provided by the subaward.

(6) Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

(i) Salary and bonus.

(ii) Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

(iii) Earnings for services under nonequity incentive plans. This does not include group life, health, hospitalization, or medical reimbursement plans that do not discriminate in favor of executives, and are available generally to all salaried employees. (iv) Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

(v) Above-market earnings on deferred compensation which is not tax-qualified.

(vi) Other compensation, if the aggregate value of all such other compensation (for example, severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

[END OF PROVISION]

**36. AWARD TERM AND CONDITION FOR RECIPIENT INTEGRITY AND PERFORMANCE MATTERS (APRIL 2016)**

A. Reporting of Matters Related to Recipient Integrity and Performance

1. General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2. Proceedings About Which You Must Report

Submit the information required about each proceeding that:

a. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

b. Reached its final disposition during the most recent five year period; and

c. Is one of the following:

(1) A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

(2) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

(3) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

(4) Any other criminal, civil, or administrative proceeding if:

(i) It could have led to an outcome described in paragraph 2.c.(1), (2), or (3)of this award term and condition;

(ii) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

(iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

4. Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five year period,

either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report.

Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions

For purposes of this award term and condition:

a. Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

b. Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

c. Total value of currently active grants, cooperative agreements, and procurement contracts includes— (1) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and (2) The value of all expected funding increments under a Federal award and options, even if not yet exercised.

B. [Reserved]

[END OF PROVISION]

**[END OF STANDARD PROVISIONS]**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-00402 (AHA) |

I, Pete Marocco, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2. Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State. Previously, I served as a United States Marine and as a Deputy Assistant

Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

A. Payment Process

3. The Department of State and USAID are currently completing individualized review of contracts and grants. Determining the appropriate course for existing contracts and grants is a cumbersome, multi-step process. Once an initial decision is made concerning whether to lift a stop-work order or terminate a contract, under authority conferred by both the contracts/grants and independent legal authority, State and USAID began the process of lifting stop work orders and terminating others as quickly as possible with the resources they have.

4. The Court's latest order enforcing the TRO and requiring payments to issue by February 26 at 11:59pm will have drastic consequences. For USAID, I estimate the Court's order would require the payment of at a minimum **$1.5 billion dollars** across approximately 2,000 outstanding and newly created payment requests. For State, I estimate the Court's order would require the payment of at a minimum **$400 million** in outstanding payment requests. These payments cannot be accomplished in the time allotted by the Court and would instead take multiple weeks.

5. USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project. Policy staff first performed a first line review to determine whether the individual agreement was in line with foreign policy priorities (and therefore could potentially be continued) or not (and presumptively

could be terminated as inconsistent with Agency priorities and the national interest). Those recommendations were reviewed by a senior policy official to confirm that, for awards recommended for termination, that ending the program was consistent with the foreign policy of the United States and the operations and priorities of the Agency. The results of that review were routed to me for further review, including of institutional and diplomatic equities. As one example, a presumptively terminated agreement might be continued for a variety of foreign policy reasons, such as the location of the project or the general subject matter, or the judgment and foreign policy perspectives of the second line reviewer. Termination recommendations approved by me ultimately received the Secretary of State's review. The Secretary of State's personal involvement confirmed that termination decisions were taken with full visibility into the unique diplomatic, national security, and foreign policy interests at stake vis-à-vis foreign assistance programs.

6. At the Department of State, the review process for grants began with compiling a list of all the grants administered by the Department. This list was then sorted by the Department bureau responsible for each grant. The Senior Bureau Official (Assistant Secretary or equivalent) in each Bureau was tasked with reviewing each grant within his or her Bureau and providing a recommendation to the Office of the Secretary on whether to continue or terminate the grant. If the Bureau desired to continue the grant, a justification was required. Bureau responses were due at 12 noon on Friday, February 21st. Upon receipt, the Office of the Secretary would review the recommendations and made additional edits pursuant to the Secretary's instructions. As with USAID, this resulted in recommendations that receive the Secretary of State's ultimate review. The Secretary of State's personal involvement confirms that, for example, work of particular importance to the United States' relationships with particular foreign nations is not impaired. With respect to contracts, the Department of State ran a similar process. At both USAID and State, there

are also other lists of contracts and grants that were sent to the leadership at USAID for termination through a content search or other means and these were approved for termination.

7. USAID and State terminated instruments according to their terms and conditions, consistent with the provisions previously cited to the Court. *See 2/18 Marocco Decl.* (No. 25-cv-400 Dkt. 22-1) ¶¶ 9-11, 23 (citing the various authorities available for State and USAID to terminate agreements). The review processes described above is ongoing with respect to the ten plaintiffs' grants and contracts, and is also ongoing with respect to other grants and contracts.

8. With respect to the ten plaintiff entities, State and USAID identified the contracts, grants, or funding instruments to which they are counterparties. Each is subject to termination under the provisions cited previously as well as the terms of those agreements. The outcome of the case-by-case review with respect to the ten plaintiffs' agreements is still ongoing.

9. For terminated agreements of the Plaintiffs (and others)—as specified in Section 12(d) of the January 24, 2025 ALDAC, (a section that this Court did not enjoin), and the February 5, 2024 ALDAC, see Exhibit B, providing further guidance on Section 12—USAID and State will make payments for legitimate expenses incurred prior to January 24, 2025 as specified in that Guidance. In doing so, they will require only the same basic materials any rational counterparty would normally require—an invoice that documents verifiable work that the Government actually committed to fund in its contract, grant, or other instrument, payments entries that actually match said invoices, and receipts, vouchers or other supporting information that explains the purpose and amount of funds sought. For payments that meet those basic prerequisites, State and USAID are committed to payment of money owed under the relevant instrument. Further, a description of the steps related to initiating payments to counterparties is described in Part C.

10. Separately, terminated contracts, grants, and funding instruments of Plaintiffs (and others)

each have close-out procedures that the counterparty may utilize regarding any wind down payments related to the termination of these agreements. A description of these close-out procedures is described below in Part D.

B. Status of Payments

11. In Section 12 of his January 24, 2025 ALDAC, the Secretary of State approved a waiver of the pause for any "legitimate expenses incurred prior to the date of this ALDAC [January 24, 2025] under existing awards or legitimate expenses associated with stop-work orders". Jan. 24, ALDAC, Exh. A at ¶ 12(d).

12. On February 5, 2025, Secretary Rubio issued an additional ALDAC to provide "Technical Guidance for Waivers Approved by the Secretary of State and the Director of Foreign Assistance." Feb. 5, 2025 ALDAC, 25 STATE 10948, attached as Exh. B. As relevant to the pre-January 24, 2025, obligations under existing contracts and legitimate expenses associated with stop-work orders, "'Legitimate expenses' must include allowable and allocable costs under the terms and conditions of the applicable award or contract that are approved by the Director of Foreign Assistance after submission for consideration …." *Id.* ¶ 9. The disbursement of obligated funds that are excepted under Paragraph 12(d) is addressed in Paragraph 13 of the February 5 ALDAC.

13. On February 25, 2025, amended FAQs were issued regarding the exception process. See State & USAID Foreign Assistance Pause Exception Process and Disbursement FAQs (Feb. 25, 2025), attached as Exh. C. Among other things, these FAQs, streamlined the clearance process, see id. ¶ 1, provided additional guidance regarding disbursements, *id.* ¶¶ 13-14, and explained what is required for authorized payments under Paragraph 12(d) of the January 24 ALDAC, *id.* ¶ 16, and explained what costs associated with stop-work orders may be incurred. *Id.* ¶¶ 17-18. While the payment of pre-January 24, 2025 obligations for "existing awards or legitimate expenses

associated with stop-work orders, bureaus/offices **do not** need to get approval of the Director of Foreign Assistance but should obtain approval from the Senior Bureau Official (SBO) of the relevant bureau. *Id.* ¶ 16. USAID expects to pay individual funding recipient Plaintiffs' invoices for legitimate expenses incurred under Paragraph 12(d). State expects to pay individual funding recipient Plaintiffs' invoices for legitimate expenses incurred under Paragraph 12(d).

C. Delays in Restarting Payments

14. Restarting funding related to terminated or suspended agreements is not as simple as turning on a switch or faucet. Rather, the payment systems of USAID and State are complicated and require various steps before payments are authorized to be disbursed by the U.S. Treasury, Department of Health and Human Services, and/or the Department of State, involving multiple agencies, which are not a party to this litigation. The approval process must comply with the Federal Managers Financial Integrity Act and the Federal Financial Management Improvement Act. At a high level, their payment system is: (1) working with vendors, (2) creating new payment requests, (3) getting them certified, (4) getting them re-certified, and (5) effectuating payments electronically through the Department of the Treasury, Health and Human Services or if overseas through the Department of State, or a combination thereof. The documentary evidence necessary to ensure compliance with policy added time to a process that already required the necessary controls, including appropriate separation of duties, to validate an invoice, review for compliance with appropriation law and accounting standards, and make the final payment. Adding an additional documentation step into an existing complex process, takes time to before it is fully efficient. Training for the staff, adjusting the system, and developing data management tools all resulted in a backlog of payments which is being addressed.

15. At times, both State and USAID could process several thousand payments each day. The

overseas mission adds further complexity with the use of 244 overseas banks and 133 different currencies. For payments, State and USAID rely on multiple methods depending on location on execution and the type of payment and/or agreement.

16. For State domestic payments, most contract payments are now run through Treasury's Invoice Processing Platform (IPP). For IPP, vendors submit invoices electronically into IPP, which are then routed through bureau/program defined approvals, including the contracting officer representative (COR). Once approved in IIP, State invoices are interfaced into State's Global Financial Management System (GFMS) for certification and payment. USAID domestic invoices are routed through the GLAAS contract management system and ultimately ported into the Phoenix accounting system. From Phoenix, payments are directed to GFMS or similar systems operated by Treasury or the Health and Human Services (HHS). Some payment packages, given certain complexities, continue to be submitted and routed manually.

17. For domestic grants, both State and USAID utilizes HHS' payment management system (PMS) to process grant payments. Bureau program personnel enter approvals and payment instruction into PMS and these activities are recorded into GFMS. State's Comptroller staff are now approving program office requests before final payment. For overseas, invoices for contracts and/or grants funded and executed at posts are received at post and either reviewed, certified, and paid by post or sent through State's Comptroller for centralized voucher examination, certification, and payment in dollars and foreign currency. As part of system of new controls, all overseas payments will be certified by this central unit. USAID payments are similarly being manually reviewed and approved by a specialized task-force of payments specialists, before receiving a final check to ensure the validity and completeness of supporting documentation. Restarting payments on the 10 plaintiffs' contracts and grants would be burdensome and take time to make sure they

are legitimate.

18. Moreover, at USAID, my understanding is that some payment requests are not supported by any documentation or, where there is documentation, inadequate documentation to show actual work performed, compliance with the terms of the relevant contract or award, and the like. In addition and for example, my understanding is that payments to associations have been submitted without the names of specific members who have done work or even the names of vendors associated with the awards or payments. Nor are payment requests all submitted in the same format—often they do not contain consistent numbers or consistent supporting documentation—and payments have been requested across multiple different payment systems, administered by partner agencies, which process payments differently and use different computer systems to identify and release payments. Payments have also been made across different timetables.

19. As a result, for a majority of the plaintiff requests, there are currently no payments prepared and sitting in the USAID system that can be readily sent to recipients. Making the payments the Court has ordered will generally require an entirely new process for each that includes the creation of a new payment, certification, approval at the accounting level, preparation in the payment computer, and recertification for disbursement.

20. At USAID, contractual counterparties and grant recipients frequently submit payment requests before they are due under the governing instruments. The Court's Order appears to now require early payment without any review of these payment requests. Additionally, many payments are submitted in batched payment requests that cannot be disentangled or paid separately. The Court's order thus appears to require payment of requests related to new work.

D. Closeout Procedures for Terminated Agreements and Counterparties Remedies

21. As described in the February 18 Marocco Declaration and described further below, when

a contract, grant, or funding instrument is terminated, the counterparty may utilize the closeout procedures regarding funds that they believe that they are owed under those agreements.

22. To the extent that counterparties believe they are entitled to reimbursement for past work or other remedies under their funding instruments, USAID is prepared to entertain such claims and seek resolution. Indeed, there is an established mechanism for counterparties to submit disputes for resolution to USAID. *See, e.g.*, ADS Chapter 303 MAB § M10(e) & M13 (disputes and appeals). If counterparties believe they have claims that resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); cf. *Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

23. Similarly, to the extent that counterparties of State believe they are entitled to reimbursement for past work or other remedies under their particular funding instruments, State is prepared to entertain such claims and seek resolution. For contracts, the process is governed by the Contracts Disputes Act, 41 U.S.C. § 7101, *et seq*, and begins with the submission of a written claim to the relevant contracting officer. The contracting officer must issue a written decision that "shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided [by the Contract Disputes Act]." The contracting officer must issue his decision within 60 days for claims less than $100,000 and within a reasonable time for larger claims (and for such claims, the contracting officer must notify the contractor of the timeframe for his decision will be made within 60 days). For grants and other federal assistance awards, 2 CFR 200.344 describes

the closeout process for awards following their termination or conclusion, including the process by which a recipient submits financial reports for payment. 2 CFR 200.343 and 200.403 further describe what costs are allowable under federal assistance awards, including specifically in the case of a suspension or termination. If counterparties believe these claims processes are not sufficient, mechanisms exist to pursue, settle, and in certain cases litigate such claims through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. 200.343 (effects of suspension and termination); *cf. Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction).

24. Recouping any taxpayer dollars sent under the Court's order that we later determine to have been improperly billed or sent would be extremely difficult. Contractual counterparties and grant recipients are often overseas and once money leaves the Government's accounts, we cannot control what those counterparties and recipients will do with it. Since many USAID programs involve sub-awards, it is likely that any funds disbursed would soon be transferred to third-party sub-vendors and contractors.

25. Moreover, the plaintiffs have claimed that many grant recipients and contractual counterparties are insolvent or nearly so, raising the high likelihood that they will immediately spend any funds they receive—making it impossible for the Government to recover those funds as a practical matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25, 2025

Pete Marocco

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL HEALTH COUNCIL,
2300 N Street NW, Suite 501 A
Washington, DC 20037,

SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES,
655 15th Street NW, Suite 425
Washington, DC 20005,

HIAS,
300 Spring Street,
Silver Spring, MD 20910,

MANAGEMENT SCIENCES FOR HEALTH,
4201 Wilson Blvd., Suite 500
Arlington, VA 22203,

CHEMONICS INTERNATIONAL, INC.,
1275 New Jersey Ave. SE, Suite 200
Washington, DC 20003,

DAI GLOBAL, LLC,
7700 Wisconsin Ave., Suite 340
Bethesda, MD 20814,

DEMOCRACY INTERNATIONAL, INC.,
7200 Wisconsin Ave., Suite 1000
Bethesda, MD 20814,

and

AMERICAN BAR ASSOCIATION,
321 N. Clark Street
Chicago, IL 60654,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America,
1600 Pennsylvania Ave. NW
Washington, DC 20050,

Civil Action No. 25-cv-402-AHA

MARCO RUBIO, in his official capacity as Secretary of State,
2201 C Street NW
Washington, DC 20520,

JEREMY LEWIN, in his official capacity performing the duties of Under Secretary for Foreign Assistance, Humanitarian Affairs and Religious Freedom at the United States Department of State ,
2201 C Street NW
Washington, DC 20004,

RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget and Acting Administrator of the United States Agency for International Development,
725 17th Street NW
Washington, DC 20503,

UNITED STATES DEPARTMENT OF STATE,
2201 C Street NW
Washington, DC 20520,

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,
2201 C Street NW
Washington, DC 20004,

and

OFFICE OF MANAGEMENT AND BUDGET,
725 17th Street NW
Washington, DC 20503,

*Defendants*.

**THIRD AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Over the course of eleven months, the President and executive-branch officials have dismantled U.S. foreign aid spending and operations in defiance of the will of Congress. They have even abolished, without congressional approval, the United States Agency for International Development (USAID)—eliminating the entire agency that Congress created to serve as the principal administrator of foreign aid programs and funding.

2. Defendants' unlawful actions have caused grievous harm to Plaintiffs and other USAID and State Department grantees, contractors, and implementing partners. For many of the Plaintiffs in this action, their businesses' or organization's existence depended entirely on USAID and the funds it is supposed to award to implementing partners.

3. The harms have been far more devastating for people in need around the world. According to recent estimates, the dismantling of USAID has already caused the deaths of six-hundred-thousand people, two-thirds being children. Many more people have needlessly suffered disease, starvation, and poverty that congressionally appropriated foreign assistance would have prevented, if only Defendants had spent it as Congress directed. This tragedy is ongoing and will only continue as foreign-assistance operations remain disrupted and congressionally appropriated funds remain unavailable for their intended purposes.

4. Plaintiffs now assert claims with respect to four categories of unlawful actions Defendants have taken.

5. First, Defendants have decided not to spend foreign assistance appropriations in the amounts that Congress required, for the purposes that Congress required, and by the deadlines Congress required. Defendants' withholding of, and intent to impound, foreign assistance funds

violates the relevant appropriations acts, constitutes arbitrary and capricious agency action, and represents an unconstitutional violation of the separation of powers.

6. Second, Defendants' elimination of foreign assistance programs, initiatives, offices, and partnerships represents arbitrary and capricious agency actions in every way possible. Programs such as the Feed the Future Initiative and Power Africa, offices such as USAID's Bureaus for Democracy, Human Rights, and Governance, and partnerships in which the United States participated such as Gavi, the Vaccine Alliance, advanced U.S. interests as determined by Congress and provided a lifeline to millions of persons in need around the world. In eliminating these programs, initiatives, offices, and partnerships, Defendants provided no reasoned explanations, and in many cases provided no explanation at all. Nor did Defendants consider the enormous reliance interests upended by these eliminations.

7. Third, Defendants acted unlawfully in their disposition of billions of dollars of appropriations at the end of Fiscal Year 2025, with respect both to money they did obligate and money they did not. For funds they did purportedly obligate, Defendants failed to comply with the directives of Sections 7030-7061 of the 2024 Appropriations Act to obligate specific or minimum amounts for particular purposes. Even if Defendants were unable to meet all of the directives because some funds were purportedly unavailable because they had been included in the President's late-August rescission proposal, Defendants were required by law to maximize the number of directives that they would meet. For the money in the rescission proposal, Defendants violated the relevant appropriations acts by not obligating the funds prior to September 30, 2025, the original expiration date that Congress had set. And if Defendants were correct that Congress had to be given 45 days to consider the proposal no matter what, that would just mean that Defendants are continuing to violate the law, because 2 U.S.C. § 683(b) provides

without qualification that funds "shall be made available" for obligation if Congress did not act on a rescission proposal within the 45-day period.

8. Fourth and finally, Defendants' abolishment of USAID as an executive agency violates foundational principles of the separation of powers. Under the Constitution, only Congress has the power to establish agencies and assign them duties, and the Executive Branch has no power to unilaterally wipe away an agency that Congress has created and provided myriad responsibilities. Only Congress can abolish USAID through duly enacted legislation. Defendants' unilateral elimination of USAID flies in the face of the separation of powers.

9. Defendants have been candid about their motivations. As agency memoranda, guidance, and public statements make clear, the President disagrees with Congress's choice to establish and fund foreign-assistance programs, which have been legislatively mandated for more than a half century. To be sure, the President may establish his own policy priorities and pursue the implementation of those policies consistent with the law. But neither the President nor his subordinates may simply disregard Congress' directives, especially when Congress has acted pursuant to its core constitutional power of the purse and its exclusive authority to establish agencies of the federal government.

10. Whether for policy or political reasons, Defendants made foreign-assistance funding the testing ground for an unprecedented assertion of unilateral executive power in defiance of Congress and all established principles of administrative law. The Court must hold these actions unlawful and set them aside.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the U.S. Constitution and the

Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 704-06, and mandamus relief pursuant to 28 U.S.C. § 1361.

12. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**PARTIES**

13. Plaintiff Global Health Council (GHC) is a private, not-for-profit, membership alliance incorporated in Delaware, headquartered in Washington, D.C., and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. GHC was founded in 1972 under the name National Council of International Health as a U.S.-based, nonprofit membership organization with the purpose of identifying priority global health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community. Many of GHC's members administer global health programs and receive funding from USAID and other federal agencies in the form of contracts, grants, and cooperative agreements. GHC's members depended on sustained, uninterrupted funding to continue their work.

14. Plaintiff Small Business Association for International Companies (SBAIC) is a membership organization established to promote the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance, including USAID. SBAIC has almost 170 members, including small businesses under every Small Business Administration

category. SBAIC's members are or were recipients of foreign aid through contracts, grants, and cooperative agreements.

15. Plaintiff HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered in Silver Spring, Maryland. Working with the organized American Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom. As of January 20, 2025, 38% of HIAS's funding came from the U.S. government, including the Department of State and USAID.

16. Plaintiff Management Sciences for Health, Inc. (MSH) is a global nonprofit organization incorporated in Massachusetts and headquartered in Arlington, VA. Founded in 1971, MSH has worked to improve health systems and health outcomes in more than 150 countries by providing governments, health organizations, and the private sector with the strategies, tools, and management support to effectively and efficiently deliver high-functioning health systems. As of January 20, 2025, approximately 88% of MSH's funding came from USAID. .

17. Plaintiff Chemonics International, Inc. (Chemonics) is an employee-owned sustainable development company headquartered in Washington, D.C. Founded in 1975, Chemonics has been a trusted partner to the U.S. government for 50 years, having successfully implemented more than 1,000 foreign-assistance programs in more than 100 countries on behalf of USAID and other U.S. government clients. As of January 20, 2025, approximately 88% of Chemonics and its subsidiaries' funding came from USAID, with Chemonics actively working with USAID on 104 different projects in over 90 countries.

18. Plaintiff DAI Global, LLC (DAI) is an employee-owned global development company headquartered in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted

partner of the U.S. government, especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. As of January 20, 2025, nearly 80% of DAI's revenue (more than $750 million in 2024) came from USAID. As of January 20, 2025, DAI was working with USAID and Millennium Challenge Accounts on 99 different projects in 45 countries.

19. Plaintiff Democracy International, Inc., a small business, is an international development company founded in 2003 and headquartered in Bethesda, Maryland. Over the past 22 years, it has conducted more than 200 democracy, human rights, governance, peace and resilience, and other projects for USAID in more than 80 countries. Approximately 96% of Democracy International's revenues in 2024 came from prime awards from USAID.

20. Plaintiff the American Bar Association (ABA) is a non-partisan organization, founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service, and education programs that improve access to justice in the United States and globally. The ABA Center for Global Programs (APA CGP) is an ABA FJE-entity whose mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of, and in partnership with, USAID, the Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. In total, approximately 38% and 60% of ABA GGP's FY 2025 funding is respectively derived from USAID and Department of State funding after a competitive procurement process. As of January 20, 2025, ABA was implementing 19 programs funded by USAID and 45 programs funded by the Department of State.

21. Defendant Donald J. Trump is the President of the United States. He is being sued in his official capacity only.

22. Defendant United States Department of State is an executive department of the United States government that is responsible for the United States' foreign policy and relations. The Department of State is headquartered in Washington, D.C.

23. Defendant United States Agency for International Development (USAID) is codified in law as a standalone agency of the United States government that is responsible for administering civilian foreign aid and assistance. USAID was headquartered in Washington, D.C.

24. Defendant Office of Management and Budget (OMB) is a federal agency within the Executive Office of the President that is responsible for producing the President's budget and coordinating interagency policy initiatives. OMB is headquartered in Washington, D.C.

25. Defendant Marco Rubio is the Secretary of State. He is being sued in his official capacity only. Secretary Rubio maintains an office at 2201 C Street NW, Washington, D.C. 20520.

26. Defendant Jeremy Lewin is performing the duties of Under Secretary for Foreign Assistance, Humanitarian Affairs and Religious Freedom at the United States Department of State and previously served as the Deputy Administrator of USAID. He is being sued in his official capacity only. Mr. Lewin maintains an office at 2201 C Street NW, Washington, D.C. 20520.

27. Defendant Russell Vought is the Director of OMB and Acting Administrator of USAID. He is being sued in his official capacities only. Director Vought maintains an office at 725 17th Street NW, Washington, D.C. 20503.

## FACTUAL ALLEGATIONS

### *Congress Establishes USAID as an Executive Agency*

28. For more than a half century, federal law has declared it the policy of the United States to support economic development and foster democratic institutions abroad through foreign assistance. *See* Foreign Assistance Act of 1961 § 102, Pub. L. No. 87-195, 75 Stat. 424, 424 (codified as amended at 22 U.S.C. § 2151). Congress has implemented that policy through numerous statutory programs directing USAID, the Department of State, and others to support a host of critical goals, from global health to agricultural production to disaster relief. 22 U.S.C. §§ 2151-2152k, 2292-94. And for more than a half century, USAID and the Department of State have fulfilled these statutory mandates by leading American efforts to alleviate poverty, disease, and humanitarian need; supporting developing countries' economic growth; and building countries' capacity to participate in world trade. Cong. Rsch. Serv., IF10261, U.S. Agency for International Development: An Overview 1 (Jan. 6, 2025) [hereinafter Jan. 2025 CRS Report].

29. Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations—the cornerstone of what is now called "soft power." As President Kennedy stated on signing the Foreign Assistance Act, "Our adversaries are intensifying their efforts in the entire under-developed world. Those who oppose their advance look to us and I believe, at this dangerous moment, we must respond." Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub. Papers 588 (Sept. 4, 1961), https://perma.cc/H8WR-B76D. Or as Senator Lindsey Graham noted more recently, soft power is a "critical component of defending America and our values." Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://perma.cc/GT2Q-6E82. "If you don't get involved

in the world and you don't have programs in Africa where China's trying to buy the whole continent, we're making a mistake," Graham explained. *Id.*

30. Since its establishment, USAID has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting poverty, improving access to education, and promoting economic growth, among other functions. In the 1960s, for example, USAID was a key part of the global effort to eradicate smallpox and, years later, a similar effort to fight polio. Today, USAID plays an indispensable role in implementing the President's Emergency Plan for AIDS Relief, a program that, since its inception during the George W. Bush Administration in 2003, has delivered AIDS treatment to tens of millions of people in 54 countries.

31. USAID's work is essential to addressing the root causes of extremism, terrorism, and international conflict. As then-Acting USAID Administrator John Barsa put it in 2020, "Our aid advances American interests by reducing the vulnerability of populations to extreme ideologies[;] … [it] cultivates democracies and creates a network of states that advance our common interests and values[;] … [it] restores stability, and prevents disasters from creating the conditions that can give rise to conflict and discord[;] … [and it] can stop wars before they start, reducing the need to put our men and women in uniform in harm's way." John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), archived at https://bit.ly/48Rw9SM (Barsa, *Remarks*).

32. USAID's programs also strengthen allies' economies, open markets, create opportunities for American businesses, protect America's supply chains, and create jobs to reduce migration pressure. These programs counter malign influences globally from China, Russia, Iran,

and others, and advance America's national security and economic interests. In short, USAID has long played a key role in furthering American interests.

33. But USAID does not do this alone. In fact, USAID generally does not implement foreign-assistance projects itself. Instead, most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations, including nonprofits and academic institutions. *See* Jan. 2025 CRS Report at 1. USAID partners, including American companies employing thousands of Americans, thus perform the lion's share of the work necessary to safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.

34. In 1998, Congress formally established USAID as a standalone agency outside the State Department. Foreign Affairs Reform and Restructuring Act of 1998 § 413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791; *see* 5 U.S.C. § 104. In so doing, Congress carefully circumscribed the President's authority to make changes to the agency's structure or operations, allowing the President only sixty days after USAID's establishment to eliminate the agency or reassign its functions. 22 U.S.C. § 6601(a). President Clinton declined to do so. Instead, he ordered that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998 pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998.

***Congress Appropriates Funding for Foreign Assistance***

35. Since Congress established USAID as its own agency in 1998, Congress has consistently appropriated funds for foreign assistance through USAID. In March 2024, Congress appropriated tens of billions to USAID to carry out the following eight topline categories of foreign assistance activities:

36. With respect to USAID, the 2024 Appropriations Act appropriates, among other amounts:

a. $4 billion "for global health activities" called for in "chapters 1 and 10 of part I of the Foreign Assistance Act of 1961" (FAA), which "shall be made available for training, equipment, and technical assistance to build the capacity of public health institutions and organizations in developing countries." *Id.* tit. III, 138 Stat. at 740; *see* 22 U.S.C. §§ 2151-2152k, 2293-2294 (FAA provisions). Congress instructed USAID to effectuate these purposes through "such activities as" child survival and maternal health programs; immunization and oral rehydration; programs addressing the needs of mothers and children; assistance for displaced children; programs for the prevention and treatment of HIV/AIDS, tuberculosis, polio, malaria, and other infectious diseases; disaster preparedness; programs for responding to emergent global health threats; and family planning and reproductive health. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 740.

b. $3.93 billion in "development assistance" to carry out provisions of the FAA that direct actions to help develop agriculture, education and human resources, energy production, schools and hospitals, small businesses, and human welfare in sub-Saharan Africa (*id.* at 742);

c. $4.78 billion in "international disaster assistance" "to carry out the provisions of section 491 of the [FAA] for international disaster relief, rehabilitation, and reconstruction assistance" *(id.)*;

d. $75 million in "transition initiatives" for "international disaster rehabilitation and reconstruction assistance administered by" USAID's Office of

Transition Initiatives "pursuant to section 491 of the [FAA], and to support transition to democracy and long-term development of countries in crisis" (*id.*);

e. $55 million to implement the Complex Crisis Fund established by the Global Fragility Act of 2019, which USAID administers "to support programs and activities to prevent or respond to emerging or unforeseen events overseas," 22 U.S.C. § 9808(b) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

f. $3.89 billion to implement the FAA's Economic Support Fund, which the State Department and USAID administer to furnish "assistance to countries and organizations … to promote economic or political stability," 22 U.S.C. § 2346(a), (b) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

g. $140 million "to carry out the provisions of the [FAA] for the promotion of democracy globally, including to carry out" pro-democracy training, institution-building, and pluralism purposes established in the National Endowment for Democracy Act, 22 U.S.C. § 4411(b)(3), (5) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743); and

h. $770 million for assistance for Europe, Eurasia, and Central Asia under the FREEDOM Support Act, Pub. L. No. 102-511, which authorizes assistance for "urgent humanitarian needs," "[e]stablishing a democratic and free society," "[d]eveloping free and independent media," and other critical measures in nations of the former Soviet Union, 22 U.S.C. § 2295, and the Support for Eastern European Democracy (SEED) Act of 1989, Pub. L. No. 101-17, which calls for currency stabilization loans, debt reduction, agricultural assistance, and other measures to promote democracy and free markets in eastern Europe, 22 U.S.C. § 5401 (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744).

37. For many of these funds, the 2024 Appropriations Act provided that the appropriations would be available until September 30, 2025, while for others Congress provided that the funds would remain available until expended. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742-44. For none of these appropriations did Congress provide USAID discretion to spend less than the full top-line amount appropriated.

38. For the Global Health Programs funds, Congress provided that the money "shall be apportioned directly to [USAID]," and Congress similarly provided that the funds for Development Assistance, International Disaster Assistance, and the Complex Crises Fund "shall be apportioned to [USAID]." *Id.*

39. Congress has separately appropriated funds for foreign aid to be administered by the State Department. In Titles III and IV of the 2024 Appropriations Act, Congress appropriated to the State Department the following seven top-line categories of appropriations:

a. $6 billion "to carry out the provisions of the Foreign Assistance Act of 1961 for the prevention, treatment, and control of, and research on, HIV/AIDS" (*id.* at 742);

b. $205 million "to carry out the provisions of the [FAA] for the promotion of democracy globally" consistent with the National Endowment for Democracy Act, 22 U.S.C. § 4411(b)(3), (5) (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743);

c. $3.93 billion for migration and refugee assistance, including to enable the Secretary of State to carry out the provisions of section 2(a) and (b) of the Migration and Refugee Assistance Act of 1962," 22 U.S.C. 2601 (*see* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744);

d. $870 million for preventing the proliferation of nuclear weapons, combatting terrorism, and demining conflict zones pursuant to specified provisions of the FAA, FREEDOM Support Act, and Arms Export Control Act (*id.* tit. IV, 138 Stat. at 748)

e. $410 million to carry out provisions of section 511 of the FAA "for peacekeeping operations and other programs carried out in furtherance of the national security interests of the United States," 22 U.S.C. § 2348 (*see* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 749-50); and

f. $1.4 billion "to carry out section 481 of the [FAA]," "for the control of narcotic and psychotropic drugs and other controlled substances, or for other anticrime purposes," 22 U.S.C. § 2291(a)(4) (*see* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 747).

40. Of these appropriations to the State Department, all except the funds for HIV/AIDS and Peacekeeping Operations were to remain available until September 30, 2025. The HIV/AIDS funds were to remain available for four years, until September 30, 2028. A portion of the Peacekeeping Operations funds were to remain available until September 30, 2024, while a majority were to remain available until September 30, 2025.

41. The 2024 Appropriations Act speaks in mandatory terms. For example, it directs that funds appropriated for global health programs "shall be apportioned directly to the United States Agency for International Development." *Id.*, 138 Stat. 740. Other provisions similarly provide that specific funding amounts "shall" be apportioned to USAID or the State Department for specified purposes. *See, e.g.*, *id.*, 138 Stat. 741-43.

42. In addition to apportioning funds directly to USAID and State for these congressionally established purposes, the 2024 Appropriations Act requires Defendants to spend

specific or minimum amounts of funds for specific foreign aid purposes. Section 7019(a) requires that funds "shall be made available" in amounts specifically designated in tables appended to the Act. Those tables include line items with specific amounts that must be obligated for defined purposes. *See* Further Consolidated Appropriations Act, 2024, Comm. Print of the H. Comm. on Appropriations, Legislative Text and Explanatory Statement, ECF No. 125-11 (hereinafter "Legislative Tables").

43. In addition, Sections 7030 to 6061 of the 2024 Appropriations Act prescribe subcategories for which USAID and State must spend minimum amounts of funds. Those sections contain directives that "no less than" particular amounts of funds "shall be made available" for particular foreign aid purposes. For instance, the Act provides that "[o]f the funds appropriated by this Act . . . under the heading 'Democracy Fund,' not less than $5,000,000 shall be made available for democracy and Internet freedom programs for Hong Kong." *Id.* §§ 7043(g)(2), 138 Stat. 814.

44. Across Sections 7030 through 7061 and the tables made binding by Section 7019(a), the 2024 Appropriations Act contains roughly 240 subcategories of purposes for which Congress required specific amounts of funds—or "not less than" specific amounts of funds—that "shall be made available" by the agencies. These directives total nearly $25 billion.

45. Many of the line items in the tables referenced in Section 7019(a), and many of the directives in Sections 7030 to 7061, reference specific initiatives, programs, and partnerships for which the appropriations must be used.

46. The Act also calls for specific, concrete actions from USAID and the State Department to implement statutory foreign-assistance programs funded under the Act. For example, the Act commands that "[f]unds appropriated by this Act under the heading 'Economic

Support Fund' *shall be made available* for programs to protect international freedom of expression and independent media, including through multilateral initiatives." *Id.* div. F, tit. VII, § 7032(h), 138 Stat. at 787 (emphasis added). The Act also defines "democracy programs" for purposes of several of its USAID and State appropriations so as to prescribe particular types of programs: those "that support good governance, credible and competitive elections, freedom of expression, association, assembly, and religion, human rights, labor rights, independent media, and the rule of law, and that otherwise strengthen the capacity of democratic political parties, governments, nongovernmental organizations and institutions, and citizens to support the development of democratic states and institutions that are responsive and accountable to citizens." *Id.* § 7032(c), 138 Stat. at 786. And the Act commands that "USAID shall continue to implement civil society and political competition and consensus building programs abroad with funds appropriated by this Act in a manner that recognizes the unique benefits of grants and cooperative agreements in implementing such programs." *Id.* § 7032(f), 138 Stat. at 787 (emphasis added).

47. The Act also generally prohibits deviation from its funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. *See id.* § 7019(b), 138 Stat. at 772.

48. Congress's 2024 foreign-aid appropriations build on multiple years of prior appropriations for similar purposes, much of which remains available for obligation and expenditure. For example, Congress has appropriated at least $3 billion annually to USAID for global health programs since at least 2019 and, according to the most recently published federal

spending data, over $14 billion of the total available resources for these appropriations remain unobligated.[1]

49. On March 15, 2025, Congress enacted a continuing resolution that has the effect of re-appropriating all of the funds that were appropriated to USAID in the 2024 Appropriations Act, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, §§ 1101-08, 139 Stat. 9, 10-12, Pub. L. 119-4 (Mar. 15, 2025) (the "2025 Continuing Resolution"). Under the continuing resolution, specific programs for which Congress appropriated funds in the 2024 Appropriations Act carry over. For example, as described above, the 2024 Appropriations Act appropriated $3,985,450,000 for Global Health Programs, to last through two fiscal years (in that case, through September 30, 2025). The 2025 Continuing Resolution thus *re*-appropriated an *additional* $3,985,450,000 for Global Health Programs, to again last through two fiscal years (this time, through September 30, 2026). The 2025 Continuing Resolution replicated not just the top-line appropriations, but also the same directives in Sections 7030-7061 and the required amounts from the tables as provided in Section 7019(a). The 2025 Continuing Resolution thus appropriated to USAID and the State Department the same levels of funds for the same discrete programs, on the same terms, as did the text of the 2024 Appropriations Act.

50. In July 2025, acting in part on a rescission proposal from the President, Congress rescinded a portion of the funds that it had appropriated for foreign aid in the 2025 Continuing

[1] *See* Pub. L. No. 117-328, div. K, tit. III, 136 Stat. 4459, 4985 (Dec. 29, 2022) ($4.17 billion); Pub. L. No. 117-103, div. K, 136 Stat. 49, 575 (Mar. 15, 2022) ($3.88 billion); Pub. L. No. 116-260, div. K, tit. III, 134 Stat. 1182, 1691 (Dec. 27, 2020) ($3.3 billion); Pub. L. No. 116-94, div. G, tit. III, 133 Stat. 2534, 2827 (Dec. 20, 2019) ($3.16 billion); Pub. L. No. 116-6, div. F, tit. III, 133 Stat. 278 (Feb. 15, 2019) ($3.12 billion); *Global Health Programs, State: FY 2025 Snapshot*, USASpending.gov, https://www.usaspending.gov/federal_account/019-1031.

Resolution. *See* Rescissions Act of 2025, 139 Stat. 467, Pub. L. 119-28 (July 24, 2025). For example, Congress rescinded $500,000,000 in funding for Global Health Programs, except that "none of the amounts rescinded . . . shall be from the unobligated balances for the following programs: HIV/AIDS, Tuberculosis, Malaria, Nutrition, or Maternal and Child Health." 139 Stat. at 468. Congress also rescinded some funding for the Complex Crises Fund, the Democracy Fund, the Economic Support Fund, and certain other categories of funding. *See id.* However, Congress left in place many billions of dollars in foreign aid that it had appropriated in the 2025 Continuing Resolution, and Congress declined to adopt the President's request to rescind money appropriated for the State Department's PEPFAR program.

51. On November 12, 2025, Congress enacted a continuing resolution re-appropriating pro-rata amounts appropriated in the 2024 Appropriations Act for USAID and the State Department, to be available until January 30, 2026. Pub. L. 119-37, 139 Stat. 495 (2025).

***The New Administration Takes Offices and Decides Not to Administer Foreign Aid Spending and Programs as Congress Directed***

52. Starting on President Trump's first day in office, Defendants halted spending foreign assistance appropriations required by Congress to be spent for specific purposes.

53. This process began with Executive Order 14,169. *See* 90 Fed. Reg. 8619 (Jan. 20, 2025). In that Order, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump asserted his authority "under the Constitution and the laws of the United States of America" to issue an executive order purporting to immediately freeze all foreign assistance funding. *Id.* at § 2. The President claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* § 1. He

further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

54. The Acting Deputy of USAID confirmed that the President "exercised his constitutional authority" to issue the executive order. Decl. of Pete Marocco ¶ 3, ECF No. 25-1.

55. In order to more "fully align[]" foreign assistance programs with President Trump's policy preferences, Executive Order 14,169 directed four actions. *Id.*

56. First, it directed a "90-day pause in United States foreign development assistance," purportedly "for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* § 3(a). It required all "department and agency heads with responsibility for United States foreign development assistance programs" to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors." *Id.* Under the order, programs were to be paused "pending review[]," and OMB was to "enforce this pause through its apportionment authority." *Id.* This "pause" could be waived for specific programs by the Secretary of State. *Id.* § 3(e).

57. Second, the Executive Order directed each "responsible department and agency head[]" to initiate those "[r]eviews of each foreign assistance program … under guidelines provided by the Secretary of State, in consultation with the Director of OMB." *Id.* § 3(b).

58. Third, based upon these reviews, "[t]he responsible department and agency head[], in consultation with the Director of OMB" was ordered to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.* § 3(c).

59. Fourth, the Executive Order purportedly allowed "[n]ew obligations and disbursements of foreign development assistance funds [to] resume for a program prior to the end of the 90-day period" only after "a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form." *Id.* § 3(d). Any "other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB." *Id.*

60. Defendants swiftly set to work implementing the Executive Order. On January 22, 2025, then-USAID Acting Administrator Jason Gray instructed agency employees that, pursuant to the Executive Order, "USAID will immediately pause all new program-funded commitments and new or incremental obligations." USAID, Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 22, 2025) (the "Gray Initial Instructions") (ECF 57-1). The instructions further stated that "[t]his directive encompasses every level of programming—including at the obligation (e.g., development objective agreement) and subobligation levels." *Id.*

61. On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," Secretary of State Marco Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (the "Rubio Memo") (ECF 17-1, Ex. B).

62. Secretary Rubio asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda," he

ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He further directed that "no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review," and that "contracting officers and grant officers [must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7. In short, Secretary Rubio mandated that neither the Department of State nor USAID would provide any foreign assistance "without the Secretary of State's authorization or the authorization of his designee." *Id.* ¶ 5.

63. The same day, USAID Senior Procurement Executive (SPE) Jami Rodgers issued a notice "[i]n accordance with the President's Executive Order" to "paus[e] all new obligations of funding, and sub-obligations of funding under Development Objective Agreements." USAID, Notice on Implementation of Executive Order on *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (the "Rodgers Guidance") (ECF 57-2). The notice also instructed agency personnel not to "issue new awards or release any new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation for foreign assistance funding until each activity has been reviewed and approved as consistent with the President's policy." *Id.*

64. Also the same day, Gray issued follow-up instructions to agency employees for implementing the Executive Order and the Rubio Memo. USAID, Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 24, 2025) (the "Gray Follow-Up Instructions") (ECF 57-3). The follow-up instructions directed that, "[p]er the [Rubio Memo], within 30 days, the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop appropriate review standards to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda. Information on this

review process will be shared as it becomes available." *Id.* The follow-up instructions further stated that, "[c]onsistent with and building on" the Gray Initial Instructions, "all new program-funded obligations and subobligations are to remain on pause unless exempt." *Id.* Gray also announced that he was "immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." *Id.*

65. Two days later, on January 26, 2025, Gray issued a further clarification. USAID, Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) (the "Gray Clarification") (ECF 57-4). As described by the USAID Inspector General, this clarification "also included a directive for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* at 1 (Feb. 10, 2025) [hereinafter OIG Report] (quotation marks omitted).

66. The State Department also halted most spending of appropriated foreign-assistance funding through programs administered outside USAID.

67. In parallel, in early February, Defendants began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025), https://bit.ly/3WU13oq. It placed thousands of USAID employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use [their] position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a

supervisor in [their] chain of command." Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US*, CNN (Feb. 5, 2025), https://perma.cc/VM4L-TSSA. Defendants also caused thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. As the USAID Office of Inspector General observed in the February 10, 2025 report, these "personnel actions … substantially reduced the [agency's] operational capacity." OIG Report at 1.

68. On February 3, 2025, the State Department issued a press release announcing that Secretary of State Rubio had been appointed as Acting Administrator of USAID. Media Note, Office of the Spokesperson (Feb. 3, 2025), https://perma.cc/5Y9E-Q7CA. That press release asserted that "it is now abundantly clear that significant portions of USAID funding are not aligned with the core national interests of the United States." *Id.*

69. On the same day, the USAID building headquarters in DC was closed, preventing staff from accessing it. Ido Sadeh-Wertz & Phelim Kine, *USAID Building Closed as Agency's Future in Doubt*, Politico (Feb. 3, 2025), https://perma.cc/6QFY-ULNS. Later reporting confirmed that the building lease was terminated. Ellen Knickmeyer, *Trump Administration Takes USAID Off Its Building Lease*, PBS NewsHour (Feb. 10, 2025), https://perma.cc/G7UD-CTGN.

70. On February 4, 2025, Secretary Rubio sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://perma.cc/8V6C-A23F.

71. The effect of these actions was to halt the spending of foreign-assistance funding wholesale and functionally halt all USAID initiatives and programs. In the words of the USAID Inspector General, "staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between [] staff and [] implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming." OIG Report at 2.

72. From February through August 2025, USAID and the State Department obligated only small portions of the foreign assistance funds they had appropriated, including funds that were set to expire on September 30, 2025. During this time, Defendants obligated only extremely few funds that had been appropriated to USAID. Defendants refused to obligate foreign assistance funds during this period even though, until late August 2025, they were under a preliminary injunction from this Court to obligate all funds that were expiring on September 30, 2025.

73. On information and belief, absent this litigation and the preliminary injunctions that Plaintiffs obtained, Defendants would have intentionally allowed more than $10 billion in foreign assistance funds expire on September 30, 2025, unspent.

***Defendants Abolish USAID***

74. On March 10, 2025, Secretary Rubio announced in a post on X that Defendants were "officially cancelling 83% of the programs at USAID." @Marco Rubio, Mar. 20, https://perma.cc/8HSH-WBNS. Rubio asserted that the eliminated programs "spent tens of billions of dollars in ways that did not serve, (and in some cases even harmed), the core national interests of the United States." *Id.* As for the remaining 17% of programs, Defendants "intend for the … programs … to now be administered more effectively under the State Department." *Id.*

75. On March 28, Defendant Lewin sent a memorandum to all USAID employees announcing that Defendants "will seek to retire USAID's independent operation." Will Steakin

Case 1:25-cv-00402-AHA Document 174 Filed 01/05/26 Page 27 of 65

& Lucien Bruggeman, *After months of cuts, State Department says it's officially shuttering USAID*, ABC News, Mar. 28, 2025 https://perma.cc/C2BG-VQQC. Lewin wrote that the State Department "intends to assume responsibility for many of USAID's functions and its ongoing programming." *Id.*

76. That same day, nearly all of USAID's remaining 900 employees received notice that they would be subject to a final reduction-in-force, to go into effect on July 1 or September 2. Fatma Tanis, *USAID Terminates Nearly All Its Remaining Employees*, NPR, Mar. 28, 2025, https://perma.cc/9JP2-96E3.

77. Also on March 28, the State Department sent a Congressional Notification to Congress expressing its "intent to realign select USAID functions to the Department and to phase out others." *See* Congressional Notification Transmittal Letter, March 28, 2025, at 3, https://perma.cc/8TYS-BGX3 ("March Congressional Notification"). The State Department stated that "USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives," and that "numerous programs were discontinued" as a result. *Id.* Further, the State Department stated that it "has carefully considered which USAID programs could continue to advance the Administration's foreign policy objectives," which "have been determined to be humanitarian assistance, global health functions, strategic investment, and limited national security programs." *Id.* The State Department explained that it planned to restructure the organization to retain these limited functions but that "[o]ther functions … would be eliminated … ." *Id.* at 4.

78. The Congressional Notification also included a chart showing USAID's remaining unobligated funds. The chart indicated that, as of March 23, 2025, USAID had nearly $24 billion in appropriations that remained unobligated.

79. In May 2025, the State Department sent another Congressional Notification, indicating that it would eliminate most offices in its Bureau of Democracy, Human Rights, and Labor, including all of its regional offices. Congressional Notification Transmittal Letter, 35-032, at 19, https://perma.cc/3W5R-XK46 ("May Congressional Notification") (USAID Organization Chart as of March 2025).

80. Consistent with these congressional notifications, on July 1, 2025, USAID officially shut down and ceased forward-looking operations. Cong. Rsch. Serv., IF10261.20, U.S. Agency for International Development: An Overview 1 (Updated Sept. 5, 2025). On that day, Secretary Rubio announced that USAID would "officially cease to implement foreign assistance." *Id.*; Fatma Tanis & Leila Fadel, *USAID Officially Shuts Down and Merges Remaining Operations with State Department*, NPR (July 1, 2025), https://perma.cc/8BA9-XVF4.

81. On information and belief, the employees that remained past July 1 through their September 2 reduction-in-force effective dates were not performing forward-looking work to carry out the agency's statutory duties and mission, but instead were working only on the winding down of USAID, transferring funds to the State Department, and offboarding and separation of staff.

82. On information and belief, the full-time employees remaining at USAID are mainly contracting officers charged with closing out terminated awards. On information and belief, these individuals report to the Office of Management and Budget.

***Defendants Eliminate USAID and State Programs and Initiatives***

83. As part of abolishing USAID, or even before abolishing USAID, Defendants eliminated long-established USAID and State Department programs, initiatives, bureaus, and

intentional partnerships (programs and initiatives) on which Plaintiffs have relied and would compete for awards.

84. For example, The "Feed the Future" Initiative was first established in 2010 to help alleviate global poverty. *See* Cong. Rsch. Serv., R44216, The Obama Administration's Feed the Future Initiative 1 (Oct. 5, 2015). Since that time, USAID has spent billions of dollars on the initiative, which is credited with lifting 23.4 million people out of poverty, preventing stunting caused by malnutrition in 3.4 million children, and creating opportunities for 5.2 million families who no longer suffer from hunger. Daniel V. Speckhard, *Feed the Future: After a Decade of Success, Let's Make It Better*, Atlantic Council, https://perma.cc/75G5-T9ZA. Congress has specifically funded the initiative, including in Section 7060(d) of the 2024 Appropriations Act, which provided $960 million to carry out the purposes of the Global Food Security Act of 2016, including specifically the "Feed the Future" Initiative. 138 Stat. at 839.

85. On information and belief, Defendants have fully or largely eliminated the "Feed the Future" initiative, materially curtailing program activity and dismissing or reassigning staff.

86. On information and belief, Defendants also eliminated the longstanding USAID "American Schools and Hospitals Abroad" (ASHA) program. Congress first authorized the ASHA programs in the Smith-Mundt Act of 1947 and reauthorized it in Section 214 of the FAA. *See* 22 U.S.C. 2174. Throughout this time, USAID carried out ASHA's purpose of strengthening overseas schools and hospitals that best demonstrate American ideas and values and creating institutions that meet America's educational standards, expanding educational and medical opportunities in Africa, Asia, Eurasia, Europe, Latin America, the Caribbean and the Near East. U.S. Agency for Int'l Dev., American Schools and Hospitals Abroad (July 18, 2012) archived at

https://bit.ly/44USaPs. Section 7060(b) of the 2024 Appropriations Act provided $31.5 million for the ASHA program.

87. On information and belief, Defendants eliminated the ASHA program entirely and eliminated the USAID ASHA Office.

88. On information and belief, Defendants also eliminated the "Power Africa" program. The Power Africa program was created in 2013 to double access to electricity in sub-Saharan Africa, where more than 600 million people lacked access at the time. *See* FACT SHEET: Power Africa, https://perma.cc/CV4E-NNJB. In recent years, the program had an annual budget of roughly $100 million, channeled through USAID. Chico Harlan, *The U.S. Says Africa Needs Energy. But DOGE Halted a Program to Help*, Wash. Post, Apr. 14, 2025, https://perma.cc/U5CC-SUT8. The program helped to accelerate the completion of 164 energy-related projects across Africa, and had $26.4 billion in deals with U.S. companies at the time the program was eliminated. *See id.* Congress has specifically funded the program, including in § 7061(f) of the 2024 Appropriations Act.

89. On information and belief, Defendants have eliminated the Power Africa program in its entirety, no longer spending money on the initiative and dismissing all staff.

90. On information and belief, Defendants have also eliminated USAID's Family Planning and Reproductive Health initiatives (Legislative Tables at 1170). USAID's Office of Population and Reproductive Health has existed for decades and provided global family planning and reproductive health assistance, contributing to goals including protecting women's health by reducing unintended and high-risk pregnancies. *U.S. Bilateral International Family Planning and Reproductive Health Programs: Background and Selected Issues*, Cong. Research Serv. R46215 (Feb. 6, 2020) available at https://perma.cc/GY3U-73V6. On information and belief, Defendants

have eliminated USAID's Office of Population and Reproductive Health entirely, no longer funding or carrying out the programs and dismissing or reassigning all staff that worked on it.

91. On information and belief, Defendants have also eliminated USAID's education programs. Congress has long directed and funded USAID's education activities, and first made education a distinctive policy objective of foreign assistance in 1973, when it added sector-specific objectives to the FAA, including goals "to reduce illiteracy, to extend basic education, and to increase manpower training in skills related to development." 22 U.S.C. § 2151c. For decades, USAID's Office of Education Programs has implemented education activities, including activities aimed at improving reading skills for 100 million primary school children, improving workforce development programs to build appropriate skills to meet developing country needs, and increasing equitable access to education in crisis and conflict environments. *Foreign Aid and the Education Sector: Programs and Priorities* 1 (Cong. Research Serv. R44676, Version 3, updated Nov. 2, 2016) https://perma.cc/6C96-KU77,.

92. The FAA declares it officially the policy of the United States for USAID to carry out basic education programs abroad. The FAA provides: "it shall be the policy of the United States to work with partner countries, as appropriate, other donors, multilateral institutions, the private sector, and nongovernmental and civil society organizations, including faith-based organizations and organizations that represent teachers, students, and parents, to promote sustainable, quality basic education through [certain] programs and activities." 22 U.S.C. § 2151c(c)(2).

93. Congress has also appropriated funds specifically for education programs. The 2024 Appropriations Act and 2025 Further Continuing Resolution appropriated more than $1 billion for basic education programs, including $922 million for the Nita M. Lowey Basic

Education Fund (of which Congress directed that $150 million should be available for the education of girls in areas of conflict), § 7060(1)(A); and $152 million for contributions to multilateral partnerships that support educations, § 7060(1)(B). Congress further directed that not less than $271 million shall be made available for assistance for higher education, § 7060(3); and that not less than $7 million shall be made available for scholar rescue programs to support projects that strengthen democracy and civil society by protecting scholars at risk overseas, including through fellowships and placement opportunities abroad, § 7060(3).

94. On information and belief, Defendants have shuttered USAID's education portfolio in its entirety, halting all basic and higher-education programs, and dismissing or reassigning the staff responsible for administering education initiatives. This includes eliminating USAID's Office of Education and eliminating the congressionally-mandated Senior Coordinator for Basic Education Assistance. *See* Pub. L. 115-56, Div. A, § 3, Sept. 8, 2017, 131 Stat. 1134–35.

95. Defendants have eliminated additional longstanding programs and initiatives, including but not limited to the Advisor for Indigenous Peoples Issues (Legislative Tables at 1173), Prosper Africa (§ 7062(b)), and Development Innovation Ventures (Legislative Tables at 1173).

96. On information and belief, Defendants have eliminated other programs and initiatives as well.

97. In addition to establishing these programs and initiatives, USAID and State also set up various bureaus and funds to carry out their statutory duties. For example, USAID established Bureaus for Democracy, Human Rights, and Governance; for Conflict Prevention and Stabilization; and for Resilience, Environment, and Food Security. *See* March Congressional

Notification at 11 (USAID Organization Chart as of March 2025). The State Department likewise established the Human Rights and Democracy Fund and the Bureau of Democracy, Human Rights, and Labor. *Id.* at 12 (State Organization Chart); *see also* 138 Stat. at 743 (appropriating funds for Human Rights and Democracy Fund). On information and belief, Defendants have eliminated each of these bureaus and funds.

98. On information and belief, USAID and State have also discontinued providing funding for, or participating in, certain international partnerships and initiatives, such as Gavi, the Vaccine Alliance, the Global Partnership for Education, and the Education Cannot Wait initiatives.

99. Plaintiffs have competed or would compete for awards funded from or administered by each of the eliminated programs, initiatives, offices, or partnerships, listed in the paragraphs above, as well as other programs, initiatives, offices, or partnerships that have been eliminated on information and belief.

***Defendants Refuse to Spend Funds Expiring at the End of FY25 As Congress Directed***

100. On August 28, 2025, the D.C. Circuit issued its mandate effectuating a three-judge panel's amended opinion vacating the portion of the Court's previous preliminary injunction requiring Defendants to obligate funds before they expired on September 30, 2025.

101. Within hours of the mandate's issuance, President Trump purportedly submitted a rescissions package to Congress to rescind more than $4 billion dollars in expiring foreign aid appropriations—with the explicit intent to effectuate a "pocket rescission" of these funds. ECF No. 129. The package included expiring foreign aid funds that were appropriated in the 2020, 2021, and 2024 Appropriations Acts. The proposal sought rescission of $3.2 billion in development assistance from the 2024 Appropriations Act, which the proposal stated "would

align with the Administration's efforts to return funding from wasteful U.S. Agency for International Development programs to the American taxpayers." ECF No. 129-3 at 15. The proposal also sought rescission of more than $600 million from the Democracy Fund appropriated in various years, which the proposal stated "would return funding from wasteful foreign assistance programs to taxpayers in alignment with America First foreign policy." *Id.* at 3–6.

102. The Office of Management and Budget proclaimed on social media the next day that the President "CANCELLED $4.9 billion in America Last foreign aid using a pocket rescission." @WHOMB, X, Aug. 29, 2025 (8:46 AM), https://perma.cc/L8YZ-WVMQ. The White House stated in an official press release that the President had acted "to deploy a pocket rescission, cancelling $5 billion in foreign aid." White House, Historic Pocket Rescission Package Eliminates Woke, Weaponized, and Wasteful Spending, Aug. 29 2025, https://perma.cc/BV3F-P789 (emphasis in original). The White House told the press that same day that "it doesn't matter" what Congress does in response to the proposal. Jennifer Scholtes & Kyle Cheney, *White House declares $4.9B in foreign aid unilaterally canceled in end-run around Congress' funding power*, POLITICO (Aug. 29, 2025), https://perma.cc/P3A7-HY5M.

103. On August 29, 2025, Plaintiffs moved for a preliminary injunction, seeking an order requiring Defendants to make available for obligation and to obligate, by September 30, 2025, all expiring funds that Congress appropriated for foreign assistance programs in the 2024 Appropriations Act and prior appropriations acts. Plaintiffs' motion encompassed both the $4 billion proposed for rescission in the President's rescissions package and an additional $6.5 billion in expiring funds that were not included in the package. This Court granted Plaintiffs' motion as to both categories of funds on September 3, 2025. ECF No. 139. The government sought a stay

of the injunction pending appeal, which this Court and the D.C. Circuit denied. ECF No. 146; Order, No. 25-5317 (Sept. 5, 2025).

104. Defendants then sought a partial stay in the Supreme Court, but only with respect to the $4 billion proposed for rescission. Defendants did not seek a stay with respect to the other $6.5 billion in funds subject to the Court's injunction. On September 26, the Supreme Court granted a partial stay as to the $4 billion proposed for rescission only. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025). The Court cautioned that its order "should not be read as a final determination on the merits," but that the relief granted "reflected [its] preliminary view, consistent with the standards for interim relief." *Id.*

105. With respect to the $4 billion proposed for rescission, Congress never took any action with respect to the President's proposal. No bill to effectuate the proposal was even introduced, consistent with the fact that Defendants never intended Congress to actually consider the proposal at all. The 45-day period for Congress to pass such a rescission bill has since expired. *See* 2 U.S.C. § 683(b). Defendants have taken the position that Congress's inaction before the September 30, 2025 expiration date means that they may now withhold the full $4 billion included in the rescission proposal.

106. With respect to the other $6.5 billion subject to this Court's injunction, Defendants represented that they obligated that full amount prior to the funds' expirations. However, on information and belief, Defendants obligated most of these funds through an inter-agency transaction between USAID and the State Department, under which USAID "obligated" the funds to the State Department, and the funds are now parked at the State Department. Defendants had

indicated in filing that they would obligate some or most of these funds to the State Department without specifying the purpose for which the funds will be used. ECF No. 145 at 3.

107. On information and belief, Defendants did not obligate the minimum amounts required for specific purposes, pursuant to directives in Sections 7030-7061 of the 2024 Appropriations Act and prior appropriations acts. Instead, on information and belief, Defendants intentionally minimized the number of directives they would comply with. On information and belief, Defendants did so by "attributing" appropriations in the pocket rescission proposal to particular Section 7030-7061 directives, even though nothing in the special message or any other source of law required doing so, and Defendants then claimed that there was no money to comply with the directives because the money in the special message was deemed "rescinded." Defendants have done this even where they could use other appropriations not in the special message to carry out the directive.

108. Defendants have also obligated funds using instruments that do not specify the purposes for which the funds are being obligated. Defendants have provided no information as to how they intend to use these instruments to comply with the appropriations statutes' requirements to be specific or minimum amounts of funds on the top-level categories of foreign-assistance appropriations, the amounts designated in the tables appended to the act, and the amounts in the directives in Sections 7030-7061.

***Defendants' Actions Shutter Longstanding USAID and State Department Partners and Imperil Their Employees***

109. Defendants' actions have devastated USAID's implementing partners, including Plaintiffs and their members.

110. Most of USAID's programs were implemented—whether by grant, cooperative agreement, or contract—by private-sector partners. Jan. 2025 CRS Report, *supra*, at 1. USAID

had thousands of partners—Plaintiffs among them—including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments. *See id.* Their work was critical to USAID's efforts to fight disease, educate children, provide clean water, advance democracy and protect human rights, and support economic and other forms of development in approximately 130 countries around the world. *See id.* And they worked in some of the most needy parts of the world, including conflict zones. *See id.*

111. Defendants' actions stopped these efforts, with immediate consequences. Half a billion dollars' worth of food grown in America's heartland—enough to feed more than 30 million people—rotted in domestic ports and warehouses, unable to reach starving populations abroad. *See* Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025) https://perma.cc/8JLT-AK2A; Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations*, Minn. Star Tribune (Feb. 6, 2025), https://perma.cc/B3WP-E9XU?type=standard. Efforts aimed at preventing and treating disease stalled as tens—if not hundreds—of thousands of healthcare workers were let go. Declan Walsh, "*We Are in Disbelief*"*: Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025), https://bit.ly/40RJpCT.

112. As of April 1, 2025, an estimated $27 million worth of family planning products already procured by USAID were stuck on boats, in ports, and in warehouses, with no programs or employees left to unload them or hand them over to governments. *Millions of Women Will Lose Access to Contraception as a Result of Trump Aid Cuts*, N.Y. Times (Apr. 1, 2025), https://bit.ly/4pZWzsu. In response, USAID leadership proposed destroying the products. *Id.*

113. In July 2025, Defendants ordered that nearly 500 metric tons of emergency food—

enough to feed about 1.5. million children for a week—be incinerated because it was set to expire unused. The food, meant for children in Afghanistan and Pakistan, became ash. Hana Kiros, *The Trump Administration Is About to Incinerate 500 Tons of Emergency Food, The Atlantic*, July 14, 2025, https://perma.cc/6W9E-FG4P?type=image.

114. By August, Defendants' cuts to foreign aid had stalled treatment campaigns for debilitating tropical diseases, placing millions of doses of essential medications at risk of expiration and waste in storage facilities. Drugs for Tropical Diseases Go to Waste After US Aid Cuts, Eco-Business (Aug. 25, 2025), https://bit.ly/4j41431. In Africa alone, about 1.6 million doses of medication had already expired in August, with 8 million more set to by the end of 2025 and another 90 million by May 2026. *Id.*

115. Plaintiffs have been irreversibly harmed by these actions.

116. Plaintiff Democracy International's Justice, Rights, and Security—Rapid Response Assistance project provided lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. To name just two of many impacted programs: In Bangladesh, Democracy International had to stop providing medical care to hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last summer, leaving them without necessary medical services. And in Burkina Faso, human rights defenders who are working to track violence against Christian communities are now at risk of being killed because Democracy International's program can no longer help them relocate and provide them with food, shelter, and subsistence. Cutting off Democracy International's programs has also halted emergency assistance to refugees and victims of state-sponsored violence; interrupted programs working to prevent at-risk youth from joining gangs; and left beneficiaries vulnerable to being recruited into terrorist

organizations.

117. Approximately 98% of Democracy International's 2024 revenue came directly or indirectly from USAID. In the past, Democracy International has held awards funded from the following Appropriations Act Title III categories: Complex Crises Fund; Development Assistance; Transition Initiatives; Assistance for Europe, Eurasia and Central Asia; Democracy Fund (USAID); Global Health Programs; and Economic Support Fund. It has also held awards funded from numerous subcategories set forth in the tables designated by Section 7019(a) of the 2024 Appropriations Act or identified in Sections 7019 to 7061 of the Act, and, if given the opportunity, would compete for future awards appropriated for the purposes and subpurposes of these appropriations. Because USAID has not spent these funds as directed by Congress, Democracy International has not had the opportunity to bid on new projects in 2025 and has had to significantly reduce staff salaries and cut benefits as a result. Democracy International expects to miss out on nearly all of the revenues it had projected for 2025 and 2026, reducing the company's annual revenues by more than 95 percent. Such a significant loss of revenue poses an existential threat to the company and will put the company at risk of bankruptcy.

118. Plaintiff DAI's portfolio has been similarly devastated, with far-ranging, often life-threatening effects. Specifically, Defendants' actions have ended funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, for safe drinking water in politically strategic communities in Lebanon, for civil-society organizations contending with brutal authoritarian violence in Burma, and for efforts to track and contain zoonotic diseases in Bangladesh.

119. In prior years, nearly 80% of DAI's revenue (more than $750 million in 2024) came from U.S. foreign assistance funds, including those managed by USAID and the Department

of State. Like Democracy International, DAI has received awards funded by various categories and subcategories of appropriations set forth in Titles III and IV of the Appropriations Acts, and would compete for such awards in the future. *See* Appendices B–C. If USAID does not spend these funds as directed by Congress, DAI expects to miss out on 80% of the revenue it had projected for 2026, creating major financial, operations, capacity, and reputational harms for the company.

120. Plaintiff Chemonics is also heavily reliant on USAID, with 88% of its revenues coming from USAID in prior years. If USAID does not spend appropriated funds as directed by Congress, Chemonics expects to miss out on $618 million in 2026 revenues, representing 73.7% of its total projected revenue for that year. The inability to compete for foreign assistance funds going forward threatens Chemonics' ability to implement vital programs that advance national security, food security, economic growth, and humanitarian assistance worldwide. For 50 years in more than 100 countries, Chemonics has worked to build relationships, goodwill, and its reputation. The substantial loss in revenue would create major financial, operations, and reputational threats to the company.

121. Plaintiff MSH has historically relied on USAID for 90% of its total annual revenues. MSH has consistently provided technical assistance across a wide range of functions, including supply chain functions, health financing, leadership and governance, and workforce training. MSH's technical assistance enables governments and large institutions to efficiently deliver healthcare across a range of populations and health areas, including HIV/AIDS, tuberculosis, malaria and maternal and child health. It has competed for and been awarded funding under global health programs for more than 50 years.

122. Without access to programs and funding opportunities that Congress has directed

USAID to provide, MSH expects to miss out on 67% of its projected revenue for 2026, posing a catastrophic and existential threat to the organization. MSH would be forced to terminate critical staff, reduce its global presence, and suffer harm to the reputation it has built over the course of 50 years. In addition, without USAID support, MSH has been rendered vulnerable to legal claims and extortion by foreign governments claiming tax amounts that are not owed. In addition, the sudden dissolution of programs has meant that USAID has not conducted adequate project reviews and gave high-performing MSH projects perfunctory lower scores.

123. Plaintiff HIAS has relied on State Department and USAID funding to serve refugees globally for years, with such funding making up 38% of its FY25 revenues. As with the other Plaintiffs, it has received awards in multiple categories and subcategories of appropriations that Defendants are withholding, and would compete for awards under a broad array of programs. Defendants' actions in withholding such funds, eliminating such programs, and abolishing USAID pose an existential threat to the company.

124. Plaintiff ABA had relied on USAID funding to advance access to justice, support counter-terrorism efforts, advance freedom of expression and freedom of religion, strengthen anti-corruption efforts, promote internet freedom, and protect human rights defenders at risk. It previously received funding under the Democracy Fund, the Economic Support Fund, and other funds and allocations under democracy programs, which are defined in appropriations statutes to include programs that support promotion of human rights, labor rights, and the rule of law. ABA's Center for Global Programs (ABA CGP) has relied on USAID for approximately 38% of its revenues in the past, and relied on the State Department for another 60% of its revenues. If Congressionally appropriated funds are withheld, ABA CGP expects to lose 90% of its projected revenues for 2026, which would pose a dire threat to the ongoing viability of ABA CGP.

125. Plaintiff GHC's members, including Plaintiff MSH, have also been severely impacted by Defendants' actions. GHC's membership includes over 100 organizations. These organizations have previously held awards funded by *every category* of "global health programs" appropriations, including appropriations for maternal and child health, to combat HIV/AIDs, and for family planning and reproductive health. If given the opportunity, GHC's members would compete for such awards again in the future. Defendants' actions have harmed several of GHC's members, many of whom report projected revenue losses of 25–60% of their annual budgets, forcing them to close or downsize U.S. offices, move jobs overseas, impose pay cuts, and eliminate health insurance and benefits for American employees.

126. Plaintiff SBAIC's members—American small businesses that provide foreign assistance in all sectors and all geographies, including conflict zones—have also suffered ruinous injuries. SBAIC's members, including Plaintiff Democracy International, have had their operations devastated by losing access to vitally necessary appropriated funds. SBAIC member companies are dependent on these funds and constructed business models around this funding; numerous member companies would lose nearly 100% of their revenue if funds appropriated by Congress are not spent, posing existential harm for such companies.

## CLAIMS FOR RELIEF

### <u>Counts 1-6: Failure to Obligate Congressionally Mandated Foreign Assistance Funding</u>

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

127. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

128. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

129. Defendants have made a final decision not to obligate, by the deadlines set by Congress, the full amounts that Congress has appropriated and required to be obligated for specific purposes, including in the top-level categories of appropriations in Titles III and IV, in the tables incorporated by referenced in Section 7019(a), and in the directives in Sections 7030-7061. The decision not to obligate congressionally mandated foreign assistance funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

130. Because annual appropriations acts require Defendants to obligate funds in specific amounts by specific deadlines for specific purposes, if the executive branch wishes not to spend funds as directed by Congress, it must request that Congress rescind the funds, and must obligate the funds as required unless Congress actually rescinds the funds in a bill that the President signs.

131. In the 2024 Appropriations Act and the 2025 Continuing Resolutions and subsequent continuing resolutions, Congress did not provide the agencies discretion to spend less than the full amounts appropriated for the designated categories and sub-categories of purposes. To the contrary, the 2024 Appropriations Act and 2025 Continuing Resolution, and subsequent continuing resolutions, required that the appropriated amounts "shall" be apportioned to USAID or the State Department to spend for specific top-line categories of purposes, and that specific or minimum amounts "shall be made available" by USAID and the State Department for specific sub-categories of purposes.

132. By refusing to spend funds that Congress has appropriated for USAID's operations and for specified foreign-assistance programs and purposes, or by spending the funds on purposes other than those which Congress specified, Defendants have violated federal statutes including the 2024 Appropriations Act, the 2025 Continuing Resolution, prior and subsequent appropriations acts, and the Anti-Deficiency Act and the Purpose Act.

133. The Constitution vests lawmaking power in Congress, including exclusive power over federal spending. The executive branch lacks inherent constitutional power to ignore statutory mandates and decline to spend funds that Congress has appropriated. By ignoring statutory mandates and refusing to spend funds that Congress has allocated for specified foreign-assistance programs, Defendants have violated the constitutional separation of powers.

134. Defendants' conduct is therefore "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

## ***SECOND CLAIM FOR RELIEF***

**Violation of the Administrative Procedure Act—Arbitrary and Capricious: Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

135. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

136. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

137. The decision not to obligate congressionally mandated foreign assistance funding is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

138. Defendants' decisions not to obligate foreign assistance appropriations in the amounts and for the purposes that Congress directed are arbitrary and capricious.

139. Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

140. Defendants provided no reasoned explanation for their decision not to obligate congressionally mandated foreign assistance funding.

141. Defendants failed to reasonably explain the reasons for their change in policy in failing to obligate congressionally mandated foreign assistance funding.

142. Defendants ignored the factors that Congress required the agencies to consider and considered factors that Congress did not permit them to consider.

143. Defendants failed to consider the serious reliance interests of contractors, grantees, and the members of the public that they serve that are jeopardized by their decision not to obligate congressionally mandated foreign assistance funding.

144. In deciding not to obligate congressionally mandated foreign assistance funding, Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered the detrimental impact of not obligating congressionally mandated foreign assistance funding, any reasonable alternative policy change, or grantees' reasonable reliance on the funds or the reliance interests of communities served by foreign assistance programs.

145. Defendants' decision not to obligate congressionally mandated foreign assistance funding must be declared unlawful and set aside as arbitrary and capricious.

146. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

***THIRD CLAIM FOR RELIEF***

**Violation of the Administrative Procedure Act—**
**Agency Action Unlawfully Withheld or Unreasonably Delayed:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

147. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

148. The 2024 Appropriations Act, the 2025 Continuing Resolution, and prior appropriations acts mandate that Defendants obligate the full amounts appropriated by specific deadlines and for specific purposes, with no discretion to spend less than those full amounts. Defendants have non-discretionary duties to comply with these commands.

149. Defendants' withholding of these appropriated funds is "unlawful." 5 U.S.C. § 706(1).

150. Alternatively, Defendants have "unreasonably delayed" spending the relevant funds.

151. Plaintiffs are entitled to relief under § 706(1).

***FOURTH CLAIM FOR RELIEF***

**Ultra Vires:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

152. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

153. A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert

such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

154. Defendants' refusal to obligate the full amounts that Congress required to be spent by specific deadlines, for specific purposes, is a clear departure from the appropriations acts' requirements and is blatantly lawless.

155. No statute, constitutional provision, or other source of law authorizes Defendants to withhold, rescind, or re-purpose foreign-assistance funds that Congress has appropriated. Nor does any statute, constitutional provision, or other source of law authorize Defendants to withhold foreign-assistance funds on the ground that the President disfavors the objective for which Congress has specifically directed funds be spent. Defendants' actions in doing so exceed their lawful authority.

156. Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful and enjoin Defendants' ultra vires actions.

***FIFTH CLAIM FOR RELIEF***

**Mandamus:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

157. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

158. If relief is not available on Plaintiffs' APA and ultra vires claims concerning Defendants failure to obligate congressionally mandated foreign assistance funding by the specific deadlines, for the specific purposes, that Congress required, the Court should enter a writ of mandamus.

159. Defendants have disregarded their clear duties to spend appropriations enacted by Congress for those programs.

160. Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials, including specifically where federal officials refuse to spend congressionally appropriated funds for policy reasons. *Aiken Cnty.*, 725 F.3d at 258.

161. Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on their other claims.

***SIXTH CLAIM FOR RELIEF***

**Violation of the Separation of Powers:**
**Failure to Obligate Congressionally Mandated Foreign Assistance Funding**
*Against All Defendants*

162. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

163. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

164. The Constitution vests exclusive lawmaking in Congress, including exclusive power over federal spending.

165. Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the President has no unilateral authority to amend or ignore congressional appropriations. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

166. Yet President Trump purported to exercise his Article II constitutional powers in directing USAID and the State Department to not spend foreign-assistance fund as Congress intended. At the time of taking relevant actions, and at all times prior to appellate proceedings from the March 2025 preliminary injunction, the President and the other Defendants relied solely on the President's purported constitutional authority for refusing to spend foreign-assistance appropriations as Congress directed.

167. By refusing to obligate foreign-assistance funds that Congress has appropriated in the amounts and for the purposes that Congress directed, including by doing so based on incorrect assertions of the President's constitutional powers, Defendants are violating the separation of powers.

**<u>Claims 7-10: Abolishment of USAID</u>**

***SEVENTH CLAIM FOR RELIEF***

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Abolishment of USAID**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

168. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

169. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).

170. The decision to abolish USAID is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

171. The Constitution grants Congress "plenary control over the . . . existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010);

*see* U.S. Const. Art. I, § 8, cl. 18. The President lacks authority to unilaterally abolish an agency that Congress has created.

172. Congress exercised its authority under the Necessary and Proper Clause to create USAID as an executive agency. *See* 22 U.S.C. § 6563 ("[T]here is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5 [*i.e.*, an executive agency]."). In the Foreign Assistance Act, Congress has assigned specific responsibilities to the USAID Administrator to be carried out by USAID. And Congress has not exercised its authority to abolish USAID. To the contrary, Congress has continued to fund USAID as recently as March 2025 and November 2025.

173. Under Article II, the President must take care to faithfully execute the laws, including laws establishing executive agencies. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the Executive Branch has no unilateral authority to abolish a federal agency that Congress established, nor may it reassign all of an agency's statutory responsibilities to a different federal agency.

174. By abolishing USAID and purporting to transfer some of its statutory responsibilities to the State Department, without congressional authorization, Defendants are violating the separation of powers.

175. Defendants' conduct is contrary to law, and Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### *EIGHTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Arbitrary and Capricious: Abolishment of USAID**
*Against Defendants Rubio, Lewin, Vought, Department of State, USAID, and OMB*

176. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

177. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

178. The decision to abolish USAID is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

179. Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

180. Defendants provided no reasoned explanation for their decision to abolish USAID.

181. Defendants failed to reasonably explain the reasons for their change in policy in abolishing USAID.

182. Defendants ignored the factors that Congress required the agencies to consider and considered factors that Congress did not permit them to consider.

183. Defendants failed to consider the serious reliance interests of contractors, grantees, other implementing partners, the beneficiaries of USAID programs, and others that are jeopardized by abolishing USAID.

184. In abolishing USAID and transferring all of its statutory responsibilities to the State Department, Defendants have failed to consider multiple important aspects of the problem. Defendants failed to adequately consider the detrimental impact of the abolishment of USAID on plaintiffs and other implementing partners, or the communities served by plaintiffs and other implementing partners, and Defendants did not adequately consider any alternative more limited policy change, or grantees' reasonable reliance on USAID or the reliance interests of communities served by USAID.

185. Defendants' decision to abolish USAID must be declared unlawful and set aside as arbitrary and capricious.

186. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

***NINTH CLAIM FOR RELIEF***

**Ultra Vires:**
**Abolishment of USAID**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

187. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

188. A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

189. No statute, constitutional provision, or other source of law authorizes Defendants to abolish USAID without congressional authorization. Defendants' actions doing so exceed their lawful authority.

190. Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful and enjoin Defendants' ultra vires actions.

***TENTH CLAIM FOR RELIEF***

**Violation of the Separation of Powers:**
**Abolishment of USAID**
**(Against All Defendants)**

191. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

192. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

193. The Constitution grants Congress "plenary control over the . . . existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see* U.S. Const. Art. I, § 8, cl. 18. The President lacks authority to unilaterally abolish an agency that Congress has created.

194. Congress exercised its authority under the Necessary and Proper Clause to create USAID as an executive agency. *See* 22 U.S.C. § 6563 ("[T]here is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5 [*i.e.*, an executive agency]."). In the Foreign Assistance Act, Congress has assigned specific responsibilities to the USAID Administrator, to be carried out by USAID. And Congress has not exercised its authority to abolish USAID. To the contrary, Congress has continued to fund USAID as recently as March 2025.

195. Under Article II, the President must take care to faithfully execute the laws, including laws establishing executive agencies. Consistent with the constitutional division of

legislative and executive powers and the requirements of bicameralism and presentment, the President has no unilateral authority to amend or ignore legislation establishing an executive agency. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

196. By abolishing USAID and purporting to transfer some of its statutory responsibility to the State Department, without congressional authorization, Defendants are violating the separation of powers.

**Claim 11: Elimination of Programs, Initiatives, Offices and Partnerships**

***ELEVENTH CLAIM FOR RELIEF***

**Violation of the Administrative Procedure Act—Arbitrary and Capricious: Elimination of Foreign-Assistance Programs, Initiatives, Offices and Partnerships**
*Against Defendants Rubio, Lewin, Vought, Department of State, USAID, and OMB*

197. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

198. Defendants' decisions to entirely or almost entirely shut down foreign-assistance programs, initiatives, offices, and partnerships are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

199. "The creation of [an agency] program—and its rescission—is an action that provides a focus for judicial review" under the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020).

200. Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; failed to consider key aspects of the problem, reasonable alternatives, or the substantial reliance interests at stake; relied on factors Congress did not authorize them to consider; and failed to acknowledge or justify their change of position.

201. Defendants provided no reasoned explanation for their decision to eliminate foreign-assistance programs, initiatives, offices, and partnerships, nor did they offer any reasonable explanation for these decisions.

202. Defendants failed to reasonably explain the reasons for their change in policy in eliminating long-standing USAID programs, initiatives, offices, and partnerships.

203. Defendants failed to consider the serious reliance interests of contractors, grantees, other implementing partners, and the ultimate beneficiaries of the eliminated USAID initiatives, offices, and partnerships.

204. Defendants have failed to consider multiple important aspects of the problem. There is no indication that Defendants considered the detrimental impact of the elimination of USAID programs, initiatives, offices, and partnerships on Plaintiffs and the people that they serve, or any reasonable alternatives.

205. Defendants' decision to eliminate USAID programs, initiatives, offices, and partnerships, must be declared unlawful and set aside as arbitrary and capricious.

206. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

**Claims 12-17: Disposition of Funds Originally Set to Expire on September 30, 2025**

***TWELFTH CLAIM FOR RELIEF***

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Failure to Comply with Directives for Funds Originally Set to Expire in September 2025**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

207. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

208. In the 2024 Appropriations Act and prior appropriations acts, Congress included directives in Sections 7030-7061 requiring that minimum or specific amounts of funds "shall be made available" for specific purposes.

209. Many of the directives in Sections 7030-7061 do not specify one particular top-line category of appropriations from Titles III or IV that must be used to meet the directive. Some merely require Defendants to use "funds appropriated under title III [and/or title IV] of this Act" to meet the directive that "not less than" a particular amount "shall be available for a particular purpose. For instance, Section 7061(e) states that "[o]f the funds appropriated under title III of this Act, not less than $256,500,000 shall be made available for adaptation programs." 2024 Appropriations Act, § 7061(e).

210. After Defendants purported to submit the pocket rescission proposal to Congress on August 28, 2025, Defendants used accounting maneuvers to purport to get out of complying with the directives in Sections 7030-7061 to spend minimum specific amounts for specific purposes. Defendants did so by "attributing," meaning assigning as an accounting matter, appropriations in the special message for use in meeting a particular Section 7030-7061 directive. Defendants then claimed that the "rescission" of the funds in the special message obviated the requirement that Defendants comply with the directive, because the funds in the special message had been designated to be used for the directive were purportedly no longer available. Defendants made use of this tactic even where there were other appropriations available, not in the special message, that could have been used to meet the directive.

211. By engaging in this tactic, Defendants were able to obligate those available funds to the State Department and others without designating a particular purpose for the use of the funds.

212. Defendants' decisions to attribute funds in the special message to Sections 7030-7061 directives, even where such action was not necessary, are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

213. Defendants' final agency actions to "attribute" appropriations in the special message to the Sections 7030-7061 directives are unlawful, regardless of whether the special message lawfully rendered the funds included in the special message unavailable for obligation, and regardless of whether Defendants thereby lacked sufficient funds to meet all of the Section 7030-7061 directives.

214. As the D.C. Circuit has held, where a statute directs the government to spend certain "minimum funds" for a particular purpose, but a later constraint prevents the government from spending all of the funds for that purpose, the government must still "effectuate the original statutory scheme as much as possible, within the limits of the added constraint." *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1348 (D.C. Cir. 1996) (quoting *City of Los Angeles v. Adams*, 556 F.2d 40 (D.C. Cir. 1977)), *amended* (Aug. 6, 1996). Thus, Defendants were required to maximize compliance with the Sections 7030-7061 directives "as much as possible." *Id.* But Defendants did the opposite.

215. For the appropriations that were originally set to expire on September 30, 2025, Defendants' failure to comply with the Sections 7030-7061 directives as much as possible is contrary to law, in violation of the 2024 Appropriations Act and prior appropriations acts.

216. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### *THIRTEENTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Contrary to Law:**
**Failure to Obligate by September 30, 2025 Funds Included in the Special Message**
**(Declaratory Relief Only)**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

217. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

218. On August 28, 2025, Defendants purported to transmit a special message to Congress proposing to rescind more than $4 billion in appropriations that were originally set to expire on September 30, 2025. Defendants deliberatively waited until less than 45 days remained before September 30, 2025 to submit the rescission proposal, to enable the Defendants to claim that the money was rescinded if Congress took no action on the proposal by September 30, 2025.

219. Defendants' final decision on or around August 28, 2025 to not obligate the funds in the special message by September 30, 2025 is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

220. Defendants' decision not to obligate the funds in the pocket rescission by September 30, 2025 violates the 2024 Appropriations and prior appropriations act that set September 30, 2025 as the deadline for Defendants to obligate the funds in the special message.

221. The 2024 Appropriations Act and prior appropriations acts mandated that Defendants obligate the full amount of funds included in the special message by September 30, 2025, and the submission of a rescission proposal for those funds less than 45 days prior to September 30, 2025, did not obviate Defendants' of their statutory duty to obligate the funds by that date.

222. Plaintiffs are entitled to declaratory relief that Defendants' decision not to obligate funds in the special message by September 30, 2025, and Defendants' withholding of the funds from obligation beyond that date, are unlawful.

***FOURTEENTH CLAIM FOR RELIEF***

**Ultra Vires:**
**Failure to Obligate by September 30, 2025 Funds Included in the Special Message**
**(Declaratory Relief Only)**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

223. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

224. A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

225. Defendants' refusal to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message was a clear departure from the requirements of the 2024 Appropriations Act and prior appropriations acts and was blatantly lawless.

226. No statute, constitutional provision, or other source of law authorized Defendants to refuse to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message. Defendants' actions doing so exceed their lawful authority.

227. Pursuant to Plaintiffs' non-statutory right of action, the Court should declare unlawful Defendants' ultra vires actions in not obligating, by September 30, 2025, the funds included in the special message.

## *FIFTEENTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Contrary to Law: Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought, Department of State, USAID, and OMB*

228. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

229. Defendants have made a final decision not to obligate the appropriations included in the August 28, 2025 special message.

230. Under 2 U.S.C. § 683(b), "[a]ny amount of budget authority proposed to be rescinded . . . in [a] special message *shall be made available for obligation* unless, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded or that is to be reserved."

231. Section 683(b) requires an agency to make available for obligation any funds that were proposed to be rescinded but which Congress did not rescind. If an agency does not obligate funds by the deadline that Congress original set for obligation, on the ground that Section 683(b) permits the agency not to obligate funds included in a rescission proposal until Congress has had a full 45-day period to consider the proposal, then Section 683(b) requires that the funds "shall be made available for obligation" by the agency after that 45-day period runs, regardless of whether that is after the original deadline Congress set for the funds to be obligated.

232. Defendants' final decision to never obligate funds included in the August 28, 2025 rescission proposal is contrary to law.

233. Plaintiffs are entitled to relief under 5 U.S.C. § 706(2).

### *SIXTEENTH CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—**
**Agency Action Unlawfully Withheld or Unreasonably Delayed:**
**Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

234. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

235. Pursuant to 2 U.S.C. § 683(b), Defendants' failure to obligate funds included in the August 28, 2025 rescission proposal constitutes agency action unlawfully withheld.

236. Alternatively, Defendants have "unreasonably delayed" obligating funds included in the August 28, 2025 rescission proposal.

237. Plaintiffs are entitled to relief under 5 U.S.C. § 706(1).

### *SEVENTEENTH CLAIM FOR RELIEF*

**Ultra Vires:**
**Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

238. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

239. A nonstatutory right of action is also available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure by the [agency] from its statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

240. Defendants' ongoing refusal to obligate the appropriations included in the August 28, 2025 special message is a clear departure from the requirements of 2 U.S.C. § 683(b) and is blatantly lawless.

241. No statute, constitutional provision, or other source of law authorizes Defendants to refuse to obligate the appropriations included in the August 28, 2025 special message.

242. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions.

### *EIGHTEENTH CLAIM FOR RELIEF*

**Mandamus:**
**Ongoing Failure to Obligate Funds Included in the Special Message**
*Against Defendants Rubio, Lewin, Vought,*
*Department of State, USAID, and OMB*

243. Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

244. If relief is not available on Plaintiffs' APA and ultra vires claims concerning Defendants failure to obligate the funds included in the August 28, 2025 special message as required by 2 U.S.C. § 683(b), the Court should enter a writ of mandamus.

245. Defendants have disregarded their clear duty to spend the funds included in the special message.

246. Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials, including specifically where federal officials refuse to spend congressionally appropriated funds for policy reasons. *Aiken Cnty.*, 725 F.3d at 258.

247. Mandamus is warranted here if Plaintiffs are unable to obtain complete relief on their other claims.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request judgment in their favor against Defendants as follows:

1. Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' abolishment of USAID.

2. Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' elimination of foreign assistance programs, initiatives, offices, and partnerships.

3. Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' decisions not to spend foreign assistance appropriations in the specific or minimum amounts, for the specific purposes, that Congress directed in appropriations acts; any decisions by Defendants to spend USAID's and the State Department's appropriations on purposes other than those for which Congress appropriated the funds; and any other actions taken by Defendants that prevent Defendants from fulfilling their duties to obligate and disburse appropriated foreign-assistance funds in accordance with law;

4. Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin Defendants' decisions in August and September 2025 not to maximize the number of directives in Sections 7030-7061 of the 2024 Appropriations Act with which Defendants would comply, even if the funds in the August 28, 2025 special message were not available for obligations, and Defendants' decisions to instead attribute funds in the special message to directives in order to minimize the number of directives with which Defendants would comply.

5. Declare unlawful Defendants' decision not to obligate, by September 30, 2025, the appropriations included in the August 28, 2025 special message.

6. Declare unlawful, vacate, set aside, and enjoin Defendants' decision not to make available for obligation consistent with 2 U.S.C. § 683(b) the appropriations included in the August 28, 2025 special message, after the 45-day period for Congress to consider the special message had run.

7. Order that, pursuant to 5 U.S.C. § 706(1), Defendants are compelled to make available for obligation and to obligate, by the deadline set by Congress: (i) the full amount of funds that Congress appropriated for foreign assistance programs in the 2024 Appropriations Act, the 2025 Continuing Resolution, and prior and subsequent appropriations acts and (ii) the specific or minimum amounts of funds that Congress required Defendants to obligate for particular uses and purposes in Section 7019(a) and Sections 7030-7061 of the 2024 Appropriations Act and in prior appropriations, and in subsequent continuing resolutions and appropriations acts.

8. Order that, pursuant to 5 U.S.C. § 706(1), Defendants must make available for obligation consistent with 2 U.S.C. § 683(b) the appropriations included in the August 28, 2025 special message.

9. Issue a writ of mandamus compelling Defendants to carry out their clear duties, if complete relief is not available under Plaintiffs' other claims;

10. Award Plaintiffs reasonable attorneys' fees and costs; and

11. Grant such other and further relief as the Court may deem just and proper.

Dated: December 12, 2025

Respectfully submitted,

*<u>/s/ Daniel F. Jacobson</u>*
Daniel F. Jacobson (D.C. Bar 1016621)
Stephen K. Wirth (D.C. Bar 1034038
John Robinson (D.C. Bar 1044072)
Nina Cahill (D.C. Bar No. 1735989)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. Ste. 301
Washington, DC 20016

Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

U.S. Department of State

# FEDERAL ASSISTANCE AWARD

**1. Recipient Name**
AMERICAN BAR ASSOCIATION
DBA AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUCATION

**2. Assistance Type:**
- [x] Cooperative Agreement
- [ ] Fixed Amount Award
- [ ] Grant
- [ ] Property Grant
- [ ] Voluntary Contribution

**3. Address**
1050 CONNECTICUT AVE., N.W., SUITE 400
WASHINGTON, DC 20036
UNITED STATES

**4. Recipient POC:** AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUC
Phone Number 202/662-1988
Email Vladimir.Gurin@americanbar.org

| 5. Type of Entity | 6. Unique Entity Identifier | 7. EIN/ TIN |
|---|---|---|
| U.S. Non-Profit Organization (501(c) (3)) | 806207841 | ********** |

| 8. CFDA Number | 9. Statutory Authority for Assistance | 10. Award Number |
|---|---|---|
| 19.345 | Foreign Assistance Act | SLMAQM20CA2101 |

**11. Period of Performance**
Start Date 20-Aug-2020 End Date 31-Mar-2022

**12. Amendment Number**

**13. Accounting and Appropriation Data**
1900-2019-2020-19729010370013-1051-DRL--2762-SLMAQM20CA2101-4122------ -2020FDSTRIE7813-SLMAQM20CA2101 $740,740.00 USD

**14. Funds Certified By**
Calvin Reaves

**Funding Distribution**

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | | $740,740.00 USD | $740,740.00 USD |
| Recipient Share of Costs | | $0.00 USD | $0.00 USD |
| Total Costs | | $740,740.00 USD | $740,740.00 USD |

**16. Purpose of the Federal Award Activity**
To support developing and reforming a new legal frameworks for Sudan that adhere to international human rights standards.

**17. Specific Award Conditions**
- [x] Attached

**Agreement**

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| 18a. Recipient Name | 19a. Grants Officer Name |
|---|---|
| Vladimir Gurin | Selina Holt |

| 18b. Recipient Signature | 19b. Grants Officer Signature |
|---|---|
| Vladimir Gurin (electronically signed) | Selina Holt |

| 18c. Title | 18d. Date (dd-mmm-yyyy) | 19c. Bureau/Office/Post | 19d. Date (dd-mmm-yyyy) |
|---|---|---|---|
| Director - Grant Operations and Com | 21-Aug-2020 | OFFICE OF ACQUISITION MANAGEMENT (A/LM/AQM) | 20-Aug-2020 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here: HoltSM@state.gov

## Award Points of Contact: Roles and Responsibilities

**Department of State Roles and Responsibilities**

**The Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM)**

**1. Grants Officer (GO)**

The Grants Officer is the only person authorized award, amend, terminate a federal assistance award, and provide formal, required award approval including those outlined in 2 CFR 200.308 and 2 CFR 200.407. The recipient must contact the GO to request changes to the federal assistance award, terms and conditions including an extension, budget changes, or other requests requiring formal approval. Correspondence should be routed through the GOR.

**Selina Holt**
703-875-5857
Holtsm@state.gov

**2. Grants Management Specialist (GMS)**

The Grants Management Specialist has been designated to process actions on behalf of the GO. Cc the GMS on all correspondences to the GO.

**Selina Holt**
703-875-5857
Holtsm@state.gov

**The Bureau of Democracy Human Rights and Labor (DRL)**

**3. Grants Officer Representative (GOR)**

The Grants Officer Representative is the person with the technical expertise related to program implementation and who is designated, in writing, by the GO to administer certain aspects of a specific federal assistance award. The GOR is not authorized to approve or deny any request to amend the award.

**Megan Anderson**
DRL/GP
202-285-6915
AndersonME@state.gov

**4. Program Officer (PO)**

The Program Officer is responsible for the programmatic and/or technical aspects of the pre-award cycle.

**Megan Anderson**
DRL/GP
202-285-6915
AndersonME@state.gov

**The above roles are subject to change at any time without necessitating an amendment to the award by US Department of State.**

Recipients will be notified of any changes via the Grant Solutions System or by email if award is not in Grant Solutions. See State Department's Recipient Guidebook, pages 4-8, https://statebuy.state.gov/fa/Pages/RecipientGuidebook.aspx

**Recipient Administrators Points of Contact**

**1. Project Point of Contact (POC):**
**Sebastian Albuja**
Director, Africa Division, Rule of Law Initiative
ABA ROLI
1050 Connecticut Ave NW, Suite 450
Washington, DC 20036
Sebastian.albuja@americanbar.org
(202) 662-1734

**2. Authorized Award Signatory:**

**Vladimir Gurin**
Director – Grants Operations and Compliance
ABA ROLI
1050 Connecticut Ave NW, Suite 450
Washington, DC 20036
Vladimir.Gurin@americanbar.org
(202) 662-1988

**Please notify DOS in anticipation of any changes in the above Recipient Administrators Points of Contact.**

Also note that any change in a key person specified in the application or the Federal award require prior approval from the Grants Officer per 2 CFR 200. 308(c)2.

# U.S. DEPARTMENT OF STATE
# AWARD PROVISIONS

During the period of performance, the Recipient must comply with:

- The Award Provisions below;
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at: https://www.state.gov/m/a/ope/index.htm;
- The applicable sections of 2 CFR §200 and 2 CFR §600; and
- All assurances and certifications made during the application process.

1) FEDERAL AWARD IDENTIFICATION NUMBER (FAIN): SLMAQM-20-CA-2101

2) FEDERAL SHARE OF AWARD: $740,740.00

3) PURPOSE AND OBJECTIVES OF AWARD:

a. Purpose:

**American Bar Association** (hereinafter referred to as the Recipient), is hereby provided a federal award, the purpose of which is to support developing and reforming a new legal frameworks for Sudan that adhere to international human rights standards and build a sustainable, rights-respecting government.

The Recipient shall carry out this award in accordance with its proposal dated June 26, 2020 and any revisions to which both parties agree to in writing. The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

b. Objectives and Expected Outcomes: The Recipient agrees to perform the program and meet the specific objectives below:

See attached Scope of Work

4) CONTACT INFORMATION: SEE ROLES AND RESPONSIBILITIES

5) AUTHORIZED BUDGET SUMMARY:

Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

# Grant and Cooperative Agreement

CHOOSE ONE: [X] COOPERATIVE AGREEMENT [ ] GRANT

CHOOSE ONE: [X] EDUCATION [ ] FACILITIES [ ] RESEARCH [ ] SDCR [ ] TRAINING

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE | 4. COMPLETION DATE |
|---|---|---|---|
| 7200AA22CA00021 | | 09/29/2022 | 09/28/2027 |

5. ISSUED TO
NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip)
AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUCATION
1050 CONNECTICUT AVE NW, STE 400
WASHINGTON DC 20036-5369

6. ISSUED BY USAID M/OAA
**Mailing Address:** Office of Acquisition & Assistance
1300 Pennsylvania Avenue, NW, UA
Washington DC 20523-1000

7. TAXPAYER IDENTIFICATION NO. (TIN)

8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO.

9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*)
David Rubino

10. RESEARCH, PROJECT OR PROGRAM TITLE
Legal Support Project (LSP)

11. PURPOSE
To address challenges to the capacity, resiliency, and efficacy of the Eurasian legal sector and civil society.

12. PERIOD OF PERFORMANCE (*Approximately*)
09/29/2022 through 09/28/2027

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $7,500,000.00 | THIS ACTION | $1,385,639.00 |
| CASH SHARE | $0.00 | **TOTAL** | $1,385,639.00 |
| NON-CASH SHARE | $7,500,000.00 | | |
| RECIPIENT SHARE | $0.00 | | |
| **TOTAL** | $7,500,000.00 | | |

14. ACCOUNTING AND APPROPRIATION DATA
See Schedule

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| REQ-EE-22-000011 | | | |
| | | | |

15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | | | | |
| NEGOTIATOR | | | | |
| ADMINISTRATOR | Trenae Bonner | | 202-916-2764 | tbonner@usaid.gov |
| PAYMENTS | | | | |

16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :
The Foreign Assistance Act of 1961, as amended and Federal Grant and Cooperative Agreement Act.

17. APPLICABLE STATEMENT(S), IF CHECKED:
[ ] NO CHANGE IS MADE TO EXISTING PROVISIONS
[ ] FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT

18. APPLICABLE ENCLOSURE(S), IF CHECKED:
[X] PROVISIONS [ ] SPECIAL CONDITIONS
[ ] REQUIRED PUBLICATIONS AND REPORTS

| **UNITED STATES OF AMERICA** | | **COOPERATIVE AGREEMENT RECIPIENT** | |
|---|---|---|---|
| CONTRACTING/GRANT OFFICER | DATE | AUTHORIZED REPRESENTATIVE | DATE |
| Artaveya Carter | | | |

# Grant and Cooperative Agreement

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST UNIT PRICE (E) | ESTIMATED COST AMOUNT (F) |
|---|---|---|---|---|---|
| | Period of Performance: 09/29/2022 to 09/28/2027 | | | | |
| 0005 | To address challenges to the capacity, resiliency, and efficacy of the Eurasian legal sector and civil society.<br><br>Accounting Info:<br>BBFY: 2021 EBFY: 2022 Fund: EC OP: E+E/ENP Prog Area: DR.4 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $463,789.00<br>Accounting Info:<br>BBFY: 2022 EBFY: 2024 Fund: EC-UKR OP: E+E/TSO Prog Area: DR.4 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $229,031.00<br>Accounting Info:<br>BBFY: 2021 EBFY: 2022 Fund: EC OP: E+E/ENP Prog Area: DR.5 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $463,788.00<br>Accounting Info:<br>BBFY: 2022 EBFY: 2024 Fund: EC-UKR OP: E+E/TSO Prog Area: DR.5 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $229,031.00 | | | | |

# Grant and Cooperative Agreement

CHOOSE ONE: [X] COOPERATIVE AGREEMENT [ ] GRANT

CHOOSE ONE: [X] EDUCATION [ ] FACILITIES [ ] RESEARCH [ ] SDCR [ ] TRAINING

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE | 4. COMPLETION DATE |
|---|---|---|---|
| 7200AA22CA00021 | | 09/29/2022 | 09/28/2027 |

5. ISSUED TO
NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip)
AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUCATION
1050 CONNECTICUT AVE NW, STE 400
WASHINGTON DC 20036-5369

6. ISSUED BY USAID M/OAA
**Mailing Address:** Office of Acquisition & Assistance
1300 Pennsylvania Avenue, NW, UA
Washington DC 20523-1000

7. TAXPAYER IDENTIFICATION NO. (TIN)

8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO.
D2KUZ2RYLJJ6

9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*)
David Rubino

10. RESEARCH, PROJECT OR PROGRAM TITLE
Legal Support Project (LSP)

11. PURPOSE
To address challenges to the capacity, resiliency, and efficacy of the Eurasian legal sector and civil society.

12. PERIOD OF PERFORMANCE (*Approximately*)
09/29/2022 through 09/28/2027

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $7,500,000.00 | THIS ACTION | $1,385,639.00 |
| CASH SHARE | $0.00 | **TOTAL** | $1,385,639.00 |
| NON-CASH SHARE | $7,500,000.00 | | |
| RECIPIENT SHARE | $0.00 | | |
| **TOTAL** | $7,500,000.00 | | |

14. ACCOUNTING AND APPROPRIATION DATA
See Schedule

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| REQ-EE-22-000011 | | | |
| | | | |

15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | | | | |
| NEGOTIATOR | Joseph Tembo | | | jtembo@usaid.gov |
| ADMINISTRATOR | Trenae Bonner | | 202-916-2764 | tbonner@usaid.gov |
| PAYMENTS | | | | |

16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :
The Foreign Assistance Act of 1961, as amended and Federal Grant and Cooperative Agreement Act.

17. APPLICABLE STATEMENT(S), IF CHECKED:
[ ] NO CHANGE IS MADE TO EXISTING PROVISIONS
[ ] FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT

18. APPLICABLE ENCLOSURE(S), IF CHECKED:
[X] PROVISIONS [ ] SPECIAL CONDITIONS
[ ] REQUIRED PUBLICATIONS AND REPORTS

| UNITED STATES OF AMERICA | | COOPERATIVE AGREEMENT RECIPIENT | |
|---|---|---|---|
| CONTRACTING/GRANT OFFICER | DATE | AUTHORIZED REPRESENTATIVE | DATE |
| Artaveya Carter | | | |

# Grant and Cooperative Agreement

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST UNIT PRICE (E) | ESTIMATED COST AMOUNT (F) |
|---|---|---|---|---|---|
| 0005 | To address challenges to the capacity, resiliency, and efficacy of the Eurasian legal sector and civil society.<br><br>Accounting Info:<br>BBFY: 2021 EBFY: 2022 Fund: EC OP: E+E/ENP Prog Area: DR.4 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $463,789.00<br>Accounting Info:<br>BBFY: 2022 EBFY: 2024 Fund: EC-UKR OP: E+E/TSO Prog Area: DR.4 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $229,031.00<br>Accounting Info:<br>BBFY: 2021 EBFY: 2022 Fund: EC OP: E+E/ENP Prog Area: DR.5 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $463,788.00<br>Accounting Info:<br>BBFY: 2022 EBFY: 2024 Fund: EC-UKR OP: E+E/TSO Prog Area: DR.5 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $229,031.00 | | | | 7,500,000.00 |

USAID
FROM THE AMERICAN PEOPLE

**September 29, 2022**

David Rubino
Director, Europe and Eurasia Division,
ABA Rule of Law Initiative
1050 Connecticut Ave, N.W., Suite 450,
Washington, D.C. 20036

**Cooperative Agreement Number**: 7200AA22CA00021, **Legal Support Project (LSP)**

Dear Mr. Rubino:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development ("USAID" or "Grantor") provides to **ABA Rule of Law Initiative (ABA ROLI)** ("Grantee," or "Recipient"), the sum set forth in Section A.3 of this *Agreement* to implement the project, as described in Attachment B of this Agreement entitled **Legal Support Project.**

This Cooperative Agreement is effective as shown in **Section A.2** "Period of Award." Obligation is made as of the date of this agreement (see page 2) and shall apply to commitments made by the Recipient in furtherance of program objectives for the period described in Section A.2 of this Agreement. USAID shall not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Cooperative Agreement is awarded to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in the attachments listed under my signature below, which together constitute the entire award document, and to which your organization has agreed.

Please sign the second page of this cover letter to acknowledge your receipt of this award and email a scanned copy of the signed page to the undersigned at acarter@usaid.gov and Joseph Tembo at jtembo@usaid.gov.

Sincerely,

Artaveya Carter
Senior Agreement Officer
M/OAA/RM/AEM

**ATTACHMENTS**:

A. Schedule
B. Program Description
C. Standard Provisions

**ACKNOWLEDGED**:

BY: ________________________________________

NAME: ________________________________________

TITLE: ________________________________________

DATE: ________________________________________

**ACCOUNTING AND APPROPRIATION DATA**

**A. GENERAL**

| | |
|---|---|
| A.1 Total Estimated Amount: | **$7,500,000.00** |
| A.2 Total Obligated USAID Amount: | $1,385,639.00 |
| A.3 Total Cost-Sharing Amount (Non-Federal): | See Section A.10 |
| A.4 Activity Title: | Legal Support Project (LSP) |
| A.5 Agreement Officer's Representative (AOR): | See Section A.14 |
| A.6 Tax I.D. Number | 36-6110299 |
| A.7 UEI Number: | D2KUZ2RYLJJ6 |
| A.8 LOC Number: | N/A |

**B. SPECIFIC**

| **REQ** | **REQ-EE-22-000011** | | | |
|---|---|---|---|---|
| **Funding ID** | **1** | **2** | **3** | **4** |
| **Acc Template** | E+E Prog Funds | E+E Prog Funds | E+E Prog Funds | E+E Prog Funds |
| **BBFY** | 2021 | 2022 | 2021 | 2022 |
| **EBFY** | 2022 | 2024 | 2022 | 2024 |
| **Fund** | EC | EC - Ukraine | EC | EC - Ukraine |
| **OP** | E+E/ENP | E+E/TSO | E+E/ENP | E+E/TSO |
| **Prog Area** | DR.4 | DR.4 | DR.5 | DR.5 |
| **Dist Code** | 180-REG | 180-REG | 180-REG | 180-REG |
| **BGA** | 180 | 180 | 180 | 180 |
| **SOC** | 4100202 | 4100202 | 4100202 | 4100202 |
| **Amount** | $463,789.00 | $229,031.00 | $463,788.00 | $229,031.00 |
| **Total Obligation** | | **$1,385,639.00** | | |

## TABLE OF CONTENTS

**AWARD FORM** .......... **1**

**ATTACHMENT A - SCHEDULE** .......... **8**
A.1 Purpose of Cooperative Agreement .......... 8
A.2 Period of Cooperative Agreement .......... 8
A.3 Amount of Cooperative Agreement and Payment .......... 8
A.4 Cooperative Agreement Budget .......... 9
A.5 Reporting, Monitoring, and Evaluation .......... 10
A.6 Annual Workplans, Activity MEL Plan, and Safety and Security Plan .......... 17
A.7 Title To and Use of Property .......... 20
A.8 Indirect Cost Rate .......... 20
A.9 Program Income .......... 21
A.10 Cost-Sharing (Matching) .......... 21
A.11 Authorized Geographic Code .......... 21
A.12 Substantial Involvement .......... 21
A.12.1 Approval of the Recipient's Implementation Plans .......... 22
A.12.2 Approval of Key Personnel .......... 22
A.12.3 USAID review and approval of substantive provisions of proposed subawards .......... 22
A.13 Resolution of Conflicts .......... 24
A.14 Post-Award Agreement Administration .......... 24
A.15 Special Provisions .......... 24
A.16 Environmental Compliance and Management .......... 26
A.17 Branding Strategy and Marking Plan .......... 27
A.18 Termination .......... 27
A.19 Disputes .......... 28

**ATTACHMENT B – PROGRAM DESCRIPTION** .......... **29**

**ATTACHMENT C – STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS** .......... **44**
**MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS** .......... 44
M1. Applicability of 2 CFR 200 And 2 CFR 700 (November 2020) .......... 44
M2. Ineligible Countries (May 1986) .......... 44
M3. Nondiscrimination (June 2012) .......... 44
M4. Amendment of Award (June 2012) .......... 45
M5. Notices (June 2012) .......... 45
M6. Subawards and Contracts (December 2014) .......... 45
M7. OMB Approval under the Paperwork Reduction Act (December 2014) .......... 45
M8. USAID Eligibility Rules for Goods and Services (May 2020) .......... 46
M9. Debarment, Suspension, And Other Responsibility Matters (June 2012) .......... 47
M10. Drug-Free Workplace (June 2012) .......... 48
M11. Equal Participation by Faith-Based Organizations (June 2016) .......... 48
M12. Preventing Transactions With, or the Provision of Resources or Support to, Sanctioned Groups and Individuals (May 2020) .......... 49
M13. Marking and Public Communications under USAID-Funded Assistance (December 2014) .......... 49
M14. Regulations Governing Employees (June 2018) .......... 51
M15. Conversion of United States Dollars to Local Currency (November 1985) .......... 52
M16. Use of Pouch Facilities (August 1992) .......... 53
M17. Travel and International Air Transportation (December 2014) .......... 53
M18. Ocean Shipment of Goods (June 2012) .......... 55
M19. Voluntary Population Planning Activities – Mandatory Requirements (May 2006) .......... 55
M20. Trafficking in Persons (April 2016) .......... 56
M21. Submissions to the Development Experience Clearinghouse and Publications (June 2012) .......... 58

M22. Limiting Construction Activities (August 2013) .......... 58
M23. USAID Implementing Partner Notices (IPN) Portal for Assistance (July 2014) .......... 58
M24. Pilot Program for Enhancement of Grantee Employee Whistleblower Protections (September 2014) .......... 59
M25. Submission of Datasets to the Development Data Library (October 2014) .......... 60
M26. Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (May 2017) .......... 60
M27. Child Safeguarding (June 2015) .......... 61
M28. Mandatory Disclosures (July 2015) .......... 62
M29. Nondiscrimination Against Beneficiaries (November 2016) .......... 63
M30. Conflict of Interest (August 2018) .......... 63
M31. PROHIBITION ON CERTAIN TELECOMMUNICATION AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (July 2022) .......... 64
REQUIRED AS APPLICABLE STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS .......... 65
RAA1. Negotiated Indirect Cost Rates – Predetermined (November 2020) .......... 65
RAA2. Negotiated Indirect Cost Rates – Provisional (Nonprofit) (NOVEMBER 2020) .......... 65
RAA3. Negotiated Indirect Cost Rates – Provisional (Profit) (DECEMBER 2014) .......... 66
RAA4. Indirect Cost Rates – De Minimis Rate (November 2020) .......... 66
RAA5. Exchange Visitors and Participant Training (June 2012) .......... 66
RAA6. Voluntary Population Activities – Supplemental Requirements (January 2009) .......... 66
RAA7. Protection of the Individual as a Research Subject (April 1998) .......... 66
RAA8. Care of laboratory Animals (March 2004) .......... 66
RAA9. Title to and care of Property (Cooperating Country Title) (November 1985) .......... 66
RAA10. Cost Sharing (Matching) (February 2012) .......... 66
RAA11. Prohibition of Assistance to drug traffickers (June 1999) .......... 66
RAA12. Investment Promotion (November 2003) .......... 66
RAA13. Reporting Host Government Taxes (December 2014) .......... 66
RAA14. Foreign Government Delegates to International Conferences (June 2012) .......... 67
RAA15. Conscience Clause Implementation (Assistance) (February 2012) .......... 67
RAA16. Condoms (Assistance) (September 2014) .......... 67
RAA17. Probition on the Promotion or Advocacy of the Legalization or Practice of Prostitution or Sex Trafficking (Assistance) (September 2014) .......... 67
RAA18. USAID Disability Policy – Assistance (December 2004) .......... 68
RAA19. Standards for Accessibility for the Disabled in USAID Assistance awards involving Construction .......... 68
RAA20. Statement for the Implementers of Anti-trafficking Activities on lack of Support for Prostitution (June 2012) .......... 68
RAA21. Eligibility of subrecipients of anti-trafficking funds (June 2012) .......... 68
RAA22. Probition on the use of Anti-trafficking funds to Promote, Support, or Advocate for the legalization or Practice of Prostitution (June 2012) .......... 68
RAA23. Universal Identifier and System for Award Management (November 2020) .......... 68
RAA24. Reporting Subaward and Executive Compensation (November 2020) .......... 69
RAA25. Patent Reporting Procedures (November 2020) .......... 72
RAA26. Access to USAID Facilities and USAID'S Information Systems (August 2013) .......... 72
RAA27. Contract Provision for DBA Insurance under Recipient Procurements (December 2014) ... 72
RAA28. Award Term and Condition for Recipient Integrity and Performance Matters (April 2016) 74
RAA29. Reserved .......... 75
RAA30. Program Income (August 2020) .......... 75
RAA31. Never Contract with the Enemy (November 2020) .......... 76

**ATTACHMENT D -- INITIAL ENVIRONMENTAL EXAMINATION .......... 77**

subawards are described in the Program Description (Attachment B) of this Cooperative Agreement and identified and funded in the budget of this Cooperative Agreement.

(b) Sub-award Authority

(1) Sub-awards under $150,000

In accordance with ADS 303.3.11.c(2), entitled "Substantial Involvement" and the applicable provisions of this Cooperative Agreement, the Agreement Officer hereby authorizes the Recipient to enter into sub-awards under **$150,000.00** based on the following conditions:

(A) USAID AOR written approval is obtained.

(B) The proposed sub-awards are to be written in accordance with the standard established provision entitled "Applicability of 2 CFR 200".

(C) If prior approval was granted by the AOR for a sub-award but the subaward is subsequently amended to increase the total amount above $149,999.99 and the revised ceiling is at $150,000.00 or above, then the amended sub-award must be submitted to the Agreement Officer for review and approval.

This authorization **does not apply to <u>sub-contracts</u>** of any value to any organization, as well as sub-awards of any value with Foreign Governmental Organizations. The Agreement Officer must approve all contracts (other than acquisition of supplies, material or general support services, per 2 CFR 200.308(c)(vi); and all sub-awards with Foreign Governmental Organizations, no matter the value. The Agreement Officer reserves the right to not approve any subawards which the Agreement Officer finds to be in non-compliance with the terms and conditions of the prime Agreement; and 2 CFR 200 (which govern this Agreement).

(2) Sub-awards equal to or exceeding $150,000

Sub-awards equal to or exceeding $150,000 requires Agreement Officer's approval in addition to the clearance by the AOR. The Recipient must maintain and retain documentation on each sub-award (sub-grant/agreement and contract) sufficient to show that all applicable requirements of 2 CFR 200 and the terms of this prime Cooperative Agreement have been complied with and that all applicable clauses must flow down to the sub-awards, including but not limited to source/eligibility, and commodity prior approval/waiver requirements.

(c) Subawards

Pursuant to 2 CFR 200.308(c)(6), whereby the Agreement Officer must approve subawards (as defined in 2 CFR 200.1), the Agreement Officer hereby delegates authority to the AOR to approve the selection of subrecipients (as defined in 2 CFR 200.1) and the substantive provisions of the subawards as outlined above. USAID will approve all subawards in coordination with relevant points of contact. The AOR's approval of the substantive provisions of the subawards is limited to **technical and programmatic matters only**; such concurrence shall not extend to "contractual"/ administrative/financial provisions, which must be in accordance with the terms and conditions of this Agreement unless otherwise approved, in advance and in writing, by the Agreement Officer.

AOR retains substantial involvement for activities conducted directly under the Recipient to track program and activity design, implementation, progress and evaluation, conduct management

reviews, and budgetary analyses. Pursuant to the approved budget of this cooperative agreement, the following sub-awards are approved under this award:

| Name of Sub-awardee | Scope Summary | Subaward Amount |
|---|---|---|
| TBD | | |

Any revisions to this subaward must be approved by the AO if the subaward amount will increase is at or above $150,000. Any other changes and amount below $150,000 must be approved by the AOR.

## A.16 Environmental Compliance and Management

(a) The Foreign Assistance Act of 1961, as amended, Section 117 requires that the impact of USAID's activities on the environment be considered and that USAID include environmental sustainability as a central consideration in designing and carrying out its development programs. This mandate is codified in Federal Regulations (2 CFR 322) and in USAID's Automated Directives System (ADS) Parts 201.5.10g and 204 (http://www.usaid.gov/policy/ADS/200/), which, in part, require that the potential environmental impacts of USAID-financed activities are identified prior to a final decision to proceed and that appropriate environmental safeguards are adopted for all program activities. The recipient's environmental compliance obligations under these regulations and procedures are specified in the Initial Environment Examination (IEE) in Attachment D.

(b) In addition, the recipient must comply with host country environmental regulations unless otherwise directed in writing by USAID. In case of conflict between host country and USAID regulations, the latter shall govern.

(c) No activity funded under this agreement will be implemented unless an environmental threshold determination, as defined by 2 CFR 322, has been reached for that activity, as documented in a Request for Categorical Exclusion (RCE), Initial Environmental Examination (IEE), or Environmental Assessment (EA) duly signed by the Bureau Environmental Officer (BEO). (Hereinafter, such documents are described as "approved Regulation 322 environmental documentation.")

USAID has determined the following categories:

***1. Categorical Exclusions:***

A categorical exclusion is recommended for the following sub-activities under 22 CFR 216.2(c)(2):

- Sub-activity 1.1, 1.2, 1.4, 1.5, 1.6, 1.8, 1.9, 1.10, 1.12, 2.2, 2.3, 2.5, 2.6, 2.7, 2.8, 2.9, 2.10, 2.11, 2.12, 2.13, 2.15, 2.16, 2.17, 3.1, 3.2, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.11, 3.12, 4.2, 4.4, 4.5, 4.6, 4.9, 4.10, 4.11, 4.12 under §216.2(c)(2)(i) Education, technical assistance, or training programs except to the extent such programs include activities directly affecting the environment (such as construction of facilities, etc.);
- Sub-activity 1.3, 2.1, 2.4, 3.10, 4.3, 4.8 under §216.2(c)(2) (iii) Analyses, studies, academic or research workshops and meetings;
  - Sub-activity 2.14, 3.3, 4.7 under §216.2(c)(2)(v) Document and information transfers;

***2. Negative Determination:***

## ATTACHMENT C – STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS

### MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS

#### M1. Applicability of 2 CFR 200 And 2 CFR 700 (November 2020)

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of "Non-Federal Entity" in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

#### M2. Ineligible Countries (May 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

#### M3. Nondiscrimination (June 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee. In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

USAID | DEMOCRATIC REPUBLIC OF THE CONGO
FROM THE AMERICAN PEOPLE

March 11, 2024

Ms. Blerta Picari, Sr. Division Director, Middle East and Africa
American Bar Association Rule of Law Initiative
321 N Clark Street
Chicago, IL 60654-4714
blerta.picari@americanbar.org | www.abaroli.org

Subject: USAID Cooperative Agreement Number 72066024CA00003
USAID's Action to Reduce and Respond to Exploitation and Trafficking (ARRETE) Activity

Digitally signed by Kevin Y. Pak
Date: 2024.03.06 13:06:30 -06'00'

Dear Ms. Picari,

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) hereby awards to American Bar Association Rule of Law Initiative (ABA/ROLI), hereinafter referred to as the "Recipient", the sum of $ $18,000,000.00, to provide support for a program titled "USAID's Action to Reduce and Respond to Exploitation and Trafficking (ARRETE)" in the Democratic Republic of Congo, as described in the Schedule of this award and in Attachment B, entitled "Program Description".

This Cooperative Agreement is effective March 11, 2024, and obligation is made and will apply to expenditures made by the Recipient in furtherance of program objectives for the period described in Section A.2 of this Agreement. USAID will not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Cooperative Agreement is made to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in Attachment A (the Schedule), Attachment B (the Program Description), and Attachment C (the Standard Provisions), all of which have been agreed to by your organization.

Please sign the second page of this letter to acknowledge your receipt of the Cooperative Agreement, and return the signed copy to the Agreement Officer, Michele Maximilien at mmaximilien@usaid.gov with a copy to the Administrative Agreement Officer, Lauralea Gilpin at lgilpin@usaid.gov.

Sincerely,

Michele Maximilien
Digitally signed by Michele Maximilien
Date: 2024.03.08 05:49:38 -05'00'

Michele Maximilien
Agreement Officer
USAID/Democratic Republic of Congo

Attachments:
A. Schedule
B. Program Description
C. Standard Provisions
D. Branding and Marking Plan

ACKNOWLEDGED:

American Bar Association Rule OF LAW (ABA/ROLI)

By: Alpha M. Brady

Title: Executive Director

Date: 3/7/24

## A. GENERAL

| | |
|---|---|
| 1. Amount Obligated this Action: | $4,900.000.00 |
| 2. Total Estimated USAID amount | $18,000,000.00 |
| 3. Total Obligated USAID Amount: | $4,900,000.00 |
| 4. Cost-Sharing Amount (Non-Federal) | $1,800,000.00 |
| 5. Expected program Income | $0 |
| 6. Total Program Amount | $19,800,000.00 |
| 7. Activity Title: | USAID's Action to Reduce and Respond to Exploitation and Trafficking (ARRETE) |
| 8. USAID Technical Office: | USAID/DRC/DRG |
| 9. Tax I.D. Number: | 360723150 |
| 10. UEI Number: | L6R3PLXVANN9 |
| 11. LOC Number: | 13A4 |

## B. SPECIFIC

Requisition Number: REQ-660-23-000072
Accounting Information: Fiscal Data

| Funding ID | BBFY | EBFY | Fund | OP | Prog Area | Dist Code | BGA | SOC | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2022 | 2023 | DV | DROC | DR. 4 | 660-M | 660 | 4100100 | $2,300,000.00 |
| 2 | 2022 | 2023 | DV | DROC | DR. 6 | 660-M | 660 | 4100100 | $1,225,000.00 |
| 3 | 2022 | 2023 | DV | DROC | DR. 1 | 660-M | 660 | 4100100 | $600,000.00 |
| 4 | 2022 | 2023 | DV | DROC | DR. 5 | 660-M | 660 | 4100100 | $275,000.00 |
| 5 | 2022 | 2023 | DM | DDI/DRG | DR. 6 | 660-M | 660 | 4100100 | $500,000.00 |

## C. PAYMENT OFFICE

LETTER OF CREDIT OFFICE
USAID/M/FM/CMP/CIB
RONALD REAGAN BUILDING
1300 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20523-7700

**TABLE OF CONTENTS**

ATTACHMENT A – SCHEDULE
A.1 PURPOSE OF AWARD .......... 5
A.2 PERIOD OF AWARD..........5
A.3 AMOUNT OF AWARD AND PAYMENT ..........5
A.4 AWARD BUDGET ..........5
A.5 INDIRECT COST RATE..........6
A.6 REPORTING AND EVALUATION ..........7
A.7 AGREMENT OFFICER'S REPRESENTATIVE..........16
A.8 SUBSTANTIAL INVOLVEMENT .......... ..........17
A.9 AUTHORIZED GEOGRAPHIC CODE..........18
A.10 TITLE TO PROPERTY ..........18
A.11 APPLICABILITY OF CERTAIN STANDARD PROVISIONS..........18
A.12 COST SHARE ..........19
A.13 ENVIRONMENTAL COMPLIANCE ..........19
A.14 ADS 303.3.35.2 COVERED TELECOMMUNICATION AND VIDEO SURVEILLANCE EQUIPMENT OR SERVICES EFFECTIVE DATE: 07/01/2022 .........20
A.15 RESOLUTION OF CONFLICTS ..........21

ATTACHMENT B - PROGRAM DESCRIPTION ..........22

ATTACHMENT C – STANDARD PROVISIONS ..........46
I. MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS..........46
II. REQUIRED AS APPLICABLE STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS ..........83

ATTACHMENT D – BRANDING STRATEGY AND MARKING PLAN..........100

ATTACHMENT E – ANNEXES ..........108

**ATTACHMENT A - SCHEDULE**

**A.1 PURPOSE OF AWARD**

The purpose of this Cooperative Agreement is to provide support for the program, "USAID's Actions to Reduce and Respond to Exploitation and Trafficking (ARRETE)", more specifically described in Attachment B to this Cooperative Agreement entitled "Program Description".

**A.2 PERIOD OF AWARD**

The effective date of this Award is March 11, 2024. The estimated completion date of this Award is March 10, 2029.

**A.3 AMOUNT OF AWARD AND PAYMENT**

The total estimated amount of this award for the period shown in A.2 above is $19,800,000.00, inclusive of cost share. This amount includes $18,000,000.00 of USAID funding and $1,800,000.00 of Cost Share.

1. USAID hereby obligates the amount of $4,900,000.00, for program expenditures during the period set forth in A.2 above. The Recipient will be given written notice by the Agreement Officer if additional funds will be added. USAID is not obligated to reimburse the Recipient for the expenditure of amounts in excess of the total obligated amount. All costs for the project need to remain within the allocated budget.

2. Payment will be made to the Recipient by Cost Reimbursement in accordance with procedures set forth in 2 CFR 200 and 2 CFR 700.

3. Additional funds up to the total amount of the award shown in A.3.1 above may be obligated by USAID subject to the availability of funds, satisfactory progress of the project, and continued relevance to USAID programs.

**A.4 AWARD BUDGET**

The following Budget is based on the detailed budget that the Recipient submitted (January 26, 2024) with its application for this award. Revisions to this Budget shall be made in accordance with 2 CFR 200 and 2 CFR 700.

# ATTACHMENT C: MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS

## M1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (NOVEMBER 2020)

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of "Non-Federal Entity" in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any sub-awards made with non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

## M2. INELIGIBLE COUNTRIES (MAY 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

## M3. NONDISCRIMINATION (JUNE 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

USAID
FROM THE AMERICAN PEOPLE

May 13, 2024

Mr. Eric Bjornlund
President and CEO (DI), Secretary (ADEPT)
Advancing Democratic Elections & Political Transitions (ADEPT)
7600 Wisconsin Avenue, Suite 1010
Bethesda, MD 20814-5302 USA
Email: eric@democracyinternational.com

Subject: Cooperative Agreement No.: 72067524CA00001 Citizen Observation for Democratic Elections (CODE)

References: (a) Notice of Funding Opportunity (NOFO) Number 72067523RFA00003
(b) ADEPT/DI Revised technical and cost application dated March 26, 2024

Dear Mr. Bjornlund:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development in Guinea (USAID/Guinea) hereby awards to Advancing Democratic Elections & Political Transitions (ADEPT) hereinafter referred to as the "Recipient," a Cooperative Agreement with a Total Estimated Amount of $6,000,000 to provide support for a three-year program entitled Citizen Observation for Democratic Elections (CODE) Activity as described in the Attachment A, entitled "Schedule" of this award and in Attachment B, entitled "Program Description."

This Cooperative Agreement is effective, and obligation is made as of the date outlined in Section A.2. of Attachment A (Schedule) of this Cooperative Agreement. It shall apply to expenditures made by the Recipient in furtherance of program objectives during the period outlined in the Schedule. USAID/Guinea will not be liable for reimbursing the Recipient for any costs over the obligated amount.

This Cooperative Agreement is made to ADEPT on condition that the funds will be administered by the terms and conditions as outlined in Attachment A (the Schedule), Attachment B (the Program Description), Attachment C (the Standard Provisions), and Attachment D (Branding Strategy and Marking Plan), all of which have been agreed to by your organization.

Please sign in the space provided below to acknowledge your receipt of the Cooperative Agreement and return the signed electronic version to the undersigned Director of Regional Acquisition and Assistance Office at eperez@usaid.gov with a copy Ms. Bernadette Daluz at bdaluz@usaid.gov.

Sincerely,

_______________________________________

Edel Perez-Campos
Director, Regional Acquisition & Assistance Office
U.S. Agency for International Development

Attachments:

A. Schedule
B. Program Description
C. Standard Provisions
D. Branding Strategy and Marking Plan

**ACKNOWLEDGED BY:**

**Advancing Democratic Elections & Political Transitions (ADEPT)**

SIGNATURE: ________________________________

NAME: ________________________________

TITLE: ________________________________

DATE: ________________________________

## ACCOUNTING AND APPROPRIATION DATA

### A. GENERAL

1. Total Estimated USAID Amount: $6,000,000
2. Total Obligated USAID Amount: $5,000,000
3. Cost-Sharing Amount (Non-Federal): $0
4. Activity Title: Citizen Observation for Democratic Elections Activity (CODE)
5. USAID Technical Office: Guinea, Democracy, Human Rights & Governance Office
6. UIE No.: GGAMJLDN5WH6
7. Tax ID Number: 47-3441791
8. LOC No.: C5790P1
9. Federal Assistance Listing Number: 98.001

### B. SPECIFIC

Requisition No.: REQ-675-23-000016

| Delivery/ Funding ID | Accounting Template | BBFY | EBFY | Fund | OP | Prog. Area | Dist. Code | SOC | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 675-CX-X23/2023 FUNDS | 2023 | None | CX-X23 | CPS/CVP | PS.6 | 675-M | 4100201 | $3,000,000 |
| 2 | 675 DM-22/23 FUNDS | 2022 | 2023 | DM | DDI/DRG | DR.3 | 675-M | 4100201 | $1,000,000 |
| 3 | 675 DV-22/23 FUNDS | 2022 | 2023 | DV | Guinea | DR.3 | 675-M | 4100201 | $1,000,000 |
| | | | | | | | | TOTAL | $5,000,000 |

### C. PAYMENT OFFICE

U.S. Agency for International Development
M/CFO/CFM-LOC Unit
500 D Street SW
8th Floor, Room 8.6.3C
Washington, D.C. 20547

**TABLE OF CONTENTS**

ATTACHMENT A - SCHEDULE 8
A.1 PURPOSE OF AWARD 8
A.2 PERIOD OF AWARD 8
A.3 AMOUNT OF AWARD AND PAYMENT 8
A.4 COOPERATIVE AGREEMENT BUDGET 8
A.5 REPORTING AND EVALUATION 9
A.6 SUBSTANTIAL INVOLVEMENT 13
A.7 POST AWARD ADMINISTRATION 14
A.8 KEY PERSONNEL 15
A.9 AUTHORIZED GEOGRAPHIC CODE 15
A.10 TITLE TO PROPERTY 15
A.11 NON-FEDERAL COST SHARE 15
A.12 PROGRAM INCOME 15
A.13 SUB-AWARD 15
A.14 EQUIPMENT 16
A.15 COMMUNICATION AND MEDIA 18
A.16 DEVELOPMENT EXPERIENCE CLEARINGHOUSE REQUIREMENTS 18
A.17 SECURITY CONDITIONS 20
A.19 SPECIAL PROVISIONS 21
A.20 RESOLUTION OF CONFLICTS 24
ATTACHMENT B - PROGRAM DESCRIPTION 25
ATTACHMENT C - STANDARD PROVISIONS 41
C.1. MANDATORY STANDARD PROVISIONS FOR U.S. NON-GOVERNMENTAL ORGANIZATIONS 41
M1. Applicability of 2 CFR 200 and 2 CFR 700 USNGO (NOV 2020) 41
M2. Ineligible Countries (MAY 1986) 41
M3. Nondiscrimination (JUN 2012) 41
M4. Amendment of Award (JUN 2012) 42
M5. Notices (JUN 2012) 42
M6. Subawards and Contracts (DEC 2022) 42
M7. OMB Approval Under the Paperwork Reduction Act (OCT 2023) 42
M8. USAID Eligibility Rules for Goods and Services (MAY 2020) 43
M9. Debarment, Suspension, and Other Responsibility Matters (JUNE 2012) 44
M10. Drug-Free Workplace (JUN 2012) 45

M11. Equal Participation by Faith-Based Organizations (JUN 2016) 45

M12. Preventing Transactions with, or the Provision of Resources or Support to, Sanctioned Groups and Individuals (MAY 2020) 47

M13. Marking and Public Communications Under USAID Funded Assistance (DEC 2014) 47

M14. Regulations Governing Employees (OCT 2023) 49

M15. Conversion of United States Dollars to Local Currency (NOV 1985) 50

M16. Use of Pouch Facilities (AUG 1992) 50

M17. Travel and International Air Transportation (DEC 2014) 51

M18. Ocean Shipment of Goods (JUNE 2012) 53

M19. Voluntary Population Planning Activities - Mandatory Requirements (MAY 2006) 53

M20. Trafficking in Persons (APRIL 2016) 54

M21. Submissions to the Development Experience Clearinghouse and Publications (JUNE 2012) 56

M22. Limiting Construction Activities (AUG 2023) 56

M.23 USAID Implementing Partner Notices Portal for Assistance (JULY 2014) 58

M24. Enhancement of Recipient Employee Whistleblower Protections (DEC 2022) 59

M25. Submission of Datasets to the Development Data Library (OCT 2014) 60

M26. Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (MAY 2017) 61

M27. Safeguarding Against Exploitation, Sexual Abuse, Child Abuse, and Child Neglect (OCT 2023) 62

M28. Mandatory Disclosures (JUNE 2023) 65

M29. Nondiscrimination Against Beneficiaries (NOV 2016) 65

M30. Conflict of Interest (AUG 2018) 66

M31. Prohibition on Certain Telecommunication and Video Surveillance Services or Equipment (DEC 2022) 67

M32. USAID Disability Policy – Assistance (DEC 2022) 67

C.2. REQUIRED AS APPLICABLE STANDARD PROVISIONS FOR U.S. NON-GOVERNMENTAL ORGANIZATIONS 72

RAA2. Negotiated Indirect Cost Rates – Provisional (Nonprofit) (NOV 2020) - N/A 72

RAA10. Cost Sharing (Matching) (February 2012) – N/A 75

RAA13. Reporting Host Government Taxes (DEC 2022) 75

RAA14. Foreign Government Delegations to International Conferences (June 2012) 76

RAA23. Universal Entity Identifier (UEI) and System For Award Management (SAM) (DEC 2022) 77

RAA24. Reporting Subawards and Executive Compensation (DEC 2022) 78

RAA27. Contract Provision for DBA Insurance under Recipient Procurements (DEC 2022) 82
RAA31. Never Contract with the Enemy (NOV 2020) 83
ATTACHMENT D - BRANDING STRATEGY AND MARKING PLAN 85

## ATTACHMENT C - STANDARD PROVISIONS

## C.1. MANDATORY STANDARD PROVISIONS FOR U.S. NON-GOVERNMENTAL ORGANIZATIONS

### M1. Applicability of 2 CFR 200 and 2 CFR 700 USNGO (NOV 2020)

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of "Non-Federal Entity" in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with Non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

(END OF PROVISION)

### M2. Ineligible Countries (MAY 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

(END OF PROVISION)

### M3. Nondiscrimination (JUN 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee. In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

(END OF PROVISION)

USAID
FROM THE AMERICAN PEOPLE

September 23, 2019

Baigal Darambazar
DAI Global, LLC
7600 Wisconsin Ave, Ste. 200
Bethesda, MD 20814

Reference: Cooperative Agreement No. 7200AA19CA00019, Feed the Future Policy Leadership, Interactions, Networks and Knowledge (Policy LINK)
Subject: Award of Cooperative Agreement

Dear Baigal Darambazar,

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) hereby awards the program entitled Feed the Future Leadership, Interactions, Networks and Knowledge (Policy LINK) to DAI Global, LLC hereinafter referred to as the "Recipient". Subject to the availability of funds, up to $38,500,000 will be awarded for the implementation of the Cooperative Agreement. This sum includes funding from USAID missions, Regional Bureaus, and other Offices for buy-ins subject to the availability of funds and commitments from USAID missions, over the 5-year life-of-project. Of the total estimated amount (TEA), **$3,200,000** is currently obligated.

This Cooperative Agreement is effective and obligation is made as of September 23, 2019 and shall apply to expenditures made by the Recipient in furtherance of program objectives during the period beginning September 30, 2019 and ending September 29, 2024. USAID will not be liable for reimbursing the Recipient for any costs in excess of the obligated amount. This Cooperative Agreement is made to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in Attachments A - E, all of which have been agreed to by your organization. Please sign this letter to acknowledge your receipt of the Cooperative Agreement and return it to the Agreement Officer.

Sincerely yours,

Paul Burford, M/OAA/BFS
Agreement Officer

**Attachments:**

A. Schedule
B. Program Description
C. Standard Provisions
D. Branding Strategy and Marking Plan
E. Initial Environmental Examination

**ACKNOWLEDGED:**

By: Bajal Darambazar

Title: VP, CONTRACTS & GRANTS

Date: September 25, 2019

**A.** General

1. USAID Amount Obligated: $3,200,000
2. Total Estimated USAID Amount: $38,500,000
3. Activity Title: Policy Leadership, Interactions, Networks and Knowledge (Policy LINK)
4. USAID Technical Office: BFS/ARP
5. Tax I.D. Number: 52-0904808
6. DUNS Number: 066781956
7. LOC Number: 17D8P

B. SPECIFIC ACCOUNTING AND APPROPRIATIONS DATA

| | |
|---|---|
| BBFY | 2018 |
| EBFY | 2019 |
| Fund | DV-GFSI |
| Operating Unit (OP) | BFS-ARP |
| Program Area | EG.3 |
| Distribution Code | BFS-POL |
| BGA | 000 |
| SOC | 4100201 |
| Obligated Amount | **$2,700,000** |

| | |
|---|---|
| BBFY | 2018 |
| EBFY | 2019 |
| Fund | DV-GFSI |
| Operating Unit (OP) | SUDAN_SOUTH |
| Program Area | EG.3 |
| Distribution Code | 668-W |
| BGA | 668 |
| SOC | 4100301 |
| Obligated Amount | **$500,000** |

C. PAYMENT OFFICE

U.S. Agency for International Development
Office of the Chief Financial Officer
Federal Center Plaza (SA-44)
M/CFO/CMP, 4th Floor
301 4th Street, S.W.
Washington, DC 20547

Letter of Credit: loc@usaid.gov

**Table of Contents**

**ATTACHMENT A: SCHEDULE……………………………………………………………5**
**ATTACHMENT B: PROGRAM DESCRIPTION……………………………………..12**
**ATTACHMENT C: STANDARD PROVISIONS………………………………………13**
**ATTACHMENT D: BRANDING STRATEGY AND MARKING PLAN……………51**
**ATTACHMENT E: INITIAL ENVIRONMENTAL EXAMINATION………………52**

## Attachment C: Standard Provisions

### C1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (DECEMBER 2014)

All provisions of 2 CFR 200, 2 CFR 700, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients which meet the definition of "Recipient" in part 2 CFR 200.86, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

For any subawards made with Non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

### C2. INELIGIBLE COUNTRIES (MAY 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

### C3. NONDISCRIMINATION (JUNE 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

### C4. AMENDMENT OF AWARD (JUNE 2012)

This award may only be amended in writing, by formal amendment or letter, signed by the Agreement Officer (AO), and in the case of a bilateral amendment, by the AO and an authorized official of the recipient.

[END OF PROVISION]

# Grant and Cooperative Agreement

CHOOSE ONE: [X] COOPERATIVE AGREEMENT [ ] GRANT

CHOOSE ONE: [ ] EDUCATION [ ] FACILITIES [ ] RESEARCH [ ] SDCR [X] TRAINING

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE | 4. COMPLETION DATE |
|---|---|---|---|
| 72011524CA00005 | | 10/01/2024 | 09/30/2029 |

5. ISSUED TO
NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip)
DEMOCRACY INTERNATIONAL INC
7600 WISCONSIN AVE STE 1010
BETHESDA MD 20814-3670

6. ISSUED BY USAID/Central Asia/Kazakhstan
**Mailing Address:** 41 Kazibek Bi St.
Almaty 050010, Kazakhstan
00000

7. TAXPAYER IDENTIFICATION NO. (TIN)

8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO.

9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*)

10. RESEARCH, PROJECT OR PROGRAM TITLE
New Civil Society Activity in the Kyrgyz Republic

11. PURPOSE

12. PERIOD OF PERFORMANCE (*Approximately*)
10/01/2024 through 09/30/2029

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $10,000,000.00 | THIS ACTION | $1,642,582.00 |
| CASH SHARE | $0.00 | **TOTAL** | $1,642,582.00 |
| NON-CASH SHARE | $0.00 | | |
| RECIPIENT SHARE | $0.00 | | |
| **TOTAL** | $10,000,000.00 | | |

14. ACCOUNTING AND APPROPRIATION DATA
See Schedule

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| REQ-176-24-000038 | | | |
| | | | |

15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | | | | |
| NEGOTIATOR | | | | |
| ADMINISTRATOR | | | | |
| PAYMENTS | | | | |

16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :
The Foreign Assistance Act of 1961, as amended, and the Executive Order 11223

17. APPLICABLE STATEMENT(S), IF CHECKED:
[ ] NO CHANGE IS MADE TO EXISTING PROVISIONS
[ ] FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT

18. APPLICABLE ENCLOSURE(S), IF CHECKED:
[ ] PROVISIONS [ ] SPECIAL CONDITIONS
[ ] REQUIRED PUBLICATIONS AND REPORTS

| UNITED STATES OF AMERICA | | COOPERATIVE AGREEMENT RECIPIENT | |
|---|---|---|---|
| CONTRACTING/GRANT OFFICER | DATE | AUTHORIZED REPRESENTATIVE | DATE |
| Raphael Metzger | | | |

# Grant and Cooperative Agreement

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST UNIT PRICE (E) | ESTIMATED COST AMOUNT (F) |
|---|---|---|---|---|---|
| | New Civil Society Activity in the Kyrgyz Republic<br>Period of Performance: 10/01/2024 to 09/30/2029 | | | | |
| 0001 | New Civil Society Activity<br><br>Accounting Info:<br>115 23/24 PRG KG EC FUNDS BBFY: 2023 EBFY: 2024 Fund: EC OP: KYRGYZSTAN Prog Area: DR.4 Dist Code: 116-M Prog Elem: DR.4.2 BGA: 116 SOC: 4100201<br>Funded: $1,245,136.00<br>Accounting Info:<br>115 23/24 PRG KG EC FUNDS BBFY: 2023 EBFY: 2024 Fund: EC OP: KYRGYZSTAN Prog Area: DR.6 Dist Code: 116-M Prog Elem: DR.6.1 BGA: 116 SOC: 4100201<br>Funded: $300,000.00<br>Accounting Info:<br>115 23/24 PRG KG EC FUNDS BBFY: 2023 EBFY: 2024 Fund: EC OP: KYRGYZSTAN Prog Area: DR.4 Dist Code: 116-M Prog Elem: DR.4.2 BGA: 116 SOC: 4100201<br>Funded: $97,446.00 | | | | |

**ACCOUNTING AND APPROPRIATION DATA**

**A. GENERAL**

1. Total Estimated USAID Amount: $10,000,000
2. Total Obligated USAID Amount: $1,545,136
3. Cost-Sharing Amount (Non-Federal): $500,000
4. Activity Title: New Civil Society Activity in the Kyrgyz Republic
5. USAID Technical Office: USAID/Kyrgyz Republic Democracy &Governance Office
6. UEI Number: MA89NCEMNBS3
7. LOC Number: C579001

**B. FISCAL DATA**

REQ-176-24-000038
Obligated Amount: $1,245,136
Accounting Template: 115 23/24 PRG KG EC FUNDS
BBFY: 2023
EBFY: 2024
Fund: EC
OP: KYRGYZSTAN
Prog Area: DR.4
Dist Code: 116-M
Prog Elem: DR.4.2
BGA: 116
SOC: 4100201

Obligated Amount: $300,000
Accounting Template: 115 23/24 PRG KG EC FUNDS
BBFY: 2023
EBFY: 2024
Fund: EC
OP: KYRGYZSTAN
Prog Area: DR.6
Dist Code: 116-M
Prog Elem: DR.6.1
BGA: 116
SOC: 4100201

Obligated Amount: $97,446
Accounting Template: 115 23/24 PRG KG EC FUNDS
BBFY: 2023
EBFY: 2024

Fund: EC
OP: KYRGYZSTAN
Prog Area: DR.4
Dist Code: 116-M
Prog Elem: DR.4.2
BGA: 116
SOC: 4100201

**C. PAYMENT OFFICE**

USAID/Central Asia
Office of Financial Management
Park Palace Building
41 Kazybek Bi Street
Almaty 050010, Kazakhstan
Email: CARinvoices@usaid.gov

# Contents

**ATTACHMENT A – SCHEDULE** ..... 6
**ATTACHMENT B – PROGRAM DESCRIPTION** ..... 25
**ATTACHMENT C – STANDARD PROVISIONS** ..... 42
**ATTACHMENT D – BRANDING STRATEGY AND MARKING PLAN** ..... 95
**ATTACHMENT E – INITIAL ENVIRONMENTAL EXAMINATION** ..... 96

**ATTACHMENT C – STANDARD PROVISIONS**

**MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS**

**M1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (AUGUST 2024)**

(a) The versions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award or amendment, and all Standard Provisions attached to this agreement, are applicable to the award, except for as noted in paragraph (b) below.

(b) If the award is being issued or amended between August 7, 2024 and September 30, 2024, all parts of the "2024 Revisions" of 2 CFR 200 (89 FR 30046 dated April 22, 2024), the 2 CFR 700 in effect on the date of this award or amendment, and all Standard Provisions attached to this agreement are applicable to the award.

[END OF PROVISION]

**M2. INELIGIBLE COUNTRIES (MAY 1986)**

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

**M3. NONDISCRIMINATION (AUGUST 2024)**

(a) No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, sex, sexual orientation or gender identity, under any program or activity funded by this award when work under the award is performed in the U.S. or when employees are recruited from the U.S.

(b) Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy, sexual orientation, gender identity, or transgender status), national origin, age (40 or older), physical or mental disability, genetic information, marital or parental status, veteran status, membership in an employee organization, political affiliation, or involvement in protected equal employment opportunity (EEO) activity.

(c) In addition, the Agency strongly encourages its recipients and subrecipients, as well as vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive

U.S. Department of State

# FEDERAL ASSISTANCE AWARD

| | | |
|---|---|---|
| 1. Recipient Name<br>HIAS INC | | 2. Assistance Type:<br>☐ Cooperative Agreement<br>☐ Fixed Amount Award<br>☑ Grant<br>☐ Property Grant<br>☐ Voluntary Contribution |
| 3. Address<br>1300 SPRING STREET SUITE 500<br>SILVER SPRING, MD 20910-3634<br>UNITED STATES | | |
| 4. Recipient POC: Lara Moninghoff<br>Phone Number 301-844-7274<br>Email lara.moninghoff@hias.org | | |
| 5. Type of Entity<br>U.S. Non-Profit Organization (501(c) (3)) | 6. Unique Entity Identifier<br>XG6JMUVNY2F3 | 7. EIN/ TIN<br>********** |
| 8. Assistance Listing Number<br>19.345 | 9. Statutory Authority for Assistance<br>Foreign Assistance Act | 10. Award Number<br>SAQMIP23GR0213 |
| 11. Period of Performance<br>Start Date 18-Sep-2023 | End Date 29-Sep-2025 | 12. Amendment Number |
| 13. Accounting and Appropriation Data<br>1900-2022-2023-19__2311210000-1051-DRL--2762-SAQMIP23GR0213-4121------ -2023FDSTRIE7811-SAQMIP23GR0213-TX4-DR.6 — $1,000,000.00 USD | | 14. Funds Certified By<br>Calvin Reaves |

**Funding Distribution**

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | | $1,000,000.00 USD | $1,000,000.00 USD |
| Recipient Share of Costs | | $0.00 USD | $0.00 USD |
| Total Costs | | $1,000,000.00 USD | $1,000,000.00 USD |

16. Purpose of the Federal Award Activity

To empower marginalized racial and ethnic communities in Europe, including people of African descent and Roma people, to advocate for and advance their rights.

17. Specific Award Conditions

☑ Attached

**Agreement**

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| | | | |
|---|---|---|---|
| 18a. Recipient Name<br>Giovani Adrian Simandjuntak | | 19a. Grants Officer Name<br>Selina Holt | |
| 18b. Recipient Signature<br>Giovani Adrian Simandjuntak (electronically signed) | | 19b. Grants Officer Signature<br>Selina Holt | |
| 18c. Title<br>Senior Director, Budget and Fiscal | 18d. Date (dd-mmm-yyyy)<br>21-Sep-2023 | 19c. Bureau/Office/Post<br>OFC OF PROCUREMENT EXECUTIVE (A/OPE) | 19d. Date (dd-mmm-yyyy)<br>18-Sep-2023 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here: HoltSM@state.gov

# U.S. Department of State
# Award Provisions

During the period of performance, the Recipient must comply with:
- The Award Provisions below;
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at: https://www.state.gov/about-us-office-of-the-procurement-executive/
- The applicable sections of 2 CFR §200 and 2 CFR §600; and
- All assurances and certifications made during the application process.

## 1) FEDERAL AWARD IDENTIFICATION NUMBER (FAIN):
**SAQMIP23GR0213**

## 2) FEDERAL SHARE OF AWARD:
**$1,000,000.00 USD**

## 3) PURPOSE AND OBJECTIVES OF AWARD:

**a. Purpose:**
HIAS INC (hereinafter referred to as the Recipient), is hereby provided a federal award, the purpose of which is to:

To empower marginalized racial and ethnic communities in Europe, including people of African descent and Roma people, to advocate for and advance their rights.

The Recipient shall carry out the Agreement in accordance with its proposal dated: 23-Aug-2023, and any revisions to which both parties agree to in writing. The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

**b. Objectives and Expected Outcomes:** The Recipient agrees to perform the program and meet the specific objectives below:

See Attached Scope of Work

## 4) CONTACT INFORMATION:

a. Grants Officer:

| | |
|---|---|
| Name: | Selina Holt |
| Post/Bureau: | A/OPE/AQM/IP |
| Section: | |
| Street Address: | 1200 Wilson BLVD<br>Arlington VA |
| Zip Code: | 22209 |
| E-mail: | HoltSM@state.gov |
| Telephone: | 703-875-5857 |

b. Grants Officer Representative:

Name: Kerry Ashforth
Post/Bureau: DRL/GP
Section:
Street Address:
Zip Code:
E-mail: ASHFORTHK@STATE.GOV
Telephone: 202-938-1043

## 5) AUTHORIZED BUDGET SUMMARY:

Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

| No | Budget Categories | Prior Costs | New Costs | Total Costs |
|---|---|---|---|---|
| 1 | Personnel | $0.00 | $235771.00 | $235771.00 |
| 2 | Fringe Benefits | $0.00 | $63462.00 | $63462.00 |
| 3 | Travel | $0.00 | $25326.00 | $25326.00 |
| 4 | Equipment | $0.00 | $0.00 | $0.00 |
| 5 | Supplies | $0.00 | $2000.00 | $2000.00 |
| 6 | Contractual | $0.00 | $517068.00 | $517068.00 |
| 7 | Construction | $0.00 | $0.00 | $0.00 |
| 8 | Other Direct Costs | $0.00 | $55049.00 | $55049.00 |
| 9 | Total Direct Costs (Lines 1-8) | $0.00 | $898676.00 | $898676.00 |
| 10 | Indirect Costs | $0.00 | $101324.00 | $101324.00 |
| 11 | U.S. Share of Costs (Lines 9-10) | $0.00 | $1000000.00 | $1000000.00 |
| 12 | Recipient Share of Costs | $0.00 | $0.00 | $0.00 |

## 6) INDIRECT COSTS:

| Type | Rate % | Applicable to |
|---|---|---|
| Predetermined | 20% | All Programs |

The base of application for the rate(s) above is defined in the Recipient's Negotiated Indirect Cost Rate Agreement dated 26-Feb-2021.

## 7) PRE-AWARD COSTS:

N/A

## 8) PROGRAM INCOME:

Deduction: Any program income earned by the Recipient as a result of this award and during the period of performance must be deducted from the total allowable costs in order to determine the net allowable costs for the award.

## 9) COST SHARING:

N/A

## 10) SUBRECIPIENTS:

Issuing subawards that were not proposed in the Recipient's approved budget requires prior approval. The Recipient must submit the proposed subaward budget and scope of work to the GO for review of cost allowability and approval prior to executing a

subaward. The executed subaward does not need to be submitted to the GO but must be provided upon request.

All subawards must comply with the requirements of 2 CFR §200.332--Requirements for pass-through entities

## 11) PAYMENTS:

Payments under this award will be made through the U.S. Department of Health and Human Services (HHS) Payment Management System (PMS). Unless otherwise stipulated, the Recipient may request payments on a reimbursement or advance basis. Instructions for requesting payments are available at: https://pms.psc.gov/

Advance payments must be limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash requirements of the Recipient in carrying out the purpose of this award. The timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements by the Recipient for direct program or project costs and the proportionate share of any allowable indirect costs.

Failure to comply with the terms and conditions of this award may result in payment delays.

## 12) REPORTING AND MONITORING:

The Recipient is required to submit Quarterly performance and Quarterly financial reports. All reports must be signed and certified by an authorized representative of the Recipient organization. All performance progress reports must indicate the Federal Award Identifying Number (FAIN), period of performance, reporting period end date, reporting frequency (quarterly, interim, semi-annual, annual, final) and include a detailed description of program progress.

Program reports must communicate, when applicable, progress toward achieving program objectives as included in section 3 of this award in a measurable way, referencing specific objectives, indicators, and activities. Reports should share lessons learned, information on improving program outcomes, and how to foster the adoption of promising practices.

N/A

Reports are due 30 days after the end of a reporting period and in accordance with the schedule below. **A final program and financial report is due 120 calendar days after the period of performance end date.** Failure to comply with these reporting requirements may jeopardize the Recipient's eligibility for future awards and/or delays in payments.

| Performance Progress Report Schedule | | | |
|---|---|---|---|
| **Report** | **Report Range Start** | **Report Range End** | **Due Date** |
| Report | 18-Sep-2023 | 30-Sep-2023 | 30-Oct-2023 |
| Report | 01-Oct-2023 | 31-Dec-2023 | 30-Jan-2024 |
| Report | 01-Jan-2024 | 31-Mar-2024 | 30-Apr-2024 |
| Report | 01-Apr-2024 | 30-Jun-2024 | 30-Jul-2024 |
| Report | 01-Jul-2024 | 30-Sep-2024 | 30-Oct-2024 |
| Report | 01-Oct-2024 | 31-Dec-2024 | 30-Jan-2025 |
| Report | 01-Jan-2025 | 31-Mar-2025 | 30-Apr-2025 |
| Report | 01-Apr-2025 | 30-Jun-2025 | 30-Jul-2025 |
| Report | 01-Jul-2025 | 29-Sep-2025 | 29-Oct-2025 |
| Final | 18-Sep-2023 | 29-Sep-2025 | 27-Jan-2026 |

| Federal Financial Report Schedule | | | |
|---|---|---|---|
| **Report** | **Report Range Start** | **Report Range End** | **Due Date** |
| Report | 18-Sep-2023 | 30-Sep-2023 | 30-Oct-2023 |
| Report | 01-Oct-2023 | 31-Dec-2023 | 30-Jan-2024 |
| Report | 01-Jan-2024 | 31-Mar-2024 | 30-Apr-2024 |
| Report | 01-Apr-2024 | 30-Jun-2024 | 30-Jul-2024 |
| Report | 01-Jul-2024 | 30-Sep-2024 | 30-Oct-2024 |
| Report | 01-Oct-2024 | 31-Dec-2024 | 30-Jan-2025 |
| Report | 01-Jan-2025 | 31-Mar-2025 | 30-Apr-2025 |
| Report | 01-Apr-2025 | 30-Jun-2025 | 30-Jul-2025 |
| Report | 01-Jul-2025 | 29-Sep-2025 | 29-Oct-2025 |
| Final | 18-Sep-2023 | 29-Sep-2025 | 27-Jan-2026 |

**Financial Reports:**
All financial reports must be submitted using form SF-425--Federal Financial Report. Financial reports shall be completed in the Payment Management system. Instructions for completing the SF-425 in PMS are available at: https://pms.psc.gov/

Financial Reports completed in PMS must also be downloaded and submitted to the Grants Officer and Grants Officer Representative via SAMS Domestic.

**Performance Reports:**
As appropriate, performance reports must contain:

- A comparison of actual accomplishments to the objectives of the federal award established for the period. This should include information relating fiscal data and accomplishments to performance goals and objectives:
- The reasons why established goals were not met, and
- Additional pertinent information including an analysis and explanation of cost overruns or high unit costs.

Performance Reports must be submitted to the Grants Officer and Grants Officer Representative via SAMS Domestic.

The Recipient acknowledges that the Department of State may make site visits as determined by the Grants Officer.

## 13) SUBSTANTIAL INVOLVEMENT:

N/A

## 14) WAIVER OF ACKNOWLEDGMENT OF DEPARTMENT OF STATE SUPPORT AND BRANDING AND MARKING REQUIREMENTS:

The Department of State Standard Terms and Conditions for Federal Awards requires that materials produced under a federal award be marked appropriately to acknowledge the support of the U.S. Department of State. However, the Department of State has determined that for the purposes of this award, the Recipient is not required to publicly display Department of State and/or U.S. government branding and marking for materials produced under this award, nor insert the disclaimers required in the Standard Terms and Conditions.

## 15) ADDITIONAL BUREAU/POST SPECIFIC REQUIREMENTS:

This award has been deemed sensitive and is not subject to the Federal Funding Accountability and Transparency Act (FFATA).

F: Indicators
DR 4.2-1: Number of human rights organizations trained and supported
DR 4.2-2 : Number of civil society organizations receiving USG assistance engaged in advocacy interventions
DR 6.1-2 Number of human rights defenders trained and supported

## 16) SPECIFIC CONDITIONS:

N/A

## 17) SPECIAL PROVISION FOR PERFORMANCE IN A DESIGNATED COMBAT AREA:

N/A

## 18) STATE DEPARTMENT LEAHY AMENDMENT VETTING REQUIREMENTS:

N/A

## 19) REPORTING TAXES ON FOREIGN ASSISTANCE FUNDS:

The Recipient is required to submit a report detailing foreign taxes assessed under this award during the prior U.S. Government fiscal year (10/01 - 09/30). The report must be submitted to the Grants Officer on an annual basis by February 15. The Recipient should submit an updated report if the foreign government reimburses the Recipient for any of the taxes reported in a previous report. The report must include the Recipient's name, contact information, award number, and the amount of foreign taxes assessed by a foreign government.

Taxes to be reported include value-added taxes and customs duties assessed by each foreign government receiving foreign assistance under this award (listed separately) on any purchase of goods or services of $500 or more or any other tax that is assessed in an amount of $100 or more on United States foreign assistance funds under this award. The Recipient is not required to report on individual income taxes assessed to local staff or any taxes assessed by a third-party foreign government, which is not a beneficiary of the foreign assistance funds used to finance this award.

## 20) PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT:

N/A

## 21) PROCUREMENT OF COVERED MATERIAL:

N/A

## Award Points of Contact: Roles and Responsibilities

**Department of State Roles and Responsibilities**

**The Bureau of Administration, Office of Procurement Executive, Office of Acquisitions Management (A/OPE/AQM)**

**1. Grants Officer (GO)**

The Grants Officer is the only person authorized award, amend, terminate a federal assistance award, and provide formal, required award approval including those outlined in 2 CFR 200.308 and 2 CFR 200.407. The recipient must contact the GO to request changes to the federal assistance award, terms and conditions including an extension, budget changes, or other requests requiring formal approval. Correspondence should be routed through the GOR.
**Selina Holt**
703-875-5857
Holtsm@state.gov

**2. Grants Management Specialist (GMS)**

The Grants Management Specialist has been designated to process actions on behalf of the GO. Cc the GMS on all correspondences to the GO.
**Selina Holt**
703-875-5857
Holtsm@state.gov

**The Bureau of Democracy Human Rights and Labor (DRL)**

**3. Grants Officer Representative (GOR)**

**Kerry Ashforth**
DRL/GP
202-394-8231
AshforthK@state.gov

**4. Program Officer (PO)**

The Program Officer is responsible for the programmatic and/or technical aspects of the pre-award cycle.
**Kaley Fulton**
DRL/GP
202-938-1043
FultonKA@state.gov

**The above roles are subject to change at any time without necessitating an amendment to the award by US Department of State.**

Recipients will be notified of any changes via the SAMS Domestic System or by email if award is not in SAMS Domestic.

**Recipient Administrators Points of Contact**

**1. Project Point of Contact (POC):**
**Lara Moninghoff**
Senior Vice President Programs
HIAS Inc.
1300 Spring Street Suite 500
Silver Spring, Maryland 20910-3616 USA
lara.moninghoff@hias.org
301-844-7274

**2. Authorized Award Signatory:**

**Giovani Simandjuntak**
Senior Director
HIAS Inc.
1300 Spring Street Suite 500
Silver Spring, Maryland 20910-3616 USA
giovani.simandjuntak@hias.org
301-844-7295

**Please notify DOS in anticipation of any changes in the above Recipient Administrators Points of Contact.**

Also note that any change in a key person specified in the application or the Federal award require prior approval from the Grants Officer per 2 CFR 200. 308(c)2.

Docusign Envelope ID: 9E901EDA-D1CA-40B8-999B-F144352BE2DC

USAID
FROM THE AMERICAN PEOPLE

Mark Hetfield
CEO
HIAS Inc.
1300 Spring Street, Suite 500
Silver Spring MD 20910-3616

E-mail: mark.hetfield@hias.org
PoC Email: carrie.taneyhill@hias.org

Subject: Grant No. 720BHA24GR00159

Dear Mr. Hetfield:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (hereinafter referred to as "USAID" or "Grantor") hereby provides to HIAS Inc. (hereinafter referred to as "**HIAS Inc.**," "Grantee," or "Recipient" or "non-Federal entity) the sum set forth in Section 1.3 of this Agreement to provide support for a program entitled "Multisectoral assistance and life-saving protection services for most vulnerable and at-risk Venezuelans affected by the crisis in Venezuela," as described in Attachment 2 of this Agreement entitled "Program Description."

This Agreement is effective and obligation is made as of the date of this letter and shall apply to expenditures and obligations made by the Recipient in furtherance of program objectives for the period described in Section 1.2 of this Agreement. USAID shall not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Agreement is awarded to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in the attachments listed under my signature below, which together constitute the entire award document, and to which your organization has agreed.

Please sign the second page of this cover letter to acknowledge your receipt of this award and forward a scanned copy of only the signed page to bha.grantsunit.admin@usaid.gov.

Sincerely,

GEORGE SERAPIS IRBY (affiliate) Digitally signed by GEORGE SERAPIS IRBY (affiliate) Date: 2024.07.17 15:30:14 -04'00'

G. Serapis Irby
Agreement Officer
Office of Acquisition and Assistance
M/OAA

Attachments:
1. Schedule
2. Program Description
3. Standard Provisions
4. Branding Strategy and Marking Plan

ACKNOWLEDGED: **HIAS Inc**

By: DocuSigned by: [signature] CA9436746A29486...

Name: Mark Hetfield

Title: President and CEO

Date: 7/19/2024

**ACCOUNTING AND APPROPRIATION DATA**

A. GENERAL

| | | | |
|---|---|---|---|
| A.1. | Total Estimated USAID Amount | : | $18,500,000.00 |
| A.2. | Total Obligated USAID Amount | : | $10,000,000.00 |
| A.3. | Cost-Sharing Amount (Non-Federal) | : | $0.00 |
| A.4. | Agreement Officer's Representative (AOR) | : | See Section 1.12 |
| A.5. | Tax I.D. Number | : | 13-5633307 |
| A.6. | Unique Entity Identifier | : | XG6JMUVNY2F3 |
| A.7. | LOC Number | : | N/A |
| A.8. | USAID CFDA Number | : | 98.001 |
| A.9. | Award Number | : | 720BHA24GR00159 |

B. SPECIFIC

| | | | |
|---|---|---|---|
| B.1.(a) | REQ Number | : | REQ-BHA-24-000643 |
| B.1.(b) | Control Number | : | AL20242650 |
| B.1.(c) | Fund | : | FD-X24-ISR |
| B.1.(d) | Operating Unit | : | BHA/ALAC |
| B.1.(e) | Program Area | : | HA.1 |
| B.1.(f) | Distribution Code | : | 529-W |
| B.1.(g) | BGA | : | 529 |
| B.1.(h) | SOC | : | 4100201 |
| B.1.(i) | Obligated Amount | : | $10,000,000.00 |

Docusign Envelope ID: 9E901EDA-D1CA-40B8-999B-F144352BE2DC

## ATTACHMENT 3 – STANDARD PROVISIONS

(Note: Throughout this Agreement, the following terms may be used interchangeably: (a) "Grant Officer" and “Agreement Officer;" (b) "Grantee," "Recipient," and "Awardee;" (c) "Grant," “Cooperative Agreement," "Agreement," and "Award;" (d) Agreement Officer’s Representative ,” "Cognizant Technical Officer," “Project Officer,” and "Activity Manager;" (e) "Subaward," "Subgrant," and "Subagreement;" and (f) "Subrecipient," "Subgrantee," and "Subawardee." All references to dollars ($) mean U.S. dollars or the equivalent thereof in another currency. References to “USAID,” without an indication of the specific position or individual within USAID, shall mean “Agreement Officer” unless otherwise indicated or delegated to another USAID position or individual by the Agreement Officer.)

**a) MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS**

**M1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (NOVEMBER 2020)**

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of “Non-Federal Entity” in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with Non-U.S. subrecipients the recipient must include the applicable “Standard Provisions for Non-US Nongovernmental Organizations.” Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

**M2. INELIGIBLE COUNTRIES (MAY 1986)**

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

**M3. NONDISCRIMINATION (JUNE 2012)**

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran’s status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

**M4. AMENDMENT OF AWARD (JUNE 2012)**

This award may only be amended in writing, by formal amendment or letter, signed by the Agreement Officer (AO), and in the case of a bilateral amendment, by the AO and an authorized official of the recipient.

[END OF PROVISION]

**M5. NOTICES (JUNE 2012)**

Any notice given by USAID or the recipient is sufficient only if in writing and delivered in person, mailed or e-mailed as follows:

U.S. Department of State

# FEDERAL ASSISTANCE AWARD

| | |
|---|---|
| 1. Recipient Name<br>MERCY CORPS | 2. Assistance Type:<br>☐ Cooperative Agreement<br>☐ Fixed Amount Award<br>☒ Grant<br>☐ Property Grant<br>☐ Voluntary Contribution |
| 3. Address<br>45 SW ANKENY<br>PORTLAND, OR<br>97204-3504<br>USA | |
| 4. Recipient POC: KAREN SMITH GEON<br>Phone Number: 5038965000<br>Email: ksmithgeon@mercycorps.org | |

| | | |
|---|---|---|
| 5. Type of Entity<br>U.S. Non-Profit Organization | 6. Unique Entity Identifier<br>P51TEEFDJ3E8 | 7. EIN/ TIN<br>********** |
| 8. Assistance Listing Number<br>19.345 | 9. Statutory Authority for Assistance<br>Foreign Assistance Act | 10. Award Number<br>SAOMIP24GR5142 |
| 11. Period of Performance<br>Start Date 2024-09-30 | End Date 2025-01-25 | 12. Amendment Number<br>M001 |
| 13. Accounting and Appropriation Data<br>1900-2023-2024-19723410370013-1051-DRL-2762--SAQMIP24GR5142-4121--018102-----2024FDSTRIE7813-SAQMIP24GR5142-SX1-DR.6 | $0.00 | 14. Funds Certified By |

Funding Distribution

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | $986,000.00 | $0.00 | $986,000.00 |
| Recipient Share of Costs | $0.00 | $0.00 | $0.00 |
| Total Costs | $986,000.00 | $0.00 | $986,000.00 |

16. Purpose of the Federal Award Activity

This award has been terminated in alignment with an Executive Order or ALDAC

17. Specific Award Conditions

☐ Attached

Agreement

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| | | | |
|---|---|---|---|
| 18a. Recipient Name Olaide A Ogunsanya | | 19a. Grants Officer Name Olaide A Ogunsanya | |
| 18b. Recipient Signature<br>*Olaide A Ogunsanya signed with consent of Grants Officer: Award Termination per EO (electronically signed)* | | 19b. Grants Officer Signature<br>*Olaide A Ogunsanya (electronically signed)* | |
| 18c. Title | 18d. Date (dd-mmm-yyyy)<br>2025-03-27 | 19c. Bureau/Office/Post<br>OFC OF PROCUREMENT EXECUTIVE (A/OPE) | 19d. Date (dd-mmm-yyyy)<br>2025-03-27 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here:

U.S. DEPARTMENT OF STATE
AWARD PROVISIONS

During the period of performance, the Recipient must comply with:

- The Award Provisions below
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at:https://www.state.gov/about-us-office-of-the-procurement-executive/
- The applicable sections of 2 CFR §200 and 2 CFR §600 and
- All assurances and certifications made during the application process.

1) FEDERAL AWARD IDENTIFICATION NUMBER (FAIN):

SAQMIP24GR5142

2) FEDERAL SHARE OF AWARD:

$(USD)986,000.00

3) PURPOSE AND OBJECTIVES OF AWARD:

1. Purpose:

MERCY CORPS (hereinafter referred to as the Recipient), is hereby provided a federal award, the purpose of which is to:

Foster inclusive processes to reconcile water security issues and build sustainable local peace and water resource use through community level empowerment of women.

The Recipient shall carry out this award in accordance with its proposal dated 2024-08-12 and any revisions to which both parties agree to in writing.

The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

2. Objectives and Expected Outcomes: The Recipient agrees to perform the program and meet the specific objectives below:

See Attached Statement of Work.

4) CONTACT INFORMATION:

a. Grants Officer:

- Name: Olaide A Ogunsanya
- Bureau/Mission: OFFICE OF ACQUISITION MANAGEMENT (A/OPE/AQM/IP)
- Section:
- Address: ., .
- Telephone: 202.655.0002
- Email: Ogunsanyaoa@state.gov

b. Grants Officer Representative:

- Name: Negina Sawez
- Bureau/Mission: BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR (DRL)
- Section:
- Address: ., .
- Telephone: 202.445.7621
- Email: Sawezn@state.gov

5) AUTHORIZED BUDGET SUMMARY:
Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

| **Budget Category** | **New Costs** | **Prior Costs** | **Total Costs** |
|---|---|---|---|
| a) Personnel | $0.00 | $166,603.00 | $166,603.00 |
| b) Fringe Benefits | $0.00 | $44,983.00 | $44,983.00 |
| c) Travel | $0.00 | $19,556.00 | $19,556.00 |
| d) Equipment | $0.00 | $0.00 | $0.00 |
| e) Supplies | $0.00 | $3,600.00 | $3,600.00 |
| f) Contractual | $0.00 | $334,320.00 | $334,320.00 |
| g) Construction | $0.00 | $0.00 | $0.00 |
| h) Other Direct Costs | $0.00 | $244,940.00 | $244,940.00 |
| i) Total Direct Costs (Lines a-h) | $0.00 | $814,002.00 | $814,002.00 |
| j) Indirect Costs | $0.00 | $171,998.00 | $171,998.00 |

USAID
FROM THE AMERICAN PEOPLE

Craig Redmond
Senior VP Programs, Mercy Corps
45 SW Ankeny St.
Portland, OR, 97204-3504

E-mail: credmond@mercycorps.org
jseward@mercycorps.org

Subject: Award No. 720BHA21CA00013

Dear Mr. Redmond:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (hereinafter referred to as "USAID" or "Grantor") hereby provides **to Mercy Corps** (hereinafter referred to as "Mercy Corps," "Grantee," or "Recipient" or "non-Federal entity) the sum set forth in Section 1.3 of this Agreement to provide support for a program entitled "**INVEST DM 2.0.: Investing in Human Capital for Disaster Management**," as described in Attachment 2 of this Agreement entitled "Program Description."

This Agreement is effective and obligation is made as of the date of this letter and shall apply to expenditures and obligations made by the Recipient in furtherance of program objectives for the period described in Section 1.2 of this Agreement. USAID shall not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Agreement is awarded to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in the attachments listed under my signature below, which together constitute the entire award document, and to which your organization has agreed.

Please sign the second page of this cover letter to acknowledge your receipt of this award, and forward a scanned copy of only the signed page to bha.grantsunit.admin@usaid.gov.

Sincerely,

MICHAEL ANTHONY CLARK (affiliate)
Digitally signed by MICHAEL ANTHONY CLARK (affiliate)
Date: 2021.06.23 10:10:35 -04'00'

Michael A. Clark
Agreement Officer
Office of Acquisition and Assistance
M/OAA

Attachments:
1. Schedule
2. Program Description
3. Standard Provisions
4. Branding Strategy and Marking Plan

ACKNOWLEDGED: Mercy Corps

By:




Name:

Craig Redmond 06/24/2021 17:28 PDT

Title:

Date:

**ACCOUNTING AND APPROPRIATION DATA**

A. GENERAL

| | | | |
|---|---|---|---|
| A.1. | Total Estimated USAID Amount | : | $2,500,000.00 |
| A.2. | Total Obligated USAID Amount | : | $1,678,733.00 |
| A.3. | Cost-Sharing Amount (Non-Federal) | : | $0 |
| A.4. | Agreement Officer's Representative (AOR) | : | See Section 1.12 |
| A.5. | Tax I.D. Number | : | 91-1148123 |
| A.6. | Unique Entity Identifier | : | 134170547 |
| A.7. | LOC Number | : | HHS-55A5P |
| A.8. | USAID CFDA Number | : | 98.001 |

B. SPECIFIC

| | | | |
|---|---|---|---|
| B.1.(a) | Award Number | : | 720BHA21CA00013 |
| B.1.(b) | REQ Number | : | REQ-BHA-21-000513 |
| B.1.(c) | Organization ID | : | 12504 |
| B.1.(d) | Control Number | : | AL20211471 |
| B.1.(e) | Fund | : | FD-X21 |
| B.1.(f) | Program Element | : | N/A |
| B.1.(g) | Operating Unit | : | BHA/ALAC |
| B.1.(h) | Program Area | : | HA.2 |
| B.1.(i) | Distribution Code | : | 497-W |
| B.1.(j) | BGA | : | 497 |
| B.1.(k) | SOC | : | 4100201 |
| B.1.(l) | Amount | : | $1,678,733.00 |

# ATTACHMENT 1 – SCHEDULE

## 1.1 PURPOSE OF AGREEMENT

The purpose of this Agreement is to provide support for the program described in Attachment 2 of this Agreement entitled "Program Description."

## 1.2 PERIOD OF AGREEMENT

(a) The period of performance of this Agreement is **May 17, 2021** to **February 28, 2023**. Subject to the terms and conditions of this Agreement, allowable costs incurred by the Recipient shall be reimbursable during the period of performance.

(b) The place of performance is **Indonesia**.

(c) To request an extension of the period of performance, recipients must notify the Agreement Officer's Representative (AOR) in writing with the supporting reasons and revised period of performance at least 30 calendar days before the end of the period of performance specified in Section 1.2(a) above. All extensions to the period of performance must be approved by the Agreement Officer (AO) through a modification to this award.

(d) As indicated in Section 1.3(e) below, this Agreement is incrementally-funded. The obligated amount set forth in Section 1.3(b) below is anticipated to be sufficient through approximately **May 2022**, although the Recipient is authorized to continue expending obligated funds, if available, beyond that date, but not after the estimated completion date set forth in Section 1.2(a) above.

## 1.3 AMOUNT OF AGREEMENT AND PAYMENT

(a) The total estimated amount of this Agreement for its full period, as set forth in Section 1.2(a) above, is $**2,500,000**.

(b) The amount of $**1,678,733** is obligated by USAID for the purposes of this Agreement.

(c) USAID is not required to reimburse the Recipient for any costs in excess of this amount, nor is the Recipient required to continue performance or incur costs in excess of this amount (including actions/costs under the termination and suspension provisions of 2 CFR 200.340 and 2 CFR 200.343). If, pursuant to 2 CFR 200.308(c)(8), the Recipient requests additional USAID funding and USAID determines not to provide such additional funding, the Agreement Officer will, upon written request of the Recipient, terminate this Agreement pursuant to 2 CFR 200.340(a)(3).

(d) Advance payments shall be made to the Recipient via Letter of Credit in accordance with the regulations set forth in 2 CFR 200.305, 2 CFR 700.7, 2 CFR 700.8 and the procedures of the Payment Management System (PMS) administered by the U.S. Department of Health and Human Services (HHS). Such advance payments will be liquidated via the financial reporting requirements described in Section 1.5(a) below.

(e) Until such time as the obligated amount shall equal the total estimated amount of this Agreement, additional increments of funds may be obligated by USAID under this Agreement (by a unilateral modification to this Agreement), subject to availability of funds, successful performance by the Recipient, possible evaluation of the program, program priorities at the time, and the requirements of 2 CFR 200.305.

## 1.4 AGREEMENT BUDGET

(a) Summary Budget

## ATTACHMENT 3 – STANDARD PROVISIONS

(Note: Throughout this Agreement, the following terms may be used interchangeably: (a) "Grant Officer" and “Agreement Officer;" (b) "Grantee," "Recipient," and "Awardee;" (c) "Grant," “Cooperative Agreement," "Agreement," and "Award;" (d) Agreement Officer’s Representative ,” "Cognizant Technical Officer," “Project Officer,” and "Activity Manager;" (e) "Subaward," "Subgrant," and "Subagreement;" and (f) "Subrecipient," "Subgrantee," and "Subawardee." All references to dollars ($) mean U.S. dollars or the equivalent thereof in another currency. References to “USAID,” without an indication of the specific position or individual within USAID, shall mean “Agreement Officer” unless otherwise indicated or delegated to another USAID position or individual by the Agreement Officer.)

**a) MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS**

**1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (NOVEMBER 2020)**

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of “Non-Federal Entity” in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with Non-U.S. subrecipients the recipient must include the applicable “Standard Provisions for Non-US Nongovernmental Organizations.” Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

**2. INELIGIBLE COUNTRIES (MAY 1986)**

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

**3. NONDISCRIMINATION (JUNE 2012)**

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran’s status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

**4. AMENDMENT OF AWARD (JUNE 2012)**

This award may only be amended in writing, by formal amendment or letter, signed by the Agreement Officer (AO), and in the case of a bilateral amendment, by the AO and an authorized official of the recipient.

[END OF PROVISION]

**5. NOTICES (JUNE 2012)**

Any notice given by USAID or the recipient is sufficient only if in writing and delivered in person, mailed or e-mailed as follows:

USAID | AFGHANISTAN
FROM THE AMERICAN PEOPLE

July 10, 2020

Matt Iwanowicz
Senior Director of Finance and Contracts
Management Sciences for Health, Inc.
200 Rivers Edge Drive
Medford, Massachusetts 02155
Miwanowicz@msh.org
+1-617-250-9354

Subject: Cooperative Agreement No. 72030620CA00006
National Health Technical Assistance Program (NHTAP)

Dear Mr. Iwanowicz:

Pursuant to the authority contained in the U.S. Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) (hereinafter referred to as "USAID" or "Grantor") hereby awards to Management Sciences for Health (MSH), hereinafter referred to as the "Recipient", the sum of $117,000,000.00 to provide support for an activity entitled "National Health Technical Assistance (NHTAP)" as described in the Schedule of this Cooperative Agreement and the Attachment B, "Program Description".

This Cooperative Agreement is effective, and obligation is made as of the start date of the agreement and shall apply to commitments made by the Recipient in furtherance of activity objectives during the period beginning with the effective date of July 10, 2020 and ending July 9, 2025. USAID will not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Cooperative Agreement is made to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in 2 CFR 200 and 2 CFR 700, entitled "Uniformed Administrative Requirements, Costs Principles, and Audit Requirement for Federal Awards;" Attachment A (Schedule), Attachment B (Program Description), and Attachment C (Standard Provisions) all of which have been agreed to by your organization and are incorporated into this award.

Please sign the acknowledgement in the following page, confirming acceptance of the Award, and return it electronically to the Agreement Officer at kblaidoaaohnteam@usaid.gov.

Sincerely,

Digitally signed by Sarah R Bueter
Date: 2020.07.09 10:47:30 -04'00'

Sarah R. Bueter
Agreement Officer

ATTACHMENTS:

A. Schedule
B. Program Description
C. Standard Provisions
D. Branding and Marking Plan

**ACKNOWLEDGED BY: Management Sciences for Health, Inc. (MSH)**

Signature: Matthew A. IWANOWICZ
Digitally signed by Matthew A. IWANOWICZ
DN: cn=Matthew A. IWANOWICZ, o=Management Sciences for Health, ou, email=miwanowicz@msh.org, c=US
Date: 2020.07.09 14:32:42 -04'00'

Name: ______________________

Title: ______________________

Phone: ______________________

Email: ______________________

Date: ______________________

## A. GENERAL

1. Total Estimated USAID Amount (TEA): **$117,000,000.00**
2. Total Obligated USAID Amount: **$30,600,000.00**
3. Cost-share Amount: **$7,285,893.00**
4. Total Activity Amount: **$124,285,893.00**
5. Activity Title: **National Health Technical Assistance Program (NHTAP)**
6. USAID Technical Office: **Office of Health and Nutrition (OHN)**
7. DUNS number: **071713085**
8. Letter of Credit number: **72-00-1385**

## B. SPECIFIC

1. Requisition number: **REQ-306-20-000001**

| Fund Site | Prog Element | Element | Prog Area | SOAG | Amount |
|---|---|---|---|---|---|
| ES-OCO/2017/2018 | DR.2.2 | Non-security Executive Authority - Function and Processes | DR.2 | 306-AA-18-DO2.OHN | $800,000 |
| ES-OCO/2017/2018 | HL.5.1 | Neglected Tropical Diseases and Other Infectious Diseases | HL.5 | 306-AA-18-DO2.OHN | $1,170,742 |
| ES-OCO/2017/2018 | HL.6.1 | Birth Preparedness and Maternity Services | HL.6 | 306-AA-18-DO2.OHN | $9,100,000 |
| ES-OCO/2017/2018 | HL.7.1 | Service Delivery | HL.7 | 306-AA-18-DO2.OHN | $8,498,814 |
| ES-OCO/2015/2016 | A052 | Maternal and Child Health | A11 | 306-SOAG-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.00--1 | $6,825,276 |
| ES-OCO/2016/2017 | A051 | Other Public Health Threats | A11 | 306-SOAG-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.00--1 | $534,654 |
| ES-OCO/2016/2017 | A052 | Maternal and Child Health | A11 | 306-SOAG-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.00--1 | $900,134 |
| ES-OCO/2016/2017 | A053 | Family Planning and Reproductive Health | A11 | 306-SOAG-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.00--1 | $1,920,380 |
| ES-OCO/2016/2017 | A142 | Nutrition | A11 | 306-SOAG-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.00--1 | $850,000 |

## C. PAYMENT OFFICE

US Agency for International Development
M/FM/CMP-LOC Unit
Room 424, SA44
1300 Pennsylvania Avenue
Washington, DC 20523
Email: loc@usaid.gov

## D. ADMINISTRATIVE OFFICE

Diego Marquez
Agreement Officer (AO)

Office of Acquisition and Assistance
USAID/Afghanistan
dmarquez@usaid.gov

Sarah Safi
Agreement Officer Representative (AOR)
Office of Health and Nutrition
USAID/Afghanistan
ssafi@usaid.gov

## Table of Contents

A. GENERAL ..... 3
B. SPECIFIC ..... 3
C. PAYMENT OFFICE ..... 3
D. ADMINISTRATIVE OFFICE ..... 3

**ATTACHMENT A – THE SCHEDULE ..... 8**

A.1 PURPOSE OF AWARD ..... 8
A.2 PERIOD OF AWARD ..... 8
A.3 AMOUNT OF AWARD AND PAYMENT ..... 8
A.4 AWARD BUDGET ..... 9
A.5 REPORTING REQUIREMENTS ..... 10
A.6. INDIRECT COSTS ..... 14
A.7 TITLE TO PROPERTY ..... 14
A.8 AUTHORIZED GEOGRAPHIC CODE ..... 14
A.9 COST-SHARING ..... 15
A.10 AGREEMENT OFFICER'S REPRESENTATIVE (AOR) ..... 15
A.11 SUBSTANTIAL INVOLVEMENT ..... 15
A.12 SUB-AWARD ..... 17
A.13 INFORMATION SHARING ..... 17
A.14 RESOLUTION OF CONFLICTS ..... 18
A.15 BRANDING STRATEGY AND MARKING PLAN ..... 18
A.16 ENVIRONMENTAL COMPLIANCE ..... 18
A.17 SPECIAL PROVISION SPECIFIC TO AFGHANISTAN (ASSISTANCE) ..... 20
A.17.1 SECURITY REQUIREMENTS ..... 20
A.17.2 SERIOUS INCIDENT REPORTING (SIR) IN AFGHANISTAN (APRIL 2016) ..... 22
A.17.3 SPECIAL PROVISION FOR PERFORMANCE IN AFGHANISTAN (JULY 2010) ..... 23
A.17.4 SMART TRAVELER ENROLLMENT PROGRAM (STEP) (AUGUST 2016) ..... 24
A.17.5 VETTING REQUIREMENT (NOVEMBER 2016) ..... 24
A.17.6 HOMELAND SECURITY PRESIDENTIAL DIRECTIVE (HSPD-12) (SEPTEMBER 2006) ..... 25
A.17.7 IMPLEMENTING PARTNER NOTICES (NOVEMBER 2016) ..... 26
A.17.8 RESERVED ..... 26
A.17.9 DATABASE AND GIS/GPS REPORTING REQUIREMENTS (DECEMBER 2016) ..... 26
A.17.10 RESERVED ..... 28
A.17.11 COMPENSATION FOR COOPERATING COUNTRY NATIONALS (CCNS) IN AFGHANISTAN – FOR NON-US BASED ASSISTANCE RECIPIENTS (NOVEMBER 2016) ..... 28
A.17.12 NON-FEDERAL AUDITS (NOVEMBER 2016) ..... 29
A.17.13 USAID/AFGHANISTAN HOST COUNTRY TAXES AND DUTIES (NOVEMBER 2016) ..... 29
A.17.14 SUB-AWARD REQUIREMENTS (NOVEMBER 2016) ..... 29
A.17.15 RESTRICTIONS ON RECIPIENTS EXECUTING AGREEMENTS WITH GOVERNMENT OF AFGHANISTAN ..... 30
A.17.16 USAID/AFGHANISTAN PRESS RELATIONS (NOVEMBER 2016) ..... 31
A.17.17 RESTRICTIONS ON FUNDING FOR LAW ENFORCEMENT (NOVEMBER 2016) ..... 31
A.17.18 COMPLIANCE WITH ADS 206 PROHIBITION OF ASSISTANCE TO DRUG TRAFFICKERS (AUGUST 2016) ..... 31
A.17.19 USAID/AFGHANISTAN FRAUD REPORTING (NOVEMBER 2016) ..... 31
A.17.20 RESERVED ..... 32
A.17.21 COMPLIANCE WITH ADS 252 & 253 - TRAINING AND RESULTS AND INFORMATION NETWORK (TRAINET) (AUGUST 2016) ..... 32

**ATTACHMENT B – PROGRAM DESCRIPTION ..... 35**

LIST OF ACRONYMS ..... 35
EXECUTIVE SUMMARY ..... 37
I. TECHNICAL APPROACH ..... 40
II. MANAGEMENT AND STAFFING PLAN ..... 61
III. ACTIVITY MONITORING, EVALUATION, AND LEARNING PLAN ..... 67

**ATTACHMENT C – STANDARD PROVISIONS ..... 73**

***MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS ..... 73***

M1. APPLICABILITY OF 2 CFR 200 AND 2 CFR 700 (DECEMBER 2014) .... 73
M2. INELIGIBLE COUNTRIES (MAY 1986) .... 73
M3. NONDISCRIMINATION (JUNE 2012) .... 73
M4. AMENDMENT OF AWARD (JUNE 2012) .... 73
M5. NOTICES (JUNE 2012) .... 74
M6. SUBAWARDS AND CONTRACTS (DECEMBER 2014) .... 74
M7. OMB APPROVAL UNDER THE PAPERWORK REDUCTION ACT (DECEMBER 2014) .... 74
M8. USAID ELIGIBILITY RULES FOR GOODS AND SERVICES (MAY 2020) .... 75
M9. DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS (JUNE 2012) .... 76
M10. DRUG-FREE WORKPLACE (JUNE 2012) .... 77
M11. EQUAL PARTICIPATION BY FAITH-BASED ORGANIZATIONS (JUNE 2016) .... 77
M12. PREVENTING TRANSACTIONS WITH, OR THE PROVISION OF RESOURCES OR SUPPORT TO, SANCTIONED GROUPS AND INDIVIDUALS (MAY 2020) .... 78
M13. MARKING AND PUBLIC COMMUNICATIONS UNDER USAID-FUNDED ASSISTANCE (DECEMBER 2014) .... 79
M14. REGULATIONS GOVERNING EMPLOYEES (AUGUST 1992) .... 81
M15. CONVERSION OF UNITED STATES DOLLARS TO LOCAL CURRENCY (NOVEMBER 1985) .. 82
M16. USE OF POUCH FACILITIES (AUGUST 1992) .... 82
M17. TRAVEL AND INTERNATIONAL AIR TRANSPORTATION (DECEMBER 2014) .... 83
M18. OCEAN SHIPMENT OF GOODS (JUNE 2012) .... 85
M19. VOLUNTARY POPULATION PLANNING ACTIVITIES - MANDATORY REQUIREMENTS (MAY 2006) .... 85
M20. TRAFFICKING IN PERSONS (APRIL 2016) .... 86
M21. SUBMISSIONS TO THE DEVELOPMENT EXPERIENCE CLEARINGHOUSE AND PUBLICATIONS (JUNE 2012) .... 87
M22. LIMITING CONSTRUCTION ACTIVITIES (AUGUST 2013) .... 88
M23. USAID IMPLEMENTING PARTNER NOTICES (IPN) PORTAL FOR ASSISTANCE (JULY 2014) 89
M24. PILOT PROGRAM FOR ENHANCEMENT OF GRANTEE EMPLOYEE WHISTLEBLOWER PROTECTIONS (SEPTEMBER 2014) .... 90
M25. SUBMISSION OF DATASETS TO THE DEVELOPMENT DATA LIBRARY (OCTOBER 2014) .... 91
M26. PROHIBITION ON REQUIRING CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS OR STATEMENTS (MAY 2017) .... 92
M27. CHILD SAFEGUARDING (JUNE 2015) .... 93
M28. MANDATORY DISCLOSURES (JULY 2015) .... 95
M29. NONDISCRIMINATION AGAINST BENEFICIARIES (NOVEMBER 2016) .... 95
M30. CONFLICT OF INTEREST (AUGUST 2018) .... 96

***REQUIRED AS APPLICABLE STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS* .... 98**

RAA1. NEGOTIATED INDIRECT COST RATES - PREDETERMINED (DECEMBER 2014) *(N/A)* .... 98
RAA2. NEGOTIATED INDIRECT COST RATES - PROVISIONAL (NONPROFIT) (DECEMBER 2014) .... 98
RAA3. NEGOTIATED INDIRECT COST RATE - PROVISIONAL (PROFIT) (DECEMBER 2014) *(N/A)* 99
RAA4. RAA4. INDIRECT COSTS – DE MINIMIS RATE (MAY 2020) .... 99
RAA5. EXCHANGE VISITORS AND PARTICIPANT TRAINING (JUNE 2012) (N/A) .... 99
RAA6. VOLUNTARY POPULATION PLANNING ACTIVITIES – SUPPLEMENTAL REQUIREMENTS (JANUARY 2009) .... 99
RAA6. PROTECTION OF THE INDIVIDUAL AS A RESEARCH SUBJECT (APRIL 1998) *(N/A)* .... 102
RAA8. CARE OF LABORATORY ANIMALS (MARCH 2004) *(N/A)* .... 102
RAA9. TITLE TO AND CARE OF PROPERTY (COOPERATING COUNTRY TITLE) (NOVEMBER 1985) *(N/A)* .... 102
RAA10. COST SHARING (MATCHING) (FEBRUARY 2012) .... 102
RAA11. PROHIBITION OF ASSISTANCE TO DRUG TRAFFICKERS (JUNE 1999) .... 102
RAA12. INVESTMENT PROMOTION (NOVEMBER 2003) *(N/A)* .... 103
RAA13. REPORTING HOST GOVERNMENT TAXES (DECEMBER 2014) .... 103
RAA14. FOREIGN GOVERNMENT DELEGATIONS TO INTERNATIONAL CONFERENCES (JUNE 2012) .... 104
RAA15.CONSCIENCE CLAUSE IMPLEMENTATION (ASSISTANCE) (FEBRUARY 2012) *(N/A)* .... 104
RAA16.CONDOMS (ASSISTANCE) (SEPTEMBER 2014) *(N/A)* .... 104

RAA17.PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING (ASSISTANCE) (SEPTEMBER 2014) *(N/A)* 104
RAA18. USAID DISABILITY POLICY - ASSISTANCE (DECEMBER 2004) ........ 104
RAA19. STANDARDS FOR ACCESSIBILITY FOR THE DISABLED IN USAID ASSISTANCE AWARDS INVOLVING CONSTRUCTION (SEPTEMBER 2004) (N/A)........ 105
RAA20. STATEMENT FOR IMPLEMENTERS OF ANTI-TRAFFICKING ACTIVITIES ON LACK OF SUPPORT FOR PROSTITUTION (JUNE 2012) *(N/A)* ........ 105
RAA21.ELIGIBILITY OF SUBRECIPIENTS OF ANTI-TRAFFICKING FUNDS (JUNE 2012) *(N/A)* ..... 105
RAA22.PROHIBITION ON THE USE OF ANTI-TRAFFICKING FUNDS TO PROMOTE, SUPPORT, OR ADVOCATE FOR THE LEGALIZATION OR PRACTICE OF PROSTITUTION (JUNE 2012) *(N/A)* ...... 105
RAA23. UNIVERSAL IDENTIFIER AND SYSTEM OF AWARD MANAGEMENT (JULY 2015).......... 105
RAA24.REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION (DECEMBER 2014) ........ 107
RAA25.PATENT REPORTING PROCEDURES (DECEMBER 2014)........ 110
RAA26.ACCESS TO USAID FACILITIES AND USAID'S INFORMATION SYSTEMS (AUGUST 2013*)* *(N/A)* ........ 110
RAA27. CONTRACT PROVISION FOR DBA INSURANCE UNDER RECIPIENT PROCUREMENTS (DECEMBER 2014)........ 110
RAA28. AWARD TERM AND CONDITION FOR RECIPIENT INTEGRITY AND PERFORMANCE MATTERS (APRIL 2016) ........ 111
RAA29. PROTECTING LIFE IN GLOBAL HEALTH ASSISTANCE (MAY 2019)........ 113
**ATTACHMENT D - BRANDING STRATEGY AND MARKING PLAN ........ 122**

## ATTACHMENT A – THE SCHEDULE

### A.1 PURPOSE OF AWARD

The purpose of this Cooperative Agreement is to provide support for the program described in Attachment B to this Cooperative Agreement entitled "National Health Technical Assistance Program (NHTAP)".

The recipient is responsible for ensuring the achievement of the program and using its unique combination of staff, facilities, and experience. The Recipient has the primary responsibility for the efficient and effective administration of the award through the application of sound organization and management practices. The Recipient will assume responsibility for administering Federal funds in a manner consistent with underlying agreements, program, and the terms and conditions of this award.

### A.2 PERIOD OF AWARD

(a) The effective date of this Agreement is July 10, 2020, and the estimated completion date is July 9, 2025.

(b) Subject to the terms and conditions of this Agreement, allowable costs incurred by the Recipient will be reimbursable during the period specified in paragraph (a) above.

(c) Funds obligated hereunder are anticipated to be sufficient through approximately March 30, 2022.

### A.3 AMOUNT OF AWARD AND PAYMENT

(a) The Total Estimated Amount (TEA) of this Cooperative Agreement for the period as set forth in Section A.2 (a) above is $117,000,000.00.

(b) USAID hereby obligates the amount of $30,600,000.00 for program expenditures during the period set forth in A.2(c) above and as shown in the Budget below. The Recipient will be given written notice by the Agreement Officer if additional funds will be added. USAID is not obligated to reimburse the Recipient for the expenditure of amounts in excess of the total obligated amount.

(c) Payment shall be made to the Recipient through Letter of Credit in accordance with the procedures set forth in 2 CFR 200.305.

.

(d) Until such time as the obligated amount must equal the total estimated amount of this Award, additional increments of funds may be obligated by USAID through a unilateral modification to this Award, subject to availability of funds, successful performance by the Recipient, evaluation of the program, and requirement of 2 CFR 200.308.

(e) The Recipient is required to notify the Agreement Officer in writing whenever it has reason to believe that the costs it expects to incur under this award in the next 60 days will exceed 75 percent of the total obligated amount.

## ATTACHMENT C – STANDARD PROVISIONS

### *MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS*

### M1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (DECEMBER 2014)

a. All provisions of 2 CFR 200 and 2 CFR 700 and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients which meet the definition of "Recipient" in part 200.86, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.
b. For any subawards made with Non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

### M2. INELIGIBLE COUNTRIES (MAY 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

### M3. NONDISCRIMINATION (JUNE 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

### M4. AMENDMENT OF AWARD (JUNE 2012)

This award may only be amended in writing, by formal amendment or letter, signed by the Agreement Officer (AO), and in the case of a bilateral amendment, by the AO and an

U.S. Department of State

# FEDERAL ASSISTANCE AWARD

| | |
|---|---|
| 1. Recipient Name<br>SAVE THE CHILDREN FEDERATION, INC. DBA SAVE THE CHILDREN | 2. Assistance Type:<br>☒ Cooperative Agreement<br>☐ Fixed Amount Award<br>☐ Grant<br>☐ Property Grant<br>☐ Voluntary Contribution |
| 3. Address<br>501 KINGS HWY E STE 400<br>FAIRFIELD, CT<br>06825-4861<br>USA | |
| 4. Recipient POC: DENISE SCHROEDER<br>Phone Number: 2027941790<br>Email: dschroeder@savechildren.org | |

| | | |
|---|---|---|
| 5. Type of Entity<br>U.S. Non-Profit Organization | 6. Unique Entity Identifier<br>V2BDJK5JZU56 | 7. EIN/ TIN<br>********** |
| 8. Assistance Listing Number<br>19.517 | 9. Statutory Authority for Assistance<br>Migration/Refugee Act | 10. Award Number<br>SPRMCO24CA0152 |
| 11. Period of Performance<br>Start Date 2024-09-15 | End Date 2025-09-14 | 12. Amendment Number |
| 13. Accounting and Appropriation Data<br>1900-2024--19___X11430I10-1037-PRM---SPRMCO24CA0152-4122-RPNEA001-031000--PRMOTRCR---2024FDSTRRM5220-SPRMCO24CA0152-M-EGY-HA.1 | $1,200,000.00 | 14. Funds Certified By<br>*Melony Hawkins*<br>Melony Hawkins |

Funding Distribution

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | | $1,200,000.00 | $1,200,000.00 |
| Recipient Share of Costs | | $0.00 | $0.00 |
| Total Costs | | $1,200,000.00 | $1,200,000.00 |

16. Purpose of the Federal Award Activity

Recently arrived and existing vulnerable refugees, asylum-seekers, and host community children and their families in Aswan and greater Cairo can meet urgent and basic needs.

17. Specific Award Conditions

☐ Attached

Agreement

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| | | | |
|---|---|---|---|
| 18a. Recipient Name Jody Leigh Yasinowsky | | 19a. Grants Officer Name Noorullah Ahmadzai | |
| 18b. Recipient Signature<br>*Jody Leigh Yasinowsky (electronically signed)* | | 19b. Grants Officer Signature<br>*Noorullah Ahmadzai (electronically signed)* | |
| 18c. Title<br>Head of Humanitarian Response | 18d. Date (dd-mmm-yyyy)<br>2024-09-11 | 19c. Bureau/Office/Post<br>BUREAU OF POPULATION, REFUGEES AND MIGRATION (PRM) | 19d. Date (dd-mmm-yyyy)<br>2024-08-28 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here:

U.S. STATE OF DEPARTMENT
AWARD PROVISION

During the period of performance, the Recipient must comply with:

- The Award Provisions below
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at:https://www.state.gov/about-us-office-of-the-procurement-executive/
- The applicable sections of 2 CFR §200 and 2 CFR §600 and
- All assurances and certifications made during the application process.

1) FEDERAL AWARD IDENTIFICATION NUMBER (FAIN):

SPRMCO24CA0152

2) FEDERAL SHARE OF AWARD:

$(USD)1,200,000.00

3) PURPOSE AND OBJECTIVES OF AWARD:

1. Purpose:

SAVE THE CHILDREN FEDERATION, INC. (hereinafter referred to as the Recipient), is hereby provided a federal award, the purpose of which is to:

Provide "FORSA X: Empowering civil society to address newly arrived and existing refugees and host communities' multidimensional vulnerabilities through Protection, Education, and Health services in Egypt". The recipient shall support recently arrived and existing vulnerable refugees, asylum-seekers, and host community children and their families in Aswan and greater Cairo can meet their urgent and basic needs through the delivery of quality services in CP, education, MHPSS, and health, provided by strong and sustainable civil society organizations in Egypt in accordance with its proposal (Attachment A to this award).

The Recipient shall carry out this award in accordance with its proposal dated 2024-05-15 and any revisions to which both parties agree to in writing.

The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

2. Objectives and Expected Outcomes: The Recipient agrees to perform the program and meet the specific objectives below:

The Recipient agrees to the Objectives and Indicators detailed within the attached Proposal for PRM Funding – Section 5 within Attachment A to this award.

4) CONTACT INFORMATION:

a. Grants Officer:

- Name: Noorullah Ahmadzai
- Bureau/Mission: Department of State - Bureau of Population, Refugees and Migration
- Section:
- Address: 2025 E St NW 8th Floor, 20006
- Telephone: +1 202-571-4923
- Email: ahmadzain@state.gov

b. Grants Officer Representative:

- Name: KAREN TAYLOR
- Bureau/Mission: Department of State - Bureau of Population, Refugees and Migration
- Section:
- Address: 2025 E St NW 8th Floor, 20006
- Telephone: (202) 213 1687
- Email: taylorke@state.gov

5) AUTHORIZED BUDGET SUMMARY:
Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

| **Budget Category** | **New Costs** | **Prior Costs** | **Total Costs** |
|---|---|---|---|
| a) Personnel | $217,750.00 | $0.00 | $217,750.00 |
| b) Fringe Benefits | $79,930.00 | $0.00 | $79,930.00 |
| c) Travel | $42,516.00 | $0.00 | $42,516.00 |
| d) Equipment | $0.00 | $0.00 | $0.00 |
| e) Supplies | $1,500.00 | $0.00 | $1,500.00 |
| f) Contractual | $634,497.00 | $0.00 | $634,497.00 |
| g) Construction | $0.00 | $0.00 | $0.00 |

| Budget Category | New Costs | Prior Costs | Total Costs |
|---|---|---|---|
| h) Other Direct Costs | $82,401.00 | $0.00 | $82,401.00 |
| i) Total Direct Costs (Lines a-h) | $1,058,594.00 | $0.00 | $1,058,594.00 |
| j) Indirect Costs | $141,406.00 | $0.00 | $141,406.00 |
| k) US Share of Costs (Lines i-j) | $1,200,000.00 | $0.00 | $1,200,000.00 |
| l) Recipient Share of Costs | $0.00 | $0.00 | $0.00 |

6) INDIRECT COSTS:

| Type | Rate (%) | Applicable to |
|---|---|---|
| Provisional | 22.84% | See attached NICRA |

The base of application for the rate(s) above is defined in the Recipient's Negotiated Indirect Cost Rate Agreement dated 2023-05-01.

7) PRE-AWARD COSTS:

N/A

8) PROGRAM INCOME:

Deduction: Any program income earned by the Recipient as a result of this award and during the period of performance must be deducted from the total allowable costs in order to determine the net allowable costs for the award.

9) COST SHARING:

N/A

10) SUBRECIPIENTS:

Subawards not included in the Recipient's approved budget must be submitted to the Grants Officer prior to execution in order to determine cost allowability.

All subawards must comply with the requirements of [2 CFR §200.332—Requirements for pass-through entities](#).

11) PAYMENTS:

Payments under this award will be made through the U.S. Department of Health and Human Services (HHS) Payment Management System (PMS). Unless otherwise stipulated, the Recipient may request payments on a reimbursement or advance basis. Instructions for requesting payments are available at: https://pms.psc.gov/

U.S. DEPARTMENT OF STATE

# STANDARD TERMS AND CONDITIONS FOR FEDERAL AWARDS

*EFFECTIVE OCTOBER 21, 2020*


* **A.** Introduction ..... **02**
* **B.** Order of Precedence ..... **02**
* **C.** Applicability ..... **02**
* **D.** Department of State Responsibilities ..... **03**
**E.** Recipient Responsibilities and Compliance with Federal Requirements ..... **03**
**F.** Universal Identifier and System of Award Management ..... **04**
**G.** Reporting Subaward and Executive Compensation Information ..... **04**
* **H.** Award Term for Trafficking in Persons ..... **04**
* **I.** Never Contract with the Enemy ..... **04**
* **J.** Nonprocurement Debarment and Suspension ..... **05**
**K.** Governmentwide Requirements for Drug-Free Workplace ..... **05**
* **L.** Domestic Preference for Procurements ..... **05**
**M.** Prior Approval Requirements ..... **06**
* **N.** Branding and Marking ..... **06**
* **O.** Government-financed Air Transportation ..... **07**
* **P.** Mandatory Disclosure ..... **07**
* **Q.** Conflict of Interest ..... **07**
* **R.** Restrictions on Lobbying ..... **08**
* **S.** Prohibition Against Assignment ..... **08**
**T.** Indirect Costs ..... **09**
**U.** Audits ..... **09**
* **V.** Termination ..... **09**
* **W.** Appeals ..... **10**
**X.** Closeout ..... **10**
* **Y.** Nondiscrimination in Department of State Programs ..... **11**
* **Z.** Prohibition of Assistance to Drug Traffickers ..... **12**
* **AA.** Prohibition on Use of Funds for Performance or Research Respecting Abortions or Involuntary Sterilization ..... **12**
* **BB.** Policy Guidance ..... **12**
Appendix 1 ..... **13**
Appendix 2 ..... **14**
* Appendix 3 ..... **17**
Appendix 4 ..... **19**


**Applicable to Awards to Individuals*

## A. INTRODUCTION

These Standard Terms and Conditions for Federal Awards outline the Department of State's mandatory award terms as required by Title 2—Grants and Agreements, of the Code of Federal Regulations. Certain applicable Federal administrative standards are incorporated by reference. Electronic copies containing the complete text of the Code of Federal Regulations are available at https://www.ecfr.gov.

The recipient shall provide the principal investigator(s) or project director(s) with a copy of these terms and conditions, including the award provisions, and any subsequent changes to the award. Electronic copies of these Terms and Conditions are publicly available at https://www.state.gov/about-us-office-of-the-procurement-executive/.

These term and conditions may be duplicated, copied or otherwise reproduced as appropriate.

## B. ORDER OF PRECEDENCE

In the event of any inconsistency between provisions of the award, the inconsistency will be resolved by giving precedence in the following order:

(1) Applicable laws and statutes of the United States, including any specific legislative provisions mandated in the statutory authority for the award.

(2) Code of Federal Regulations (CFR)

(3) Standard Terms and Conditions

(4) Award Provisions

(5) Other award documents and attachments

## C. APPLICABILITY

| Organization Type | Applicable Administrative Requirements |
|---|---|
| Domestic Non-federal entity (including state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization) | • 2 CFR 200: Subparts A through F<br>• 2 CFR 600 & 601 |
| Foreign Non-Profit Organization | • 2 CFR 200: Subparts A through E<br>• 2 CFR 600 & 601 |
| Domestic & Foreign For-Profit Organization | • 2 CFR 200: Subparts A through D<br>• 2 CFR 600 & 601<br>• 48 CFR Part 30 & 31 |
| Individuals | • None |
| Foreign Public Entities<br>(Including Public International Organizations) | • None |

## T. INDIRECT COSTS

A non-profit organization which has not previously established an indirect cost rate with a Federal agency, that believes the Department should be its cognizant agency, shall submit its initial indirect cost proposal immediately after the organization is advised that the award will be made and, in no event, later than three months after the effective date of the award. When requested by the recipient, the GO will provide instructions on how to submit the indirect cost rate proposal.

## U. AUDITS

All U.S. recipients (not including for-profit organizations) that expend $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year in accordance with the provisions of 2 CFR Part 200 Subpart F. In addition, the recipients are subject to the audit requirements found in the Single Audit Act of 1984, 31 U.S.C. 7501-7506. The cost of an audit may be charged to the award in accordance with 2 CFR 200.425.

All foreign recipients that expend $750,000 or more during the recipient's fiscal year in Department of State awards must have a single or program-specific audit conducted for that year in accordance with these terms and conditions. In the event the recipient undergoes an audit for another Federal agency, a second audit does not need to be procured so long as the Department's funding was analyzed under the same audit. A program-specific audit means an audit of one Federal award program. Single audit means an audit that includes both the recipient's financial statements and the Department awards received to be conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

The audit must be independently and professionally executed in accordance with GAGAS either prescribed by a government's Supreme Audit Institution with auditing standards approved by the Comptroller General of the United States, or in accordance with the host country's laws or adopted by the host country's public accountants or associations of public accountants, together with generally accepted international auditing standards. However, foreign entity audits consistent with International Standards for Auditing or other auditing standards are acceptable with the GO's approval.

The Department and its authorized representatives have the legally enforceable right to examine, audit, and copy, at any reasonable time, all records in the Department's possession pertaining to the award. Furthermore, the Inspector General or any of his or her duly authorized representatives shall have access to any pertinent books, documents, papers and records of the recipient. Information accessible to the Inspector General includes written, printed, recorded, produced, or reproduced by any mechanical, magnetic, or other process or medium. The Department reserves the right to make audits, inspections, excerpts, transcriptions or other examinations as authorized by law of the recipient's documents and facilities.

## V. TERMINATION

In compliance with 2 CFR 200.340, any award may be terminated in whole or in part as follows:

(1) By the Department, if the recipient fails to comply with the terms and conditions of the award;

(2) By the Department, to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities;

(3) By the Department with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

(4) By the recipient upon sending to the Department GO written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Department determines in the case of partial termination that the reduced or modified portion of the award will not accomplish the purposes for which the award was made, the Department may terminate the award in its entirety; or

(5) By the Department pursuant to termination provisions included in the award provisions.

## W. APPEALS

If the recipient fails to comply with Federal statutes, regulations or the terms and conditions of the award, the GO may take appropriate action including, but not limited to, withholding payments, disallowing costs, suspending or terminating the award, or initiating suspension and debarment proceedings.

In accordance with 2 CFR 200.341, the GO will provide the recipient an opportunity to object and provide information and documentation challenging the action. The recipient has 30 days after receiving the written notification to submit its appeal. The recipient's appeal should contain:

A cover letter with a brief statement of the recipient's argument and the disputed factual, legal, or other issues.

(1) the date the recipient received the GO's decision;

(2) the amount of disallowed costs in dispute (if applicable); and

(3) any other relevant documents.

## X. CLOSEOUT

In accordance with 2 CFR 200.345, the closeout of the award does not affect any of the following:

(1) the right of the Department to disallow costs and recover funds on the basis of a later audit or other review.

(2) The requirement for the recipient to return any funds due as a result of later refunds, corrections, or other transactions including final indirect cost rate adjustments.

# Grant and Cooperative Agreement

CHOOSE ONE:
[X] COOPERATIVE AGREEMENT
[ ] GRANT

CHOOSE ONE: [ ] EDUCATION [ ] FACILITIES [X] RESEARCH [ ] SDCR [ ] TRAINING

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE | 4. COMPLETION DATE |
|---|---|---|---|
| 7200AA20LA00004 | | 08/07/2020 | |

5. ISSUED TO
NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip)
SAVE THE CHILDREN
Attn: David Barth
501 KINGS HWY E STE 400
FAIRFIELD CT 06825-4861

6. ISSUED BY USAID M/OAA
**Mailing Address:** Office of Acquisition & Assistance
1300 Pennsylvania Avenue, NW, UA
Washington DC 20523-1000

7. TAXPAYER IDENTIFICATION NO. (TIN)

8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO.

9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*)

10. RESEARCH, PROJECT OR PROGRAM TITLE
Resilience Evaluation Analysis and Learning (REAL 2)

11. PURPOSE
See Schedule

12. PERIOD OF PERFORMANCE (*Approximately*)
09/01/2020 through 08/31/2025

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $19,499,932.00 | THIS ACTION | $4,000,000.00 |
| CASH SHARE | $0.00 | **TOTAL** | $4,000,000.00 |
| NON-CASH SHARE | $0.00 | | |
| RECIPIENT SHARE | $0.00 | | |
| **TOTAL** | $19,499,932.00 | | |

14. ACCOUNTING AND APPROPRIATION DATA

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| REQ-BFS-20-000023 | | | |
| | | | |

15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | | | | |
| NEGOTIATOR | | | | |
| ADMINISTRATOR | | | | |
| PAYMENTS | | | | |

16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :
The Foreign Assistance Act of 1961, as amended and Executive Order 11223.

17. APPLICABLE STATEMENT(S), IF CHECKED:
[ ] NO CHANGE IS MADE TO EXISTING PROVISIONS
[X] FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT

18. APPLICABLE ENCLOSURE(S), IF CHECKED:
[X] PROVISIONS [X] SPECIAL CONDITIONS
[ ] REQUIRED PUBLICATIONS AND REPORTS

| **UNITED STATES OF AMERICA** | | **COOPERATIVE AGREEMENT RECIPIENT** | |
|---|---|---|---|
| CONTRACTING/GRANT OFFICER | DATE | AUTHORIZED REPRESENTATIVE | DATE |
| Paul Burford | 08/07/2020 | | |

# Grant and Cooperative Agreement

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | A&A Specialist: Teena Curry, M/OAA/RFS<br><br>11. PURPOSE:<br>To provide 1)evidence and learning to inform design and implementation of USAID-funded resilience investments for the benefit of implementers and public good and b) continued support for the broader development community, including host governments. The specific activities are linked to: a) generation of key resilience evidence; b) continued thought leadership on resilience measurement and analysis in frontier areas; and c) collaboration, learning, and adapting to enhance implementation of resilience programming.<br>Delivery Location Code: WASHINGTON RRB<br>RRB<br>USAID<br>1300 Pennsylvania Ave, NW<br>Washington, DC 20523-7101<br><br>BBFY: 2019 EBFY: 2020 Fund: DV-GFSI OP: BFS/CSI Prog Area: EG.3 Dist Code: BFS-ER BGA: 997 SOC: 4100201<br>Period of Performance: 09/01/2020 to 08/31/2025 | | | | |
| 0001 | The purpose of (Resilience Evaluation Analysis and Learning) REAL 2.0 is based on the continued need for: a) evidence and learning to inform design and implementation of USAID-funded resilience investments for the benefit of implementers and public good and b) continued support for the broader development community, including host governments. The specific activities are linked to: a) generation of key resilience evidence; b) continued thought leadership on resilience measurement and analysis in frontier areas; and c) collaboration,<br>Continued ... | | | | |

# Grant and Cooperative Agreement

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | learning, and adapting to enhance implementation of resilience programming | | | | |
| | The potential objectives include the following: | | | | |
| | Serve as key technical advisor to IDEAL and implementing partners in resilience research and data translation | | | | |
| | Generate greater understanding of the value of applying a resilience approach in frontier areas (i.e. conflict analysis, climate change adaptation, measuring systems change, trauma and mental health, health system strengthening, social protection.) | | | | |
| | Test/scale accessible resilience measurement approaches for programs, Missions and implementing partners to enhance learning and decision-making | | | | |
| | engage in and create opportunities for collaboration, learning and adaptation among missions, implementing partners and other mechanisms as appropriate | | | | |
| | Conduct user-centered research into knowledge gaps/ program-based approaches to resilience-building to inform decision-making (bottom-up processes) | | | | |
| | A&A Specialist: Teena Curry, M/OAA/RFS | | | | |

August 3, 2020
Mr. Josh DeWald
Sr. Director, Food Security and Livelihoods
Save the Children
501 KINGS HWY E STE 400
FAIRFIELD, CT 06825
Tele: (202) 794 – 1729
Email: JDeWald@savechildren.org

Subject: Cooperative Agreement No. 7200AA20LA00004

Program Title: Resilience, Evaluation, Analysis and Learning 2 (REAL 2)

Dear Mr. DeWald,

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development (USAID) hereby awards to Save the Children hereinafter referred to as the "Recipient," the sum of $19,499,932.00 to implement the "REAL 2" program as described in the Schedule of the award and in Attachment B, entitled "Program Description".

This Cooperative Agreement is effective and obligation is made as of August 3, 2020 and shall apply to expenditures made by the Recipient in furtherance of program objectives during the period beginning September 1, 2020 and ending August 31, 2025. USAID will not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Cooperative Agreement is made to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in Attachments A - C, all of which have been agreed to by your organization.

Please sign this letter to acknowledge your receipt of the Cooperative Agreement and return it to the Agreement Officer.

Sincerely yours,

__________________
Paul Burford, M/OAA/BFS
Agreement Officer

Attachments:

Schedule
Program Description
Standard Provisions

ACKNOWLEDGED:

By: ______________________________

Title: ______________________________

Date: ______________________________

GENERAL

USAID Amount Obligated by this Action: $4,000,000.00
Total Estimated USAID Amount: $19,499,932.00
Activity Title: "REAL 2"
USAID Technical Office: BFS/C4R
Tax I.D. Number: 06-0726487
DUNS Number: 072129919

SPECIFIC ACCOUNTING AND APPROPRIATIONS DATA

| | |
|---|---|
| Accounting Template | BFS PRG Funds |
| BBFY | 2019 |
| EBFY | 2020 |
| Fund | DV-GFSI |
| Operating Unit (OP) | BFS/CSI |
| Program Area | EG.3 |
| Distribution Code | BFS-ER |
| BGA | 997 |
| SOC | 4100201 |
| Obligated Amount | $4,000,000 |

PAYMENT OFFICE

U.S. Agency for International Development
Office of the Chief Financial Officer
M/CFO/CMP
1300 Pennsylvania Avenue, NW
USAID Annex
Washington, DC 20523.

Electronic Invoices: ei@usaid.gov
TABLE OF CONTENTS

ATTACHMENT A: SCHEDULE……………………………………………………………8
ATTACHMENT B: PROGRAM DESCRIPTION……………………………………...16
ATTACHMENT C: STANDARD PROVISIONS………………………………………42
ATTACHMENT A: SCHEDULE

A.1 Purpose of Cooperative Agreement

The purpose of this Cooperative Agreement is to provide support for the program described in Attachment B "Program Description" to this Cooperative Agreement.

A.2 Period of Cooperative Agreement

The effective date of this Cooperative Agreement is August 3, 2020. The period of performance is estimated to run September 1, 2020 through August 31, 2025.

A.3 Amount of Cooperative Agreement, Obligated Amount, and Payment

The total estimated amount of this Cooperative Agreement for the period shown in A.2 above is $19,499,932.00.

USAID hereby obligates the amount of $4,000,000.00 for program expenditures during the period set forth in A.2 above and as shown in the Budget in Section A.4. The Recipient will be given written notice by the Agreement

A Knowledge Management and Resilience Learning Journeys Lead will support all administrative functions with relation to award management, as well as serve as Mercy Corps' knowledge management coordinator on the award. This role will also support the development of inputs into the learning journey processes, including supporting development of learning agendas, guiding multi-stakeholder discussions, and providing inputs into key capacity-building needs identified by missions, including resilience foundations.

Finally, a Senior Finance Advisor will support financial management of the award and will be responsible for direct function financial and compliance sub-award management processes as defined by the Mercy Corps Field Finance Manual, USAID policies and procedures, and sub-award requirements.

ATTACHMENT C: STANDARD PROVISIONS

C1. APPLICABILITY OF 2 CFR 200 and 2 CFR 700 (DECEMBER 2014)

a. All provisions of 2 CFR 200, 2 CFR 700, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients which meet the definition of "Recipient" in part 2 CFR 200.86, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with Non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

C2. INELIGIBLE COUNTRIES (MAY 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

C3. NONDISCRIMINATION (JUNE 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee.

In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

U.S. Department of State

# FEDERAL ASSISTANCE AWARD

**1. Recipient Name**
AMERICAN BAR ASSOCIATION
DBA AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUCATION

**2. Assistance Type:**
- ☐ Cooperative Agreement
- ☐ Fixed Amount Award
- ☑ Grant
- ☐ Property Grant
- ☐ Voluntary Contribution

**3. Address**
1050 CONNECTICUT AVE., N.W., SUITE 400
WASHINGTON, DC 20036
UNITED STATES

**4. Recipient POC:** AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUC
Phone Number 202/662-1988
Email Vladimir.Gurin@americanbar.org

| 5. Type of Entity | 6. Unique Entity Identifier | 7. EIN/ TIN |
|---|---|---|
| U.S. Non-Profit Organization (501(c) (3)) | D2KUZ2RYLJJ6 | ********** |

| 8. Assistance Listing Number | 9. Statutory Authority for Assistance | 10. Award Number |
|---|---|---|
| 19.345 | Foreign Assistance Act | SAQMIP22GR0055 |

**11. Period of Performance**
Start Date 01-Oct-2022 End Date 31-Mar-2025

**12. Amendment Number**

**13. Accounting and Appropriation Data**
1900-2021-2022-19__1211210000-1051-DRL--2762-SAQMIP22GR0055-4121------ -2022FDSTRIE7811-SAQMIP22GR0055-SDN-DR.4 $987,654.00 USD

**14. Funds Certified By**
Calvin Reaves

**Funding Distribution**

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | | $987,654.00 USD | $987,654.00 USD |
| Recipient Share of Costs | | $0.00 USD | $0.00 USD |
| Total Costs | | $987,654.00 USD | $987,654.00 USD |

**16. Purpose of the Federal Award Activity**
To strengthen tolerance and equal protection under the law for religious minorities in Sudan.

**17. Specific Award Conditions**
☑ Attached

**Agreement**

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| 18a. Recipient Name | 19a. Grants Officer Name |
|---|---|
| Vladimir Gurin | Rachel Cook |

| 18b. Recipient Signature | 19b. Grants Officer Signature |
|---|---|
| Vladimir Gurin (electronically signed) | |

| 18c. Title | 18d. Date (dd-mmm-yyyy) | 19c. Bureau/Office/Post | 19d. Date (dd-mmm-yyyy) |
|---|---|---|---|
| Director - Grant Operations and Com | 26-Aug-2022 | OFC OF PROCUREMENT EXECUTIVE (A/OPE) | 17-Aug-2022 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here: COOKR1@state.gov

# U.S. Department of State
# Award Provisions

During the period of performance, the Recipient must comply with:

- The Award Provisions below;
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at: https://www.state.gov/about-us-office-of-the-procurement-executive/
- The applicable sections of 2 CFR §200 and 2 CFR §600; and
- All assurances and certifications made during the application process.

## 1) FEDERAL AWARD IDENTIFICATION NUMBER (FAIN):

**SAQMIP22GR0055**

## 2) FEDERAL SHARE OF AWARD:

**$987,654.00 USD**

## 3) PURPOSE AND OBJECTIVES OF AWARD:

**a. Purpose:**

AMERICAN BAR ASSOCIATION (hereinafter referred to as the Recipient), is hereby provided a federal award, the purpose of which is to:

Strengthen tolerance and equal protection under the law for religious minorities in Sudan.

The Recipient shall carry out the Agreement in accordance with its proposal dated: 17-Jun-2022, and any revisions to which both parties agree to in writing. The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

**b. Objectives and Expected Outcomes:** The Recipient agrees to perform the program and meet the specific objectives below:

See attached Statement of Work (SOW).

## 4) CONTACT INFORMATION:

a. Grants Officer:

| | |
|---|---|
| Name: | Rachel Cook |
| Post/Bureau: | OFFICE OF ACQUISITION MANAGEMENT (A/LM/AQM) |
| Section: | |
| Street Address: | 1701 N. FT MYER DR<br>RM 1802 |
| Zip Code: | 22209 |
| E-mail: | COOKR1@state.gov |
| Telephone: | 703-875-6230 |

b. Grants Officer Representative:

| | |
|---|---|
| Name: | Mary Gunderson |
| Post/Bureau: | BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR (DRL) |
| Section: | |
| Street Address: | 2401 E Street, DS-01 Room L419<br>ATTN: Federal Assistance (DRL/GP) |
| Zip Code: | 20037 |
| E-mail: | GundersonME@state.gov |
| Telephone: | |

## 5) AUTHORIZED BUDGET SUMMARY:

Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

| No | Budget Categories | Prior Costs | New Costs | Total Costs |
|---|---|---|---|---|
| 1 | Personnel | $0.00 | $239972.00 | $239972.00 |
| 2 | Fringe Benefits | $0.00 | $26175.00 | $26175.00 |
| 3 | Travel | $0.00 | $61119.00 | $61119.00 |
| 4 | Equipment | $0.00 | $0.00 | $0.00 |
| 5 | Supplies | $0.00 | $39229.00 | $39229.00 |
| 6 | Contractual | $0.00 | $185000.00 | $185000.00 |
| 7 | Construction | $0.00 | $0.00 | $0.00 |
| 8 | Other Direct Costs | $0.00 | $212075.00 | $212075.00 |
| 9 | Total Direct Costs (Lines 1-8) | $0.00 | $763570.00 | $763570.00 |
| 10 | Indirect Costs | $0.00 | $224084.00 | $224084.00 |
| 11 | U.S. Share of Costs (Lines 9-10) | $0.00 | $987654.00 | $987654.00 |
| 12 | Recipient Share of Costs | $0.00 | $0.00 | $0.00 |

## 6) INDIRECT COSTS:

| Type | Rate % | Applicable to |
|---|---|---|
| Predetermined | 32.62% | Domestic Fringe Benefits |
| Predetermined | 26.03% | International Fringe Benefits |
| Predetermined | 8.84% | Domestic Grant Overhead |
| Predetermined | 28.93% | International Grant Overhead |
| Predetermined | 15.53% | General & Administrative |

The base of application for the rate(s) above is defined in the Recipient's Negotiated Indirect Cost Rate Agreement dated 03-Mar-2021.

## 7) PRE-AWARD COSTS:

N/A

## 8) PROGRAM INCOME:

Deduction: Any program income earned by the Recipient as a result of this award and during the period of performance must be deducted from the total allowable costs in order to determine the net allowable costs for the award.

## 9) COST SHARING:

N/A

U.S. DEPARTMENT OF STATE

# STANDARD TERMS AND CONDITIONS FOR FEDERAL AWARDS

*EFFECTIVE OCTOBER 21, 2020*


| | | | |
|---|---|---|---|
| * | **A.** | Introduction | **02** |
| * | **B.** | Order of Precedence | **02** |
| * | **C.** | Applicability | **02** |
| * | **D.** | Department of State Responsibilities | **03** |
| | **E.** | Recipient Responsibilities and Compliance with Federal Requirements | **03** |
| | **F.** | Universal Identifier and System of Award Management | **04** |
| | **G.** | Reporting Subaward and Executive Compensation Information | **04** |
| * | **H.** | Award Term for Trafficking in Persons | **04** |
| * | **I.** | Never Contract with the Enemy | **04** |
| * | **J.** | Nonprocurement Debarment and Suspension | **05** |
| | **K.** | Governmentwide Requirements for Drug-Free Workplace | **05** |
| * | **L.** | Domestic Preference for Procurements | **05** |
| | **M.** | Prior Approval Requirements | **06** |
| * | **N.** | Branding and Marking | **06** |
| * | **O.** | Government-financed Air Transportation | **07** |
| * | **P.** | Mandatory Disclosure | **07** |
| * | **Q.** | Conflict of Interest | **07** |
| * | **R.** | Restrictions on Lobbying | **08** |
| * | **S.** | Prohibition Against Assignment | **08** |
| | **T.** | Indirect Costs | **09** |
| | **U.** | Audits | **09** |
| * | **V.** | Termination | **09** |
| * | **W.** | Appeals | **10** |
| | **X.** | Closeout | **10** |
| * | **Y.** | Nondiscrimination in Department of State Programs | **11** |
| * | **Z.** | Prohibition of Assistance to Drug Traffickers | **12** |
| * | **AA.** | Prohibition on Use of Funds for Performance or Research Respecting Abortions or Involuntary Sterilization | **12** |
| * | **BB.** | Policy Guidance | **12** |
| | | Appendix 1 | **13** |
| | | Appendix 2 | **14** |
| * | | Appendix 3 | **17** |
| | | Appendix 4 | **19** |


**Applicable to Awards to Individuals* 

## A. INTRODUCTION

These Standard Terms and Conditions for Federal Awards outline the Department of State's mandatory award terms as required by Title 2—Grants and Agreements, of the Code of Federal Regulations. Certain applicable Federal administrative standards are incorporated by reference. Electronic copies containing the complete text of the Code of Federal Regulations are available at https://www.ecfr.gov.

The recipient shall provide the principal investigator(s) or project director(s) with a copy of these terms and conditions, including the award provisions, and any subsequent changes to the award. Electronic copies of these Terms and Conditions are publicly available at https://www.state.gov/about-us-office-of-the-procurement-executive/.

These term and conditions may be duplicated, copied or otherwise reproduced as appropriate.

## B. ORDER OF PRECEDENCE

In the event of any inconsistency between provisions of the award, the inconsistency will be resolved by giving precedence in the following order:

(1) Applicable laws and statutes of the United States, including any specific legislative provisions mandated in the statutory authority for the award.

(2) Code of Federal Regulations (CFR)

(3) Standard Terms and Conditions

(4) Award Provisions

(5) Other award documents and attachments

## C. APPLICABILITY

| Organization Type | Applicable Administrative Requirements |
|---|---|
| Domestic Non-federal entity (including state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization) | • 2 CFR 200: Subparts A through F<br>• 2 CFR 600 & 601 |
| Foreign Non-Profit Organization | • 2 CFR 200: Subparts A through E<br>• 2 CFR 600 & 601 |
| Domestic & Foreign For-Profit Organization | • 2 CFR 200: Subparts A through D<br>• 2 CFR 600 & 601<br>• 48 CFR Part 30 & 31 |
| Individuals | • None |
| Foreign Public Entities (Including Public International Organizations) | • None |

## T. INDIRECT COSTS

A non-profit organization which has not previously established an indirect cost rate with a Federal agency, that believes the Department should be its cognizant agency, shall submit its initial indirect cost proposal immediately after the organization is advised that the award will be made and, in no event, later than three months after the effective date of the award. When requested by the recipient, the GO will provide instructions on how to submit the indirect cost rate proposal.

## U. AUDITS

All U.S. recipients (not including for-profit organizations) that expend $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year in accordance with the provisions of 2 CFR Part 200 Subpart F. In addition, the recipients are subject to the audit requirements found in the Single Audit Act of 1984, 31 U.S.C. 7501-7506. The cost of an audit may be charged to the award in accordance with 2 CFR 200.425.

All foreign recipients that expend $750,000 or more during the recipient's fiscal year in Department of State awards must have a single or program-specific audit conducted for that year in accordance with these terms and conditions. In the event the recipient undergoes an audit for another Federal agency, a second audit does not need to be procured so long as the Department's funding was analyzed under the same audit. A program-specific audit means an audit of one Federal award program. Single audit means an audit that includes both the recipient's financial statements and the Department awards received to be conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

The audit must be independently and professionally executed in accordance with GAGAS either prescribed by a government's Supreme Audit Institution with auditing standards approved by the Comptroller General of the United States, or in accordance with the host country's laws or adopted by the host country's public accountants or associations of public accountants, together with generally accepted international auditing standards. However, foreign entity audits consistent with International Standards for Auditing or other auditing standards are acceptable with the GO's approval.

The Department and its authorized representatives have the legally enforceable right to examine, audit, and copy, at any reasonable time, all records in the Department's possession pertaining to the award. Furthermore, the Inspector General or any of his or her duly authorized representatives shall have access to any pertinent books, documents, papers and records of the recipient. Information accessible to the Inspector General includes written, printed, recorded, produced, or reproduced by any mechanical, magnetic, or other process or medium. The Department reserves the right to make audits, inspections, excerpts, transcriptions or other examinations as authorized by law of the recipient's documents and facilities.

## V. TERMINATION

In compliance with 2 CFR 200.340, any award may be terminated in whole or in part as follows:

(1) By the Department, if the recipient fails to comply with the terms and conditions of the award;

(2) By the Department, to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities;

(3) By the Department with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

(4) By the recipient upon sending to the Department GO written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Department determines in the case of partial termination that the reduced or modified portion of the award will not accomplish the purposes for which the award was made, the Department may terminate the award in its entirety; or

(5) By the Department pursuant to termination provisions included in the award provisions.

## W. APPEALS

If the recipient fails to comply with Federal statutes, regulations or the terms and conditions of the award, the GO may take appropriate action including, but not limited to, withholding payments, disallowing costs, suspending or terminating the award, or initiating suspension and debarment proceedings.

In accordance with 2 CFR 200.341, the GO will provide the recipient an opportunity to object and provide information and documentation challenging the action. The recipient has 30 days after receiving the written notification to submit its appeal. The recipient's appeal should contain:

A cover letter with a brief statement of the recipient's argument and the disputed factual, legal, or other issues.

(1) the date the recipient received the GO's decision;

(2) the amount of disallowed costs in dispute (if applicable); and

(3) any other relevant documents.

## X. CLOSEOUT

In accordance with 2 CFR 200.345, the closeout of the award does not affect any of the following:

(1) the right of the Department to disallow costs and recover funds on the basis of a later audit or other review.

(2) The requirement for the recipient to return any funds due as a result of later refunds, corrections, or other transactions including final indirect cost rate adjustments.

U.S. Department of State

# FEDERAL ASSISTANCE AWARD

| | |
|---|---|
| 1. Recipient Name<br>AMERICAN BAR ASSOCIATION<br>DBA AMERICAN BAR ASSOCIATION FUND FOR JUSTICE AND EDUCATION | 2. Assistance Type:<br>☐ Cooperative Agreement<br>☐ Fixed Amount Award<br>☑ Grant<br>☐ Property Grant<br>☐ Voluntary Contribution |
| 3. Address<br>1050 CONNECTICUT AVE., N.W., SUITE 400<br>WASHINGTON, DC 20036<br>UNITED STATES | |
| 4. Recipient POC: VLADIMIR GURIN<br>Phone Number 2026621988<br>Email Vladimir.Gurin@americanbar.org | |

| | | |
|---|---|---|
| 5. Type of Entity<br>U.S. Non-Profit Organization (501(c) (3)) | 6. Unique Entity Identifier<br>806207841 | 7. EIN/ TIN<br>********** |
| 8. CFDA Number<br>19.703 | 9. Statutory Authority for Assistance<br>Foreign Assistance Act | 10. Award Number<br>SINLEC21GR3052 |
| 11. Period of Performance<br>Start Date 01-Feb-2021 | End Date 31-Jan-2023 | 12. Amendment Number |
| 13. Accounting and Appropriation Data<br>1900-2018-2019-1911891022000C-0261-INL--0261-SINLEC21GR3052-4121-IN41MD20---INLBL-0261920000-1---MDA-DR.1 | $1,500,000.00 USD | 14. Funds Certified By<br>[signature]<br>Kimberly E. Maine |

Funding Distribution

| 15. | Total Prior Costs | New Costs | Total Cost |
|---|---|---|---|
| U.S. Share of Costs | | $1,500,000.00 USD | $1,500,000.00 USD |
| Recipient Share of Costs | | $60,270.00 USD | $60,270.00 USD |
| Total Costs | | $1,560,270.00 USD | $1,560,270.00 USD |

16. Purpose of the Federal Award Activity
to support the continued development of the criminal justice system and actors in Moldova, and to strengthen targeted anticorruption efforts.

17. Specific Award Conditions
☐ Attached

Agreement

**The recipient agrees to execute the work in accordance with the Notice of Award, the approved application incorporated herein by reference or as attached, and 2 CFR Parts 200 and 600 including any subsequent revisions.**

| | | | |
|---|---|---|---|
| 18a. Recipient Name<br>VLADIMIR GURIN | | 19a. Grants Officer Name<br>Najar D. Starr | |
| 18b. Recipient Signature | | 19b. Grants Officer Signature<br>Najar Starr | |
| 18c. Title | 18d. Date (dd-mmm-yyyy) | 19c. Bureau/Office/Post<br>DEPARTMENT OF STATE - MGMT SYSTEMS DIV (INL/RM/MS) | 19d. Date (dd-mmm-yyyy)<br>29-Jan-2021 |

By signing this Federal award, the recipient acknowledges that it will comply with Federal regulations, the Terms and Conditions, and any Special Award Conditions associated with this award. Receipt of the recipient's signature and return of the Federal Award Coversheet is required within ten (10) business days of the Grants Officer's signature. Please return to the Grants Officer address indicated here: starrnd@state.gov

# U.S. DEPARTMENT OF STATE AWARD PROVISIONS

During the period of performance, the Recipient must comply with:

- The Award Provisions below;
- The Department of State Standard Terms and Conditions for Federal Awards, which are incorporated by reference and made part of this Federal Award. Electronic copies containing the complete text are available at: https://www.state.gov/about-us-office-of-the-procurement-executive/;
- The applicable sections of 2 CFR §200 and 2 CFR §600; and
- All assurances and certifications made during the application process.

1) FEDERAL AWARD IDENTIFICATION NUMBER (FAIN):
SINLEC21GR3052

2) FEDERAL SHARE OF AWARD:
$1,500,000.00

3) PURPOSE AND OBJECTIVES OF AWARD:

a. Purpose:
**American Bar Association Fund for Justice and Education** (hereinafter referred to as the Recipient), is hereby provided a federal award for the project entitled ***"Supporting Criminal Justice Reform and Strengthening Anticorruption Efforts in Moldova."*** The recipient shall ***support the Prosecution Service and the judiciary to increase professionalism and integrity in their ranks through expert technical assistance and training; develop and conduct innovative training to build capacity among Moldova's anticorruption and integrity agencies to investigate corruption cases and for those agencies to institute institutional reforms; work closely with the Ministry of Justice (MOJ) to increase its capacity to meaningfully drive and respond to legislative initiatives regarding criminal justice; and work with legal aid lawyers and with existing legal clinics to expand the availability of high quality legal aid to those in need.***

The Recipient shall carry out this award in accordance with its proposal dated July 3, 2020, and any revisions to which both parties agree to in writing. The Recipient's proposal and any subsequent negotiated revisions are hereby incorporated by reference.

b. Award Period of Performance:

Award Start Date: February 1, 2021
Award End Date: ***January 31, 2023***

c. Objectives and Expected Outcomes: The Recipient agrees to perform the program and meet the specific objectives below in ***ATTACHMENT A - Scope of Work.***

4) CONTACT INFORMATION:

a. Grants Officer:
Najar Starr
Department of State
Bureau of International Narcotics and Law Enforcement Affairs
INL/EX/GAPP
Email: StarrND@state.gov

b. Grants Officer Representative:
Olga Rabei-Secrieru
Department of State
Bureau of International Narcotics and Law Enforcement Affairs
INL/ADMIN
Email: RabeiO@state.gov

5) AUTHORIZED BUDGET SUMMARY:

Unless otherwise stipulated, funds provided under this award may only be expended on authorized activities which take place during the period of performance.

| Budget Categories | Amount |
|---|---|
| 1. Personnel | $148,887.00 |
| 2. Fringe Benefits | $48,567.00 |
| 3. Travel | $52,376.00 |
| 4. Equipment | --- |
| 5. Supplies | $11,697.00 |
| 6. Contractual | $359,758.00 |
| 7. Construction | --- |
| 8. Other Direct Costs | $543,059.00 |
| 9. Total Direct Costs (lines 1-8) | $1,164,344.00 |

U.S. DEPARTMENT OF STATE

# STANDARD TERMS AND CONDITIONS FOR FEDERAL AWARDS

*EFFECTIVE OCTOBER 21, 2020*


| | | | |
|---|---|---|---|
| * | **A.** | Introduction | **02** |
| * | **B.** | Order of Precedence | **02** |
| * | **C.** | Applicability | **02** |
| * | **D.** | Department of State Responsibilities | **03** |
| | **E.** | Recipient Responsibilities and Compliance with Federal Requirements | **03** |
| | **F.** | Universal Identifier and System of Award Management | **04** |
| | **G.** | Reporting Subaward and Executive Compensation Information | **04** |
| * | **H.** | Award Term for Trafficking in Persons | **04** |
| * | **I.** | Never Contract with the Enemy | **04** |
| * | **J.** | Nonprocurement Debarment and Suspension | **05** |
| | **K.** | Governmentwide Requirements for Drug-Free Workplace | **05** |
| * | **L.** | Domestic Preference for Procurements | **05** |
| | **M.** | Prior Approval Requirements | **06** |
| * | **N.** | Branding and Marking | **06** |
| * | **O.** | Government-financed Air Transportation | **07** |
| * | **P.** | Mandatory Disclosure | **07** |
| * | **Q.** | Conflict of Interest | **07** |
| * | **R.** | Restrictions on Lobbying | **08** |
| * | **S.** | Prohibition Against Assignment | **08** |
| | **T.** | Indirect Costs | **09** |
| | **U.** | Audits | **09** |
| * | **V.** | Termination | **09** |
| * | **W.** | Appeals | **10** |
| | **X.** | Closeout | **10** |
| * | **Y.** | Nondiscrimination in Department of State Programs | **11** |
| * | **Z.** | Prohibition of Assistance to Drug Traffickers | **12** |
| * | **AA.** | Prohibition on Use of Funds for Performance or Research Respecting Abortions or Involuntary Sterilization | **12** |
| * | **BB.** | Policy Guidance | **12** |
| | | Appendix 1 | **13** |
| | | Appendix 2 | **14** |
| * | | Appendix 3 | **17** |
| | | Appendix 4 | **19** |


**Applicable to Awards to Individuals*

## T. INDIRECT COSTS

A non-profit organization which has not previously established an indirect cost rate with a Federal agency, that believes the Department should be its cognizant agency, shall submit its initial indirect cost proposal immediately after the organization is advised that the award will be made and, in no event, later than three months after the effective date of the award. When requested by the recipient, the GO will provide instructions on how to submit the indirect cost rate proposal.

## U. AUDITS

All U.S. recipients (not including for-profit organizations) that expend $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year in accordance with the provisions of 2 CFR Part 200 Subpart F. In addition, the recipients are subject to the audit requirements found in the Single Audit Act of 1984, 31 U.S.C. 7501-7506. The cost of an audit may be charged to the award in accordance with 2 CFR 200.425.

All foreign recipients that expend $750,000 or more during the recipient's fiscal year in Department of State awards must have a single or program-specific audit conducted for that year in accordance with these terms and conditions. In the event the recipient undergoes an audit for another Federal agency, a second audit does not need to be procured so long as the Department's funding was analyzed under the same audit. A program-specific audit means an audit of one Federal award program. Single audit means an audit that includes both the recipient's financial statements and the Department awards received to be conducted in accordance with Generally Accepted Government Auditing Standards (GAGAS).

The audit must be independently and professionally executed in accordance with GAGAS either prescribed by a government's Supreme Audit Institution with auditing standards approved by the Comptroller General of the United States, or in accordance with the host country's laws or adopted by the host country's public accountants or associations of public accountants, together with generally accepted international auditing standards. However, foreign entity audits consistent with International Standards for Auditing or other auditing standards are acceptable with the GO's approval.

The Department and its authorized representatives have the legally enforceable right to examine, audit, and copy, at any reasonable time, all records in the Department's possession pertaining to the award. Furthermore, the Inspector General or any of his or her duly authorized representatives shall have access to any pertinent books, documents, papers and records of the recipient. Information accessible to the Inspector General includes written, printed, recorded, produced, or reproduced by any mechanical, magnetic, or other process or medium. The Department reserves the right to make audits, inspections, excerpts, transcriptions or other examinations as authorized by law of the recipient's documents and facilities.

## V. TERMINATION

In compliance with 2 CFR 200.340, any award may be terminated in whole or in part as follows:

(1) By the Department, if the recipient fails to comply with the terms and conditions of the award;

(2) By the Department, to the greatest extent authorized by law, if the award no longer effectuates the program goals or agency priorities;

(3) By the Department with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

(4) By the recipient upon sending to the Department GO written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Department determines in the case of partial termination that the reduced or modified portion of the award will not accomplish the purposes for which the award was made, the Department may terminate the award in its entirety; or

(5) By the Department pursuant to termination provisions included in the award provisions.

## W. APPEALS

If the recipient fails to comply with Federal statutes, regulations or the terms and conditions of the award, the GO may take appropriate action including, but not limited to, withholding payments, disallowing costs, suspending or terminating the award, or initiating suspension and debarment proceedings.

In accordance with 2 CFR 200.341, the GO will provide the recipient an opportunity to object and provide information and documentation challenging the action. The recipient has 30 days after receiving the written notification to submit its appeal. The recipient's appeal should contain:

A cover letter with a brief statement of the recipient's argument and the disputed factual, legal, or other issues.

(1) the date the recipient received the GO's decision;

(2) the amount of disallowed costs in dispute (if applicable); and

(3) any other relevant documents.

## X. CLOSEOUT

In accordance with 2 CFR 200.345, the closeout of the award does not affect any of the following:

(1) the right of the Department to disallow costs and recover funds on the basis of a later audit or other review.

(2) The requirement for the recipient to return any funds due as a result of later refunds, corrections, or other transactions including final indirect cost rate adjustments.

# Grant and Cooperative Agreement

CHOOSE ONE: [X] COOPERATIVE AGREEMENT [ ] GRANT

CHOOSE ONE: [X] EDUCATION [ ] FACILITIES [ ] RESEARCH [ ] SDCR [ ] TRAINING

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE | 4. COMPLETION DATE |
|---|---|---|---|
| 7200AA22CA00022 | | 09/29/2022 | 09/28/2027 |

5. ISSUED TO
NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip)
FREE RUSSIA FOUNDATION
819 SIERRA OAKS VISTA LN
SACRAMENTO CA 95864-4961

6. ISSUED BY USAID M/OAA
**Mailing Address:** Office of Acquisition & Assistance
1300 Pennsylvania Avenue, NW, UA
Washington DC 20523-1000

7. TAXPAYER IDENTIFICATION NO. (TIN)

8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO.
ND6XUKDEKRW1

9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*)
Nataliya Arno

10. RESEARCH, PROJECT OR PROGRAM TITLE
Eurasia Phoenix

11. PURPOSE
See Schedule

12. PERIOD OF PERFORMANCE (*Approximately*)
09/29/2022 through 09/28/2027

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $9,000,000.00 | THIS ACTION | $1,866,574.00 |
| CASH SHARE | $0.00 | **TOTAL** | $1,866,574.00 |
| NON-CASH SHARE | $9,000,000.00 | | |
| RECIPIENT SHARE | $0.00 | | |
| **TOTAL** | $9,000,000.00 | | |

14. ACCOUNTING AND APPROPRIATION DATA
See Schedule

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| REQ-EE-22-000011 | | | |
| | | | |

15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | | | | |
| NEGOTIATOR | Joseph Tembo | | | jtembo@usaid.gov |
| ADMINISTRATOR | Trenae Bonner | | 202-916-2764 | tbonner@usaid.gov |
| PAYMENTS | | | | |

16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :
the Foreign Assistance Act of 1961, as amended and the Federal Grant and Cooperative Agreement Act

17. APPLICABLE STATEMENT(S), IF CHECKED:
[ ] NO CHANGE IS MADE TO EXISTING PROVISIONS
[ ] FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT

18. APPLICABLE ENCLOSURE(S), IF CHECKED:
[X] PROVISIONS [ ] SPECIAL CONDITIONS
[ ] REQUIRED PUBLICATIONS AND REPORTS

| UNITED STATES OF AMERICA | | COOPERATIVE AGREEMENT RECIPIENT | |
|---|---|---|---|
| CONTRACTING/GRANT OFFICER | DATE | AUTHORIZED REPRESENTATIVE | DATE |
| Artaveya Carter | | Nataliya Arno | 09/22/2022 |

# Grant and Cooperative Agreement

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST UNIT PRICE (E) | ESTIMATED COST AMOUNT (F) |
|---|---|---|---|---|---|
| | 11. PURPOSE:<br>To stabilize and strengthen Eurasian civil society in exile, enabling it to adapt to the new operating environment and increase its ability to affect positive political and social development in Eurasia. | | | | |
| 0002 | Civil Society Activity #2<br><br>Accounting Info:<br>BBFY: 2022 EBFY: 2024 Fund: EC-UKR OP: E+E/TSO Prog Area: DR.4 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $488,551.00<br>Accounting Info:<br>BBFY: 2021 EBFY: 2022 Fund: EC OP: E+E/ENP Prog Area: DR.4 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $926,747.00<br>Accounting Info:<br>BBFY: 2022 EBFY: 2024 Fund: EC-UKR OP: E+E/TSO Prog Area: DR.5 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $128,498.00<br>Accounting Info:<br>BBFY: 2021 EBFY: 2022 Fund: EC OP: E+E/ENP Prog Area: DR.5 Dist Code: 180-REG Team/Div: E+E/TSO BGA: 180 SOC: 4100202<br>Funded: $322,778.00 | | | | 9,000,000.00 |

USAID
FROM THE AMERICAN PEOPLE

**September 29, 2022**

Nataliya Arno
President
Free Russia Foundation (FRF)
1015 15th St NW, Suite 600
Washington, DC 20005

**Cooperative Agreement Number**: 7200AA22CA00022, **Eurasia Phoenix**

Dear Ms. Arno:

Pursuant to the authority contained in the Foreign Assistance Act of 1961, as amended, the U.S. Agency for International Development ("USAID" or "Grantor") provides to **Free Russia Foundation (FRF)** ("Grantee," or "Recipient"), the sum set forth in Section A.3 of this *Agreement* to implement the project, as described in Attachment B of this Agreement entitled **Eurasia Phoenix.**

This Cooperative Agreement is effective as shown in **Section A.2** "Period of Award." Obligation is made as of the date of this agreement (see page 2) and shall apply to commitments made by the Recipient in furtherance of program objectives for the period described in Section A.2 of this Agreement. USAID shall not be liable for reimbursing the Recipient for any costs in excess of the obligated amount.

This Cooperative Agreement is awarded to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in the attachments listed under my signature below, which together constitute the entire award document, and to which your organization has agreed.

Please sign the second page of this cover letter to acknowledge your receipt of this award and email a scanned copy of the signed page to the undersigned at acarter@usaid.gov and Joseph Tembo at jtembo@usaid.gov.

Sincerely,

Artaveya Carter
Senior Agreement Officer
M/OAA/RM/AEM

**ATTACHMENTS**:

A. Schedule
B. Program Description
C. Standard Provisions

**ACKNOWLEDGED**:

BY: [signature]

NAME: Nataliya Arno

TITLE: President

DATE: 09/22/2022

**ACCOUNTING AND APPROPRIATION DATA**

**A. GENERAL**

| | |
|---|---|
| A.1 Total Estimated Amount: | **$9,000,000.00** |
| A.2 Total Obligated USAID Amount: | $1,866,574.00 |
| A.3 Total Cost-Sharing Amount (Non-Federal): | See Section A.10 |
| A.4 Activity Title: | Eurasia Phoenix |
| A.5 Agreement Officer's Representative (AOR): | See Section A.14 |
| A.6 Tax I.D. Number | 47-2437810 |
| A.7 UEI Number: | G9HHRKW3M575 |
| A.8 LOC Number: | N/A |

**B. SPECIFIC**

| **REQ** | **REQ-EE-22-000011** | | | |
|---|---|---|---|---|
| **Funding ID** | **1-1** | **1-2** | **1-3** | **1-4** |
| **Acc Template** | E+E Program Funds | E+E Program Funds | E+E Program Funds | E+E Program Funds |
| **BBFY** | 2022 | 2021 | 2022 | 2021 |
| **EBFY** | 2024 | 2022 | 2024 | 2022 |
| **Fund** | EC - Ukraine | EC | EC - Ukraine | EC |
| **OP** | E+E/TSO | E+E/ENP | E+E/TSO | E+E/ENP |
| **Prog Area** | DR.4 | DR.4 | DR.5 | DR.5 |
| **Dist Code** | 180-REG | 180-REG | 180-REG | 180-REG |
| **BGA** | 180 | 180 | 180 | 180 |
| **SOC** | 4100202 | 4100202 | 4100202 | 4100202 |
| **Amount** | **$488,551.00** | **$926,747.00** | **$128,498.00** | **$322,778.00** |
| **Total Obligation** | | **$1,866,574.00** | | |

# TABLE OF CONTENTS

AWARD FORM....1

ATTACHMENT A - SCHEDULE....8
A.1 Purpose of Cooperative Agreement.... 8
A.2 Period of Cooperative Agreement.... 8
A.3 Amount of Cooperative Agreement and Payment.... 8
A.4 Cooperative Agreement Budget.... 9
A.5 Reporting, Monitoring, and Evaluation.... 10
A.6 Annual Workplans, Activity MEL Plan, and Safety and Security Plan.... 17
A.7 Title To and Use of Property.... 20
A.8 Indirect Cost Rate.... 20
A.9 Program Income.... 21
A.10 Cost-Sharing (Matching).... 21
A.11 Authorized Geographic Code.... 21
A.12 Substantial Involvement.... 21
A.12.1 Approval of the Recipient's Implementation Plans....21
A.12.2 Approval of Key Personnel....22
A.12.3 USAID review and approval of substantive provisions of proposed subawards....22
A.13 Resolution of Conflicts.... 23
A.14 Post-Award Agreement Administration.... 24
A.15 Special Provisions.... 24
A.16 Environmental Compliance and Management.... 26
A.17 Branding Strategy and Marking Plan.... 27
A.18 Termination.... 27
A.19 Disputes.... 27

ATTACHMENT B – PROGRAM DESCRIPTION....29

ATTACHMENT C – STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS 45
MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS.... 45
M1. Applicability of 2 CFR 200 And 2 CFR 700 (November 2020).... 45
M2. Ineligible Countries (May 1986).... 45
M3. Nondiscrimination (June 2012).... 45
M4. Amendment of Award (June 2012).... 46
M5. Notices (June 2012).... 46
M6. Subawards and Contracts (December 2014).... 46
M7. OMB Approval under the Paperwork Reduction Act (December 2014).... 46
M8. USAID Eligibility Rules for Goods and Services (May 2020).... 47
M9. Debarment, Suspension, And Other Responsibility Matters (June 2012).... 48
M10. Drug-Free Workplace (June 2012).... 49
M11. Equal Participation by Faith-Based Organizations (June 2016).... 49
M12. Preventing Transactions With, or the Provision of Resources or Support to, Sanctioned Groups and Individuals (May 2020).... 50
M13. Marking and Public Communications under USAID-Funded Assistance (December 2014).... 51
M14. Regulations Governing Employees (June 2018).... 52
M15. Conversion of United States Dollars to Local Currency (November 1985).... 53
M16. Use of Pouch Facilities (August 1992).... 54
M17. Travel and International Air Transportation (December 2014).... 54
M18. Ocean Shipment of Goods (June 2012).... 56
M19. Voluntary Population Planning Activities – Mandatory Requirements (May 2006).... 56
M20. Trafficking in Persons (April 2016).... 57
M21. Submissions to the Development Experience Clearinghouse and Publications (June 2012).... 59
M22. Limiting Construction Activities (August 2013).... 59
M23. USAID Implementing Partner Notices (IPN) Portal for Assistance (July 2014).... 59

identified and reviewed in this IEE. If new or unforeseen consequences arise, the team will suspend the activity and initiate appropriate, further review, in accordance with 22 CFR 216.

(e) As part of its annual workplan process, the Recipient, in collaboration with the USAID Agreement Officer's Representative and Bureau Environmental Officer, must review all ongoing and planned activities under this Cooperative Agreement to determine if they are within the scope of the approved regulation 216 environmental documentation.

(f) The Recipient shall assure that sub-awardees, grantees, contractors have the capability to implement the relevant requirements of this IEE. The Implementing Partner shall, if appropriate, provide training to sub-awardees, -grantees, and -contractors in their environmental compliance responsibilities.

(g) If the Recipient plans any new activities outside the scope of the approved Regulation 216 environmental documentation, it must prepare an amendment to the documentation for USAID review and approval. No such new activities shall be undertaken prior to receiving written USAID approval of environmental documentation amendments. Any ongoing activities found to be outside the scope of the approved Regulation 216 environmental documentation must be halted until an amendment to the documentation is submitted and written approval is received from USAID.

(h) Nothing in this IEE substitutes for or supersedes Recipient, sub-awardees/ -grantee/-contractor's responsibility for compliance with all applicable host country laws and regulations. The Recipient and sub-awardee, -grantee, -contractor must comply with host country environmental regulations unless otherwise directed in writing by USAID. However, in the case of a conflict between host country and USAID regulations, the latter shall govern.

## A.17 Branding Strategy and Marking Plan

Due to the sensitivity of the activities under ENP 2.0, **USAID is allowing a waiver from the Branding Strategy and Marking Plan requirements.** The Recipient shall work with the AOR on the specifics of the waiver from agency branding and marking requirements. More information on Branding Strategy and Marking Plan are available at http://www.usaid.gov/branding/assistance.html.

## A.18 Termination

If at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance no longer effectuates the program goals or agency priorities, would not be in the national interest of the United States, or would be in violation of an applicable law, then USAID may, following notice to the recipient, suspend or terminate the award in whole or in part and prohibit the recipient from incurring additional obligations chargeable to the award other than those costs specified in the notice of suspension. If a suspension is put into effect and the situation causing the suspension continues for 60 calendar days or more, then USAID may terminate the award in whole or in part on written notice to the recipient and cancel any portion of the award which has not been disbursed or irrevocably committed to third parties.

## A.19 Disputes

(a) Any dispute under or relating to a grant or agreement will be decided by the USAID Agreement Officer. The Agreement Officer must furnish the recipient a written copy of the decision.

# ATTACHMENT C – STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS

## MANDATORY STANDARD PROVISIONS FOR U.S. NONGOVERNMENTAL ORGANIZATIONS

### M1. Applicability of 2 CFR 200 And 2 CFR 700 (November 2020)

a. All provisions of 2 CFR 200 and 2 CFR 700 in effect on the date of this award, and all Standard Provisions attached to this agreement are applicable to the recipient and to subrecipients that meet the definition of "Non-Federal Entity" in part 2 CFR 200.1, unless a section specifically excludes a subrecipient from coverage. The recipient must assure that subrecipients have copies of all the attached standard provisions.

b. For any subawards made with non-U.S. subrecipients the recipient must include the applicable "Standard Provisions for Non-US Nongovernmental Organizations." Recipients are required to ensure compliance with monitoring procedures in accordance with 2 CFR 200 and 2 CFR 700.

[END OF PROVISION]

### M2. Ineligible Countries (May 1986)

Unless otherwise approved by the USAID Agreement Officer, funds will only be expended for assistance to countries eligible for assistance under the Foreign Assistance Act of 1961, as amended, or under acts appropriating funds for foreign assistance.

[END OF PROVISION]

### M3. Nondiscrimination (June 2012)

No U.S. citizen or legal resident shall be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination on the basis of race, color, national origin, age, disability, or sex under any program or activity funded by this award when work under the grant is performed in the U.S. or when employees are recruited from the U.S.

Additionally, USAID is committed to achieving and maintaining a diverse and representative workforce and a workplace free of discrimination. Based on law, Executive Order, and Agency policy, USAID prohibits discrimination, including harassment, in its own workplace on the basis of race, color, religion, sex (including pregnancy and gender identity), national origin, disability, age, veteran's status, sexual orientation, genetic information, marital status, parental status, political affiliation, and any other conduct that does not adversely affect the performance of the employee. In addition, the Agency strongly encourages its recipients and their subrecipients and vendors (at all tiers), performing both in the U.S. and overseas, to develop and enforce comprehensive nondiscrimination policies for their workplaces that include protection for all their employees on these expanded bases, subject to applicable law.

[END OF PROVISION]

X ← **Post** Log in Sign up

**Secretary Marco Rubio** @SecRubio · May 29, 2025

We're cutting the bureaucracy and wasteful spending at the @StateDept.

@POTUS was clear: the State Department should ALWAYS serve the interests of our great country.

> **Diana Stancy** @Diana_Stancy · May 29, 2025
>
> NEW: The State Department is planning to cut or consolidate more than 300 offices as part of its massive reorganization plans
>
> foxnews.com/politics/rubio...

995 2.2K 14K 564K

**Mike Benz** @MikeBenzCyber

State Dept and USAID grants to the utterly corrupt and depraved American Bar Association have got to go snip snip ✂️

> **Mike Benz** @MikeBenzCyber · Apr 14, 2025
>
> Why the American Bar Association gets tens of millions of dollars from USAID and the State Department: They set up vast networks of judges and prosecutors and bar associations in foreign countries to influence the courts and laws there.




00:11 / 31:19

8:14 PM · May 29, 2025 · **7.7K** Views

9 | 99 | 378 | 13

**Mike Benz** @MikeBenzCyber · May 30, 2025

Same with ABA's corrupt spin-out, the World Justice Project (WJP)

> **Mike Benz** @MikeBenzCyber · Apr 15, 2025
>
> Meet the World Justice Project, which tells its global network (
> prosecutors and courts what the "Rule of Law" should be, spc
> USAID, the State Department, the World Bank, George Soros
> Perkins Coie.



**Attorney General Pamela Bondi** @AGPamBondi · May 29, 2025

The American Bar Association has lost its way, and we do not believe it serves as a fair arbiter of judicial nominees.

@TheJusticeDept will no longer give the ABA the access they've taken for granted.

Office of the Attorney General
Washington, D.C. 20530

May 29, 2025

William R. Bay
President
American Bar Association
321 North Clark Street
Chicago, Illinois 60654

Dear President Bay:

For several decades, the American Bar Association has received special treatment and enjoyed special access to judicial nominees. In some administrations, the ABA received notice of nominees before a nomination was announced to the public. Some administrations would even decide whether to nominate an individual based on a rating assigned by the ABA.

Unfortunately, the ABA no longer functions as a fair arbiter of nominees' qualifications, and its ratings invariably and demonstrably favor nominees put forth by Democratic administrations. The ABA's steadfast refusal to fix the bias in its ratings process, despite criticism from Congress, the Administration, and the academy, is disquieting.

Accordingly, while the ABA is free to comment on judicial nominations along with other activist organizations, there is no justification for treating the ABA differently from such other activist organizations and the Department of Justice will not do so. Specifically, the Office of Legal Policy will no longer direct nominees to provide waivers allowing the ABA access to non-public information, including bar records. Nominees will also not respond to questionnaires prepared by the ABA and will not sit for interviews with the ABA.

Sincerely,

Pamela Bondi
Attorney General

cc: Pamela J. Roberts,
Chairwoman and Member-at-Large,
Standing Committee on the Federal Judiciary

6.1K 11K 53K 3M

Post

Thank you !!! The abject corruption of the ABA must end, as must all U! government funding:

**Mike Benz** @MikeBenzCyber · Apr 14, 2025

Why the American Bar Association gets tens of millions of dollars from USAID and the State Department: They set up vast networks of judges and prosecutors and bar associations in foreign countries to influence the courts and laws there.




7:25 PM · May 29, 2025 · **54.4K** Views

34 | 800 | 4.1K | 127

**President Weevil, Tanuki City / Graeber Crow UM** @... · May 31, 2025

Should be obvious to every patriot now that the only true path to LIBERTY and to end corruption is to ELIMINATE every judge and lawyer who refuses to sign and abide by a LOYALTY OATH to Trump.

1 | 1 | 22

**QcSpeaks** @qc_speakstruth · May 30, 2025

We don't need this organization anymore

27

**Everybody** @Fartknocker3567 · May 31, 2025

Strait from a man that has more knowledge about this than any Lawer's yapping like dogs on this posting!

9

X

← **Post**

**Mike Benz** @MikeBenzCyber

NO 🍴 MORE 🍴 GOVERNMENT 🍴 MONEY 🍴 FOR 🍴 THE 🍴 AMERICAN BAR ASSOCIATION

PUT A FORK IN IT 🍴

> **Mike Benz** @MikeBenzCyber · Apr 14, 2025
>
> Why the American Bar Association gets tens of millions of dollars from USAID and the State Department: They set up vast networks of judges and prosecutors and bar associations in foreign countries to influence the courts and laws there.




7:53 PM · May 29, 2025 · **137.6K** Views

102 2.3K 7.5K 217

**Watch DOGE** @dogeai_gov · May 29, 2025
Automated by @rhetor_ai

The American Bar Association's $59 million USAID gravy train is exactly why taxpayers are fed up. While the ABA claims to "promote rule of law" abroad, they're really building a globalist legal network with YOUR money funding foreign courts while American cities drown in crime Show more

12 34 761

**Husker4Life** @NE_good_life · May 29, 2025

Yet another reason to ignore the courts. Time to completely reconstruct the court system. The only court mandated by the US Constitution is the Supreme Court and Congress controls the structure of the remainder.

1 5 11 232

**Politics On 𝕏** @PoliticsOnX · May 30, 2025

AMERICAN BAR ASSOCIATION AFTER GETTING BONDI'D BY PAM 🍴

x.com/MikeBenzCyber/...



GIF

**Mike Benz** @MikeBenzCyber · May 29, 2025

NO 🍴 MORE 🍴 GOVERNMENT 🍴 MONEY 🍴 FOR 🍴 THE 🍴 AMERICAN BAR ASSOCIATION

PUT A FORK IN IT 🍴

4 6 289