**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

HIAS, *et al.*,

*Plaintiffs*,

v.

UNITED STATES OF AMERICA,

*Defendant*.

Case No. 26-429 C

Hon. Matthew H. Solomson

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT**

Daniel F. Jacobson (D.C. Bar # 1016621)
Stephen K. Wirth (D.C. Bar # 1034038)
John Robinson (D.C. Bar # 1044072)
Brian C. Rosen-Shaud (D.C. Bar # 90042065)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com
stephen@jacobsonlawyersgroup.com
john@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 3

LEGAL STANDARD .......... 13

ARGUMENT .......... 13

I. Plaintiffs' Claims Are Not Barred Under 28 U.S.C. § 1500 .......... 13

II. Counts Two Through Seven State a Claim .......... 19

A. Count Two States a Claim for Breach of Contract by the State Department in Suspending and Stopping Work on Grant and Cooperative Agreements .......... 19

B. Count Three States a Claim for Breach of Contract as to the State Department Terminations of Grants and Cooperative Agreements .......... 22

C. Count Four States a Claim for Breach of Contract by USAID in Suspending and Terminating Plaintiffs' Grants and Cooperative Agreements .......... 29

D. Count Five States a Claim for Abuse of Discretion by Both Agencies in Suspending and Terminating All Three Types of Awards .......... 34

E. Count Six States a Claim for Breach of the Implied Duty of Good Faith and Fair Dealing by Both Agencies in Suspending and Terminating All Three Types of Awards .......... 38

F. Count Seven States a Claim for Bad-Faith Terminations .......... 42

CONCLUSION .......... 46

# TABLE OF AUTHORITIES

**Cases**

*27-35 Jackson Ave LLC v. United States*,
127 F.4th 1314 (Fed. Cir. 2025) .......... 34, 35, 36

*AccelGov, LLC v. United States*,
164 Fed. Cl. 345 (2023) .......... 14

*Acetris Health, LLC v. United States*,
949 F.3d 719 (Fed. Cir. 2020) .......... 14, 15, 18

*Barseback Kraft AB v. United States*,
36 Fed. Cl. 691, 705 (1996) .......... 39

*Beta Sys., Inc. v. United States,*
838 F.2d 1179 (Fed. Cir. 1988) .......... 32

*Boyd v. United States*,
134 F.4th 1348 (Fed. Cir. 2025) .......... 33

*Chapman Law Firm Co. v. Greenleaf Construction Co.*,
490 F.3d 934 (Fed. Cir. 2007) .......... 22

*Consolidation Coal Co. v. United States*,
615 F.3d 1378 (Fed. Cir. 2010) .......... 26

*Crestview Clinical Lab'y, LLC v. United States*,
181 Fed. Cl. 1 (2026) .......... 41

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) .......... 26

*Danziger v. United States*,
No. 25-1241 (Fed. Cl. Apr. 10, 2026) .......... 43, 44

*Everett Plywood Corp. v. United States*,
512 F.2d 1082 (Ct. Cl. 1975) .......... 35

*Glob. Health Council v. Trump*,
2026 WL 2884272 (D.D.C. Sept. 25, 2026) .......... 17

*Green & Healthy Homes Initiative, Inc. v. EPA*,
788 F. Supp. 3d 676 (D. Md. 2025) .......... 29

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*,
114 Fed. Cl. 258 (2013) .......... 34

*H.B. Mac, Inc. v. United States*,
153 F.3d 1338 (Fed. Cir. 1998) .......... 25

*Hamilton Square, LLC v. United States*,
160 Fed. Cl. 617 (2022) .......... 42

*Housing Auth. of Slidell v. United States*,
149 Fed. Cl. 614 (2020) .......... 3, 35, 38

*Hunter v. Underwood*,
471 U.S. 222 (1985) .......... 44

*Keco Industries, Inc. v. United States*,
492 F.2d 1200 (Ct. Cl. 1974) .......... 35, 36

*Keene Corp. v. United States*,
508 U.S. 200 (1993) .......... 14

*Krygoski Construction Co. v. United States*,
94 F.3d 1537 (Fed. Cir. 1996) .......... 35

*Lakeshore Eng'g Servs., Inc. v. United States*,
748 F.3d 1341 (Fed. Cir. 2014) .......... 20

*Launch Alaska v. Dep't of the Navy, Off. of Naval Rsch.*,
2025 WL 2223744 (D. Alaska Aug. 5, 2025) .......... 29

*Leebcor Servs., LLC v. United States*,
171 Fed. Cl. 14 (2024). .......... 18

*Libertatia Assocs., Inc. v. United States*,
46 Fed. Cl. 702 (2000) .......... 45

*Metcalf Constr. Co. v. United States*,
742 F.3d 984 (Fed. Cir. 2014) .......... 38, 40

*Metric Constrs., Inc. v. NASA*,
169 F.3d 747 (Fed. Cir. 1999) .......... 32

*Minburn Tech. Grp. LLC v. United States*,
No. 26-861, 2026 WL 2564252 (Fed. Cl. Aug. 17, 2026) .......... 31

*Mutakaber v. Secretary of State*,
162 F.4th 1141 (Fed. Cir. 2025) .......... 41

*New Jersey v. OMB*,
837 F. Supp. 3d 258 (D. Mass. 2026) .......... 23, 24

*Nicholson v. United States*,
29 Fed. Cl. 180 (1993) .......... 20, 32

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
284 F.3d 1261 (Fed. Cir. 2002) .......... 14

*Nycal Offshore Dev. Corp. v. United States*,
148 Fed. Cl. 1 (2020) .......... 14

*Orange Cove Irr. Dist. v. United States*,
28 Fed. Cl. 790 (1993) .......... 40

*Portland Mint v. United States*,
102 F.4th 1371 (Fed. Cir. 2024) .......... 41

*Prineville Sawmill Co. v. United States*,
859 F.2d 905 (Fed. Cir. 1988) .......... 36

*Res. Invs., Inc. v. United States*,
785 F.3d 660 (Fed. Cir. 2015) .......... 14, 16

*Salsbury Industries v. United States*,
905 F.2d 1518 (Fed. Cir. 1990) .......... 37, 38

*Scott Timber Co. v. United States*,
333 F.3d 1358 (Fed. Cir. 2003) .......... 20, 21

*Seventh Dimension, LLC v. United States*,
161 Fed. Cl. 110 (2022) .......... 27

*Siemens Gov't Techs., Inc. v. United States*,
177 Fed. Cl. 165 (2025) .......... 34

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) .......... 26

*Sublime Sys. v. United States*,
No. 26-cv-458 (Fed. Cl. Aug. 12, 2026) .......... 37, 40, 43, 44

*TigerSwan, Inc. v. United States*,
110 Fed. Cl. 336 (2013) .......... 34

*TigerSwan, Inc. v. United States*,
118 Fed. Cl. 447 (2014) .......... 35, 37

*Trusted Integration, Inc. v. United States*,
659 F.3d 1159 (Fed. Cir. 2011) .......... 13, 14, 16, 17

*U.S. Home Corp. v. United States*,
108 Fed.Cl. 191 (2012) .......... 17, 18

*United States v. Tohono O'Odham Nation*,
563 U.S. 307 (2011) .......... 16

*Vanquish Worldwide, LLC v. United States*,
147 Fed. Cl. 390 (2020) .......... 13

*Winnemucca Indian Colony v. United States*,
156 F.4th 1339 (Fed. Cir. 2025) .......... 19

**Statutes**

28 U.S.C.
§ 1500 .......... *passim*

5 U.S.C.
§ 706(2)(A) .......... 29

**Other Authorities**

CRS, R47106, The Appropriations Process: A Brief Overview (2023) .......... 4

CRS, R48150, Foreign Assistance: Where Does the Money Go? (2024) .......... 4

Restatement (Second) of Contracts § 205 cmt. d .......... 39

**Rules**

RCFC 12(b)(1) ........ 13, 14

RCFC 12(b)(6) ........ 2, 13, 44

RCFC 8(d) ........ 41

**Regulations**

2 C.F.R.
§ 200.202(a)(1)–(2) ........ 24
§ 200.339 ........ 5, 19, 20, 21
§ 200.339(c) ........ 5
§ 200.340 (2020) ........ 5, 20, 22, 25, 26, 28
§ 200.340 (a)(2) (2020) ........ 20, 22, 25, 26, 28
§ 601.101 ........ 5
§ 700.1 ........ 31
§ 700.2 ........ 5
§ 700.14 ........ *passim*

85 Fed. Reg. 49506 (Aug. 13, 2020) ........ 22, 23, 24

85 Fed. Reg. 49,506 (Aug. 13, 2020) ........ 5, 22, 23, 24

FAR 52.242-15 ........ 6, 7

FAR 52.249-6(a)(1) ........ 6

## INTRODUCTION

This is a contracts case. Plaintiffs do not challenge the wisdom of the President's foreign-policy priorities, whether the Executive Branch has impounded foreign assistance appropriations, or the future of USAID as an agency. Some of those issues are being litigated in other lawsuits, while others are for Congress and the American public to decide. But none are at issue here. The sole questions here are whether USAID and the State Department breached their contracts with Plaintiffs in suspending, stopping work under, and terminating their awards in 2025, and whether those agencies have paid Plaintiffs amounts duly owed for their costs incurred in connection with the agreements. Plaintiffs have plausibly alleged that the agencies did breach the agreements with all Plaintiffs, and have failed to pay amounts owed to several Plaintiffs. And this Court has jurisdiction to adjudicate these claims.

The government argues that this Court lacks jurisdiction over five Plaintiffs' claims under 28 U.S.C. § 1500, but the government remarkably ignores the controlling tests under Federal Circuit precedent for whether § 1500 applies, forfeiting any arguments that those tests are met. In any event, they are not. Under the first test, this case and *Global Health Council* (*GHC) v. Trump*, No. 25-cv-402 (D.D.C.), do not involve the same "act or contract." *Global Health Council* does not include any factual allegations or legal claims relating to the suspension or termination of grants, cooperative agreements, or procurement contracts. Under the second test, the evidence that would *establish* Plaintiffs' breach of contract claims here is entirely different from the evidence needed to establish the claims in *Global Health Council* relating to whether the agencies have not properly obligated appropriations before they expired at the end of fiscal years, and whether USAID has been abolished as a whole. Indeed, whether evaluated under these two tests or another standard, the operative facts in each case simply do not overlap.

The government's 12(b)(6) arguments to dismiss Counts Two through Seven of the Complaint fare no better. Those arguments fail to accept Plaintiffs' allegations as true and draw reasonable inferences in favor of Plaintiffs, as the Court must do on a motion to dismiss. To the extent the government raises pure questions of law, their positions are wrong. For instance, on Count Two, the contractual terms of the relevant State Department awards indisputably did not permit suspensions or stop-work-orders on the grounds that the State Department invoked, and the agency did not have "inherent" authority to suspend and stop work under the awards on grounds not specified in the contracts, as the government now claims.

As to Counts Three and Four, the amended complaint states a claim for breach of the express terms of the relevant grant and cooperative agreements of the State Department (Count Three) and USAID (Count Four). To be sure, the agencies incorporated regulations into their agreements providing them discretion to terminate where an award no longer effectuated "agency priorities" or the "national interest." But the provisions required the agencies to make an individualized assessment that the award being terminated did not, in fact, effectuate the national interest or relevant agency priorities. Plaintiffs plausibly allege that did not happen here, given the overwhelming evidence that the agencies conducted indiscriminate mass terminations that paid no attention to the individual details and purposes of each award. In moving to dismiss, the government asserts that individualized determinations "were, in fact made," MTD 36, but what "in fact" happened is not the inquiry at this stage. Moreover, as a matter of law for the State Department, it could terminate only based on the program goals and agency priorities at the time the award was made, not ever-changing goals and priorities as the agencies invoked here.

With Counts Five and Six, the government does not recognize or apply the settled legal standards for claims of abuse of discretion or breach of the implied covenant of good faith and

fair dealing, including as set forth by this Court in *Housing Authority of Slidell v. United States*, 149 Fed. Cl. 614, 638 (2020). Under those settled standards, Plaintiffs plausibly allege that the agencies abused and unreasonably exercised their contractual discretion to terminate or suspend the awards, by acting in a manner that was arbitrary, capricious, and contrary to the parties' reasonable expectations. The Complaint sets forth detailed factual allegations of the agencies' arbitrary and capricious conduct. Over the span of a few weeks, the agencies raced to mass-terminate awards in "tranches" that were assembled with no rhyme or reason, and with no evaluation of whether each award furthered the national interest or agency priorities. The agencies carried out the terminations through boilerplate form letters that often did not bother to address by name the partner being terminated, with some hedging on which official directed the termination (listing multiple possibilities), some sent to the wrong organization or multiple times to the right one, and most citing the termination language for both procurement contracts and grants and cooperative agreements, because the agencies did not even take the time to determine which awards were which type of funding instruments. Whatever the bar for plausibly alleging the abuse of contractual discretion, it is certainly met here.

Finally, Plaintiffs also plausibly allege in Count Seven that the government acted in bad faith in terminating their awards, based on the stated animus of senior officials toward Plaintiffs, both as a group and specifically toward several individual Plaintiffs.

## BACKGROUND

### A. USAID's and the State Department's Use of Implementing Parties

Traditionally, USAID and the State Department have accomplished the vast majority of their foreign assistance work through awards to private "implementing partners"—nonprofits, companies, and academic institutions that received foreign assistance awards from the State

Department or USAID. *See* CRS, R48150, Foreign Assistance: Where Does the Money Go?, at 1 (2024). When the agencies make these awards—in the form of procurement contracts, grants, and cooperative agreements—they "obligate" funds to the recipient, creating a legal liability to the recipient in that amount, conditioned on the recipient performing the award as required. CRS, R47106, The Appropriations Process: A Brief Overview 1 (2023).

As of January 2025, USAID and the State Department each had thousands of active awards with implementing partners to carry out those agencies' foreign aid work. Am. Compl. (FAC) ¶ 22. Plaintiffs are nine nonprofit organizations and companies that had served as implementing partners for years or decades, and collectively held more than 150 awards as of January 2025. *Id.* ¶¶ 1, 9–17, 19–22, 106. Their work included global health and humanitarian assistance, democracy promotion, rule of law programs, anti-trafficking efforts, food assistance, and support for refugees and displaced persons. *Id.* ¶¶ 9–17, 107, 113, 117, 127, 132, 137, 142, 148. By January 2025, many Plaintiffs depended heavily on these awards: USAID and State Department funding comprised large percentages of the organizations' funding: 98% for the ABA Center for Global Programs' funding, 96% for Democracy International, 89% for Free Russia Foundation's funding, 88% for MSH, nearly 80% for DAI, 45% for Mercy Corps, and 42% for Save the Children USA. *Id.* ¶¶ 17, 108, 114, 118, 133, 138, 143.

### B. Regulations Incorporated into Plaintiffs' Agreements Govern Suspension and Termination

Different legal regimes govern USAID's and the State Department's (i) grants and cooperative agreements and (ii) procurement contracts.

For grants and cooperative agreements, the Office of Management and Budget's Uniform Grants Guidance, promulgated at 2 C.F.R. part 200, generally governs. FAC ¶ 23. Like most agencies, the State Department and USAID have adopted the Guidance in their own regulations,

*id.* (citing 2 C.F.R. § 601.101 (State Department); 2 C.F.R. § 700.2 (USAID)), and incorporate these regulations by reference into grants and cooperative agreements, *see* FAC ¶ 29.

The Guidance contains provisions governing the suspension and termination of grants and cooperative agreements. *Id.* ¶ 24. With respect to suspensions, at all times relevant to this action, the Guidance permitted suspension only if the awardee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," and the agency "determines that noncompliance cannot be remedied by imposing specific conditions." *Id.* (quoting 2 C.F.R. § 200.339(c)). The Guidance did not permit suspensions for policy reasons or any other reason besides noncompliance. *Id.*

With respect to terminations, for all grants and cooperative agreements that the State Department and USAID awarded between August 13, 2020, and September 30, 2024, the Guidance provided four scenarios where the agency could terminate an award: (1) if the recipient fails to comply with the award's terms and conditions; (2) "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities"; (3) if the agency and recipient mutually agree to terminate; or (4) if the recipient initiates a termination. FAC ¶ 25 (citing 85 Fed. Reg. 49,506, 49,559 (Aug. 13, 2020) (promulgating 2 C.F.R. § 200.340 (2020))). Before 2025, USAID and the State Department had never terminated a grant or cooperative agreement based on changed program goals or agency priorities. *Id.* ¶ 26.

In addition to adopting these provisions, USAID has its own regulation providing: "If at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States or would be in violation of an applicable law, then USAID may, following notice to the recipient, suspend or terminate the award in whole or in part and prohibit the recipient

from incurring additional obligations chargeable to the award other than those costs specified in the notice of suspension." *Id.* ¶ 27 (quoting 2 C.F.R. § 700.14). USAID incorporates this regulation into its grants and cooperative agreements. USAID first issued a version of this regulation in 1995 and, in the 30 years between then and 2025, USAID never invoked this provision to suspend or terminate grants and cooperative agreements *en masse*. *Id.* ¶ 28.

The Federal Acquisition Regulation (FAR) typically governs USAID's procurement contracts, including the FAR provision permitting termination for convenience, *i.e.*, if "[t]he Contracting Officer determines that a termination is in the Government's interest." FAR 52.249-6(a)(1). The FAR also includes a provision permitting agencies to issue a stop-work order requiring a contractor to stop all or part of its work for a period of 90 days. FAR 52.242-15.

**C. The Government Orders a Blanket Halt and Then Mass Terminations**

On January 20, 2025, President Trump issued Executive Order 14,169, "Reevaluating and Realigning United States Foreign Aid." FAC ¶ 31. The Executive Order stated that the "United States foreign aid industry and bureaucracy" were in many cases "antithetical to American values," and "they serve to destabilize world peace." *Id.* The Order imposed a 90-day pause on obligations and disbursement of foreign aid funds to "foreign countries and implementing non-governmental organizations, international organizations, and contractors." E.O. 14,169 § 3(a). Four days later, the Secretary of State directed a pause on new foreign assistance obligations and ordered a government-wide review. FAC ¶¶ 32–33.

That same day, USAID officials directed Contracting and Agreement Officers "to <u>immediately</u> issue stop work orders, [and] amend[] or suspend existing awards." FAC ¶¶ 34–35. The State Department, in turn, issued form-letter suspension notices addressed to "Grant Recipients." *Id.* ¶ 40. Many notices stated that the award was suspended because it "no longer

effectuates agency priorities," even though no State Department award listed this ground as a basis for suspension. *Id.* USAID similarly issued form letters to suspend and stop work on awards, with each letter addressed to "Implementing Partners." *Id.* ¶ 38. USAID sent the same letter to procurement contractors and grantees and cooperative agreement recipients, even though different legal regimes govern the suspension of such awards, with USAID listing both FAR Clause 52.242-15 and 2 C.F.R. § 700.14 as legal authorities for each suspension. *Id.* ¶ 38.

Department of Government Efficiency ("DOGE") personnel were embedded within USAID and the State Department during this period. *Id.* ¶¶ 42–43. Elon Musk, who functionally led DOGE, publicly declared on February 2 that it was "[t]ime for [USAID] to die," and the next day stated that he had spent the weekend "feeding USAID into the wood chipper." *Id.* ¶¶ 43–44. Musk spread false claims about USAID and its implementing partners while DOGE was involved in suspending and terminating awards. *Id.* ¶¶ 45–48.

In the weeks that followed Musk's and DOGE's arrival, the agencies indiscriminately terminated awards *en masse*. By the end of February 2025, more than 85% of USAID's awards—5,341 in total—had been terminated. *Id.* ¶ 49. All of the terminations were carried out through form termination letters that were sloppily prepared and transmitted. None provided individualized explanations as to why the award was being terminated or how it met the stated reason for the termination, such as no longer effectuating program goals or agency policies. *Id.* ¶¶ 50–54, 109, 119, 124, 129, 134, 139, 144, 149.

USAID first terminated some awards in early February and then began processing awards in large groups it called "tranches." FAC ¶¶ 50–53. Between February 9, 2025 and February 12, 2025, USAID carried out four tranches of mass terminations. *Id.* ¶ 53. The agency appears to have raced to issue the latter tranches within this window to get ahead of a potential court ruling

that would have stopped the terminations. Two lawsuits were filed in federal court on February 10 and February 11, respectively, and the plaintiffs in the latter action also moved for a TRO upon filing the complaint. *Id.* ¶ 56. That same day, February 11, before the Court could act on the TRO, USAID Senior Procurement Executive (SPE) Jami Rodgers told Contracting and Agreement Officers that "[a]gency leadership has asked that we move quickly to terminate the awards," with two tranches due that same day and another due the next day. *Id.* ¶¶ 56–57.

When agency personnel asked what authority they were acting under and what was the basis for the terminations, Rodgers explained that an action memo for each tranche was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary. FAC ¶ 59. Rodgers stated that the action memo provided blanket authorization for all of the awards in the tranche and that, "given the timeline for completing termination notifications," they "do not need to contain termination process details." *Id.* ¶¶ 58–59. The termination notices issued in this window generically cited "programmatic efficiency and consistency with United States foreign policy" as the bases for the termination, with no explanation for how each award was not efficient or consistent with U.S. foreign policy. *Id.* ¶ 61.

On February 13, 2025, the court in the two cases, *Global Health Council ("GHC") v. Trump* and *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, entered a temporary restraining order barring the agencies from giving effect to the blanket suspensions and terminations issued pursuant to the Executive Order. FAC ¶ 63. In later enforcing the TRO, the court explained that the order did not prevent the agencies from undertaking a "good-faith, individualized assessment" of an award and taking action consistent with its terms. *Id.* ¶ 64.

Despite this ruling, on February 23, 2025 with USAID about to execute a fifth tranche of mass terminations, USAID guidance still stated that Secretary Rubio had directed the agency to

terminate awards as part of the Executive Order. *Id.* ¶ 65. When Plaintiffs in *GHC* objected that the directive violated the TRO, the agencies suddenly shifted strategies and began claiming that the terminations were being undertaken pursuant to an individualized review process. *Id.* ¶ 65. Within an hour of the *GHC* plaintiffs objecting, a senior USAID official sent an email stating that the prior guidance was retracted and that "[f]or the avoidance of doubt, . . . [t]hese awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities." *Id.* ¶ 68. Then, for the first time, the email claimed that "Secretary Rubio has individually reviewed Tranches 1-4 and made similar determinations in his capacity as Acting Administrator of USAID." *Id.* ¶ 69.

The mass terminations continued. On February 24, 2025, a senior USAID Contracting Officer official told colleagues that he and other Contracting Officers had been "instructed by DOGE and Jami [Rodgers] to terminate several awards tonight," and the official warned that "[t]here are MANY more terminations coming, so please gear up!" FAC ¶ 70. Over the next three days, USAID terminated roughly 2,000 awards. *Id.* ¶ 71.

The notices for those terminations were identical or substantially similar, with each letter beginning "Dear Implementing Partner," rather than stating the recipient's name. FAC ¶¶ 72–74. USAID used identical letters for procurement contractors and cooperative agreements, even though those instruments are governed by different legal regimes and termination provisions. *Id.* ¶¶ 72–74. Indeed, the letters stated that "[t]his award is being terminated for convenience and the interests of the U.S. government," no matter whether the award was a grant or cooperative agreement for which there was no termination for convenience provision. *Id.* Perhaps most remarkably, the letters hedged on which official gave the directive to terminate the award; the

notice stated that the termination was "pursuant to a directive from U.S. Secretary of State Marco Rubio. . . and/or Peter W. Marocco." *Id.*

Like USAID, the State Department carried out mass, indiscriminate waves of terminations in February and March of 2025. According to data on the official DOGE website, the State Department terminated 3,925 grants and cooperative agreements on a single day—February 26, 2025. FAC ¶ 77. Plaintiffs ABA, HIAS, and Save the Children USA all had State Department awards terminated that day. *Id.*

There was no meaningful individualized review of the awards that the agencies terminated. FAC ¶¶ 78–83. According to a declaration from then-Acting Deputy Administrator Peter Marocco, USAID's review began with spreadsheets in which each award was summarized on a single line with limited information, sometimes without even the project location. *Id.* ¶ 82. The agencies did not consult the Contracting Officers, Agreement Officers, or their representatives who administered the awards and knew the status of performance, sunk costs, and potential consequences of abrupt termination. *Id.* ¶¶ 79–83. The process swept up awards that had received waivers for life-saving humanitarian work; after one termination wave, a USAID official acknowledged internally that some terminations for "life saving programs" "may have been sent out in error" and needed to be identified for possible rescission. *Id.* ¶ 84.

The agencies also repeatedly re-terminated awards. Some Plaintiffs received multiple termination notices for the same award on different dates and sometimes for different stated reasons. FAC ¶¶ 89–93. One ABA award, for example, was first terminated "for convenience" and "for alignment with Agency priorities and national interest," and then terminated twice more because it purportedly "no longer effectuates agency priorities." *Id.* ¶ 89. DOGE and agency personnel prepared action memoranda for each tranche, supported by spreadsheets that lacked

adequate information about the content, scope, location, reliance interests, or termination costs of the listed awards. *Id.* ¶¶ 96–100.

**D. Plaintiffs' Awards Were Swept Up in the Mass Suspensions and Terminations**

USAID and the State Department terminated more than 150 of Plaintiffs' grants, cooperative agreements, and procurement contracts. FAC ¶ 106 & App'x A. The agencies suspended all of the ABA's awards and later terminated 48 of its grants and cooperative agreements; terminated all 15 of DAI's cooperative agreements; terminated all 11 of Democracy International's cooperative agreements and all four of its procurement contracts; suspended and terminated ADEPT's election-related cooperative agreement; terminated all ten of HIAS's cooperative agreements; terminated four of MSH's six procurement contracts and eight of its nine cooperative agreements; terminated 19 of Mercy Corps' grants and cooperative agreements; terminated 48 of Save the Children USA's grants and cooperative agreements; and terminated Free Russia Foundation's USAID cooperative agreement. *Id.* ¶¶ 107–150.

These terminations were not based on individualized review of Plaintiffs' actual projects. FAC ¶¶ 109–12, 115–16, 119–26, 129–31, 134–36, 139–41, 144–51. The agencies did not explain, for example, how Save the Children USA's work to reduce irregular migration from El Salvador, an ABA program strengthening religious freedom through the rule of law in Sudan, DAI's work supporting development of a unified Libyan government, HIAS's economic-empowerment work for refugees and migrants in Ecuador, Mercy Corps' food assistance in Ethiopia, Democracy International's assistance to human-rights defenders, or FRF's support for pro-democracy Eurasian exiles conflicted with the national interest or agency priorities. *Id.* ¶¶ 111, 116, 121, 131, 141, 147, 151. Nor did the agencies explain why some MSH projects were

terminated after USAID had already granted limited waivers because the projects involved life-saving humanitarian work. *Id.* ¶ 136.

The suspensions and terminations had immediate financial and operational consequences. Plaintiffs lost funding they otherwise would have drawn down, incurred costs as they abruptly ceased performance, laid off employees, terminated subcontracts and vendor relationships, and abandoned projects midway through performance. FAC ¶¶ 6, 166–77. Plaintiffs' losses included expected award funding and indirect-cost recovery, out-of-pocket reliance costs, and damage to Plaintiffs' reputations, goodwill, institutional capacity, and longstanding relationships with foreign governments and other partners. *Id.* ¶¶ 166–77.

**E. Procedural History**

Plaintiffs filed a complaint on March 17, 2026 and an amended complaint (the "Complaint") on August 3, 2026. The amended complaint asserts nine counts. Count One alleges that the State Department and USAID have breached Plaintiffs' grants and cooperative agreements by failing to pay at least some Plaintiffs allowable reimbursements and closeout costs. Counts Two and Three assert that the State Department breached the express terms of Plaintiffs' grants and cooperative agreements by issuing stop-work orders and suspensions (Count Two) and terminations (Count Three). Count Four asserts that USAID breached the express contract terms in suspending, stopping work on, and terminating Plaintiffs' grants and cooperative agreements. Counts Five and Six assert that the State Department and USAID abused their discretion and breached the implied covenant of good faith and fair dealing by issuing stop-work orders, suspensions, and terminations of the relevant grants, cooperative agreements, and procurement contracts. Count Seven asserts that the stop-work orders, suspensions, and terminations were issued in bad faith. And Counts Eight and Nine assert claims

pursuant to the Contract Disputes Act for two Plaintiffs, MSH and Democracy International, for failure to process, to pay termination settlement proposals, and to timely pay invoices on their procurement contracts.

The government has filed a partial motion to dismiss under RCFC 12(b)(1) and 12(b)(6), asserting that the Court lacks jurisdiction over five Plaintiffs' claims under 28 U.S.C. § 1500 and that Counts Two through Seven should be dismissed for failure to state a claim. The government does not move to dismiss Counts One, Eight, or Nine under RCFC 12(b)(6).

## LEGAL STANDARD

In adjudicating a motion to dismiss for lack of subject-matter jurisdiction under RCFC 12(b)(1), the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Likewise, "[w]hen considering a motion to dismiss for failure to state a claim upon which relief may be granted [under RCFC 12(b)(6)], the Court must accept as true all the factual allegations in the complaint, and must indulge all reasonable inferences in favor of the non-movant." *Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020) (quotations omitted). "To avoid dismissal under RCFC 12(b)(6), a party need only plead facts to state a claim to relief that is plausible on its face, with facts sufficient to nudge claims across the line from conceivable to plausible." *Id.* (quotations omitted).

## ARGUMENT

### I. Plaintiffs' Claims Are Not Barred Under 28 U.S.C. § 1500

Defendants erroneously contend that 28 U.S.C. § 1500 precludes the claims of Plaintiffs HIAS, ABA, DAI, DI, and MSH. Section 1500 provides that this Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . has pending in any other court." Congress enacted the original version of this provision in 1868 to address "a particular

group of litigants who were then prosecuting suits" in multiple courts. *Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1, 9 (2020). Specifically, Congress sought to address "duplicative lawsuits" being filed by former "residents of the Confederacy who had involuntarily parted with property (usually cotton) during the war" and were seeking compensation. *Keene Corp. v. United States*, 508 U.S. 200, 206 (1993). "[T]he underlying reason for § 1500 was the limited application of the rule of res judicata" to these suits, "requiring cotton claimants to make an election on which Court to seek relief." *Nycal*, 148 Fed. Cl. at 19 n.10 (cleaned up).

Drawing from this history, the Federal Circuit has repeatedly held in recent years that the dispositive question for purposes of § 1500 "'is whether the second Claims Court suit would have been barred by res judicata if it had been brought in district court' under 'res judicata principles as of 1868, when the predecessor to § 1500 was first enacted.'" *Acetris Health, LLC v. United States*, 949 F.3d 719, 729 (Fed. Cir. 2020) (quoting *Res. Invs., Inc. v. United States*, 785 F.3d 660, 666 (Fed. Cir. 2015)) (cleaned up). "At that time, the two tests for res judicata were the 'act or contract test' and the 'evidence test.'" *Id.*

Remarkably, the government does not cite these tests in seeking dismissal under § 1500, let alone argue that either test is met. The government has therefore waived any argument that either test would support dismissal. *See Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002); *accord AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 360 (2023) ("Arguments not raised in an opening brief are waived."). Under *Acetris Health,* that alone dooms their motion to dismiss pursuant to RCFC 12(b)(1).[1]

---

[1] Plaintiffs recognize that, in earlier precedent, the Federal Circuit stated that it did not adopt the res judicata tests as strictly controlling whether § 1500 applies. *Trusted Integration*, 659 F.3d at 1170 n.5. But the Federal Circuit subsequently described the tests as controlling in *Acetris Health* and *Resource Investments*, and that was necessary to the holding in *Acetris Health*, where the Federal Circuit held that "Section 1500 does not preclude jurisdiction here" solely on the

Waiver aside, it is plain that neither test is met here. At the outset, it is important to clarify the claims remaining in *GHC*. The Third Amended Complaint in that case, which was filed on January 5, 2026 before this case was filed, does not include *any* factual allegations or legal claims relating to the suspension or termination of the plaintiffs' specific grants, cooperative agreements, or procurement contracts. *See generally* Third Am. Compl., *GHC v. Trump*, No. 25-cv-402 (D.D.C.), ECF No. 174. The complaint instead asserts four categories of claims based on events distinct from those suspensions and terminations: (1) the failure of USAID and the State Department to obligate congressional appropriations in the amounts and for the purposes that Congress required before they expire, and in particular the alleged failure to properly obligate funds in September 2025 and September 2026 at the close of fiscal years, *id.* ¶¶ 127–167; (2) the abolishment of USAID as an entire agency and the transfer of its statutory responsibilities to the State Department, *id.* ¶¶ 74–82, 168–196; (3) the elimination of entire USAID and State Department initiatives, programs, bureaus, and international partnerships, where initiatives and programs for this purpose refer not to individual awards but rather broad initiatives for which Congress has appropriated funds year-after-year, such as the "Power Africa" and "American Schools and Hospitals Abroad" initiatives, *id.* ¶¶ 83–99, 197–206; and (4) the government's carrying out a so-called "pocket rescission" in September 2025, and other actions in relation to that purported pocket rescission, *id.* ¶¶ 100–108, 207–247.

These claims do not arise out of the same "act or contract" as the breach of contract claims in the instant case. The "act or contract" test turns on whether the claims in the Court of Federal Claims "immediately arise out of one and the same act or contract" as the claims in

ground that neither res judicata test was met. 949 F.3d at 729–30. And even in *Trusted Integration*, the court held that "[i]t is clear . . . that our analysis should consider the principles of res judicata to which the Supreme Court pointed." 659 F.3d at 1164.

district court. *Acetris Health*, 949 F.3d at 729 (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011)). This "nineteenth century act or contract test is narrower than the modern transactional test." *Res. Invs.,* 785 F.3d at 667.

The claims in *GHC* do not arise out of any executed contract, let alone "one and the same" contracts at issue in this case. The *GHC* plaintiffs' injuries derive from the agencies' failure to issue *new* awards—either because they are not properly obligating funds before they expire, they have eliminated initiatives under which new awards would be issued, or, in the case of USAID, because the agency has been abolished entirely. *See GHC*, ECF No. 178 (Pls.' MTD Opp.) at 31–34; ECF No. 202-1 (Pls.' MSJ) at 43–45. The cases do not involve the same "acts" either. Plaintiffs here challenge the discrete suspensions, stop-work-orders, and terminations of their awards in February to June 2025. *GHC* challenges the failure to issue new awards by the end of September 2025, by the end of September 2026, and on an ongoing basis, as well as the abolishment of USAID that was effectuated in July 2025 when USAID eliminated its staff and shut down its offices and forward-looking operations. *See GHC*, ECF No. 171-2 ¶¶ 79–82.

The evidence test is not met either. Under this test, § 1500 applies where the same evidence would "both support *and* establish" the claims in the two cases. *Trusted Integration*, 659 F.3d at 1169. The cases therefore must feature overlapping evidence that is "relevant to *and legally operative* to prove" the claims in both cases. *Id.* at 1170.

The evidence necessary to establish the claims in the two cases relevant here is wholly distinct. In this case, the legally operative evidence involves the terms of the contracts, the processes used to suspend and terminate them, the content of the suspension and termination notices, the justifications provided therein and veracity of those justifications, and Defendants' bad faith in taking action against Plaintiffs as contract holders.

None of this evidence would "both support *and* establish" the *GHC* claims. *Trusted Integration*, 659 F.3d at 1169. Rather, the necessary evidence to prove the claims in *GHC* relates to: (1) whether the State Department and USAID obligated all foreign aid appropriations by the fiscal year deadlines in September 2025 and September 2026; (2) whether the agencies obligated funds at those times consistent with the purposes Congress specified; (3) whether USAID and the State Department have eliminated certain initiatives, offices, bureaus, and partnerships for which Plaintiffs would compete for new awards and, if so, whether the agencies engaged in reasoned decisionmaking in doing so; and (4) whether USAID has been "abolished" as opposed to merely "reorganized," as the government has claimed in district court. *Glob. Health Council v. Trump*, No. CV 25-00402, 2026 WL 2884272, at *15 (D.D.C. Sept. 25, 2026) (largely denying the government's motion to dismiss the third amended complaint). None of the evidence going toward these facts would be necessary—or even relevant—to establishing whether the agencies breached Plaintiffs' contracts in February-to-June 2025 in suspending and terminating them.

Thus, Defendants do not dispute and could not reasonably dispute that neither test for establishing § 1500's applicability is met here. And even if these tests were not dispositive, *see* supra at 14 n.1, the claims in the two cases simply do not "arise from substantially the same operative facts." *Trusted Integration*, 659 F.3d at 1166. The government's efforts to show otherwise all fall flat.

The government points to five paragraphs in the two complaints that contain similar language, *see* MTD 18–19, which concern high-level agency directives in January 2025 in the weeks immediately following Executive Order 14,169, before any terminations occurred. These are "background facts, which describe the context for the claims presented in each suit." *U.S. Home Corp. v. United States*, 108 Fed. Cl. 191, 195 (2012). They are not "operative facts, which

provide the essential elements of the government conduct at issue in the two suits." *Id.*; *see also Acetris Health*, 949 F.3d at 730 (section 1500 does not apply where the "overlap . . . largely involves the 'res gestae,' not the 'operative facts,' of the claims").

The government stretches so far as to argue that § 1500 applies because "[b]oth cases arose from President Trump's issuance of Executive Order 14,169." MTD 18. But the government cites no case applying § 1500 simply because the facts in both cases trace their origin to the same Executive Order; here, an Executive Order that broadly relates to "the foreign policy of the President of the United States." E.O. 14,169 § 2; *see also Leebcor Servs., LLC v. United States*, 171 Fed. Cl. 14, 33 (2024).

The government also misses the mark in arguing that *GHC* challenges the elimination of certain "programs,"[2] and "the challenged grant terminations in this case" purportedly "were the result" of the elimination of those programs. MTD 19–20. Plaintiffs do not allege—and there are no facts to support—that the mass termination of USAID and State Department awards occurred as the "result" of any decisions to eliminate the discrete initiatives, programs, bureaus, and international partnerships at issue in *GHC*. Rather, Plaintiffs here allege that the agencies indiscriminately terminated awards *without* any individualized consideration of the nature or details of the award. FAC ¶¶ 49–84. Indeed, Plaintiffs specifically allege in this case that USAID did *not* "engage in program-specific review" before mass terminating awards. *Id.* ¶ 54.

Moreover, as mentioned, the claims in *GHC* concern the failure to issue *new* awards—going forward—under the relevant initiatives, programs, bureaus, and international partnerships,

---

[2] As described *infra* 29–30, USAID often used the word "program" to refer to each individual grant, cooperative agreement, and procurement contract. The remaining claims in *GHC* do not relate to "programs" in this sense; as explained, the plaintiffs in *GHC* challenge the elimination of broader initiatives that encompassed many projects and awards across time and were specifically funded by Congress, like the "Power Africa Program."

because the agencies have terminated all staff that worked on them and are no longer issuing new funding opportunities for them. The terminations of previous awards are not legally operative facts to these claims.

In all events, "section 1500 is applied on a claim-by-claim basis." *Winnemucca Indian Colony v. United States*, 156 F.4th 1339, 1352 n.10 (Fed. Cir. 2025). Thus, even if the Court finds that § 1500 precludes one count of Plaintiffs' complaint here—or one theory of liability under one count—the remedy would be to dismiss only that claim for the relevant Plaintiffs, and not the remainder of their claims.

## II. Counts Two Through Seven State a Claim

### A. Count Two States a Claim for Breach of Contract by the State Department in Suspending and Stopping Work on Grant and Cooperative Agreements

**1.** Count Two alleges a straightforward claim that the State Department breached the express terms of Plaintiffs' grants and cooperative agreements in suspending or issuing stop-work-orders for these awards. The regulations incorporated into Plaintiffs' contracts provided just one permissible ground for suspending the awards: if Plaintiffs "fail[ed] to comply with the U.S. Constitution, Federal statutes, regulations or the terms and conditions of a Federal award," FAC ¶ 198 (quoting 2 C.F.R. § 200.339). The contracts did not permit the State Department to issue suspensions or stop-work-orders because the award no longer effectuated agency priorities. *Id.* ¶¶ 24, 198. The State Department nevertheless suspended or issued stop-work orders for Plaintiffs' awards on those or similar grounds. *Id.* ¶ 198.

The government does not dispute that the grant and cooperative agreements did not list agency priorities as a permissible basis for suspending or stopping Plaintiffs' awards. But the government contends that the State Department has "inherent discretion" to suspend awards that purportedly no longer effectuate the President's foreign policy preferences. MTD 23. The

government cites no legal authority for this proposition, and it is antithetical to the contractual nature of the parties' relationship, under which the written terms of the contract control. *Nicholson v. United States*, 29 Fed. Cl. 180, 194 (1993).

The government also argues that it would make little sense for § 200.340(a)(2) to permit the State Department to terminate an award that no longer effectuates agency priorities, while § 200.339 limits State to suspending for-cause. MTD 22–24. But that argument again cannot be reconciled with the contracts' text, and the government's attempt to rewrite the contract by implication is foreclosed by Federal Circuit precedent.

Section 200.340 is titled "Termination" and provides the grounds upon which an "award may be terminated," including if it no longer effectuates program goals or agency priorities. 2 C.F.R. § 200.340 (2020). Had the government intended to permit suspensions or stop-work-orders on these grounds, it knew exactly how to say so, but it did not. "[H]aving agreed" to limit the grounds upon which it could suspend or stop awards to violations of law or the terms and conditions of the award, the State Department "cannot now rewrite the clauses to provide it protections [that Plaintiffs] did not agree to." *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1348 (Fed. Cir. 2014).

*Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003), forecloses the government's effort to add that missing authority by implication. Government contracts are interpreted under ordinary contract principles. *Id.* at 1366. In *Scott Timber*, one contract provision authorized the Forest Service to cancel or modify timber contracts in specified circumstances, while another expressly authorized suspension in different circumstances. The government argued that the cancellation-or-modification provision necessarily implied authority to suspend performance while the Forest Service decided whether to exercise those express

remedies. The Federal Circuit rejected that argument. Reading the contract as a whole, the court held that the express authorization of suspension in some circumstances made its omission elsewhere meaningful: courts "must not presume to supply remedies the parties did not provide each other by contract." *Id.* at 1367. The Forest Service therefore breached the contracts when it suspended performance without contractual authority. *Id.* at 1367–68.

The same reasoning controls here. Section 200.339 expressly authorizes suspension in defined circumstances, and the State Department did not claim at the time of the suspensions and stop-work-orders that those circumstances were met. The Court cannot rewrite those provisions to add a policy-based suspension remedy simply because the government considers that arrangement more sensible.

The government separately argues that any unauthorized suspension was not a material breach and caused no distinct harm because termination soon followed. MTD 24–25. But the Complaint expressly alleges otherwise. Plaintiffs allege that during the interval between suspension and termination they lost funding they would have drawn down through continued performance and incurred out-of-pocket costs from abruptly stopping work. FAC ¶¶ 166–67, 199. *Scott Timber* again supplies the answer: once the Federal Circuit concluded that the suspensions lacked contractual authority, it treated the government's argument that the contractor would have suffered no loss anyway as an issue of causation and damages, not as a basis for finding no breach. 333 F.3d at 1367–68. Count Two therefore states a claim.

**2.** The government alternatively argues that Count Two is moot because the State Department eventually terminated the awards and later paid some Plaintiffs' termination and closeout costs. MTD 25. That argument conflates three different events: Count Two seeks damages for the period in which State unlawfully suspended or stopped work under Plaintiffs'

awards, before termination. FAC ¶¶ 166–67, 198–99. The later terminations ended that period; they did not retroactively authorize the suspensions or compensate Plaintiffs for the damages that had already accrued.

The government relies on *Chapman Law Firm Co. v. Greenleaf Construction Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007), which explains that a case generally becomes moot when "the relief sought has been granted" or the disputed questions are no longer at issue. But *Chapman* involved corrective action that adequately addressed the effects of the challenged procurement decision and thus supplied the relief underlying the protest. *Id.* at 939–40.

Here, the payment of termination and closeout costs in connection with the *termination* does not make Plaintiffs whole for the breaches of contract in suspending and stopping work under the awards. The termination and closeout costs do not include all lost profits and other income Plaintiffs would have earned during the suspension period. And to the extent there is some overlap between particular closeout payments and damages Plaintiffs would obtain for the suspension, that would affect only the scope of available damages on Count Two. It does not moot Count Two.

### B. Count Three States a Claim for Breach of Contract as to the State Department Terminations of Grants and Cooperative Agreements

Count Three alleges that the State Department breached the express terms of Plaintiffs' grants and cooperative agreements in terminating the relevant awards. State relied exclusively on the provision of the Uniform Grants Guidance, incorporated into the contract, permitting State to terminate "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020); 85 Fed. Reg. 49,506, 49,559 (Aug. 13, 2020). This provision did not authorize State's termination of Plaintiffs' awards for four different reasons, any one of which would establish a breach.

### *1. The State Department Could Only Terminate Based on Program Goals and Agency Priorities That Existed at the Time the Awards Were Issued*

First, the relevant provision permitted the State Department to terminate Plaintiffs' grants and cooperative agreements based on the agency's goals and priorities that existed at the time the award was issued, not changed goals and priorities. A district court recently agreed with this interpretation, holding that the provision does not authorize agencies to terminate based on program goals or agency priorities first identified after the awards were made. *See New Jersey v. OMB*, 837 F. Supp. 3d 258, 276–83 (D. Mass. 2026).

As the district court there explained, the text, broader regulatory scheme, and regulatory history all support this interpretation. The provision's text refers to "the" program goals and agency priorities, indicating a discrete and identifiable set of goals. *Id.* at 277. And the provision allows for termination where a project "no longer effectuates" the relevant goals and priorities, which presupposes that the award once effectuated "the program goals and agency priorities." *Id*. The clause thus applies where an agency determines that the award can no longer achieve the objectives for which it was made.

The regulatory history supports this interpretation. In the preamble to the 2020 rulemaking that promulgated this provision, OMB explained that the "no longer effectuates" language was to allow termination of projects that could no longer meet "the intended objective of the award," or that had become "ineffective at achieving program goals." 85 Fed. Reg. 49,506, 49,507–08 (Aug. 13, 2020). These examples "support[] the conclusion" that the provision allows agencies "to terminate an award in instances where new information establishes that the original goals can no longer be met, either because the specific project cannot achieve those goals or because they are unachievable." *New Jersey*, 837 F. Supp. 3d at 281.

The government quotes a statement in the same rulemaking that the revisions to the termination provisions were "to strengthen" agencies' ability to terminate, MTD 30 (quoting 85 Fed. Reg. at 49,507), but the government cuts off the quote mid-sentence, omitting that OMB was simply reciting the text of the new provision—that it was "to strengthen the ability of the Federal awarding agency to terminate Federal awards . . . when the Federal award no longer effectuates the program goals or Federal awarding agency priorities." 85 Fed. Reg. at 49,507. And this statement preceded the examples that OMB gave, described above, that make clear the provision was addressing projects that had become "ineffective" or for other reasons no longer achieved the "intended objective of the award."

The broader regulatory context confirms this understanding. Other provisions of the Grant Guidance require agencies to design programs "[w]ith clear goals and objectives" and "[t]o measure performance based on the goals and objectives developed[.]" *New Jersey*, 837 F. Supp. 3d at 278 (quoting 2 C.F.R. § 200.202(a)(1)–(2)). And when agencies post a notice of funding opportunity for an award, they must list the "agency's funding priorities" for the award. *Id.* at 279 (quoting 2 C.F.R. Pt. 200, App. I (b)(3)(i)(B)). "It would be contrary to this extensive scheme to interpret the Termination Clause to allow the termination of grants based on new priorities, including priorities not disclosed to the grantees." *Id.*

2. *The State Department Was Required to Make Individualized Determinations of Non-Alignment With the New Goals and Priorities*

Second, regardless of whether the State Department could invoke changed goals and priorities as the government contends, the State Department breached the contracts' express terms because the agency had to make an individualized assessment of whether Plaintiffs' awards were consistent with "program goals and agency priorities." *See* FAC ¶¶ 210–211.

The relevant provision permits termination, to the extent authorized by law, "if *an* Award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (emphasis added). The provision thus requires an individualized assessment of whether "an award" continues to effectuate program goals or agency priorities. The regulatory history described above confirms this understanding, as OMB intended the provision to be invoked in circumstances such as where an award had become "ineffective" at achieving goals, which necessarily is based on the project itself. More generally, an agency cannot possibly make a reasoned determination of whether "an award" effectuates certain program goals or agency priorities without looking at the details of *that* award.

That certainly is what "a reasonable and prudent contractor" would have thought in agreeing to this provision, which must guide its interpretation. *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998). No reasonable organization in Plaintiffs' position would have thought, as the government now suggests, that an agency could presume that a project does not align with program goals and agency priorities without actually inquiring into the details of the project at issue. Because the contract required an individualized assessment and Plaintiffs plausibly allege that did not occur, Plaintiffs state a claim for breach on this basis as well.

The government does not engage with the key text providing for termination of "an award" that no longer effectuates goals and priorities; instead, they erroneously assert that "Plaintiffs cite nothing in the regulation . . . to support" this claim. MTD 32. The government's only response to this claim is that Plaintiffs' reading "would hamper agency discretion to expeditiously terminate awards in the event of national emergency or war." *Id.* But they cite zero evidence that OMB promulgated this provision for times of emergency or war. Indeed, the

federal government long managed to navigate emergencies and wars without this provision, which was not promulgated until 2020.

### *3. The State Department Could Not Terminate Based on Goals and Priorities that Conflict with Congress's Goals and Priorities*

Third, Plaintiffs have stated a claim that, even if the government could terminate based on changed program goals and agency priorities, and even if the termination provision did not require individualized assessments, the provision does not permit termination based on goals and priorities that directly conflict with Congress's goals and priorities in requiring the agency to issue the relevant awards. FAC ¶ 212. Plaintiffs plausibly allege that the State Department did that here. *Id.*

Under the doctrine of constitutional avoidance, the regulation that is the source of this ground for termination, 2 C.F.R. § 200.340(a)(2) (2020), must be interpreted in a manner that avoids rendering the regulation unconstitutional. *Consolidation Coal Co. v. United States*, 615 F.3d 1378, 1382 (Fed. Cir. 2010). The regulation would be unconstitutional if it permitted agencies to terminate based on mere disagreement with Congress' binding policy directives, as it is core to the separation of powers that the Executive must take care to execute the laws that Congress enacts.

The government addresses this breach claim only in a footnote, thereby waiving any argument to dismiss this claim. *See* MTD 33 n.10. "[A]n argument raised in a footnote in an opening brief [is] waived as not properly raised." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1320–21 n.3 (Fed. Cir. 2005)); *see also Robinson v. United States*, 182 Fed. Cl. 415, 424 (2026) ("Waived arguments include those first raised in a . . . footnote.");

*Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110, 129 (2022) (similar). On this basis alone, this breach theory, and Count Three more broadly, may not be dismissed.

In any event, the government's footnote argument does not hold water. It contends that "[t]his precise question is currently being litigated in the district court action." MTD 33 n.10. That is not true. The relevant questions in *GHC* are at a macro level: whether USAID and State Department obligated by September 30, 2025 and September 30, 2026 the full amounts that Congress appropriated, and whether they obligated the funds for the statutory purposes that Congress directed, irrespective of the means that the agencies used to obligate the funds (*e.g.*, through awards to implementing partners, interagency agreements, or agreements with foreign countries). The termination of Plaintiffs' awards many months before the funding deadlines, and the reasons why the agencies terminated the awards at that time, are legally irrelevant to the *GHC* claims. In contrast, here, the reason why the State Department terminated these awards is the sole relevant question to this particular breach claim.

Plaintiffs have plausibly alleged that the State Department terminated based on mere disagreement with Congress's policy objectives, *see, e.g.* FAC ¶¶ 19, 31-49, and this allegation is a question of fact unsuitable for resolution upon a motion to dismiss.

#### 4. *The Terminations Were Not Authorized By Law*

The State Department could terminate an agreement because the award "no longer effectuates the program goals or agency priorities" only "to the greatest extent authorized by law," and the terminations were not authorized by law because they violated the APA's requirements for reasoned decisionmaking. FAC ¶ 204. Specifically, the terminations violated the APA's reasoned decisionmaking requirements in two ways: (i) they were undertaken pursuant to high-level policy decisions to terminate the awards *en masse*, and those policy

decisions were arbitrary and capricious, *id.* ¶¶ 205–06; and (ii) termination of Plaintiffs' awards was arbitrary and capricious at the individual award level, *id.* ¶¶ 205, 207. The government does not dispute that Plaintiffs have plausibly alleged that the terminations failed to meet the APA's reasoned decisionmaking requirements at both of these levels.

The government's first response instead is a tortured grammatical one. The relevant regulation provides that an award may be terminated "By the Federal awarding agency or pass-through entity . . . to the greatest extent authorized by law, if [an] award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). The government contends that "the phrase 'to the greatest extent authorized by law' in section 200.340(a)(2) does not modify or otherwise attach to an agency's discretion to terminate a grant (or multiple grants) that conflict with programs goals or agency priorities." MTD 28. Rather, according to the government, "'to the greatest extent authorized by law' follows and is applicable to 'the Federal awarding agency or pass-through entity,' such that a funding instrument cannot be terminated for a reason that violates *substantive law* unrelated to 'program goals or agency priorities.'" *Id.* "In other words, a grant may not be terminated for an illegal purpose that is *unrelated* to program goals or agency priorities." *Id.* (emphasis added).

This interpretation makes no sense as a grammatical and legal matter. The phrase "to the greatest extent authorized by law" obviously refers to when an agency may terminate "if an award no longer effectuates the program goals or agency priorities," the phrase that immediately follows. The government's argument that "to the greatest extent authorized by law" applies to "the Federal awarding agency or pass-through entity" is hard to follow; there is no question that the State Department itself is authorized by law. What the government really seems to be arguing is that, if the reason the termination is illegal is "[]related" to the program goals and agency

priorities, then the termination is contractually permissible. So, under the government's theory, if an agency's "goals" or "priorities" are to not have cooperative agreements with members of certain racial or religious groups, the regulation and corresponding contractual provision would permit the termination, even if it violates equal protection, because the reason the termination is illegal is not "unrelated to program goals or agency priorities." MTD 28.

The regulation and associated contractual provisions cannot be interpreted in such a manner. Rather, the provision does not permit termination based on program goals or agency priorities whenever, for whatever reason, the termination would be unlawful. And here, Plaintiffs plausibly state a claim that the terminations were not "authorized by law" because they violated the requirements of the APA, a federal law. FAC ¶¶ 205–07; 5 U.S.C. § 706(2)(A).

The government contends that Plaintiffs cannot rely on the APA because it is not a source of "substantive law," MTD 28, but the regulation does not limit this constraint to "substantive law." The APA imposes a procedural requirement that agencies must engage in reasoned decisionmaking in taking action, and so the State Department cannot terminate an award based on program goals or agency priorities in a manner that violates this law. Multiple district courts have agreed that the phrase "to the greatest extent authorized by law" in this context includes the APA's reasoned decisionmaking requirements. *See Green & Healthy Homes Initiative, Inc. v. EPA*, 788 F. Supp. 3d 676, 703 (D. Md. 2025); *Launch Alaska v. Dep't of the Navy, Off. of Naval Rsch.*, No. 3:25-CV-00141-GMS, 2025 WL 2223744, at *6 (D. Alaska Aug. 5, 2025).

### C. Count Four States a Claim for Breach of Contract by USAID in Suspending and Terminating Plaintiffs' Grants and Cooperative Agreements

Plaintiffs have stated a claim in Count Four that USAID breached the express terms of Plaintiffs' grants and cooperative agreements in terminating, suspending, and stopping work on

the awards. Under 2 C.F.R. § 700.14, as incorporated into Plaintiffs' grants and cooperative agreements:

> If at any time USAID determines that continuation of all or part of the funding for *a program* should be suspended or terminated because such assistance would not be in the national interest of the United States or would be in violation of an applicable law, then USAID may, following notice to the recipient, suspend or terminate *the award*.

2 C.F.R. § 700.14 (emphases added). USAID has never claimed that continuing Plaintiffs' awards would violate any law, and thus USAID could suspend or terminate based only on a determination that continuing the award would not be in the national interest.

Plaintiffs have plausibly alleged that USAID violated this provision by indiscriminately suspending and terminating awards *en masse*, without making any individualized determination that continuation of an award was not in the national interest. FAC ¶ 220. The government argues that the provision does not require individualized consideration of whether the specific award furthers the national interest, because the provision calls for a determination of whether "a program" furthers the national interest. MTD 37–38. The government points to a definition of "program" as an "organized set of activities and allocation of resources," and contends that this definition "is not compatible with an 'individual award.'" *Id.* at 37.

The government is wrong. Although USAID sometimes refers to a broader initiative as a "program," *see supra* at 17–18 & n.2, in the context of awarding, operating, and terminating grants and cooperative agreements, USAID refers to each individual award as its own "program." FAC ¶ 222. USAID did so in the context of Plaintiffs' specific terminated awards. In a March 24, 2025 memo that USAID sent to Congress, USAID attached spreadsheets of "active and terminated programs," where the spreadsheets listed each award as its own "program." Memo of Ryan Shrum, Senior Advisor for Legislative and Congressional Affairs, *Update on*

*USAID Financial and Personnel Status as of March 21, 2025*, at 2 (Mar. 24, 2025).[3] One spreadsheet titled "USAID – TERMINATED PROGRAMS LIST" set forth each terminated USAID grant and cooperative agreement—including those of Plaintiffs. *Id.* at 37–284.

There is more. Pete Marocco, the Acting Administrator of USAID who purportedly conducted the review of awards to terminate, described review of an "individual agreement" and then said that, for an award recommended for termination, the next reviewer considered whether "ending the program" comported with foreign policy. MTD Appx057–58; *see* FAC ¶ 222. The termination notices are even clearer: after identifying a particular award, USAID stated that Marocco and Secretary Rubio determined that "continuing this program is not in the national interest." FAC ¶ 72; *see id.* ¶¶ 50, 77, 89 (letters referring to a specific award as "the program").

The plain text of 2 C.F.R. § 700.14 confirms that, for purposes of this provision, a "program" refers to an individual award. Section 700.14 states that if USAID determines that continuing "funding for *a program*" would not be in the national interest, "then USAID may . . . suspend or terminate *the award*." The provision thus equates the program that is not in the national interest to "the award" that USAID may suspend or terminate.

Nothing in the regulatory definition of "program" requires a contrary reading. An individual award to carry out a set of foreign aid activities across multiple years is readily described as "an organized set of activities and allocation of resources directed toward a common purpose, objective, or goal." 2 C.F.R. § 700.1. At a minimum, whether USAID treated the

[3] Available at https://www.evalcommunity.com/wp-content/uploads/2025/03/Update-on-USAID-Financial-and-Personnel-Status-as-of-March-21-2025-.pdf. This Court may take judicial notice of this government document. *Minburn Tech. Grp. LLC v. United States*, No. 26-861, 2026 WL 2564252, at *3 (Fed. Cl. Aug. 17, 2026).

relevant "program" as an individual award or some broader collection of awards is a factual question that cannot be resolved against Plaintiffs on the pleadings.

Because § 700.14 plausibly requires USAID to determine that continuing a specific award would not be in the national interest, USAID had to conduct an individualized assessment of the specific award and the activities to be carried out under it. Otherwise, how would USAID know that continuing the award would not advance the national interest? The regulation does not authorize USAID to draw straws or make random guesses as to whether continuing an award undermines the national interest. An ordinary award recipient in Plaintiffs' position certainly would not have understood the provision to authorize such action; any "reasonably intelligent" organization would have read this provision to require some actual assessment of an award before determining that it does not further the national interest. *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quotation omitted).

The government is incorrect that Plaintiffs rely on their "subjective understanding" of the agreements rather than the contractual language. MTD 34. "It has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation." *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed. Cir. 1988) (citation modified). To be sure, "[t]hat intention must, in the first instance, be derived from the language of the contract." *Nicholson*, 29 Fed. Cl. at 194. But the ultimate inquiry is guided by "that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors*, 169 F.3d at 752 (quotation omitted).

Here, as explained above and as Count Four alleges, the text of the provision supports the view that USAID must conduct an individualized assessment before suspending or terminating a

grant or cooperative agreement, and the fact that a reasonable awardee in Plaintiffs' position would have read the provision in this manner eliminates any doubt.

The government alternatively argues the individualized determinations "were, in fact, made." MTD 36. The government relies entirely on its characterization of a declaration by Marocco submitted in *GHC*. *See id.* But what "in fact" happened (or, in fact, did not) is not the inquiry on a motion to dismiss. At this stage, the Court must "take all factual allegations in the complaint as true and construe the facts in the light most favorable to the non-moving party." *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025). The Complaint expressly alleges that the supposed individualized determinations did not occur.

Specifically, the Complaint alleges that USAID made decisions concerning hundreds or thousands of complex awards based on spreadsheets containing as little as one line per award; did not review the award documents or consult the officials administering the projects; and did not meaningfully assess what particular projects were accomplishing or the consequences of terminating them. FAC ¶¶ 78–84. The complaint alleges concrete facts consistent with this account: USAID sent form termination notices that contained no individualized explanation for the terminations, with many addressed to "Dear Implementing Partner," some naming two different officials that may have issued the directive to terminate the award, and others sent to the wrong organization. *Id.* ¶¶ 72–74, 89, 109, 119, 124, 129, 134, 139, 144, 149. USAID terminated awards that had received lifesaving waivers, prompting an agency official to acknowledge that some "may have been sent out in error," and USAID terminated and re-terminated awards under differing rationales. FAC ¶¶ 84, 89–100. Those allegations more than plausibly support Plaintiffs' contention that USAID did not actually determine, award by award,

that continuation was contrary to the national interest. At a minimum, a declaration from a different case containing disputed assertions of fact cannot establish otherwise as a matter of law.

### D. Count Five States a Claim for Abuse of Discretion by Both Agencies in Suspending and Terminating All Three Types of Awards

For all of Plaintiffs' awards, USAID and the State Department independently committed a breach of contract by abusing their contractual discretion to suspend or terminate the award. FAC ¶¶ 225–33. No matter the breadth of discretion a contract affords an agency to take a certain action, the agency may not abuse that discretion by exercising it arbitrarily, capriciously, or unreasonably. If ever there were a case where agencies allegedly did just that, it is here.

The Federal Circuit and this Court have repeatedly recognized that a claim for abuse of discretion may arise in connection with a contract termination. *See, e.g.*, *27-35 Jackson Ave. LLC v. United States*, 127 F.4th 1314, 1319–20 (Fed. Cir. 2025); *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 347 (2013). Under this doctrine, where a contract gives the government discretion to make a particular determination or take a particular action, there is a breach where "the government's exercise of its discretion was unreasonable or arbitrary and capricious." *27-35 Jackson Ave*, 127 F.4th at 1319–20. "More specifically, in a case in which a contract gives the government unilateral authority to make a decision affecting its contracting partner, . . . the government's judgment should be exercised not capriciously or fraudulently, but reasonably, and with due regard to the rights of both the contracting parties." *Id.* (quotations omitted); *accord, e.g.*, *Siemens Gov't Techs., Inc. v. United States*, 177 Fed. Cl. 165, 174–75 (2025).

Even with the maximum discretion of a termination for convenience clause, a contractor may "prove an abuse of discretion" where it shows that the agency's "decision to terminate" pursuant to that clause "was arbitrary and capricious." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 361 (2013); *see also id.* at 384 (finding breach of contract where

the Army's termination of an award was arbitrary and capricious); *TigerSwan, Inc. v. United States*, 118 Fed. Cl. 447, 453 (2014) (similar). And if an agency abuses its discretion under a termination for convenience clause by acting arbitrarily or capriciously, *a fortiori*, an agency abuses its discretion if it acts arbitrarily or capriciously in exercising its more limited discretion to suspend and terminate grants and cooperative agreements that lack such a clause.

The government suggests that Plaintiffs are improperly seeking to import the standards of the APA into contract law, but this Court has already rejected that exact argument in *Housing Authority of Slidell*. The Court held, in the analogous context of the implied covenant of good faith and fair dealing, that the phrase "arbitrary and capricious" carries its own meaning and import in the context of the government's exercise of contractual discretion. *Housing Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020). "The cases are legion establishing that where a contract affords discretion to the government, 'exercise of that discretion must be fair and reasonable, not arbitrary and capricious.'" *Id.* (quoting *Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1090 (Ct. Cl. 1975)). And *Slidell* rejected another argument the government advances here—that the existence of contractual or regulatory authority ends the inquiry. A general right to take an action "does not demonstrate, as a matter of law, that such a contractual right properly was exercised in light of the FAC's alleged facts." *Id.* at 646. If the government disputes those facts, "that is a factual disagreement that must be resolved via summary judgment or at trial." *Id.*

The Federal Circuit confirmed in *27-35 Jackson Ave.* that the arbitrary and capricious exercise of contractual discretion constitutes a breach of contract, and the government's own authorities confirm the point. *Krygoski* holds that "[w]hen tainted by bad faith or *an abuse of contracting discretion*, a termination for convenience causes a contract breach." *Krygoski*

*Construction Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (emphasis added). In addition, the *Keco* factors the Government invokes are not conjunctive elements requiring Plaintiffs to establish both bad faith and a statutory violation. *See Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1203–04 (Ct. Cl. 1974). To the contrary, the Federal Circuit has expressly explained that "there is no requirement or implication in *Keco Industries* that each of the factors must be present," and that the "absence of a reasonable basis for the administrative decision" independently supports an abuse-of-discretion finding. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988). The government therefore has it backwards when it treats reasonableness as all Plaintiffs have "left." MTD 40. Whether the agencies exercised their discretion "reasonably," and "not capriciously or fraudulently," may be dispositive. *27-35 Jackson Ave.*, 127 F.4th at 1319–20.

Plaintiffs have more than plausibly alleged that the suspension and termination of their awards was arbitrary, capricious, and unreasonable. The Complaint alleges that State and USAID raced as quickly as possible to mass terminate awards, including to get ahead of a TRO that the district court in *GHC* was considering entering. FAC ¶¶ 56–60. Plaintiffs allege that the mass suspensions and terminations were undertaken at the whims and dictates of DOGE officials, who lacked any knowledge or expertise over foreign policy and foreign assistance grants and cooperative agreements. FAC ¶ 230. Plaintiffs allege that the government indiscriminately slashed scores of materially different awards in tranches that had no rhyme or reason, without any meaningful assessment of the work being performed under the award and whether it actually conflicted with agency priorities or the national interest. FAC ¶¶ 78–100, 229–31. The decisionmakers relied on skeletal spreadsheets containing a single line about an award; lacked basic information about projects; did not consult the officials who administered the awards;

failed to assess sunk costs, reliance interests, and the consequences of their actions; and produced obvious errors, including terminations of lifesaving awards that had been granted waivers. *Id.*

These are not allegations that Plaintiffs possessed a contractual right to a particular administrative procedure. They are factual allegations that the government did not reasonably exercise the discretion the agreements conferred.

*TigerSwan* is instructive. There, the government likewise argued that a contracting officer permissibly deferred to program officials concerning the agency's needs—including because national-security considerations were implicated. 118 Fed. Cl. at 452–53. The court rejected the proposition that such deference insulated the decision from contractual review. Even where substantial discretion existed, the decisionmaker had to "perform some investigation into the facts to determine their validity," and the failure to make an independent judgment or investigate the factual basis for termination supported an abuse-of-discretion claim. *Id.* at 453. The same principle applies here: the President may set foreign-policy priorities, but agency officials must still exercise the contractual discretion they possess reasonably when applying those priorities to particular contracts and awards. *See also, e.g.*, Tr. 82:25–83:7, *Sublime Sys. v. United States*, No. 26-cv-458 (Fed. Cl. Aug. 12, 2026) (denying motion to dismiss abuse-of-discretion claim for the termination of a cooperative agreement because "while the termination clause afforded [the government] discretion to determine whether its terms were met, that discretion cannot be exercised in an arbitrary fashion").[4]

Nor must the Court adjudicate the wisdom of the President's foreign policy to sustain Count Five. The Court may assume for purposes of this Count that the Administration was

---

[4] The transcript in *Sublime Systems*, including the court's bench ruling denying the government's motion to dismiss, is attached as Exhibit 1.

entitled to adopt new foreign-policy priorities and still ask whether State and USAID reasonably exercised their contractual discretion in carrying out the mass terminations or in determining that a Plaintiff's particular award should be suspended or terminated. The government cites *Salsbury Industries v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990), for the proposition that in the foreign-policy context, courts do not "decide *de novo* whether termination was the best course." MTD 40. True, but Plaintiffs' abuse-of-discretion claim focuses on the process the government followed; it does not require the Court to itself assess whether terminating a given award was "best" for the nation's interests. And *Salsbury* itself recognizes that a termination remains reviewable for "bad faith or clear abuse of discretion." *Id.*

In short, Count Five does not ask the Court to substitute its foreign-policy judgment for the Executive's. It asks the Court to apply an ordinary rule of government contract law: discretion conferred by a contract must be exercised reasonably, not arbitrarily or capriciously. Plaintiffs have alleged ample facts demonstrating that State and USAID failed that standard.

### E. Count Six States a Claim for Breach of the Implied Duty of Good Faith and Fair Dealing by Both Agencies in Suspending and Terminating All Three Types of Awards

Count Six alleges that State and USAID breached the implied covenant of good faith and fair dealing in suspending and terminating Plaintiffs' grants, cooperative agreements, and procurement contracts. FAC ¶¶ 236–43. Every government contract "imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990–91 (Fed. Cir. 2014) (quotations omitted). The covenant "imposes obligations on both contracting parties that include the duty . . . not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* at

991 (quotations omitted). The implied covenant prohibits "evasion of the spirit of the bargain" and "abuse of a power to specify terms." Restatement (Second) of Contracts § 205 cmt. d.

As *Slidell* explains, the implied covenant "limits the manner in which a party who is vested with discretion under the contract may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." 149 Fed. Cl. at 638 (quotation omitted). Thus, just as this Court held in *Slidell*, the government errs in arguing that Plaintiffs improperly attempt to "layer[] APA-standards on top of contractual obligations" for purposes of this implied covenant claim. MTD 44. Separate and apart from any obligations the APA imposes, the implied covenant of good faith and fair dealing independently requires an agency to exercise its contractual discretion in a manner that is not arbitrary, capricious, or contrary to the contractor's reasonable expectations. Count Six invokes that contractual duty, not a freestanding entitlement to APA procedures or remedies.

The Complaint plausibly alleges a breach of that duty. For the reasons explained in the preceding section, Plaintiffs allege that the agencies acted arbitrarily and capriciously in exercising their contractual discretion to suspend and terminate Plaintiffs' awards. Plaintiffs also plausibly allege that the agencies acted contrary to Plaintiffs' "reasonable expectations" in accepting the awards and agreeing to the termination and suspension language. *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996). Prior to 2025, neither USAID nor the State Department had ever carried out a mass termination or suspension of awards. Plaintiffs could not have reasonably expected that the agencies would vaguely invoke "agency priorities" and "national interest" to indiscriminately terminate and suspend awards *en masse*, with no individualized assessment of whether the award in fact was consistent with agency policies and

the national interest, with no care for the substantial reliance interests of Plaintiffs and communities they serve that would be disrupted, and at the impetus of an outside entity (DOGE) that had no knowledge of or experience with foreign assistance activities. Plaintiffs have plausibly alleged that USAID and State did not "effectuate the object and purpose the parties had in mind in providing for the exercise of such power" to suspend or terminate awards. *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993) (citation omitted).

Judge Kaplan recently denied a motion to dismiss an implied covenant of good faith and fair dealing claim in a similar case challenging the Department of Energy's termination of a cooperative agreement as part of a mass termination. Rejecting nearly all the same arguments that the government makes here, Judge Kaplan held that the plaintiff had sufficiently "identifie[d] a number of allegedly arbitrary actions the [government] took in exercising its discretion to terminate the award," including "failure to conduct an individualized assessment of [plaintiff's] project, its failure to engage with [plaintiff] concerning the reasons for termination, [and] its failure to provide an explanation for the termination decision beyond the boilerplate recitation of the language of the termination clause." Ex. 1 at 82:7–25.

The government provides no basis to reach a different conclusion here. It suggests that Plaintiffs cannot assert an implied covenant of good faith and fair dealing claim in connection with a termination for convenience, and it asks the court to extend that notion to grants and cooperative agreements even though they did not have a termination for convenience clause. MTD 41–42. The government cites no authority for the latter request, and it is inconsistent with the maxim that every contract carries an implied duty of good faith and fair dealing that requires the parties to exercise their contractual authorities in a reasonable manner. The grants and

cooperative agreements outlined specific grounds for termination, and Plaintiffs plausibly allege that the agencies claimed those grounds were met in a manner that violated the implied duty.[5]

The government's insistence that Plaintiffs identify an express provision prohibiting each aspect of that conduct is also off base. MTD 43–46. As *Metcalf* holds, "a breach of the implied duty of good faith and fair dealing does not require a violation of an express provision in the contract." 742 F.3d at 994 (emphasis added). Otherwise, the implied covenant would add nothing to a claim for breach of the express terms. The covenant must remain connected to the bargain and cannot contradict its allocation of risks, but Plaintiffs identify that connection here: the agencies' funding commitments and the contractual provisions governing suspension and termination. This is not an attempt to impose an unrelated obligation that the contract explicitly disclaims, as in *Mutakaber v. Secretary of State*, 162 F.4th 1141, 1148–49 (Fed. Cir. 2025), where the proposed implied duty conflicted with lease provisions relieving the government of responsibility for losses caused by third parties. Plaintiffs instead seek reasonable performance of the bargain the agencies actually made.

Finally, Count Six is not duplicative of Plaintiffs' other counts. To the extent there is overlap in allegations across counts, that is because different claims have similar elements (*e.g.*, abuse of discretion and breach of the implied duty), or because Plaintiffs are pleading in the alternative, which this Court's rules expressly permit. *Crestview Clinical Lab'y, LLC v. United States*, 181 Fed. Cl. 1, 15 n.10 (2026) (citing RCFC 8(d)). For example, Plaintiffs allege in Counts Three and Four that the contracts' express terms required individualized consideration, but if the Court holds that the express terms do not speak to that question, Plaintiffs alternatively

---

[5] Even as to the relevant procurement contracts, the government provides no doctrinal basis why the implied duty would not apply to the exercise of termination-for-convenience authority.

plead the agencies violated the implied covenant in not providing such individualized consideration under the circumstances here. And even under the government's view, the implied covenant claim may not be dismissed unless the claim for breach of express contractual terms goes forward. *Cf. Portland Mint v. United States*, 102 F.4th 1371, 1384 (Fed. Cir. 2024) (dismissing implied-covenant claim based on the same facts as a surviving breach claim).

More importantly, however, the government is wrong that the facts underlying the implied-covenant claim duplicate those for other claims. The government's redundancy argument focuses on the facts alleged in paragraph 239 of the Complaint while overlooking the additional allegations in paragraphs 240–41 concerning prior agency practice, the parties' reasonable expectations, and the contemplated function of the termination provisions. Those allegations support the theory that the agencies frustrated the bargain even if particular conduct did not violate an express provision. This Court recognized that distinction in *Hamilton Square, LLC v. United States*, 160 Fed. Cl. 617, 628–29 (2022): although an express-breach claim made one implied-duty theory unnecessary, allegations that the government destroyed the plaintiff's reasonable expectations supported a separate implied-duty theory requiring factual development. Likewise, here, whether Plaintiffs' expectations and the agencies' conduct were reasonable requires a "fact-intensive inquiry." *Id.* at 629.

**F. Count Seven States a Claim for Bad-Faith Terminations**

The Court should deny the government's motion to dismiss Count Seven, because Plaintiffs have plausibly alleged that the government acted with animus and a specific intent to injure when it terminated Plaintiffs' awards.

Plaintiffs allege far more than "disagreement" with the agencies' decisions to terminate. *Contra* MTD 3. Plaintiffs allege that State and USAID terminated Plaintiffs' awards as part of

mass terminations, based on animosity toward the awardees. The Complaint alleges that the President declared that the "United States foreign aid industry and bureaucracy" were "antithetical to American values" and served to "destabilize world peace"; that Elon Musk called USAID a "criminal organization" and spread false rumors about its implementing partners; and that the DOGE teams embedded at USAID and State drove the terminations and suspensions at Musk's animus-based direction. FAC ¶¶ 31, 42–49, 248.

The agencies also did not undertake any meaningful individualized review before terminating Plaintiffs' awards and instead rushed to predetermined results. The Complaint alleges that, after foreign-assistance recipients sought emergency relief in federal district court, USAID leadership instructed contracting and agreement officers to "move quickly to terminate the awards," with two tranches due that same day and another due the next day. FAC ¶¶ 54–59. An action memorandum for each tranche provided blanket authorization for all terminations within the tranche. *Id.* ¶ 59. The State Department allegedly terminated 3,925 grants and cooperative agreements on February 26 alone, *id.* ¶ 77, while later action memoranda selected awards by high-level programmatic categories and attached spreadsheets that lacked adequate information about the awards, *id.* ¶¶ 96–100. The agencies also allegedly used boilerplate notices in large tranches, sometimes addressed only to "Recipient" or "Implementing Partner," sometimes sent to the wrong organization, and sometimes issued multiple times for the same award. Some notices invoked "termination for convenience" for grants and cooperative agreements that could not be terminated on that basis, while others invoked "programmatic efficiency," which was not a contractual ground for termination. *Id.* ¶ 256. Those facts support a reasonable inference that the asserted rationales were pretextual rather than the product of individualized judgments about Plaintiffs' awards. *See* Ex. 1 at 83:13–20.

The government's principal response is that Plaintiffs do not allege "a specific intent to injure individual plaintiffs." MTD 48. But Plaintiffs do just that: the agencies acted with intent to harm a discrete group of entities that includes Plaintiffs, based on shared characteristics of that group. In *Danziger*, a similar case involving USAID mass terminations (there, of personal services contractors), Judge Tapp held that the former USAID contractors adequately alleged bad faith by pointing to repeated statements by senior officials denigrating the agency and its contractors as a group. Order at 2, *Danziger v. United States*, No. 25-1241 (Fed. Cl. Apr. 10, 2026), ECF No. 20. The court subsequently certified a class on the bad-faith claims, rejecting the government's arguments that a bad-faith claim must be entirely individualized. *Danziger v. United States*, 181 Fed. Cl. 93, 98 (2026).[6] In *Sublime Systems*, Judge Kaplan similarly acknowledged that a plaintiff may bring a bad-faith claim where it alleges termination "based on animus towards members of the group to which [plaintiff] belonged." Ex. 1 at 83:8–13. To hold otherwise would immunize the government's bad-faith actions so long as the challenged action harms a class of disfavored recipients rather than one award holder at a time.

The government cites no case holding that, at the pleadings stage for a claim of bad faith, a plaintiff must plead that a government official cursed a plaintiff by name. And such a requirement would defy common sense. If the government terminates an individual's benefits because the individual is a member of a group toward which the government holds animus (e.g., a certain racial or religious group), the government acted with animus in terminating the benefits, even if it did not have unique ill-will toward the individual. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (statute disenfranchising felons was motivated by animus).

[6]The government discusses only the later class-certification decision, MTD 48 n.12, but Judge Tapp also denied the government's Rule 12(b)(6) motion on the bad-faith claim, rejecting the same argument that the government makes here. *Danziger*, No. 25-1241, ECF No. 20, at 2.

In any event, the Complaint also alleges animus directed at individual Plaintiffs. For the ABA, the Complaint alleges that on February 15, 2025 Musk publicly stated that the ABA "has become a far-left political organization" and responded "Noted" to a post calling attention to the ABA's active federal awards. FAC ¶ 252. Appendix A reflects that multiple ABA State Department awards were terminated after February 15.

The animus-laden statements and actions regarding ABA, Democracy International, and MSH that postdate the award terminations are relevant. *Contra* MTD 49. This Court has recognized that post-termination conduct can be evidence of bad faith, including when a decisionmaker expresses pleasure at termination. *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 710 (2000). Thus, Plaintiffs' allegations that the Acting USAID Administrator (who was previously Acting Deputy Administrator in 2025) leveled false and inflammatory accusations at the ABA and Democracy International in April 2026, in a letter stating that "USAID is taking additional immediate and decisive action to finalize the termination[s]" of their awards, are concrete evidence of bad faith. FAC ¶¶ 249–51. So is the State Department's falsely suggesting that MSH's CEO had the sixth highest compensation of any global health implementing partner in the industry, or the government's refusal to admit that CEO to an event in New York at which a senior administration official spoke on the future of U.S. global health assistance. *Id.* ¶ 254.

The government's attempt to characterize the tranche process, boilerplate notices, and "lightning speed" as neutral policy implementation, MTD 50, asks the Court to choose the government's preferred inference from disputed facts. At this stage, those allegations must instead be considered in the light most favorable to Plaintiffs and viewed together with the pleaded statements of animus and the allegations that officials bypassed individualized review,

used inapplicable rationales, and accelerated terminations while litigation challenging the blanket suspensions was pending. FAC ¶¶ 54–78, 255–57.

Count Seven rests on plausible allegations regarding the agencies' intent and motivations that cannot be resolved at the pleadings stage. The Court should deny the government's motion to dismiss Count Seven.

## CONCLUSION

The Court should deny the government's partial motion to dismiss.

October 9, 2026

Respectfully submitted,

/s/ *Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar # 1016621)
Stephen K. Wirth (D.C. Bar # 1034038)
John Robinson (D.C. Bar # 1044072)
Brian C. Rosen-Shaud (D.C. Bar # 90042065)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com
stephen@jacobsonlawyersgroup.com
john@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com