No. 26-429C
(Chief Judge Solomson)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

HIAS, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT

---

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CORINNE A. NIOSI
Assistant Director

MATTHEW P. ROCHE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0466
Facsimile: (202) 514-8624
Matthew.p.roche@usdoj.gov

Dated: November 23, 2026

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .................................................. ii

ARGUMENT .................................................. 1

I. The Court Lacks Jurisdiction Over Five Plaintiffs' Claims Pursuant To Section 1500 .................................................. 1

II. Plaintiffs Fail To Demonstrate That Count Three States A Claim .................................................. 4

A. 2 C.F.R § 200.340(a)(2) Does Not Restrict Agency Discretion To Terminate Awards Based On Program Goals And Agency Priorities That Existed At The Time The Awards Were Issued .................................................. 4

B. The State Department Was Not Required To Use Plaintiffs' Preferred Methodology To Terminate The Grants And Cooperative Agreements .............. 10

C. Plaintiffs Fail To Identify Any Specific Congressional Goals And Priorities That Conflict With The State Department's Program Goals And Priorities ........ 11

D. Plaintiffs Fail To Show That The Terminations Were Not Authorized By Law .................................................. 12

III. Count Four Fails To State A Claim That USAID Breached The Contracts ..................... 14

IV. Plaintiffs Fail To Show That Count Five States A Claim For Abuse Of Discretion By State And USAID For The Suspensions And Terminations ...................................... 18

V. Count Six Fails To State A Breach Of The Duty Of Good Faith And Fair Dealing Claim .................................................. 21

VI. Count Seven Fails To State A Claim For Bad Faith Terminations.................................. 27

CONCLUSION .................................................. 29

## TABLE OF AUTHORITIES

Cases

*Acetris Health, LLC v. United States*,
949 F.3d 719 (Fed. Cir. 2020) .......... 2

*ACLR, LLC v. United States*,
147 Fed. Cl. 548 (2020) .......... 25

*Am-Pro Protective Agency, Inc. v. United States*,
281 F.3d 1234 (Fed. Cir. 2002) .......... 27

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
922 F.2d 792 (Fed. Cir. 1990) .......... 12

*Caldwell & Santmyer, Inc. v. Glickman*,
55 F.3d 1578 (Fed. Cir. 1995) .......... 24

*Danzinger v. United States*,
181 Fed. Cl. 93 (2026) .......... 28

*David Nassif Assocs. v. United States,*
644 F.2d 4 (Ct.Cl.1981) .......... 26

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
655 F.3d 1337 (Fed. Cir. 2011) .......... 13

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 7

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) .......... 13

*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015) .......... 17

*Dobyns v. United States*,
915 F.3d 733 (Fed. Cir. 2019) .......... 25

*Gonzalez v. Thaler*,
565 U.S. 134 (2012) .......... 2

*Green & Healthy Homes Initiative, Inc. v. Env't Prot. Agency*,
788 F. Supp. 3d 676 (D. Md. 2025) .......... 14

*Housing Authority of Slidell v. United States*,
149 Fed. Cl. 614 (2020) .......... 19, 24

*Keco Indus., Inc. v. United States,*
492 F.2d 1200 (Ct. Cl. 1974) ........ 20

*Krygoski Constr. Co. v. United States*,
94 F.3d 1537 (Fed. Cir. 1996)........ 23

*Lakeshore Eng'g Servs., Inc. v. United States*,
748 F.3d 1341 (Fed. Cir. 2014)........ 15

*Launch Alaska v. Dep't of the Navy, Off. of Naval Rsch.*,
No. 3:25-CV-00141-GMS, 2025 WL 2223744 (D. Alaska Aug. 5, 2025)........ 14

*Libertatia Assocs., Inc. v. United States*,
46 Fed. Cl. 702 (2000) ........ 29

*Metcalf Constr. Co. v. United States*,
742 F.3d 984 (Fed. Cir. 2014)........ 26

*New Jersey v. OMB*,
837 F. Supp. 3d 258 (D. Mass. 2026) ........ 5, 6, 8

*Porwancher v. Nat'l Endowment for the Hums.*,
1:25-CV-1180 (CJN), 2025 WL 2556570 (D.D.C. Aug. 25, 2025) ........ 9

*Pulsifer v. United States*,
601 U.S. 124 (2024)........ 9

*Res. Invs., Inc. v. United States*,
785 F.3d 660 (Fed. Cir. 2015)........ 2

*Rocky Mtn. Helium, LLC v. United States*,
841 F.3d 1320 (Fed. Cir. 2016)........ 11, 17

*Rudisill v. McDonough*,
601 U.S. 294 (2024)........ 7

*Sacco v. Dep't of Justice,*
317 F.3d 1384 (Fed.Cir.2003)........ 2

*Salsbury Indus. v. United States,*
905 F.2d 1518 (Fed. Cir. 1990)........ 23

*Scott Timber Co. v. United States*,
692 F.3d 1365 (Fed. Cir. 2012)........ 26

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)........ 12

*Smithson v. United States,*
847 F.2d 791 (Fed. Cir. 1988)........................................................................................ 13

*St. Christopher Assocs., L.P. v. United States*,
511 F.3d 1376 (Fed. Cir. 2008)...................................................................................... 13

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
480 F.3d 1116 (Fed. Cir. 2007).............................................................................. 13, 19

*T & M Distrib., Inc. v. United States*,
185 F.3d 1279 (Fed. Cir. 1999).............................................................................. 10, 22

*Terry v. United States*,
103 Fed. Cl. 645 (2012) ................................................................................................ 29

*TigerSwan, Inc. v. United States*,
110 Fed. Cl. 336 (2013) ............................................................................ 20, 22, 24, 26

*TigerSwan Inc. v. United States*,
118 Fed. Cl. 447 (2014) ......................................................................................... 20, 21

*Trusted Integration, Inc. v. United States*,
659 F.3d 1159 (Fed. Cir. 2011)........................................................................................ 2

*United States v. Wilson*,
503 U.S. 329 (1992)................................................................................................... 6, 7

*Winnemucca Indian Colony v. United States*,
156 F.4th 1339 (Fed. Cir. 2025) ....................................................................................... 2

<u>Statutes</u>

28 U.S.C. § 1491(a) ........................................................................................................ 20

28 U.S.C. § 1491(b) ........................................................................................................ 20

28 U.S.C. § 1500................................................................................................ 1, 2, 4, 29

<u>Regulations</u>

2 C.F.R. pt. 200............................................................................................................. 8, 9

2 C.F.R. § 200.202(a)(1)-(2) (2024) .................................................................................. 8

2 C.F.R. § 200.340(a)............................................................................................... passim

2 C.F.R. § 700.14 ...................................................................................................... passim

FAR 52.249-2 .................................................................................................................. 23

FAR 52.249-6 .......... 23

Other Authorities

85 Fed. Reg. 49,506 08 (Aug. 13, 2020).......... 7

Executive Order 14,169 .......... passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HIAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 26-429C |
| v. | ) | (Chief Judge Solomson) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT

Pursuant to this Court's order dated October 19, 2026, defendant, the United States, respectfully submits this reply to plaintiffs' response to our motion for partial dismissal. For the reasons stated herein and in our motion, we respectfully request that the Court: (1) dismiss the amended complaint in its entirety as to plaintiffs HIAS, American Bar Association (ABA), DAI Global, LLC (DAI), Democracy International Inc. (DI), and Management Sciences for Health, Inc. (MSH), pursuant to 28 U.S.C. § 1500; and (2) dismiss counts three through seven of the amended complaint for failure to state a claim as to all plaintiffs.[1]

ARGUMENT

I. The Court Lacks Jurisdiction Over Five Plaintiffs' Claims Pursuant To Section 1500

In our motion, we demonstrated that, pursuant to 28 U.S.C. § 1500, this Court does not possess jurisdiction to entertain the claims brought by HIAS, ABA, DAI, DI, and MSH because, at the time those plaintiffs filed their complaint in this Court, they already had a suit pending in the United States District Court for the District of Columbia that is based on the same set of operative facts. *See Glob. Health Council v. Trump*, No. 25-cv-402 (D.D.C.) (*GHC*). Plaintiffs

[1] Upon further consideration, defendant respectfully requests leave to withdraw its motion to dismiss count two of the amended complaint.

assert that we waived any argument pertaining to § 1500 because we did not cite to the "res judicata principles of 1868," including the "act or contrition test" and the "evidence test." Resp. 14 (quoting *Acetris Health, LLC v. United States*, 949 F.3d 719, 729 (Fed. Cir. 2020)).

To the contrary, § 1500 is a jurisdictional statute, and therefore cannot be waived. "Subject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). In *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1170 n.5 (Fed. Cir. 2011), the United States Court of Appeals for the Federal Circuit stated that it was not adopting either res judicata test as a controlling "standard by which to measure whether two claims arise from substantially the same set of operative facts." Further, simply because the Federal Circuit applied the res judicata tests in other subsequent cases, *see Acetris*, 949 F.3d at 729; *Res. Invs., Inc. v. United States*, 785 F.3d 660, 666 (Fed. Cir. 2015), does not mean that those cases held that the tests were exclusive or controlling. Nor could they. *Sacco v. Dep't of Justice,* 317 F.3d 1384, 1386 (Fed.Cir.2003) ("A panel of this court is bound by prior precedential decisions unless and until overturned *en banc.*"). In any event, our motion cited and relied on the Federal Circuit's 2025 decision in *Winnemucca Indian Colony v. United States*, 156 F.4th 1339, 1351 (Fed. Cir. 2025), which did not apply those tests.

Plaintiffs next assert that § 1500 does not bar their contract claims here because the claims in *GHC* do not include any factual allegations or claims "relating to the suspension or termination of the plaintiffs' specific grants, cooperative agreements, or procurement contracts." Resp. 15. Plaintiffs further contend that the two complaints do not satisfy either the "act of contract" or "evidence" tests. *Id.* at 15-16. It is not dispositive that the claims in *GHC* do not arise out of any specific terminated contract or involve the same evidence. *See Trusted Integration, Inc.*, 659 F.3d at 1170 n.5 ("Thus, the fact that two suits arise from different claims

under the 19th Century tests does not compel the conclusion that the suits do not arise from substantially the same operative facts."). No matter what label attaches, it is clear that both cases arise out of the same underlying factual predicate.

Both cases arose from President Trump's issuance of Executive Order 14,169, which provided that foreign assistance grants must be aligned with the foreign policy of the President of the United States. *Compare* Am. Compl. ¶ 31[2], with Appx086-88 (*GHC* 3d Am. Compl. ¶¶ 52-59, discussing Executive Order). Further, both cases are factually rooted in the implementation of Executive Order 14,169, with this case challenging the grants terminated at State and USAID following the elimination of foreign assistance programs, and *GHC* challenging the elimination of the same foreign assistance programs and the administration's restructuring of USAID. *Compare* Am. Compl. ¶¶ 32-36 (discussing Secretary Rubio's January 24, 2025 memorandum, the Rodgers notice, and the Gray instructions), *with*, Appx088-90 (*GHC* 3d Am. Compl. ¶¶ 60-65, also discussing, almost word-for-word, Secretary Rubio's January 24, 2025 memorandum, the Rodgers notice, and the Gray instructions).

Both cases expressly challenge USAID and State Department actions that "halted all disbursements of appropriated foreign assistance funding." Am. Compl. ¶ 37; *see* Appx090 (*GHC* 3d Am. Compl. ¶ 66, alleging, "State Department also halted most spending of appropriated foreign assistance funding through programs administered outside USAID.").[3] The *GHC* complaint states that "[m]ost of USAID's programs were implemented—whether by grants [or] cooperative agreements . . . by private sector parties," which includes the plaintiffs in this

[2] This discussion in our motion mistakenly referred to pages from the first complaint. We have corrected these errors in this reply.

[3] *Compare, e.g.*, Am. Compl. ¶ 93 (DAI's Feed the Future Policy LINK), *with* Appx093 (*GHC* 3d Am. Compl. ¶ 84, discussing elimination of USAID's Feed the Future Initiative); *see also* Compl. App'x A at 21, 40.

case. Appx078, 102 (*GHC* 3d Am. Compl. ¶¶ 33, 110). More importantly, the terminated USAID grants at issue in this case were terminated as part of a larger restructuring of USAID, which is directly at issue in *GHC*. *See* Appx092, 115-19 (*GHC* 3d Am. Compl. ¶¶ 74, 166-190).

Finally, both suits contend that the resulting loss of funding from the terminated funding instruments and underlying programs have irreparably harmed plaintiffs. *Compare* Am. Compl. ¶¶ 6-7, 146 (discussing harm to plaintiffs), *with* Appx069 (*GHC* 3d Am. Compl. ¶ 2); *compare* Am. Compl. ¶¶ 9, 107 (ABA), *id.* ¶¶ 10, 114 (DAI), *id.* ¶¶ 11, 118 (DI), *id.* ¶¶ 13, 128 (HIAS), *id.* ¶¶ 14, 133 (MSH), *with* Appx073-74, 107-08 (*GHC* 3d Am. Compl. ¶¶ 20, 124 (ABA), *id.* ¶¶ 18, 119 (DAI), *id.* ¶¶ 19, 116-17 (DI), *id.* ¶¶ 15, 123 (HIAS), and *id.* ¶¶ 16, 121-22 (MSH).

These are not mere background facts provided for context, as plaintiffs dismissively suggest. Resp. 17. Rather, without the challenged Executive Order 14,169, and immediate actions taken to implement it, including the restructuring of USAID, none of the causes of action would arise. Indeed, the events that form the basis for claims seven through ten in *GHC*, the abolishment of USAID, is the factual predicate for many of the injuries in this case to occur. Similarly, the point of the *GHC* litigation, according to plaintiffs, is that if the administration obligated appropriated funds, then that money would flow to the grantees in this case. Both cases, therefore, arise from a common set of operative facts. For this reason, the Court lacks jurisdiction over the claims of HIAS, ABA, DAI, DI, and MSH pursuant to § 1500.

## II. Plaintiffs Fail To Demonstrate That Count Three States A Claim

### A. 2 C.F.R § 200.340(a)(2) Does Not Restrict Agency Discretion To Terminate Awards Based On Program Goals And Agency Priorities That Existed At The Time The Awards Were Issued

In our motion, we demonstrated that count three fails to state a claim for breach of contract. The grant regulations expressly allow for terminations when the funding instruments

no longer effectuate Government policy. 2 C.F.R. § 200.340(a)(2), which was incorporated into State Department grants and cooperative agreements, provides: "The Federal award may be terminated in whole or in part as follows: . . . By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities . . . ." Here, the regulation was properly exercised in terminating the awards because State concluded that the awards "no longer effectuated State Department priorities." Am. Compl. ¶ 50.

In their response, plaintiffs claim that § 200.340(a)(2) only permits termination of grants and cooperative agreements "based on the agency's goals and priorities that existed at the time the award was issued, not changed goals and priorities." Resp. 23. As support, plaintiffs rely upon the recent decision in *New Jersey v. OMB*, 837 F. Supp. 3d 258, 276–83 (D. Mass. 2026), *appeal docketed*, No. 26-2210 (1st Cir. Oct. 23, 2026). Plaintiffs construe § 200.340(a)(2)'s use of "*the* program goals and agency priorities" as indicative of a discrete set of goals, and argue that "no longer effectuates" "presupposes that the award once effectuated 'the program goals and agency priorities.'" Resp. 23. Thus, according to plaintiffs, the clause only applies "where an agency determines that the award can no longer achieve the objectives for which it was made." *Id.* Plaintiffs' construction of 2 C.F.R. § 200.340(a)(2) is unreasonable.

To begin with, plaintiffs misquote § 200.340(a)(2), which does not refer to "goals and priorities." Rather, 2 C.F.R. § 200.340(a)(2) permits termination "if an award no longer effectuates the program goals *or* agency priorities." *Id.* (emphasis added). The clause's use of the disjunctive "or" means that the agency may terminate based on either program goals or agency priorities, and the two options are not tethered. Plaintiffs' errant interpretation focuses on "the program goals," and renders the clause's use of "agency priorities" superfluous.

As we explained in our motion, nothing in the regulation's text limits "the program goals or agency priorities" to those in effect at the time the grant was made. § 200.340(a)(2). Rather, the text simply asks whether "an award no longer effectuates the program goals or agency priorities," without any textual limitation on *when* those goals or priorities were established.

Moreover, the phrase "no longer effectuates" makes clear that the regulation contemplates a change in circumstances between when the grant was awarded and when the agency decides to terminate the grant. We agree with plaintiffs that a funding instrument must have "effectuate[d] the program goals [and] agency priorities" at the time of award. However, if "an award no longer effectuates the program goals or agency priorities," that simply means there is now a disconnect between the award and the program goals or agency priorities that did not exist at the time the award was made. But that can happen at either end, either because the awardee's performance is no longer effectuating the program goals or agency priorities, or if those goals or priorities changed subsequent to the award. Even the district court acknowledged that "the language of the Termination Clause alone does not fully confirm Plaintiff's interpretation." *New Jersey*, 837 F. Supp. 3d at 277.

Further, the tense of "program goals or agency priorities" does not limit those priorities to only agency concerns in the past tense, *i.e.*, priorities at the time the agreement was made. "[U]se of a verb tense is significant in construing" the intended meaning of policies. *See United States v. Wilson*, 503 U.S. 329, 333 (1992). And this regulation applies specific tenses to denote different purposes. In 2 C.F.R. § 200.340(a)(4), should a recipient choose to partially terminate its award, an agency may terminate the remaining portion of the award if the remaining portion "will not accomplish the purposes for which the Federal award was made[.]" *Id*. That is a backward-looking inquiry, stated in the past tense, requiring the agency to compare the

remaining portion of the award to the agency's purposes at the time "the Federal award *was* made." *Id.* (emphasis added). Section 200.340(a)(2), by contrast, contains no similar language. Instead, it is stated in the present tense—calling for a here-and now analysis of whether the award currently "effectuates the program goals or agency priorities." *Id.* § 200.340(a)(2). This is strong evidence that § 200.340(a)(2) does not limit termination to awards that "no longer effectuate[] the program goals or agency priorities" identified at the time "the Federal award was made." *Id.* *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) ("[W]e generally 'presume differences in language like this convey differences in meaning.'"); *United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes").

Section 200.340(a)(2) thus allows an agency to terminate awards when it reorients its priorities for all manner of policy reasons, for example, in response to an emergency (like a global pandemic), or a problem that arises in a particular part of the country (like a natural disaster), or if the problem that an award was designed to address was resolved. Nor does anything in § 200.340(a)(2)'s text distinguish between changes in agency priorities based on external factors like a pandemic or, as is the case here, changes in agency priorities based on new direction from politically accountable leadership, which is an entirely permissible motivating factor for agency decisions. *Department of Com. v. New York*, 588 U.S. 752, 781 (2019). Plaintiffs' construction that the regulation freezes agency priorities in time would tie an administration's hands and is unreasonable.

Plaintiffs next cite to the regulation's history, highlighting OMB's explanation that "the 'no longer effectuates' language was to allow termination of projects that could no longer meet 'the intended objective of the award,' or that had become 'ineffective at achieving program goals.'" Resp. 23 (quoting 85 Fed. Reg. 49,506, 49,507–08 (Aug. 13, 2020)). But the regulatory

history stated that its intended purpose was to "strengthen the ability of the Federal awarding agency to terminate Federal awards . . . when the Federal awards no longer effectuate the program goals *or Federal awarding agency priorities*." *Id.* at 49,507 (emphasis added).

Plaintiffs also cite the district court's opinion in *New Jerse*y, which found persuasive provisions in the grant regulations that "require agencies to design programs 'with clear goals and objectives'" and that measure performance based on those goals and objectives. Resp. 24 (quoting *New Jersey*, 837 F. Supp. 3d at 278; 2 C.F.R. § 200.202(a)(1)-(2) (2024)). The *New Jersey* court also quoted the appendix to part 200 of the grant regulations as "mandat[ing] that, in the program description of the funding opportunity, the agency list the "agency's funding priorities or focus area[.]" *New Jersey*, 837 F. Supp. 3d at 279 (quoting 2 C.F.R. pt. 200, app. I(b)(3)(i)(B) (2024)). The court interpreted these as "requirements" that "prioritize ensuring that grantees are on notice, before applying, as to what the program goals and agency priorities are for any particular award." *Id*. Thus, the court inferred that the termination clause prohibits termination "based on new priorities" that were "not disclosed to the grantees" pre-award. *Id*.

Critically, however, the district court was quoting the 2024 version of the regulation. The 2020 version, which applies to the grants in this case, contains no such mandate. Rather, it says that the program description in the notice of funding opportunity "describes the Federal awarding agency's funding priorities *or* the technical *or* focus areas in which the Federal awarding agency intends to provide assistance." 2 C.F.R. pt. 200, app. I(A) (2020) (emphasis added). This is not a *mandate* to list the agency's funding priorities, as the district court claimed.

Moreover, neither the 2020 nor 2024 grant guidelines require that the notice of funding opportunity disclose "agency priorities." *See* 2 C.F.R. Pt. 200, App. I(A) (2020); 2 C.F.R. pt. 200, app. I(b)(3)(i)(B) (2024). Indeed, the regulations do not require agencies to disclose

"agency priorities" at any point during the grant-making process. The district court simply conflated "funding priorities," which agencies must disclose in the notice of funding opportunity "if any" exist, 2 C.F.R. pt. 200 app. I(b)(3)(i)(B) (2024), with "agency priorities" from the termination clause. The district court cites no authority for this leap. *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute . . . different terms usually have different meanings."). Further, although a disclosure of program goals and funding priorities in the notice of funding opportunity may inform a potential applicant's decision about how to structure an application, that disclosure is in no way inconsistent with allowing the agency to later change those goals and terminate grants that no longer effectuate changed goals or agency priorities.

In any event, at least one other district court reached the opposition conclusion from *New Jersey* and plaintiffs' interpretation. *See Porwancher v. Nat'l Endowment for the Humans.*, No. 1:25-CV-1180 (CJN), 2025 WL 2556570, at *2 (D.D.C. Aug. 25, 2025) ("But Porwancher also contends that a grantee's failure to 'effectuate[ ] . . . program goals or agency priorities' can only stem from a change in the grantee's intended work rather than a change in NEH priorities. . . . In any event, the plain text of the regulations doesn't support Porwancher's position; if NEH's priorities change while a grantee's project remains unchanged, it is the case that the project 'no longer effectuates . . . agency priorities.' Indeed, Porwancher's position would mean that the NEH could *never* revisit a prior grant if it considered them inconsistent with its current priorities."). As the district court in *Porwancher* recognized, plaintiffs' construction of the regulation would produce the absurd result of an agency never being able to "revisit a prior grant if it considered them inconsistent with its current priorities." *Id.*

Finally, plaintiffs' construction is anomalous to virtually every other area of Government contracting, which expressly allows terminations based on changed needs or priorities. *See, e.g.*,

*T & M Distrib., Inc. v. United States*, 185 F.3d 1279, 1281–82 (Fed. Cir. 1999) (affirming contracting officer's authority to terminate contract due to agency's changed needs).

B. The State Department Was Not Required To Use Plaintiffs' Preferred Methodology To Terminate The Grants And Cooperative Agreements

Plaintiffs' claim that "an agency cannot possibly make a reasoned determination of whether '*an* award' effectuates certain program goals or agency priorities without looking at the details of that award." Resp. 25 (emphasis added). But nothing in § 200.340(a)(2) requires the agency to make the determination based on plaintiffs' vague reference to the "details of the award." Section 200.340(a)(2) does not require State to make the determination based on any particular process, or prohibit multiple award terminations on the same day, just as the Contract Disputes Act does not preclude a contracting officer from issuing a decision regarding multiple certified claims in the same letter. In short, there is no regulatory criteria for any "individualized assessment," only that a decision be made. Plaintiffs' assertion does not allow for the possibility that awards may be facially inconsistent with agency priorities. For example, if a President issued a series of orders advancing an energy policy that promoted "net zero" carbon emissions, State would not have to look at the details of grant awards that promoted an energy policy based on coal and other fossil fuels before determining that those awards no longer aligned with the agency's priorities.

Moreover, plaintiffs' assertion that State simply "presumed" that the awards did not align with program goals or agency priorities without first inquiring into the projects is belied by the amended complaint. Resp. 25. The Marocco Declaration, which was quoted in the amended complaint, explained the review process of State awards, prior to termination, thusly:

> At the Department of State, the review process for grants began with compiling a list of all the grants administered by the Department. This list was then sorted by the Department bureau

> responsible for each grant. The Senior Bureau Official (Assistant Secretary or equivalent) in each Bureau was tasked with *reviewing each grant within his or her Bureau and providing a recommendation to the Office of the Secretary on whether to continue or terminate the grant*. If the Bureau desired to continue the grant, a justification was required. . . . Upon receipt, the Office of the Secretary would review the recommendations and made additional edits pursuant to the Secretary's instructions. As with USAID, this resulted in recommendations that receive the Secretary of State's ultimate review. The Secretary of State's personal involvement confirms that, for example, work of particular importance to the United States' relationships with particular foreign nations is not impaired.

Appx058 (Marocco Decl. ¶ 6) (emphasis added). In short, *each* grant was reviewed by the Senior Bureau Official and recommendations were made based on that review. Put another way, State's terminations were based on an "individualized assessment" of *each* award. This Court does not have to accept as true count three's allegations that these assessments did not occur when they are contradicted by documents referenced in the complaint itself. *See Rocky Mtn. Helium, LLC v. United States*, 841 F.3d 1320, 1325-26 (Fed. Cir. 2016).

### C. Plaintiffs Fail To Identify *Any* Specific Congressional Goals And Priorities That Conflict With The State Department's Program Goals And Priorities

Next, plaintiffs claim that the "doctrine of constitutional avoidance" requires that § 200.340(a)(2) be interpreted in a manner that avoids rendering the regulation unconstitutional though terminations that conflict with Congress's goals and priorities "in requiring the agency to issue the relevant awards." Resp. 26 (citing Am. Comp. ¶ 212). As we explained in our motion, paragraph 212 of the amended complaint fails to state a claim on this ground because plaintiffs never identify any Congressional directives to spend funds on any particular contract, grant, or cooperative agreement that is at issue in this case. Nor do plaintiffs ever identify any of Congress's "binding policy directives" that State allegedly disagrees with. At most, this claim

consists of nothing more than arguments of counsel, which are not allegations of fact. For these reasons, paragraph 212 fails to state a claim.[4]

D. Plaintiffs Fail To Show That The Terminations Were Not Authorized By Law

In our motion, we also demonstrated that count three should be dismissed because it attempts to manufacture a breach by alleging that State's terminations were not "authorized by law" pursuant to § 200.340(a)(2) because the terminations violated the Administrative Procedure Act (APA). Am. Compl. ¶¶ 206-07. We explained that plaintiffs' claim fails because it is textually unsupported and because § 200.340(a)(2) did not incorporate the APA, which is not a source of substantive law. For this reason, plaintiffs' assertions that we did not dispute that they plausibly alleged an APA violation is flat wrong. Resp. 28. Plaintiffs' remaining arguments fail.

At the outset, plaintiffs erroneously contend that the phrase "'to the greatest extent authorized by law'" in § 200.340(a)(2) refers to "the phrase that immediately follows," *i.e.*, "if an award no longer effectuates the program goals or agency priorities." Resp. 28. This is not correct. The phrase "to the greatest extent authorized by law" in § 200.340(a)(2) is set off by commas, and therefore refers to the antecedent verb phrase "may be terminated," such that agencies may terminate a grant or award unless there is a law precluding it. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 141, 144-46 (2012). The phrase "if an award no longer effectuates the program goals or agency priorities" is a different

[4] Citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006), plaintiffs contend that we waived this argument by raising it in a footnote. Resp. 26. Waiver, however, is discretionary for the Court. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990). Here, plaintiffs had the opportunity to respond to our argument regarding paragraph 212 of the amended complaint, and so the Court should decline to deem it waived simply because we raised it in a footnote. If anything, plaintiffs' undeveloped and unsupported claim in paragraph 212 should be deemed waived, especially since plaintiffs fail to provide any details about which Congressional policies or appropriations are allegedly violated.

condition for the termination and is not modified by the preceding phrase "to the greatest extent authorized by law." § 200.340(a)(2). Thus, § 200.340(a)(2) presents two conditions on the authority of the State Department's authority to terminate: first, the termination cannot be precluded by law (*i.e.*, an unlawful purpose); and second, the termination must be because the award no longer effectuates the program goals or agency priorities. Plaintiffs misstate our argument, Resp. 28-29, as we plainly stated that an agency cannot terminate a grant for a discriminatory purpose. Def. Mot. 28.

Plaintiffs next claim that § 200.340(a)(2) incorporates the APA's procedural requirements because the phrase "to the greatest extent authorized by law" is not limited to "substantive law." Resp. 29. To the contrary, § 200.340(a)(2) allows terminations "to the greatest extent *authorized by law*." 2 C.F.R. § 200.340(a)(2). Authorized means "[t]o give legal authority; to empower." AUTHORIZE, Black's Law Dictionary (12th ed. 2024). This is a substantive requirement. Nothing in the APA either authorizes or proscribes anything. It simply permits judicial review of final agency actions and waives sovereign immunity for claims seeking injunctive relief. *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1344 (Fed. Cir. 2011). The APA in no way supplies substantive contract provisions. Nor was the APA ever incorporated into the contracts at issue. In fact, the APA does not apply to breach of contract claims *at all*. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam); *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007). More importantly, plaintiffs' argument is at odds with the Federal Circuit's guidance that courts should be "reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract explicitly provides for their incorporation." *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir.

2008); *accord Smithson v. United States,* 847 F.2d 791, 794 (Fed. Cir. 1988) (cautioning against wholesale incorporation of regulations that would create new obligations by “mere implication”).

Finally, nothing in the district court cases cited by plaintiffs compel a different conclusion, as those cases were challenges brought *pursuant to the APA*, which the courts held did not involve contract claims. *See Green & Healthy Homes Initiative, Inc. v. Env't Prot. Agency*, 788 F. Supp. 3d 676, 692 (D. Md. 2025); *Launch Alaska v. Dep't of the Navy, Off. of Naval Rsch.*, No. 3:25-CV-00141-GMS, 2025 WL 2223744, at *5 (D. Alaska Aug. 5, 2025). Reading § 200.340(a)(2) as somehow incorporating the entire United States Code generally, or judicial review provisions in the APA, into the contract, is entirely unreasonable.

III. <u>Count Four Fails To State A Claim That USAID Breached The Contracts</u>

In our motion, we explained that count four of the amended complaint fails to state a claim that USAID breached the contracts by issuing stop work orders, suspension, and terminations because the suspensions and terminations were permissible pursuant to 2 C.F.R. § 700.14, which provides: “If at any time USAID determines that continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States or would be a in violation of an applicable law, then USAID may, following notice to the recipient, suspend or terminate the award.” Contrary to plaintiffs’ arguments, § 700.14 does not require any particular form of “individualized determination” to terminate. Nor does it set forth the number of awards that may be terminated on any given day, week, or month. According to the plain terms of § 700.14, all that is required for a termination is notice following a determination by “USAID” “at any time” that “continuation of all or part of the funding for a program should be terminated because such assistance would not be in the national interest of the United States.” *Id.*

Yet, plaintiffs contend that § 700.14 requires some vaguely defined individualized determination. Resp. 30. As demonstrated above, the nature of the individualized assessment that plaintiffs seek is not specified in the agreements themselves nor in § 700.14 Resp. 32. Plaintiffs simply read all sorts of procedures into the contracts and regulations. But, as plaintiffs argue earlier in their response, "the written terms of the contract control," *id*. at 20, not plaintiffs' attempts to "rewrite the clauses to provide it protections the government did not agree to." *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1348 (Fed. Cir. 2014).

Plaintiffs posit that USAID used the term "program" interchangeably to mean both "a broader initiative" as well as individual grant awards. Resp. 30. As support, plaintiffs cite a March 21, 2025 USAID report to Congress on the status of its reorganization, which included a spreadsheet titled "USAID – TERMINATED PROGRAMS LIST" that lists terminated awards. *Id*. Regardless of whether the use of "programs" in this report supports plaintiffs' interpretation of the term "program," it more importantly contradicts plaintiffs' overarching allegations that no determinations were made pursuant to 2 C.F.R. § 700.14, as the report describes "USAID's *full-scope review* of its programming."

Similarly, plaintiffs' reliance on the Declaration of Pete Marocco as well as the termination notices as support for their interpretation of "program" as meaning individual awards, misses the larger point, *i.e.*, these documents demonstrate that USAID complied with § 700.14 when terminating the awards. Resp. 31. *See* Appx.058 (describing a second layer of review of termination recommendations to ensure that "ending the program was consistent with the foreign policy of the United States and the operations and priorities of the Agency.").

Indeed, as we explained in our motion, the suspension and termination notices quoted in or attached to the amended complaint demonstrate that the USAID foreign assistance funding

instruments were suspended and/or terminated following determinations that continuation of funding for the program "would not be in the national interest of the United States." 2 C.F.R. § 700.14. *See, e.g.*, Am. Compl. ¶ 39 (quoting Marocco declaration that USAID had "generally paused all expenditures in connection with foreign aid," for "*both new programs . . . as well as existing ones*." (emphasis added) (citation omitted)); *id.* at 19 (ABA termination notice, stating that "[i]n accordance with Executive Order 14169 . . . your award has been reviewed for *programmatic efficiency* and consistency with United States foreign policy." (emphasis added)); *see also id*. at 22 (DAI); *id.* at 23 (DI); *id*. at 27 (MSH termination notice, providing that: "Secretary Rubio and PTDO Deputy Administrator Marocco have . . . made a determination that *continuing this program is not in the national interest*." (emphasis added)); *see also* Am. Compl. App'x A at 28 (same for HIAS); *id*. at 33 (same for Save the Children); *id*. at 52 (same for Mercy Corps); *id*. at 57 (same for ADEPT and FRF).

Moreover, the Marocco Declaration is evidence that USAID made termination decisions on an award by award basis, stating that "USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project." Appx057-58 (Marocco Decl. ¶ 5). "Policy staff . . . performed a first line review to determine whether the individual agreement was in line with foreign policy priorities . . . or not (and presumptively could be terminated as inconsistent with Agency priorities and the national interest)." *Id.* "Those recommendations were reviewed by a senior policy official" and then "were routed to me for further review, including of institutional and

diplomatic equities." *Id*. "Termination recommendations approved by me ultimately received the Secretary of State's review." *Id*.

Plaintiffs dismiss the Marocco Declaration, characterizing USAID's process as little more than reviewing one line on a spreadsheet, and that "USAID did not actually determine, award by award, that continuation was contrary to the national interest." Resp. 32-34. Yet plaintiffs never explain how, if such assessments were not made, hundreds of other USAID funding instruments were not terminated.

Plaintiffs also argue that the Court cannot rely on the Marocco Declaration to decide our motion, contending that "a declaration from a different case containing disputed assertions of fact cannot establish otherwise as a matter of law." *Id*. at 54. To the contrary, plaintiffs relied on this declaration in the amended complaint, Am. Compl. ¶¶ 39, 82, and it is therefore properly reviewable by the Court. *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015). Further, to the extent that the Marocco Declaration contradict plaintiffs' allegations that "the supposed individualized determinations did not occur," the Court need not accept these allegations as true because they conflict with the contents of documents referenced by the complaint. *See Rocky Mtn. Helium*, 841 F.3d at 1325-26.

In short, plaintiffs' arguments amount to a dispute concerning the *adequacy* of the termination review process based on requirements that are not in the agreements they claim were breached, such as whether USAID "'*meaningfully assessed'* what particular projects were accomplishing or the consequences of terminating them." Resp. 33 (emphasis added). But § 700.14 only requires notice and a determination that "continuation of all or part of the funding for a program should be suspended or terminated because such assistance would not be in the national interest of the United States or would be a in violation of an applicable law." This does

not set forth *how* such a determination should be made, nor require USAID to use any particular review process first. Thus, plaintiffs' assertions in the amended complaint and in their response brief regarding individualized determinations constitute legal arguments regarding what the review process should have been, not factual allegations plausibly alleging a violation of § 700.14. Plaintiffs' disagreement with the adequacy of the process does not state a claim for breach of the termination provisions, especially when § 700.14. provides no requirements for how a determination is to be made in the first place.

## IV. Plaintiffs Fail To Show That Count Five States A Claim For Abuse Of Discretion By State And USAID For The Suspensions And Terminations

In our motion we demonstrated that the amended complaint fails to state a claim for breach of contract based on an abuse of discretion theory. As with their other claims, plaintiffs' abuse of discretion claim flows from their unsupported legal assertion that USAID and State could not terminate awards "*en masse*." Although plaintiffs never actually explain how many awards an agency may terminate in a day, plaintiffs presumably contend that agencies may only terminate one award at a time per day, and only then after a protracted review process. However, neither the regulations nor the agreements place any limits on an agency's exercise of its discretion to terminate multiple awards on any given day, week, or month. All that is required is that the *agency* makes determination that the award does not align with the program goals, agency priorities, or is no longer in the national interest. 2 C.F.R. § 200.340(a)(2); *id*. § 700.14.

The Executive Branch possesses wide discretion to implement the foreign policy determinations of the President of the United States, including terminating foreign assistance grants that no longer align with those policies. Here, Executive Order 14,169 declared that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." Exec. Order § 2, 90

Fed. Reg. at 8619; Am. Compl. ¶ 31. Both State and USAID then undertook a review process to identify funding instruments that do not align with the foreign policy of the President, and then suspended and terminated awards on that basis. Thus, the agencies exercised their discretion pursuant to the grant regulations that were incorporated into the agreements, which expressly allow for terminations of awards on this basis. 2 C.F.R. § 200.340(a)(2); *id.* § 700.14. The number of termination notices sent on any given day are, therefore, irrelevant to whether the requisite determinations have been made.

Plaintiffs tautologically assert that the suspensions and terminations were an abuse of discretion because the termination process was arbitrary and capricious, but plaintiffs only do this by grafting on the APA review standards. Although plaintiffs contend that they are not trying to "import the standards of the APA" into the case, Resp. 35, that is exactly what the amended complaint does. Indeed, count three expressly alleges that State's terminations were not authorized by law because the terminations violated the APA. Am. Compl. ¶ 204. Similarly, count five alleges that the terminations were an abuse of discretion because they were arbitrary and capricious for exactly the same reasons as count three. *Compare id.* ¶¶ 205-07 (count three), with *id.* ¶¶ 229-32 (count five). As we explained regarding count three, however, the APA does not apply to contract claims. *Suburban Mortg. Assocs., Inc.*, 480 F.3d at 1128.

Similarly, plaintiffs' reliance on *Housing Authority of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020), is misplaced. There, the plaintiffs alleged arbitrary and capricious conduct, but did not expressly claim that the alleged breach was predicated on APA violations, as the amended complaint does in this case. Further, unlike *Slidell*, outside of our § 1500 motion, we are not contesting the Court's jurisdiction over the contract claims.

Moreover, plaintiffs' theory that the terminations were an abuse of discretion "at the individual level" is expressly predicated on APA-style reasoning that is found nowhere in the regulations or agreements. Resp. 36-37; Am. Compl. ¶¶ 229-31. Simply put, neither the agreements nor the grant regulations incorporate wholesale the APA, nor do they require agencies to utilize any particular review process before terminating an award, to provide detailed explanations of the decisions to terminate, to require that the agencies consult with any particular individuals or assess plaintiffs' reliance interests, or to consider the cost of suspensions or terminations or alternatives, as the amended complaint alleges. Am. Compl. ¶ 231.

Unlike this Court's review of procurement decisions under APA standards of review, *see* 28 U.S.C. § 1491(b), in contract termination cases brought pursuant to 28 U.S.C. § 1491(a), the Court applies the *Keco* factors to assess whether a termination was an abuse of discretion. *See TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 345 (2013) (*TigerSwan I*) ("In determining whether the CO clearly 'abused its discretion' in terminating a contract for convenience, the court will consider four factors: (1) the CO's bad faith, (2) the reasonableness of the decision, (3) the amount of discretion delegated to the CO, and (4) any violations of an applicable statute or regulation." (citing *Keco Indus., Inc. v. United States,* 492 F.2d 1200, 1203–04 (Ct. Cl. 1974))).

Plaintiffs respond that they are focused on the reasonableness of the decision, Resp. 36-37, but then concede that their abuse of discretion claim "focuses on the process the government followed," *i.e.*, APA-style review of the decision-making process. This is not asking, "the Court to apply an ordinary rule of government contract law," as plaintiffs claim. *Id.* at 38.

Plaintiffs' reliance on *TigerSwan Inc. v. United States*, 118 Fed. Cl. 447 (2014) (*TigerSwan II*), does not compel a different conclusion. There, the Court stated that in "a situation where the contracting officer is given the ultimate discretion to make the decision, the

CO's failure to make an independent decision weighs in favor of finding an abuse of discretion." *Id.* at 453. Here, by contrast, the regulations do not vest "the ultimate discretion to make the [termination] decision" to any one individual, but instead specify that the decision to terminate must be made "[b]y the Federal awarding agency" for State funding instruments, 2 C.F.R. § 200.340(a)(2), and by USAID for USAID funding instruments, *id.* § 700.14. As we have shown, the Secretary of State approved both the USAID and State termination recommendations. Appx057 (Marocco Decl. ¶¶ 5,6). This is the opposite of the *TigerSwan* facts. Although we agree that the Government does not possess unfettered discretion, the Government's alleged failure to utilize plaintiffs' preferred procedures cannot constitute an abuse of discretion as a matter of law, when the regulations and agreements do not set forth any particular procedure that the Government had to follow, and when the ultimate decision to terminate was made by the Secretary of State to implement the President's foreign policy.

Finally, plaintiffs argue that "the President may set foreign-policy priorities, but agency officials must still exercise the contractual discretion they possess reasonably when applying those priorities to particular contracts and awards." Resp. 37. We agree. But those officials do not abuse their discretion simply by terminating multiple awards that have been identified through a multi-level review process as not aligning with the President's foreign policy. Similarly, plaintiffs cannot state a claim for abuse of discretion simply by layering on APA criteria onto that review process when the APA has no application to this Court's review of contract terminations. Such strawman arguments fail to state a claim for abuse of discretion.

V. <u>Count Six Fails To State A Breach Of The Duty Of Good Faith And Fair Dealing Claim</u>

In our motion, we demonstrated that count six fails to state a claim for breach of the implied duty of good faith and fair dealing for three reasons. First, convenience terminations

may only be challenged for abuse of discretion or bad faith, *T & M Distributors, Inc.*, 185 F.3d at 1283, and this principle should apply equally to grant and cooperative agreement terminations, all of which are intrinsically discretionary and rooted in the Government's right to administer contracts in light of the Government's policies. Second, we demonstrated that count six should be dismissed because it is redundant to the other breach claims. Third, we demonstrated that count six should be dismissed because it does not allege any facts plausibly stating a claim for breach of the implied duty of good faith and fair dealing.

In their response, plaintiffs assert that there is no authority to treat the grant and cooperative terminations consistently with the convenience terminations of plaintiffs' procurement contracts, and claim that doing so would be inconsistent with the implied duty. Resp. 40. Plaintiffs also assert, erroneously, that we "provide[d] no doctrinal basis why the implied duty would not apply to the exercise of termination for convenience authority." *Id.* at 41 n.5. As to the latter, plaintiffs plainly are wrong. "In the absence of bad faith or clear abuse of discretion, [a] contracting officer's election to terminate for the [G]overnment's convenience is conclusive." *T & M Distributors, Inc.*, 185 F.3d at 1283. This means that the termination of a contract for convenience that contains a termination for convenience clause may not be challenged as a claim for breach of an implied duty. *E.g.*, *TigerSwan, I*, 110 Fed. Cl. at 346 ("[T]the court agrees with the government that TigerSwan may not rely on the standards for breach of the implied duty of good faith and fair dealing as a basis for making a claim related to an improper termination for convenience."). Thus, there is no question that the implied duty claims of plaintiffs DI and MSH regarding their terminated CDA contracts must be dismissed.

There also are compelling reasons to treat the terminations of the three contract types as conclusive in the absence of abuse of discretion or bad faith. As the Federal Circuit observed in

*Krygoski Const. Co. v. United States*, termination for convenience was "initially developed for war contracts," but eventually "evolved into a principle for Government contracts of far-ranging varieties, both civilian and military," 94 F.3d 1537, 1541 (Fed. Cir. 1996). It would be anomalous for the Court to hold the convenience terminations at issue in this case to a different standard than the grant and cooperative agreement terminations when plaintiffs are pursuing virtually the same categories of breach damages for their procurement contracts as they are for their grants and cooperative agreements. Am. Compl. ¶¶ 166-77.

Moreover, the termination rights contained in the contracts, grant agreements, and cooperative agreements are all rooted squarely within the agencies' discretion to act in the Government's interest. As explained in our motion to dismiss, the parallel language between the various termination clauses shows a consistent enablement of Federal agencies to administer contracts in light of the Government's policies. *Compare* FAR 52.249-6, permitting convenience terminations in Government contracts where it "is in the Government's interest"; *with* 2 C.F.R. § 700.14 (permitting USAID to terminate awards "at any time" based on the "national interest of the United States"); and *id*. § 200.340(a)(2), permitting State to terminate when an award "no longer effectuates the program goals or agency priorities"); *see also* FAR 52.249-2; 52.249-3; 52.249-4; 52.249-5 (mirroring the "Government's interest" standard across termination for convenience provisions).

Similarly, the Federal Circuit's admonition that "[i]t is not the province of the courts to decide *de novo* whether termination was the best course," applies equally to grants and cooperative agreement terminations as it does to other contracts. *Salsbury Indus. v. United States,* 905 F.2d 1518, 1521 (Fed. Cir. 1990). The Court's assumption that the Government acted in good faith when terminating the procurement contracts also applies to the Government's

terminations of the grants and cooperative agreements. *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995). And the standard of proof required to overcome that presumption, that is, "'well-nigh irrefragable proof' that the government had a specific intent to injure it," also applies to the terminations of the three contract types. For these reasons, the Court should treat the grant and cooperative terminations consistently with the convenience terminations of plaintiffs' procurement contracts and hold that the terminations may only be challenged for abuse of discretion or bad faith.

Next, plaintiffs cite *Slidell* as support for their claim that they can simply predicate their implied duty claim on the same APA-based arbitrary and capricious claims that make up their other breach claims. Resp. 39. Again, however, plaintiffs' reliance on *Slidell* is misplaced, as that case did not involve terminated contracts or otherwise apply the implied duty of good faith and fair dealing to a termination decision. Rather, *Slidell* involved claims that a New Orleans Field and Regional HUD office breached contracts with a local housing authority by refusing to release, without cause, contractually obligated funds. *Slidell*, 149 Fed. Cl. at 621–22. In other words, the Court in *Slidell* applied the implied covenant to claims concerning contract performance, which is not the case here. *Cf. TigerSwan, I*, 110 Fed. Cl. at 346 ("Put another way, if the government has the contractual right to terminate a contract for convenience, the government may exercise that right without breaching the duty of good faith and fair dealing.").

Plaintiffs next contend that they plausibly allege that the terminations breached the implied duty "[f]or all the reasons explained in the preceding section," that is, for all the reasons that plaintiffs claim support their arbitrary and capricious claims, which in turn simply restate their quasi breach/APA claim. Resp. 39. This only underscores the redundancy of their claims. *See ACLR, LLC v. United States*, 147 Fed. Cl. 548, 562 (2020) ("Underlying plaintiff's assertions

regarding breach of the duty of good faith and fair dealing are the same facts and circumstances that inform plaintiff's breach of contract assertions. . . .This is merely a breach allegation couched in different language.").

Even if plaintiffs can state a claim for breach of the implied duty of good faith and fair dealing merely by repeating alleged arbitrary and capricious conduct, the amended complaint's allegations do not meet the plausibility standard. First, as explained above, the amended complaint cites nothing in the agreements that incorporate wholesale the APA's requirements for agency decision-making. Second, the APA is inapplicable to determining whether the Government complied with its contractual obligations beyond what is already required by the contract's terms and conditions.

In any event, the contracts imposed no duty that the Government could breach by terminating multiple awards on or near the same day. And nothing in the agreements requires any kind of detailed explanation for the suspensions or terminations, nor for any individualized considerations, or that the agencies had to first consider any of plaintiffs' preferred policies, reliance interests, or any other factors to which plaintiffs claim entitlement. This is fatal to plaintiffs' implied duty claim. *Dobyns v. United States*, 915 F.3d 733, 740 (Fed. Cir. 2019); ("The flaw with the Claims Court's analysis is that the supposed duties . . . are not duties imposed by the language in the contract."). This is not to say that we are requiring an alleged violation of an expressed provision of the contract, as plaintiffs allege. Resp. 41. Rather, it is to say that the Government had no duty, express or implied, to engage in the kind of decision-making process advanced by plaintiffs in order to exercise the Government's termination rights.

Moreover, there can be no violation of the implied duty of good faith and fair dealing based on the alleged arbitrary and capricious conduct, when all the Government did was exercise

the termination rights provided for in the agreements. *See Scott Timber Co. v. United States*, 692 F.3d 1365, 1375 (Fed. Cir. 2012) ("As our predecessor court ruled in *David Nassif Assocs. v. United States,* 644 F.2d 4, 12 (Ct.Cl.1981), 'the assertion of a legitimate contract right cannot be considered as violative of a duty of good faith and fair dealing.'"). "Importantly, where the contract authorizes the government to take action that may harm the contractor, the government may exercise that right without triggering a claim for breach of good faith and fair dealing." *TigerSwan I*, 110 Fed. Cl. at 346.

Finally, arguing that count six is not duplicative of their other claims, Resp. 39, 42, plaintiffs contend that the terminations frustrated their bargain because the terminations were contrary to their "reasonable expectations," as neither USAID nor State had ever previously terminated or suspended multiple funding instruments at or near the same time, and so plaintiffs did not expect that the agencies would invoke their contract termination rights in this manner. *Id*. at 41 (citing Am. Compl. ¶¶ 240-41). But plaintiffs cannot predicate an implied duty claim simply on the fact that they did not anticipate that the Government would exercise its termination rights because the Government had not done so previously. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (explaining that a party's conduct will not be found to violate the duty "if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision"). Here, because the contracts provided for the Government's right to terminate if it determined that continuation with the award was not in the national interest or was contrary to the agency priorities, plaintiffs always bore the risk that this right, which was in the contracts, could be exercised.

VI. Count Seven Fails To State A Claim For Bad Faith Terminations

In our motion, we demonstrated that count seven of the amended complaint fails to state a claim for bad faith for three reasons. First, plaintiffs' bad faith claim is belied by their principal theory of their case, *i.e.*, that the terminations were the result of high-level policy determinations that lacked individualized considerations, which are directly at odds with pleading facts plausibly alleging that the terminations were specifically intended to injure plaintiffs or were motivated by animus towards plaintiffs. Second, plaintiffs' unfounded theory that animus towards a defined group can somehow satisfy the pleading standards for a bad faith claim is unsupported by Federal Circuit precedent, which requires a *specific intent to injure individual plaintiffs* to show bad faith. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (explaining that plaintiffs must allege facts plausibly demonstrating conduct that evinces a "specific intent to injure" and "animus" toward the opposing party in terminating the contract to meet bad faith standard). Merely alleging animus towards a group is insufficient to overcome the long-established "presumption that government officials act in good faith." *Id.* at 1239. Third, we demonstrated that there were no facts pled connecting the termination decisions to the quotations from Elon Musk, President Trump, or other Government officials cited in the amended complaint. Indeed, the specific instances of animus cited in the amended complaint either had nothing to do with the terminated contracts or were so far removed from the terminations that they were irrelevant to the termination decisions, and thus could not show that the contracts were terminated with a specific intent to harm or injure the individual plaintiffs.

Nevertheless, plaintiffs claim that the "the government acted with animus and a specific intent to injure when it terminated Plaintiffs' awards," but all of plaintiffs' factual allegations misapply the requisite standards for pleading a bad faith claim. Resp. 42. For example, the

statements of President Trump that plaintiffs cite are quoted from Executive Order 14,169, which was directing a nation-wide policy change, not expressing animus towards any plaintiff. Am. Compl. ¶ 31. Similarly, Elon Musk's statements were directed towards USAID, not plaintiffs. *Id*. ¶¶ 42-49, 248. Additionally, specific animus towards plaintiffs cannot be reasonably inferred just from the speed with which the terminations took place, as opposed to attempting to dramatically change policies. Resp. 43.

Plaintiffs cite no precedential authority that would allow this Court to expand the bad faith standard of specific animus directed at the plaintiff to include intent to harm a group, and we are aware of none. Nor are this Court's recent decisions cited by plaintiffs persuasive. We respectfully disagree with Judge Kaplan's bench ruling in *Sublime Systems v. United States*, No. 26-cv-458 (Fed. Cl. Aug. 12, 2026), which involves only a single terminated grant. Similarly, plaintiffs' reliance on this Court's decisions in *Danzinger v. United States*, 181 Fed. Cl. 93 (2026), is misplaced. *Danzinger* only held that there were common issues of fact sufficient to certify a class. *Id*. Moreover, *Danzinger* involves claims brought by former personal service contractors who *worked at USAID*, and the unpublished decision found that statements denigrating *people who worked* there were sufficient to state a bad faith claim. *Danziger*, No. 25-1241 (Fed. Cl. Apr. 10, 2026), ECF No. 20, at 2. This is a far cry from the allegations in the amended complaint here.

None of plaintiffs' proffered statements that post-date the terminations by months plausibly give rise to a bad faith claim. Although these statements may express deeply held political and policy positions, they are just that—political disagreements—not statements that the grants were terminated to harm plaintiffs. And the April 2026 statements from the Acting USAID Administrator directed toward ABA and DI were made *a year after* their awards had

been terminated. This is not comparable to the crude statements made the day after a default termination by an incompetent and malicious contracting officer representative in *Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 708-10 (2000), which the Court found expressed ill will and intent to injure the plaintiff.

Finally, we are not asking the Court to "chose the government's preferred inference from disputed facts," as plaintiffs suggest. Resp. 45. Rather, we ask the Court to require plaintiffs to adhere to the applicable pleading standards for bad faith claims. In the absence of factual allegations plausibly tying any of the quoted remarks to the termination decisions, plaintiffs' allegations are speculative and insufficient to state a claim for bad faith. *Terry v. United States*, 103 Fed. Cl. 645, 654 (2012).

## CONCLUSION

For the foregoing reasons and those stated in our moving brief, we respectfully request that the Court dismiss plaintiffs HIAS, ABA, DAI, DI, and MSH, as well as counts eight and nine of the amended complaint for lack of jurisdiction pursuant to 28 U.S.C. § 1500, and to dismiss amended complaint counts three through seven for failure to state a claim.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CORINNE A. NIOSI
Assistant Director

/s/Matthew P. Roche
MATTHEW P. ROCHE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0466
Facsimile: (202) 514-8624
Matthew.p.roche@usdoj.gov

Dated: November 23, 2026

Attorneys for Defendant